5/17/2022 COURT SUBMITTED ELECTRONIC TRANSCRIPT OF PROCEEDINGS FILED
36317979

ELECTRONICALLY FILED
COURT OF APPEALS
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Tuesday, May 17, 2022 12:30:11 PM
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

**IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO**

| | |
|---|---|
| **STATE OF OHIO,** | **CASE NO. 2021-CR-01185** |
| **Plaintiff,** | **CA No. 029442** |
| **-vs-** | **TRANSCRIPT OF PROCEEDINGS (SCHEDULING CONFERENCE/ FINAL PRETRIAL/JURY TRIAL)** |
| **CALEB WHITFIELD,** | |
| **Defendant.** | **VOLUME I OF IV (Pages 1 - 143)** |

PRESIDING: Hon. Dennis J. Adkins

APPEARANCES:

ON BEHALF OF THE STATE
Kimberly Melnick, Esq.
Lisa Bruder, Esq.
Montgomery County Prosecutor's Office
301 West Third Street
Dayton, Ohio 45402

ON BEHALF OF THE DEFENDANT
John Pinard, Esq.
Pinard and Bryan Law
120 West 2nd Street -Suite 603
Dayton, Ohio 45402

William O. Cass, Jr., Esq.
Law Office of William O. Cass, Jr. Ltd
1250 West Dorothy Lane - Suite 203
Kettering, Ohio 45409

J. David Turner, Law Office
J David Turner, Esq.
101 Southmoor Circle NW
Kettering, Ohio 45429

DATES: September 16, 2021; October 13, 2021; October 27, 2021; February 16, 2022; February 22, 2022; February 24-25, 2022; March 16, 2022

ELECTRONICALLY
RECORDED BY: Electronically Recorded

TRANSCRIBED BY: Michelle Serdynski Oh; Linda McCurdy

* * *

TABLE OF CONTENTS


Scheduling Conference ................................ Page 5
Scheduling Conference ................................ Page 15
Scheduling Conference................................. Page 16
Final Pretrial Conference............................. Page 17
Jury Trial............................................ Page 23
Welcome Remarks by the Court.......................... Page 23
Voir Dire by the Court................................ Page 33
Voir Dire by the State................................ Page 41
Voir Dire by the Defense.............................. Page 93
Peremptory Challenges................................. Page 115
Preliminary Instructions by the Court................. Page 137


* * *

INDEX TO EXAMINATIONS

| State's Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| None | | | | |

* * *

| Defense Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| None | | | | |

* * *

INDEX TO EXHIBITS

| State's Exhibit: | ID | ADM |
|---|---|---|
| None | | |

* * *

| Defendant's Exhibit: | ID | ADM |
|---|---|---|
| None | | |

* * *

| Joint Exhibit: | ID | ADM |
|---|---|---|
| 1 - Stipulations | 142 | XX |

* * *

(Thursday, September 16, 2021, at 11:38 a.m.)

THE BAILIFF: All rise, please. This Common Pleas Court in and for the County of Montgomery County in the State of Ohio is now in Session, the Honorable Dennis J. Adkins presiding. Please be seated.

THE COURT: Thank you. Good morning, everyone.

MS. MELNICK: Good morning, Your Honor.

MS. BRUDER: Good morning.

THE COURT: The record should reflect this is State of Ohio v. Caleb Whitfield, 2021-CR-1185. Mr. Whitfield is at the Montgomery County Jail. I understand Mr. Whitfield, I'd originally said I wanted you brought over for this hearing, but I think that you have been exposed the COVID virus, and therefore in the abundance of caution we're just going to do this by video. Your Counsel, Mr. Pinard, is present in the courtroom. Representing the State is Kim Melnick and Lisa Bruder.

This matter was on the docket yesterday, and there was a request for a trial date. Counsel and the Court attempted to get a trial date within Defendant's speedy trial, which we believe was November 21st. We found that to be impossible, mainly due to the Court's scheduling of trials. And also complications counsel's calendar as well.

The earliest date where everyone was available is December 20th. Unfortunately, that's the week of Christmas, but that is

the earliest date that we have. The next one after that it appears that we could maybe fit it in on February 1st, but the first available date would be December 20th.

Mr. Pinard, I understand that your client was given the opportunity to sign a time waiver to allow us to put it at a reasonable date that was conducive on both the courts and counsel's calendar, but he was not willing to waive that right. Is that correct?

MR. PINARD: That's correct, Your Honor. He wishes to exercise his speedy trial right.

THE COURT: All right. Mr. Whitfield, you heard what I've said. You understand that I'm one person. There's only so much I can do. You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. You're absolutely right. The statute indicates that you must be brought to trial within a statutory period of time. However, the statute also allows the speedy trial right to be extended by any reasonable continuance that the court determines.

The record should reflect in this matter that as everyone knows, the COVID virus from 2020 shut down just about all jury trials in Ohio, and specifically did so here in Montgomery County. We didn't start doing jury trials until just a few months ago, and as a result there's been a tremendous backlog on the amount of trials that are going forward. We're trying

to do the oldest cases first that we can. And there are weeks when this court has four or five jury trials set the same week. And when two of them want to go, then obviously one more gets pushed back, and it becomes even more of a clog in the system to go forward.

This is a circumstance where the Court has met with counsel to try to fit this in and finds that it is impossible. I've even went as far as to see if any other colleagues could do the trial and everyone is in the same boat at the general division. Everyone's docket is full through the end of this year, and it is not reasonable for this court to set this trial any sooner than December 20th.

So due to the fact that the suspension of almost all jury trials last year, there's been a significant number of trials that had to be rescheduled for this year. I have multiple trials, as I said, set through the end of 2021, and a trial cannot be scheduled in this matter at or prior to the speedy trial deadline. Therefore, a reasonable continuance of the trial in this matter is warranted pursuant to Ohio Revised Code 2945.72, Section 8.

I do want note for the record, Mr. Whitfield, that you were indicted on August 11th. That's when then indictment came through. You were not arraigned until August 25th. So that's just been a short period of time ago. The speedy trial deadline is November 21st. The Court notes that this case is

not been languishing on the docket for any significant amount of time, unlike many of the trials set in the upcoming weeks which were continued due to the pandemic in 2020. Further, this continues so it would only be for approximately one month beyond the speedy trail deadline. And therefore the Court finds a continuance to be reasonable.

I will now turn it to the State to see if you have anything to add to the Court's discussion of this matter.

MS. MELNICK: Your Honor, no. That is the first available date the State has, and we've had lengthy discussions in chambers with all counsel present in going through everyone's calendars, including the Court's. And as much as none of us prefer to schedule a trial the week of Christmas, that is the first available date and the State is more than willing to schedule it at that time. As well as pick the jury early, which we briefly discussed in chambers before coming into court. So the State has no objection to any of that.

THE COURT: Mr. Pinard, anything you wish to add for the record?

MR. PINARD: Yes, Your Honor. On behalf of Mr. Whitfield, the Defense would object to any date outside of a speedy trial rights, aka outside the November 21st date. The reason for that is speedy trial rights, and I understand that the court is citing the statute, but it is in fact a right itself, a right derived both from the bill of rights and the

U.S. constitution, as well as the Ohio constitution.

Defense would indicate that a right that can arbitrarily be taken from it is not in fact a right, but rather a privilege. That's not what speedy trial is. It is in fact a right. We would continue an ongoing objection. We understand the Court's ruling at this time, but we do object to it and will continue to object to any trial that's outside of the November 21st date.

Thank you, Your Honor.

THE COURT: Does Counsel dispute anything that the Court said?

MR. PINARD: I would just indicate. I don't dispute that the COVID-19 pandemic occurred and is potentially ongoing, but certainly it wasn't caused by my client. I hate to think that something that came from outside of the United States is taking away the rights of our citizens. So though that's not a direct dispute with anything the Court said, that is the basis of my objection.

THE COURT: I understand that. And also, the Court denotes as I've said, we're just continuing this a short period of time. It's not like we're continuing it for an extended period of time. It's a very short period of time, and we're tying our best to get it in.

Mr. Whitfield, anything you want to say?

THE DEFENDANT: Yes, sir. Can I have that -- can you

repeat that revised code that you said that the continuance was subject under?

THE COURT: It'll be in my written decision, sir, that I file in this matter.

MR. PINARD: I'll bring a copy to you, Caleb, when I come see you once you're out of quarantine, okay?

THE DEFENDANT: Okay. Okay. Then one more thing . Am I -- (indiscernible) it doesn't seem like it's going to be implemented anyways? Is there a possibility that I'll be eligible for house arrest? (Indiscernible).

THE COURT: Sir, your counsel could file a motion for a bond review. I will have the presentence investigation people look into it and get the court a recommendation. And so that's the best I can do on that.

MR. PINARD: I'll get a written motion filed for you as well, Caleb, okay?

THE DEFENDANT: Yes, sir.

THE COURT: Anything else, Mr. Whitfield?

THE DEFENDANT: No, sir.

THE COURT: All right. Based upon the following statements by the Court, and also following the case law that has been developed over the last year because of the COVID, the Court finds that I am going to continue the trial upon the court's own motion due to the lack of unavailability. Both of counsel and of the Court. I am going to set this matter to

start on December 20th.

However, counsel has indicated their availability to actually start by picking the jury on the 17th, which is the Friday before. So we will begin with the picking of the jury on Friday, December 17th. That's as far as we'll go is pick the jury that day, and then we will begin on that Monday the 20th with the actual trial. And hopefully, we will not then run into the actual Christmas holiday if we pick the jury on that Friday. And counsel has indicted their availability to do so.

So this is set to start by the picking of the jury on Friday, December 17th. I'd like Counsel and the Defendant here at 8:30 so we can begin the selection of the jury. And Mr. Pinard, if you would take care of making sure that Mr. Whitfield has civilian clothing; I would appreciate that. And if there's any other motions to be filed I would appreciate counsel filing them as soon as possible so the Court can rule upon them prior to trial.

Anything further from the State?

MS. MELNICK: Do we have a final pretrial date?

THE COURT: That would --

MS. BRUDER: Would that be on the Wednesday before the picking of the jury, Your Honor? December 15th?

THE COURT: Yes, let's put that on the docket for that. The December 15th, at 2:00 for final pretrial.

THE DEFENDANT: Excuse me?

THE COURT: Yes, sir?

THE DEFENDANT: But my plan was for a bench trial, not a jury trial.

THE COURT: Well, you need to talk to Mr. Pinard about that. Obviously, the Court could probably accommodate you sooner than the 20th, if that's the case. I don't know. I haven't even looked on that. So Mr. Pinard, do you know anything on that?

MR. PINARD: We've discussed it. I didn't bring it up today because he needed to be here in order to sign such a waiver.

THE COURT: Right.

MR. PINARD: And I didn't think we'd made a final determination of that yet, Caleb. And I know I was because --

THE DEFENDANT: No, we did not.

MR. PINARD: -- so I was coming to see you. So the date is subject to change is what the judge is saying. Subject to if that is what you determine that you want to do. Okay, but need to discuss that a little further.

THE DEFENDANT: Okay.

MR. PINARD: So what I --

THE DEFENDANT: -- that was my plan all of my attention just discuss it further, but you know, the time never seemed really too convenient.

MR. PINARD: Well, I can't -- when you're in quarantine, I'm waiting for you to get out of that, okay? And then I'll bring all of the video and we'll go over that like we've discussed.

THE DEFENDANT: Okay.

MS. BRUDER: Do you know how long he's in quarantine for?

THE DEFENDANT: And are we still pursuing the problem with me not having all my discovery, also?

MR. PINARD: Yes, I'm acquiring -- I've been acquiring everything, and I'll make sure that you see everything. Okay?

THE DEFENDANT: Yes, sir.

THE COURT: And Mr. Pinard, after you speak to him if it's a situation where he does want a bench trial we will go back and look at dates again to see. Because obviously, there's more flexibility where the court can portion out things to get it started within the speedy trial.

MS. MELNICK: On a bench trial, Your Honor, I can tell the Court that I may have some availability just before speedy with Ron (phonetic) on something that would be a bench trial.

THE COURT: Yes.

MS. MELNICK: So I think that could be accommodated if that's what he decided he wants to do.

THE COURT: It's still going to be difficult, but it'll be easier, obviously --

MS. MELNICK: Right.

THE COURT: -- than the jury, so but I will do my best to accommodate that is what I'm telling you. So Mr. Pinard, I'll leave that in your hands to get back with the court if that's the situation. As of right now, we'll set it for the jury trial. But you let me know, and we'll go from there.

MR. PINARD: Yes.

THE COURT: Okay.

MR. PINARD: Caleb, I'll be talking with the guard about when you're done with quarantine, okay?

THE DEFENDANT: So will you talk to the guard about quarantine and why -- that's when you bringing the video footage to go over with me?

MR. PINARD: Once you're out of quarantine I'll come to do the visit and I'll bring the video inside, yes.

THE DEFENDANT: Okay. Yes, sir.

THE COURT: Okay. Anything further?

MS. MELNICK: No Your Honor, thank you.

THE COURT: Mr. Pinard?

MR. PINARD: Not at this time, Your Honor.

THE COURT: Okay. Thank you very much. We're being recessed.

MS. MELNICK: Thank you.

MS. BRUDER: Thank you, Your Honor.

(Proceedings adjourned at 11:50 a.m., recommencing on

Wednesday, October 13th, 2021, at 2:15 p.m.)

* * *

(Wednesday, October 13th, 2021, at 2:15 p.m.)

THE BAILIFF: On page 12, Caleb Whitfield, case number 21-CR-1185, set for scheduling conference. John Pinard, counsel for the Defendant. Lisa Bruder and Kim Melnick on behalf of State.

THE COURT: All right. Mr. Pinard, your client Mr. Whitfield is up on the screen. This matter is set for a jury trial coming up on December 20th. The Court set this down. You had filed a motion to withdraw as counsel for Mr. Whitfield; is that correct?

MR. PINARD: That's correct, Your Honor.

THE COURT: All right. Mr. Whitfield, are you aware that Mr. Pinard requested to withdraw as your attorney?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And is that okay with you?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Very well. Upon review of the motion and with consent of Defendant, Mr. Pinard I am going to allow you to withdraw from further representation of Mr. Whitfield.

The Court is going to order a new counsel be appointed in this matter. I am going to vacate the jury trial, because there's no way new counsel can be prepared within that period

of time. We'll appoint new counsel.

We have enough time to put this back on the docket next week, Carmel (phonetic), or?

THE CLERK: Yes, Your Honor.

THE COURT: All right. So we'll set this for a scheduling conference for next week with new counsel, and we'll set new dates and go from there. All right. Thank you very much.

(Proceedings adjourned at 2:17 p.m., recommencing on Tuesday, October 27th, 2021, at 2:19 p.m.)

* * *

(Tuesday, October 27th, 2021, at 2:19 p.m.)

THE CLERK: Turning to page 5 for a scheduling conference for Caleb Whitfield, case number 21-CR-1185. Bill Cass attorney of record.

THE COURT: And Mr. Cass, we discussed this matter. You are relatively new to this case. Your appointment has -- caused the last trial to be continued. We've had discussions with your office, the Court, and the Prosecutor's office, and the first reasonable date that we can accommodate this trial coming up would be February 22nd, at 2022, with a final pretrial of February 16th, at 2:00 p.m.

Does the State and Defense agree that this is the first reasonable date that was on everybody's calendar that we could set?

MS. MELNICK: The State would agree, Your Honor.

THE COURT: Mr. Cass, do you agree to that?

MR. CASS: Your Honor, after our conversation I would agree that that was the first reasonable date that the Court, the Prosecutor, and myself could be available, though I would note that Mr. Whitfield does object to that date, and just for the record, by agreeing to that we're preserving any right he has to assert his speedy trial.

THE COURT: Well, I explained to Mr. Whitfield upon his request for a new attorney that the jury trial would have to be set aside. I explained that to him. And I explained to him that you needed time to get up to speed. And due to the Court's calendar, it may be several months before we would set the retrial. That was all explained to him before the Court granted the motion to appoint new counsel.

So that will be the trial date set in this matter and thank you, Mr. Cass.

(Proceedings adjourned at 2:20 p.m., recommencing on Wednesday, March 16, 2022, at 2:09 p.m.)

* * *

(Wednesday, March 16, 2022, at 2:09 p.m.)

THE CLERK: Turning to page 3. Caleb Whitfield, case number 21-CR-1185. Set for a final pretrial conference. Bill Cass, Counsel of record. Lisa Bruder and Kim Melnick on behalf of the State.

THE COURT: Mr. Cass up on the screen.

MR. CASS: Yes.

THE COURT: Okay. Mr. Cass, this matter is set to -- for trial beginning on Tuesday, since Monday is a holiday. We had had some discussions. I do note that there is pending motions in front of the court in regards to speedy trial, and the court is going to address that issue on the morning of Tuesday; put that on the record.

Also, I believe that you just recently filed a motion in limine, which the Court will also address on Tuesday morning. We have discussed this matter on several occasions, so I think everyone is ready to go.

Is there anything from the State to put on the record at this time?

MS. MELNICK: Your Honor, the State has made no offers in this case as it involves a homicide. I have spoken with Mr. Cass about potential offers. We've had some conversation, but no official offers have been made by Mr. Cass as well, so I would just put on the record that there are no current offers outstanding or really made in this case up until now.

THE COURT: Does the State intend on filing any additional motions in limine or anything the Court should be aware of between now and Tuesday?

MS. MELNICK: The only thing that the State could potentially file is a response to Defense counsel's motion of

limine. We do not intend to file any motions in limine on our own behalf.

THE COURT: Okay. Thank you, Ms. Melnick. Mr. Cass, is there anything from you to put on the record?

MR. CASS: Yes, Judge, there was one discussion with Kim about an offer which was rejected by the State to basically give Mr. Whitfield community control, and they was not -- they did not accept that just so I did tell Mr. Whitfield I conveyed that to the State. (Indiscernible).

THE COURT: Mr. Cass, is there any -- excuse me, is there anything else that the Court needs to address between now and Tuesday morning?

MR. CASS: Other than, you know, I -- Mr. Whitfield has asked me through an email to withdraw from the case being that he was not happy with my representation. That he wanted a new attorney. I had some discussions with the Court and I conveyed that to the Mr. Whitfield, but I think he wants to have it addressed on the record. And maybe, I don't know if he has any other issues, but I know that one he mentioned having addressed on the record.

THE COURT: Yes, I'd be happy to address that. Mr. Whitfield previously had requested -- I believe it was Mr. Pinard to be removed, and I granted that request and appointed Mr. Cass. And I advised Mr. Whitfield at the time he certainly has an absolute right to be represented by a counsel. He

doesn't have a right to select the attorney that he wants to represent him unless he hires his own. And that hasn't happened. And I explained to Mr. Whitfield at the time that I did appoint Mr. Cass there would be no more substitutions of counsel except unless he retained counsel. So if there is any further request to change counsel, that's going to be denied.

Mr. Whitfield, is there anything further that you want to say?

THE DEFENDANT: Yes, sir. Yes, Your Honor. I don't know how - how pressed you are on time, but I have to bring some things up that I wanted to say on record. And of course the how ineffective my counsel actually was during represented -- represent.

THE COURT: Sir, the courts speaks through its documents, so I'd ask you if you have anything you want the courts to address, please file that. These -- this is just set for any last-minute items that we need to talk about before trial. If you have anything like that that we can handle here I'll be happy to, but if it's some lengthy thing that you want to file I'd appreciate you file it in writing so I can take a look at it, okay?

THE DEFENDANT: Okay, yeah, but when I first wrote you I asked if he read you a letter explaining how just simply my lawyer -- my representation was ineffective. So I was just letting you know like there might be a possibility I might be

removing counsel because I didn't want to make a scene like I was trying to prolong or delay the actual trial process. But if I'm being forced to proceed I -- with Mr. William Cass, I would rather file the motion to represent - self representation. To represent myself. I am not proceeding to trial with Mr. William Cass.

THE COURT: Okay. Well, you understand, sir, that even if I would consider appointing you new counsel, if I did that your trial is going to be delayed for several months from now, and you yourself have been pushing to have your case tried. So I don't know how you feel about that.

THE DEFENDANT: I fully understand, sir. I just know if I'm going to trial I need to be -- I need to have everything I requested. It's a lot I requested from Mr. Cass which he had not obtained. So in my eyes he is not -- by -- by his actions he is not working for me. So I need a different representation and if it gets pushed back that's fine. As long as I have proper representation that's actually working for me.

THE COURT: Now, Mr. Whitfield, do you remember me explaining to you that your last attorney also was a very competent attorney as Mr. Cass is. And I honored your request to get you a new attorney, but I told you at that point in time I wouldn't do it again. We just can't be doing this.

THE DEFENDANT: Excuse me, sir, I really don't actually remember the full conversation. I was just agreeing, but I

never filed to remove Mr. John Pinard. He filed (indiscernible). But I was actually (indiscernible) because if Mr. Pinard went (indiscernible) himself. I'm not going to try to force him to be on my case because I felt I be forcing him to be on my case he going to ineffective as well, but I never really -- I felt like he jut removed himself because I told him I -- he told me several lies that I wanted to go across. So he chose to remove himself.

I don't remember you actually saying that you wasn't going to do that, but that's why I had requested Mr. Cass to obtain my court transcripts so I could look back through them. But he said he couldn't obtain it due to whatever reason he needed an actual reasonable explanation for him to obtain my court transcripts (indiscernible) that is.

THE COURT: Well, I remember specifically telling you this, sir, and it is part of the record. But if you have some specific issues, and I did read your previous correspondence that you sent. If you have something that specific send it over to me and I'll take a look at it and we'll address it Tuesday morning before the trial, okay?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Thank you very much.

(Proceedings adjourned at 2:16 p.m., recommencing on Tuesday, February 22, 2022, at 9:33 a.m.)

* * *

(Tuesday, February 22, 2022, 9:33 a.m.)

(Prospective jury entering courtroom)

(Within the presence of the prospective jury)

THE BAILIFF: All rise, please. This Common Pleas Court in and for the County of Montgomery County in the State of Ohio is now in Session, the Honorable Dennis J. Adkins presiding. Please be seated.

THE COURT: Thank you. Good morning, everyone.

MS. BRUDER: Good morning.

MS. MELNICK: Good morning, Your Honor.

THE COURT: I am Judge Dennis Adkins. And I want to welcome you to Montgomery County Common Pleas Court. I will be the presiding judge over the case that you have been summoned here to hear.

Let me, first of all, start off by talking about a subject we've been talking about the last two years, and that's the COVID 19 and it's still hanging on around us. I know this has disrupted our lives for the last two years. And it's still a disruption because all of you are wearing a mask which are mandatory here in the court.

In the interest of justice, the courts must remain open and trials must take place. Your service is extremely appreciated. I want you to know that many measures are being taken to ensure your safety.

We have installed a hospital grade air purifier in the

courtroom, which you can see in the back of the courtroom. That's the same one they use in surgical suites at hospitals that helps circulate the air and remove any bad things from the air.

Also, it's very hard to practice social distancing in a courtroom this size and this many people; we just can't do it. However, if you are selected to be on a jury, if you would like to remove yourself from the jury box and sit toward the back, I would accommodate that. You just need to tell the bailiff that once we get started.

Now, we also are requiring everyone to wear masks in the courtroom. The only exception to this rule will be when a witness is testifying on the witness stand. In those circumstances, I will allow the witness to lower their mask while testifying if they choose to do so.

However, as you can see, we've made sure that the witness stand is surround by plexiglass. Additionally, I will give the attorneys the option to lower their mask while questioning witnesses as long as they remain at counsel table or they're behind the podium and also addressing you if they remain over in this area. Attorneys will be required to wear their mask when moving around about in the courtroom.

Finally, there'll be times, such as right now, that I will lower my mask in order to address the courtroom. I want to make sure that my voice gets out and all of you hear me. We

also have provided hand sanitizer stations throughout the courthouse; please use those as much as possible.

As a final note, if you feel ill at any time during your service as a juror, please do not come into court Call and let us know as soon as possible; and we will talk to you about it. I hope that these precautions assure you that we still are looking out for the safety and health and take it very seriously. And we try to do everything we can to minimize the exposure.

Ladies and gentlemen, I know service as a juror is one of the unique things that we do here in America. It's also one of the most important and valuable civic duties which you can perform. Trial by jury is one of the most important valuable rights that we possess here in the United States.

The Court is well aware of the fact of you being summoned here today may be an inconvenience to some of you. It may be that you will suffer some financial loss. Our reason of serving as juror, and it's understandable that you're not happy about that at all.

On the other hand, jury service is a civic duty as well as a legal obligation. The right to have disputed issues resolved by a jury is fundamental to the judicial system of our Country. And if we are to retain the rights and privileges we enjoy as free Americans, each of us must be willing to do his or her part no matter how great or how small.

Now, the Court realizes that some of you -- or have reasons that you're just waiting to tell me why you can't sit on this jury. But before you offer those reasons to be excused, I want each of you to please ask yourself this question: If this was my case or a case of a member of my family, would I want a person, such as myself, excused for the reason I'm about to offer? Just answer that truthfully to yourself.

At this time, I want to introduce my staff to you. You've already met the bailiff, Robert Schmidt. We affectionately call him Bailiff Bob. And most of your care will be in his hands throughout the problems throughout the jury trial. If you do have any problems during your service, please just let Mr. Schmidt know and he will handle it.

Also, seated in front of me is Ms. Vickie Cherry, who is the Court's technician officer. It is her responsibility to take down each and every word that is said so an accurate record is made of this trial. Now, the Court is videotaped. But at no time, will any prospective jurors or if you are selected as a jurors, be on videotape.

Now, before we begin, all prospective jurors are required to be sworn before any questions are asked of you. The bailiff is going to administer the oath to you as prospective jurors for the purpose of preliminary examination. I would ask all prospective jurors in the courtroom to please stand and raise

your right hand.

(Prospective jurors sworn)

THE COURT: Ladies and gentlemen, you have be called as prospective jurors in a criminal action entitled State of Ohio v. Caleb Whitfield. The offenses charged in this case are one count of aggravated vehicular homicide; two counts of vehicular assault; one count of resisting arrest; and one count of failure to comply with a lawful order of a police officer, commonly known as fleeing and eluding.

It is alleged to have occurred on June 25th, 2020 around the intersection of North Dixie and Hillsdale which is in Harrison Township, Ohio, Montgomery County. With that brief description, do any of you have any personal knowledge which may have happened at that location at that time? If you do, raise your hand, please.

I see a hand clear in the back. And your name, please?

MS. JOHNSON: Taylor Johnson (phonetic).

THE COURT: What is your name, please?

MS. JOHNSON: Taylor Johnson.

THE COURT: All right. And how are you familiar in this case?

MS. JOHNSON: You talking about the day he got pulled over? We was not running from y'all.

THE COURT: Ma'am, would you come on forward up here so we can talk to you?

Counsel, approach, please.
Ma'am, come on up.
MS. JOHNSON: Oh, never mind.
THE COURT: No, I -- just come on up, please.
(At sidebar)
THE COURT: Come right up here.
MS. JOHNSON: (Indiscernible).
THE COURT: You're okay.
MS. JOHNSON: My bad. I didn't understand --
THE COURT: No, no, no. Don't whisper in my ear; it has to be on the record.
MS. JOHNSON: Okay.
THE COURT: First of all, have you been summoned in as a prospective juror? Are you here as a juror?
MS. JOHNSON: What you mean? I am not no juror; I'm here -- I just was here because I was asked to come down here.
THE COURT: By whom?
MS. JOHNSON: The person y'all about to try to convict.
THE CLERK: I can't hear her. I'm sorry.
MS. JOHNSON: I said that (indiscernible). I thought y'all was talking about the time when he actually (indiscernible) stop running from y'all.
MS. MELNICK: So are you here for being a witness on the case or are you here --
MR. CASS: You're here for Caleb?

MS. JOHNSON: Uh-huh.
MR. CASS: Like, are you're friend of Caleb's?
MS. JOHNSON: Uh-huh.
MR. CASS: Okay. But you didn't come as part of the -- asked to be juror in this case --
MS. JOHNSON: At least I didn't --
MR. CASS: -- you just came to watch?
THE COURT: Okay.
MS. JOHNSON: (Indiscernible).
THE COURT: Ma'am, you're -- at this point in time, I anticipate there probably going to be a motion filed to separate witnesses. So if you are potential witnesses, I need you or anyone you came with --
MS. JOHNSON: No, I was --
THE COURT: -- to go outside.
MS. JOHNSON: -- I was --
THE COURT: Ma'am, don't whisper in my ear --
MS. JOHNSON: Oh.
THE COURT: -- okay?
MS. JOHNSON: Well, let me whisper to everybody.
THE COURT: No. You're going to whisper right here, ma'am, in to the mic so it picks you up.
MS. JOHNSON: Oh, okay. Listen, I was saying I thought y'all was talking about when y'all had got him -- I don't know about no --

THE COURT: Put your mask up, please.

MS. JOHNSON: I said, I don't know nothing about no -- I haven't been in no car when the car was crashing or nothing like that. That's what I thought y'all was saying. But I apologize for that. I kind of --

MR. CASS: You're just here to watch though?

MS. MELNICK: She's a bystander, Your Honor. She's here on behalf of the Defendant.

MS. JOHNSON: That's what I said. Thank you. That's what I said.

THE COURT: You are not going to testify in this trial at all?

MS. JOHNSON: No, not at all.

MR. CASS: I don't know who she is, though.

THE COURT: Okay. Well, this morning is just a jury process is the only thing we're doing. We're not taking any testimony. So if you want to remain, I will allow you if there's room back there. Are you with someone else here also? Is someone come with you today?

MS. JOHNSON: No, I came by myself. But he do have supporters here. His sister's here and stuff.

THE COURT: Okay. Is she a witness or going to be a witness?

MS. JOHNSON: No.

THE COURT: Okay.

MS. JOHNSON: We're here to support him.

THE COURT: All right. You can go on back then, ma'am. Counsel? I don't know.

MS. MELNICK: I don't either. I mean, she was just making comments (indiscernible).

MR. CASS: Well, I don't know what she was talking about, actually, but.

THE COURT: I didn't understand her, too. But I didn't like what she was saying; that's why I brought her up here.

MS. MELNICK: I know.

MS. BRUDER: The only concern I would bring up, Your Honor, is I know you've been concerned about COVID and not having people in here unnecessarily. It does look very crowded back there. I mean, I don't think we have any objection with her being here. But it could be a COVID concern if (indiscernible).

THE COURT: That's why I was trying to figure out who's here with her. I --

MS. MELNICK: Usually, we don't have bystanders during jury selection. So I was taken aback by that because I thought she --

THE COURT: Okay.

MS. MELNICK: -- and I couldn't find her on the list, so.

THE COURT: Would Counsel have any objections to me

asking everyone who is not a juror to step out for this process. Any objection?

MS. MELNICK: No.

MR. CASS: No.

THE COURT: All right. So that's what I'll do. All right.

(End sidebar)

THE COURT: Okay. For everyone in the courtroom who is not a prospective juror to be called or is one of the participants, I'm going to ask you to please leave the courtroom because of COVID concerns that we have. You can come back in after we have situated the jury.

But as of right now, I'm going to ask anyone to please leave that's here that's not a prospective juror. Okay? That goes for you, ma'am.

Okay. Let me go back and just repeat the last question I had. I went through a date and location that this alleged crime occurred. Does anyone have any knowledge or anything that you think you've heard about this incident based upon that date and location? All right. I see no hands raised.

All right. Representing the State of Ohio is Assistant Montgomery County Prosecutor, Kim Melnick. I'm going to ask Ms. Melnick to introduce herself and the people at her table, please.

Ms. Melnick?

MS. MELNICK: Thank you, Your Honor.

Good morning. My name is Kim Melnick. This is my co-counsel, Lisa Bruder, also from the Montgomery County Prosecutor's Office. This is Det. Bryan Statzer who is we will be asking to be the State's representative in this case who is our investigator.

THE COURT: Thank you, Ms. Melnick.

MS. MELNICK: Thank you.

THE COURT: Representing the Defendant is Attorney William Cass.

Mr. Cass, would you introduce yourself and your client, please?

MR. CASS: Good morning. My name's Bill Cass. I'm representing Caleb Whitfield.

(Prospective juror names phonetic throughout)

THE COURT: Thank you, Mr. Cass.

Does anyone in the courtroom know any of these people that just introduced themselves to you? Have had any contact with them either professionally or socially in any way?

I see one hand there. And you are Mr. Cunningham.

Mr. Cunningham, who do you know and in what capacity?

MR. CUNNINGHAM: I'm an attorney. And I met you and I been against the Prosecutors once in a while.

THE COURT: Okay. And I appreciate that. Would the fact that you know me and the Prosecutors have any bearing upon

you being a fair and impartial jury and sitting on this trial?

MR. CUNNINGHAM: I suppose I could with the opportunity. I'm a defense attorney, so I may see it one side versus the other.

THE COURT: Okay. And you understand, as an attorney, that you do take an oath to hear just the evidence as presented and make a decision based upon the evidence in the courtroom. Do you think you could follow that order of the Court?

MR. CUNNINGHAM: Yes, if necessary, I could.

THE COURT: All right. Attorneys may inquire of you later, but we'll let it go for that right now.

Is there anything -- anyone else who knows any of the parties? No other hands raised.

Ladies and gentlemen, both the State of Ohio and the Defendant are entitled to jurors who will approach this case with open minds and agree to keep their minds open until a verdict is reached. Jurors must be free, as humanly possible, from bias, prejudice, or sympathy.

Jurors must not be influenced by preconceived ideals as to the facts or the law. You will receive the evidence from the witnesses and any exhibits that may be introduced. You are not expected to know the law. You will later receive the instructions as to the law from the Court. And it is your sworn duty to accept and apply the law as it is given to you.

Now, although you may be qualified to serve as juror,

there may be something peculiar to this case that could disqualify you to serve in this case and may be better for you to serve in another case at a later time. Now, this being a criminal case, you should be aware from the outset that this proceeding began with the filing of an indictment.

The indictment is not proof of anything. The indictment is a piece of paper used to inform the Defendant of the charge against him. The State of Ohio has the burden of proving each and every element of the offense charged. The State must prove each of the elements of this offense beyond a reasonable doubt.

The Court will give you a more detailed instruction of beyond a reasonable doubt at a later time. Suffice it to say at this time that a reasonable doubt exists, if after carefully considering all the evidence, you cannot say you are firmly convinced of the truth of the charge. It is a doubt that's based upon reason and common sense and not mere possible doubt.

The Defendant is presumed innocent unless and until the State has offered sufficient evidence to convince you beyond a reasonable doubt of the existence of each and every element of the offense charged. The Defendant does not have a burden of proof; he does not have to prove anything.

Now, I just touched upon briefly on the subjects of the indictment, burden of proof, beyond a reasonable doubt, presumption of innocence, and no burden of proof on the Defendant. Is there anyone here who feels they cannot accept

and apply these rules of law? I see no hands raised.

As jurors, you'll be the sole judges of the facts. This will require jurors to determine the credibility of the witnesses and the weight to be given each witness's testimony. There may be more or less witnesses on one side of this case than the other. However, it is not the number of witnesses but it is the quality of the testimony that should be considered.

This being a criminal case, there may be some police officers that will be called as witnesses, as I'm sure there will be. You are, of course, aware of the obvious that police officers are human beings just like you and I are.

The point is that police officers that are witnesses are entitled to no more or no less credibility simply because they are police officers. Their testimony should be judge the same as any other witness. Are there any prospect jurors who they feel they may not be able to accept and abide by these rules? Again, I see no hands raised.

Many, if not all of you, have probably at one time rather seen trials portrayed on television. On Court TV there's a lot of various judge shows out there in the theatre, movies, and elsewhere. Keep in mind that what you saw and heard there was for your entertainment.

Actual trials are very serious and they are not for the entertainment of anyone. You should also be aware that state laws and procedures can be very different from state to state.

Therefore, any similarities with court proceedings viewed on television and this one are purely coincidental.

You are not to use these others as a point of reference for this trial or consider these other trials in any way. Are there any prospective jurors who might allow what they've seen on television or for entertainment to influence them in this case in any way? Again, I see no hands.

Now, this portion of the trial is called voir dire examination of prospective jurors. In just a few minutes, the attorneys will be asking you some questions. You should be aware that there are rules which set a process for selection of jurors and rules which outline qualifications of jurors.

For instance, the law requires that each juror be a resident of Montgomery County at this time. Do any of you not live in Montgomery County at this time? I see no hands raised.

Another qualification is that prospective jurors must not have any physical disabilities which cannot be reasonably accommodated which would prevent the juror from seeing or hearing the witnesses as they testified.

We do everything we can to accommodate any of your needs. Do any of you have such problems that you think you could not provide assistance to? Again, I see no hands raised.

Now, this trial is expected to be over with this week. It'll probably more than likely will go into Friday. There will be no trial on Wednesday. So you're looking at Tuesday,

Thursday and Friday; so three days. Is there anyone here who cannot be for that time for whom this might be an unusual hardship? And I emphasize "unusual hardship" to participate in this trial.

Ms. Jackson?

MS. JACKSON: Yes.

THE COURT: And what is the problem?

MS. JACKSON: It's not a hardship for me; it's a hardship for my school district. I'm a high school teacher at Mad River Locals Schools, and we have an extreme teacher shortage. So I already know for today, each one of my eight periods are pawned off on other teachers.

THE COURT: And I certainly appreciate that, ma'am. There's a lot of shortages around. But unfortunately, that's not a reason to excuse you. So I appreciate you very much.

Yes, Mr. Cunningham?

MR. CUNNINGHAM: Your Honor, I have assigned hearings on Thursday that I haven't moved yet. But of course, the Court just asked if I had anything on Thursday. So I appear up in Logan County in front of Judge Braig.

THE COURT: Well, your service here will trump that. So the judge will understand if you're selected as a juror that you must be here.

Anyone else that this be unusual?

Yes, sir, Mr. McDonald?

MR. MCDONALD: Yes, I work as a military and common life counselor at Wright-Patterson Air Force Base. And I work with families there of Airmen for seven years --

THE COURT: Please keep your mask up for me. Thank you.

MR. MCDONALD: For seven years, we have been encouraged to -- because of we're considered as essential employees to the mission at the Air Force base to do our best to not be in a jury -- on a jury.

THE COURT: Well, I understand that, sir. Unfortunately, our legislature had not excluded that as a reason to be excluded from the jury. So but I appreciate you bringing it up and maybe the attorneys will have some additional inquiry of you on that.

Anyone else? Okay. As indicated, Counsel will be asking you some questions. These questions may, on occasion, sound as though they are looking into your personal affairs. This is neither their design nor their purpose.

These questions are presented to help the Court, Counsel, and most importantly, you, to discover if you have any preconceived opinions as to the law or the facts that you cannot lay aside or if you've had any life experience that might cause you to identify yourself with either party.

These questions are necessary to assure each party an impartial jury. If any question is asked of any prospective

juror, which the prospective juror would prefer to answer in private, simply say so and we'll have that question dealt with quietly up here by what we call a sidebar; I'll have you come up with Counsel.

Now, during this examination of prospective jurors, only those jurors seated in the jury box, which is the box to my left here, 14 sit here, and all those in the front rail, which is in front of the gallery behind counsel tables, are to respond.

Those prospective jurors seated in the back of the rail, back in the spectator section should not respond; don't raise your hand. However, you should pay close attention and listen carefully so that if you're called upon, you'll be in position to respond without having to repeat all that has proceeded.

This just helps us go a little bit quicker. Now, I can assure you that some of you in the back are going to be called forward. So you need to be paying attention. And one of the first questions that'll be asked of you when you are called forward, was there anything we asked you now that you need to respond to?

So as of right now, just those 14 here and the 7 along sitting in front of the rail are to raise your hand or respond at this time. So with that, I will turn it over to the State.

Ms. Melnick, you may proceed.

MS. MELNICK: Thank you, Your Honor. I'm assuming you

want me at this podium?

THE COURT: You can, but you can move that podium. If you'd like to pull it out --

MS. MELNICK: Thank you.

THE COURT: Maybe Detective could help you there, push it out and turn it around any way that you'd like to.

MS. MELNICK: Thank you, Your Honor.

THE COURT: You need that turned around? You can move it any way you want to; it's fine. I think there's enough cord there you can --

MS. MELNICK: This way. And then I can be able to see. That's wonderful.

THE COURT: Okay.

MS. MELNICK: Thank you.

Well, good morning, everyone. As I said, my name is Kim Melnick. And I am one of the assistant prosecuting attorneys here at the Montgomery Prosecutor's Office.

I want to start off by thanking all of you for coming. I know this taking out of your days. It is an important duty to fulfill. So I appreciate you all being here. I also want to reiterate, some of the questions that I may ask might seem personal.

So I do want to reiterate to you that if you are uncomfortable answering those questions in front of the crowd, please let us know and we can go to a sidebar. I'm not going

to ask you questions for the sake of prying. But the idea behind jury selection is to do our best to get a fair and impartial jury for both sides, okay?

This isn't me trying to pick the best side for the State. This is trying to get a fair jury. That's our system and that's how we want it to work. And we do our best to get that done, okay?

So that being said, I do have a few questions for a few people that did not turn in a questionnaire. And that's fine, maybe you did turn one in and it got misplaced; that happens. So please, no judgment in what I'm saying, but I do have some questions.

Ms. Jackson?

MS. JACKSON: Yes.

THE COURT: You said you're a high school teacher?

MS. JACKSON: Yes.

MS. MELNICK: All right. What grade do you teach?

MS. JACKSON: 9 through 12.

MS. MELNICK: 9 through 12.

MS. JACKSON: I have them all.

MS. MELNICK: Okay. And how long have you been doing that?

MS. JACKSON: 22 years.

MS. MELNICK: 22 years. All right. And do you have any prior criminal convictions on your record?

MS. JACKSON: No.
THE COURT: Anyone in your close friends or immediate family have any criminal --
MS. JACKSON: My sister.
MS. MELNICK: Your sister?
MS. JACKSON: Uh-huh.
MS. MELNICK: What type of conviction is that?
MS. JACKSON: I believe it was misdemeanor theft.
MS. MELNICK: Okay. Being that this case has -- you may hear some things about a theft that occurred.
MS. JACKSON: Uh-huh.
THE COURT: But it's not the meat of what we're here for. You heard the charges in this case. Is her being involved in anything with her case, is that going to affect your ability to be fair and impartial here today in this case?
MS. JACKSON: I don't believe so.
MS. MELNICK: Okay.
Ms. Bruner? Or it's Mr. Bruner. Mr. Bruner?
MR. BRUNER: Mr. Bruner.
MS. MELNICK: I apologize. Mr. Bruner, you work at the VA; is that right?
MR. BRUNER: Yes, ma'am.
MS. MELNICK: Okay. On your questionnaire, I believe that you mentioned that you had a prior conviction?
MR. BRUNER: Yes, ma'am.

MS. MELNICK: How long ago was that?
MR. BRUNER: '99.
MS. MELNICK: '99? Do you mind telling me what it was?
MR. BRUNER: Failure to comply with a officer's signal.
MS. MELNICK: Okay. Now, you're going to hear some evidence in this case on that same exact charge. Did you feel that your case was dealt with fairly?
MR. BRUNER: Yes, ma'am.
THE COURT: Okay. Your being involved in a legal situation similar to that, is that going to affect your ability to be fair and impartial in this case?
MR. BRUNER: Not at all.
MS. MELNICK: Okay. All right, sir. Thank you.
All right. Ms. Warren? I believe you also indicated you had a prior conviction. Do you mind telling me what that was for?
MS. WARREN: It was theft.
MS. MELNICK: It was theft?
MS. WARREN: Uh-huh.
MS. MELNICK: How long ago was that?
MS. WARREN: Almost 30 years ago.
MS. MELNICK: 30 years ago? Okay.
Again, there my be some mention of a theft that occurred. This Defendant is not charged with that theft. I want to make that very, very clear. So any mention of it is just to give

you some background information, okay?

Do you think your being involved with the legal system, albeit 30 years ago on a charge of theft, would affect your ability to be fair in this case?

MS. WARREN: No.

MS. MELNICK: Okay. And I want to make sure I have the order right. Are you Mr. Tutalo?

MR. TUTALO: [Too-ta-low].

MS. MELNICK: Tutalo?

MR. TUTALO: Yes, ma'am.

MS. MELNICK: I'm sorry. Tutalo.

MR. TUTALO: It's close enough.

MS. MELNICK: All right. Well, I try. Sometimes it's a little more difficult.

Mr. Thern, is that you? Okay. Mr. Thern, you also had a conviction in the past, correct?

MR. THERN: Correct.

MS. MELNICK: How long ago was that?

MR. THERN: '98; it's sealed.

MS. MELNICK: It's sealed?

MR. THERN: Yes.

MS. MELNICK: Do you mind telling us what it was for?

MR. THERN: Receiving --

MS. MELNICK: Receiving stolen --

MR. THERN: -- criminal tools and breaking and

entering.

MS. MELNICK: Okay. Again, hearing that there might be some mention of some theft, but that's not what this Defendant is charged with. And knowing what these charges are, do you feel like your case was dealt with fairly?

MR. THERN: Yes.

MS. MELNICK: All right. Is there anything about your involvement with the legal system that you think would cause you not to be able to be fair?

MR. THERN: No.

MS. MELNICK: Okay. You think you can listen to the evidence --

MR. THERN: Yes.

MS. MELNICK: -- and weigh the evidence? Okay.

All right. So moving on from that, this is going to be kind of general questions. What I would like is a raise of hands for those in the box and the front row.

And then we'll kind of go through them. I'm going to ask you a general question. If it does not apply to you, don't raise your hand and you're off the hook, okay?

First of all, is anybody here been on a jury in the past?

PROSPECTIVE JUROR: Any what?

MS. MELNICK: Has anyone here served on a jury before? Okay. All right. And you're Ms. --

MS. SCHWEISER: Schweiser.

MS. MELNICK: -- Schweiser? How long ago were you on a jury?
MS. SCHWEISER: I think it was, like, three or four years ago.
MS. MELNICK: Okay. Was it here in Montgomery County?
MS. SCHWEISER: Yes.
MS. MELNICK: Do you remember if it was a criminal case or a civil case? A criminal case is where someone has -- is charged with violating a law. Whereas, a civil case could be an argument over neighbors or a, like, a malpractice.
MS. SCHWEISER: I think it was a civil case.
MS. MELNICK: Okay. Can you tell me, did the case, did you -- were you seated on the jury?
MS. SCHWEISER: Yes.
MS. MELNICK: Did -- without telling me your verdict, and this goes for anybody I talk to, I'm not asking you what your verdict is. Were you able to come to verdict on your jury?
MS. SCHWEISER: Yes.
MS. MELNICK: Okay. All right,
Mr. Schmidt, did you also raise your hand?
MR. SCHMIDT: Yes. Yes, ma'am.
MS. MELNICK: And how long ago were you on a jury?
MR. SCHMIDT: About eight years ago, I think.
MS. MELNICK: All right. Again, was it in Montgomery

County?

MR. SCHMIDT: Montgomery County.

MS. MELNICK: And was it criminal or civil?

MR. SCHMIDT: Civil.

MS. MELNICK: And did it go to a jury for a verdict?

MR. SCHMIDT: We went to the jury, but there -- it was dismissed during the trial.

MS. MELNICK: It was settled one way or the other? Okay. So you didn't have to render a verdict? Okay.

MR. SCHMIDT: That's correct.

MS. MELNICK: Okay.

And is it Mr. -- is it [Tat-man] or [Tate-man]?

MR. TATMAN: [Tat-man].

MS. MELNICK: Tatman. Did you raise your hand as well? No.

Mr. McIntosh, was it you?

MR. MCINTOSH: Yes.

MS. MELNICK: How long ago were you on a jury, sir?

MR. MCINTOSH: Ten years.

MS. MELNICK: Do you recall if it was criminal or civil?

MR. MCINTOSH: It was criminal and I was an associate. I was placed there because -- in case somebody couldn't serve.

MS. MELNICK: So you were an alternate juror?

MR. MCINTOSH: Right.

MS. MELNICK: Did you get to deliberate, then?

MR. MCINTOSH: No.

MS. MELNICK: You did not? Okay. Okay. I'm sorry. That's always a hard thing and nobody likes to be the -- it's like being the bridesmaid, never the bride. Nobody likes to be the alternate.

Well, let me explain to all of you. We are going to choose some alternates here. And I believe I can speak for the judge and I'm certain he'll correct me if I cannot. Alternates are extremely important.

We often, very often, call on the alternates. There are oftentimes something can occur in a trial where one of the original 12 jurors is excused for one reason or another; either illness or various reasons. And alternates then are placed on the jury to deliberate.

So it is a very important job. So if you are chosen as an alternate, please view it as is just as important as being in the initial 12, okay?

Who here has been the victim of a crime? A couple people.

Mr. -- it's Cunningham, right?

MR. CUNNINGHAM: Yep.

MS. MELNICK: What kind of crime was it, sir?

MR. CUNNINGHAM: Somebody broke into our house.

MS. MELNICK: Okay.

MR. CUNNINGHAM: About five years ago.

MS. MELNICK: Five years ago? Did they catch the person?

MR. CUNNINGHAM: No.

MS. MELNICK: No? Did they investigate it to try to catch the person?

MR. CUNNINGHAM: Sure.

MS. MELNICK: They just were unable to -- do you harbor any ill will towards the police for not finding the person who did it?

MR. CUNNINGHAM: No, not towards the police, obviously. No.

MS. MELNICK: Okay. Ill will towards the person, obviously, that got away with it, but.

MR. CUNNINGHAM: Right.

MS. MELNICK: Again, this case is not going to have anything to do with any kind of home invasion or break in. Is there anything about being involved in that that you think would cause you to not be able to be fair?

MR. CUNNINGHAM: I don't think so.

MS. MELNICK: Okay. We're going to come back to you about some other questions here in a minute but let me get through here.

Ms. Smallwood?

MS. SMALLWOOD: Yes.

MS. MELNICK: What kind of situation were you involved

in, ma'am?

MS. SMALLWOOD: IN 2005, my mother was 82 years old in perfect health. And she was hit and run over by a guy driving a truck who was high. His lawyer said he was distracted, careless driving.

MS. MELNICK: Okay.

MS. SMALLWOOD: And she was flown to Miami Valley; they did brain surgery. She died three year -- three days later. And they did not drug test him until after her death.

MS. MELNICK: Okay.

MS. SMALLWOOD: And you know, I had a hard time with this.

MS. MELNICK: Was --

MS. SMALLWOOD: I mean, as I'm sitting here, I think I remember this case -- what I saw on TV.

MS. MELNICK: All right. Don't tell me any details that --

MS. SMALLWOOD: Okay.

MS. MELNICK: -- you saw, okay? You think you saw something on the television about this case?

MS. SMALLWOOD: Yes.

MS. MELNICK: All right.

Your Honor, can we approach?

THE COURT: Yes, good idea.

(At sidebar)

THE COURT: Ms. Smallwood, step right up here for me, if you would. I -- you know something about this case? I had asked that before. Did it just click in your mind or something like --

MS. SMALLWOOD: Yeah, as we were sitting here, it just -- and I'm not even sure it's the same case.

THE COURT: Okay.

MS. SMALLWOOD: I just remember something about I think it was van that was stolen, joyriding. More -- I though there was more than one person involved. And I thought there was a young girl died; the same case?

MS. MELNICK: Aside from kind of par, she was getting real close to the facts of this. So I --

THE COURT: Go ahead and inquire. You got any other questions?

MS. MELNICK: Let me ask you this, can you set aside -- well, a couple of things, first of all. Can you set aside what happened to your mother? This is going to be a very similar fact scenario I anticipate you're going to be hearing, okay?

MS. SMALLWOOD: Well, I'll tell you, I still go to a psychiatrist. I had a rough time with this. And I don't think I can. I mean, I thought I could when you first said that. I thought won't have a problem with it.

And then I started thinking, his face was really familiar to me. And as I was thinking about it, I was like, oh,

that's --

MS. MELNICK: All right. Well, let's deal with these two things one --

MS. SMALLWOOD: Okay.

MS. MELNICK: -- thing at a time. First of all, your mom. Do you think this case is too close to the facts of what happened to your mom?

(Nods in affirmative)

MS. MELNICK: Do you think you can set that aside and be fair and weight the evidence in this case and decide whether you think that the State has proven their case or not?

MS. SMALLWOOD: I can certainly try. I don't know that I can, but I can try.

MS. MELNICK: Okay. And then --

MS. SMALLWOOD: I mean, it's very --

MS. MELNICK: Here's the question --

MS. SMALLWOOD: She was perfect health.

MS. MELNICK: All right. Well, only you know the answer to that, okay?

MS. SMALLWOOD: Uh-huh.

MS. MELNICK: And in fairness to everybody, no one's going to judge you. If this -- maybe you're perfect for a different kind of case. Maybe this just isn't the one, okay? And that's fair and that's fine. And there's no judgment by anybody here. But only you can answer that question, so.

MS. SMALLWOOD: You know, I just I don't know that I can't, but I don't know want to be unfair to that young man by sitting in this jury.

MS. MELNICK: All right. Well, let me ask you this then as well. What you may have seen on the news, if it turns out that it is this case, can you set that aside and ignore whatever you saw on the news and only listen to the facts that come to you from the witness stand and make your decision from that and not consider what you may have seen on the news?

MS. SMALLWOOD: The reason I have a hard time with that is because I been through this personally. You know, I've known for a fact that if my mother, you know, (indiscernible) presented in court. They never said he was high; he was obviously high (indiscernible) never said he was high.

MS. MELNICK: Okay.

MS. SMALLWOOD: They never said he was drunk (indiscernible).

MS. MELNICK: Okay.

MS. SMALLWOOD: So I have a hard time with this.

MS. MELNICK: Okay.

MS. SMALLWOOD: I never thought of that before. (Indiscernible).

THE COURT: All right, ma'am. I'm going to let Mr. Cass inquire. But before he does, let me -- the reason why we do this now is because we can't wait until we're halfway

through the trial --

MS. SMALLWOOD: Yes, sir.

THE COURT: -- and then you know, you realize, yes, it was the case. So that's why we're trying to get to it now. And if you really think that this would trouble you because of the death of your mother, now's the time to tell us, not halfway through. So that's why we --

MS. SMALLWOOD: I understand that.

THE COURT: -- do this. Okay?

MS. SMALLWOOD: Okay. Thank you.

THE COURT: Mr. Cass, do you have questions?

MR. CASS: So Ms. Smallwood, it sounds like your concern is whether you can be fair to my client. And based on the fact that your mother died and I guess, similar facts. And this is still an allegation --

MS. SMALLWOOD: I understand that.

MR. CASS: -- and you have to figure if he's responsible. You mentioned something about being high. Were you talking about the driver in your mother's case or what you believe --

MS. SMALLWOOD: The driver in my mother's case.

MR. CASS: Okay.

MS. SMALLWOOD: And I just know that because they didn't test him immediately afterwards because my mother didn't die until three days later. He wasn't tested until like five

or six days after the event.

MR. CASS: All right.

MS. SMALLWOOD: So I know what's presented isn't always exactly what was there.

MR. CASS: Right. And that -- you did -- you do recall hearing something on the news or just facts about a car driving away from the police and there being a death involved in the case?

MS. SMALLWOOD: Yes.

MR. CASS: Okay.

MS. SMALLWOOD: I want to say Art Institute or who knows, somebody (indiscernible).

MR. CASS: Okay. And you said that you're still getting therapy or going through therapy as a result of your mother's death?

MS. SMALLWOOD: Yes. I mean, not every week. But they're, you know, things that (indiscernible).

MR. CASS: Well, I guess the concern is that you -- after you hear everything whether you could just base it on some of the facts or you think that your experience would come in and affect your ability to be impartial to this case. Do you think it would affect your ability to be impartial?

MS. SMALLWOOD: Just from the amount that I'm feeling since this started, you know, walking in here, I didn't think it would. But as I'm going through this, yes, I think it --

MR. CASS: You haven't heard any of the facts yet in the case.
MS. SMALLWOOD: No, but I watch (indiscernible). I saw it on the news; I read a lot. I didn't remember at the beginning. But as I looked at him, it just -- I think it was him.
THE COURT: All right. Does Counsel have any objections to her being excused?
MS. MELNICK: No, we don't.
MR. CASS: No.
THE COURT: All right.
MS. SMALLWOOD: Thank you. I appreciate it.
THE COURT: All right. We're going to excuse you, ma'am. Do you have anything back at your seat that you need to pick up?
MS. SMALLWOOD: Just a bottle of water but it can be ditched.
THE COURT: Well, it doesn't matter. If you --
MS. SMALLWOOD: Okay.
THE COURT: -- want to go get it and then you'll be free to go --
MS. SMALLWOOD: Okay. Thank you.
THE COURT: -- at this time.
Counsel, please remain here. Thank you.
Bob?

Since this is early on, what I normally would do is go ahead and replace that juror. N and the next juror in line would be Juror Number 22; which I have no idea who Juror 22 is.

MS. MELNICK: Okay.

THE COURT: But that's my procedure that I would do.

MS. MELNICK: Okay.

THE COURT: Any objection from Counsel on that?

MS. MELNICK: No.

MR. CASS: No.

THE COURT: All right. So Bob, you need to take Juror Number 22 --

THE BAILIFF: Uh-huh.

THE COURT: -- and put it up in the jury box. And we need to write this down. I have 22 as Barbara Wilson.

THE BAILIFF: Yes.

THE COURT: Is that who you have?

THE BAILIFF: Yes.

THE COURT: And then if you would start your first question, was there anything that's been asked so far that you need to respond to.

MS. MELNICK: Absolutely.

THE COURT: Okay. So go ahead and put Ms. Wilson up there. And then we'll go from there.

MS. MELNICK: All right. Thank you.

(End sidebar)

THE BAILIFF: Barbara Wilson? Barbara, back in the -- behind the rail here?

MS. WILSON: What?

THE BAILIFF: Ms. Wilson? Okay. Come on down. Take the available seat up there in the top row.

MS. WILSON: All right.

THE COURT: All right. Sorry about the delay. Since we're early on, we went ahead and replaced a juror.

Ms. Melnick, you may continue.

MS. MELNICK: Thank you, Your Honor. I'm just trying to find --

THE COURT: Take your time.

MS. MELNICK: All right. Ms. Wilson, I'm going to start with you.

MS. WILSON: Okay.

MS. MELNICK: Welcome to the jury box. Was there any question that I have asked so far that you wanted to answer for us? No? You've not been on a jury before?

MS. WILSON: No.

MS. MELNICK: You've not been the victim of a crime?

MS. WILSON: No.

MS. MELNICK: Okay. All right. Anybody else here who has been the victim of a crime? Show of hands.

Go ahead, Ms. -- you would think I would know it already. Ms. Jackson.

MS. JACKSON: About 15 years ago or so, I had my car broken into twice in 10 months at an apartment complex.
MS. MELNICK: Okay. Your car itself was not stolen, but items were stolen out of it?
MS. JACKSON: Correct.
MS. MELNICK: Were they able to find anyone?
MS. JACKSON: No.
MS. MELNICK: Okay.
MS. JACKSON: They actually didn't even come to my apartment. They filled everything out over the phone.
MS. MELNICK: So you called but they didn't come out?
MS. JACKSON: Correct.
MS. MELNICK: All right. Is that frustrating to you?
MS. JACKSON: It was at the time, yes.
MS. MELNICK: All right. Can you tell me what police department was that?
MS. JACKSON: It was Dayton; I'm not sure exactly where. I was at Woodman Park Apartments right off of 35.
MS. MELNICK: Okay. Do you hold any ill will towards law enforcement as a result of that? And this is not a Dayton case. I don't anticipate you're going to be hearing from the Dayton Police Department. This is a Montgomery County Sheriff's Office case. Anything about that situation that would cause you concerns about being fair and impartial?
MS. JACKSON: No.

MS. MELNICK: Okay. Who here knows anybody in law enforcement? Lots of people. All right. Who here only knows people in law enforcement on a very cursory level and really doesn't talk to them about their cases or anything? Okay.

So of those of you have close friends and relatives in law enforcement, give me that show of hands again. All right. We're going to start --

THE COURT: Again, if you're in the back, just keep your hands down. If you're called forward, then you can raise them. Thank you.

MS. MELNICK: Ms. Porter, correct?

MS. PORTER: Yes.

MS. MELNICK: Who do you know in law enforcement?

MS. PORTER: I know someone on the New Lebanon Police Department and on Brookville and then multiple out of state.

MS. MELNICK: Okay. And are these people that are relatives of yours? Close --

MS. PORTER: Close family friends.

MS. MELNICK: Close family friends? And they discuss some of the cases they've worked on with you?

MS. PORTER: Some of the ones that have already went through the courts.

MS. MELNICK: Okay. Do you think hearing some of their stories will affect your ability in this case to be fair --

MS. PORTER: No.

MS. MELNICK: -- and impartial? Do you think you're going to give more deference to the police officers in this case than --

MS. PORTER: No.

MS. MELNICK: -- maybe another witness? Let's assume, for the sake of argument, that you are chosen for the jury.

MS. PORTER: Okay.

MS. MELNICK: And let's assume, for the sake of argument, that you come back with a not guilty verdict.

MS. PORTER: Okay.

MS. MELNICK: You going to get grief from those people when you tell them you were on a jury --

MS. PORTER: No.

MS. MELNICK: -- and you found somebody not guilty?

MS. PORTER: No.

MS. MELNICK: Okay. So I'm going to ask the same questions. Was it Ms. Porter (sic)? I'm sorry.

Ms. Wilson, did you raise your hand as well?

MS. WILSON: Yes.

MS. MELNICK: Who do you know in law enforcement ma'am?

MS. WILSON: My niece is a deputy sheriff for Troy.

MS. MELNICK: For who?

MS. WILSON: Troy.

MS. MELNICK: For Troy?

MS. WILSON: Uh-huh.

MS. MELNICK: And same question, does she talk to you about her cases?

MS. WILSON: At times.

MS. MELNICK: Is there anything about you hearing stories from her, from the perspective of a police officer that you think would cause you to not be fair in this case?

MS. WILSON: Huh-uh.

MS. MELNICK: No? I'm sorry, is that a no?

MS. WILSON: No. I'm sorry.

MS. MELNICK: Okay. Again, you think you can weigh the evidence that you hear up here on the witness stand and any physical exhibits that you will see and make a decision as fairly as you can for both sides? I need you to answer out loud, I'm sorry.

MS. WILSON: Yes, I'm sorry.

MS. MELNICK: That's okay.

Who else? Who else was there who knows people in law enforcement?

All right, Mr. Thern?

MR. THERN: Yes.

MS. MELNICK: Who do you know in law enforcement, sir?

MR. THERN: So, actually, I have some -- a business acquaintance with the sheriff's department, specifically, that district; Maj. Wilson, the former sheriff, Det. Sanders (phonetic), Connor (phonetic), some of them --

MS. MELNICK: You know all of these individuals?

MR. THERN: Yes. Sgt. Eaton, who is from the jail system.

MS. MELNICK: Let me stop you right there. You don't have to go much farther, okay? Maybe I should've started with this. We expect Det. Pat O'Connell, Det. Kent Saunders to testify in this case. Do you have a close, personal relationship with them?

I realize that it may be a working relationship. But is it a close --

MR. THERN: I also have a personal relationship with these individuals, yes.

MS. MELNICK: All right. Would that relationship affect your ability to be fair and impartial in this case? Are you automatically just going to side with whatever they say?

MR. THERN: No. I think I would be fair. I don't know anything about this case whatsoever. I don't talk about cases with them. It's just stemmed -- my relationship stemmed from owning a business in that district.

MS. MELNICK: Okay.

MR. THERN: (Indiscernible) district.

MS. MELNICK: Okay.

MR. THERN: And this is 2015 to 2018.

MS. MELNICK: Okay. You know Det. Statzer?

MR. THERN: I -- he does look familiar now, yes.

MS. MELNICK: So you own a restaurant over there?
MR. THERN: I used to, yes.
MS. MELNICK: Apparently he's eaten at your restaurant?
MR. THERN: Yeah, 2015 through 2018, yes.
MS. MELNICK: All right. So again, I'm going to pose you the same question I posed up here, for the sake of argument, let's say that you are seated on this jury. And let's say you decide to, as a jury, vote not guilty. How are you going to feel about seeing them if they're coming into your restaurant?
MR. THERN: I don't have that restaurant anymore.
MS. MELNICK: Okay.
MR. THERN: So I don't have that connection to them now often. But I'm a big boy; I make my own decisions.
MS. MELNICK: Okay. All right. You think you can be fair and impartial --
MR. THERN: Yes.
MS. MELNICK: -- regardless?
MR. THERN: I could care less what they think of my decision.
MS. MELNICK: Okay. That's fair.
Anybody else in the jury box or in the front row? All right. I'm going to do this now because I probably, like I said, should have done that already. What did I -- here it is.
All right. I'm going to read off a list of witnesses that

the State could call. Now, I want to assure you before you panic, the State does not intend to call all of these witnesses, okay? Otherwise, we would be here forever.

The State absolutely does not intend to call them but they are people that were involved in the case and that the State could potentially call, okay? So if you know one of these people, keep that in the back of your mind. And when I'm done reading the list, I will ask all of you again if you know any of these people.

Mr. Thern, You get a pass on this one, okay?

All right. Det. Patrick O'Connell, with the Montgomery County Sheriff's Office; Det. Brian Statzer, with the Montgomery County Sheriff's Office; unless I say otherwise, they're Montgomery County Sheriff's office.

Dep. Joseph Solomon; Sgt. Jay Vitali; Capt. Steve Perrin (phonetic); Dep. Benjamin Hale; Dep. Justin Bone; Dep. James Gisewite; Dep. Matthew Holton (phonetic); Det. Kent Saunders; Dr. Bryan Casto, with the Montgomery County Coroner's Office; Donnie Jones (phonetic), not a police officer; Joseph Smith (phonetic), not a police officer; Donte Dixon, not a police officer; Ofc. Austin Palmer, with the Dayton Police Department; Dep. Anthony Ball, with the sheriff's office; Dep. Hank Gebhart, sheriff's office; Det. Justin Lee, with the Dayton Police Department; Det. Curry Meyer (phonetic), with the Dayton Police Department; a nurse at Kettering Health Network by the

name of Leslie Officer (phonetic); Casey Skapek (phonetic), I don't know if I'm saying that right; I'm terrible with names.

Dr. Mbaga Walusimbi with Miami Valley Hospital; Jenna McConnell, RN, with Kettering Health Network; Mary Barger, with the Miami Valley Regional Crime Lab; Elizabeth Kiely, with the Miami Valley Regional Crime Lab; Meredith Goebel, with the Miami Valley Regional Crime Lab; Rachel Newton, with the Miami Valley Regional Crime Lab; Jelani Shackelford; Joseph Hespeth (phonetic); Cody King (phonetic), with the Harrison Township Fire Department; Tony Perkins, Harrison Township Fire Department; Connie Clingner, Harrison Township Fire Department; Alexander Becker, Harrison Town -- I'm sorry -- Harrison Township Fire Department; William Montler (phonetic), also Harrison Township Fire Department; Lauren Melby (phonetic); Cyrus Broyles, both from Harrison Township Fire Department; Dep. Mark Shively, with the sheriff's office; Dep. Anthony Regensburger, with the sheriff's office; Dep. Bradley Fizer, with the sheriff's office; Elizabeth Crest (phonetic), with the Board of Motor Vehicles.

Now, does anybody know any of the people that I've named, save Mr. Thern, who probably knows most of them.

MR. THERN: Do add the half of the fire department as well.

MS. MELNICK: Okay. Anybody else know any of those people? All right. Don't panic, we're not going call all

those people, okay? But they're possibilities.

Okay. Anyone else here been convicted of a crime?

Mr. Tatman?

MR. TATMAN: Yeah.

MS. MELNICK: What kind of crime was it, sir?

MR. TATMAN: A DUI.

MS. MELNICK: A DUI?

MR. TATMAN: Uh-huh.

MS. MELNICK: Okay. How long ago did that occur?

MR. TATMAN: 2015.

MS. MELNICK: Okay. Do you hold any ill will towards the police department or the court system or anybody else for your involvement in that?

MR. TATMAN: Yeah, the court.

MS. MELNICK: The court?

MR. TATMAN: Yeah.

MS. MELNICK: Okay. What court was that?

MR. TATMAN: In North Carolina.

MS. MELNICK: In North Carolina? Any reason to hold that against the Court here?

MR. TATMAN: (Indiscernible), no.

MS. MELNICK: You're not going to comment on that?

MR. TATMAN: No, I don't have a reason to hold it against here.

MS. MELNICK: Okay. You feel you were treated unfairly

down there in North Carolina?
MR. TATMAN: Yes.
MS. MELNICK: Okay. So my question for you is, is there anything about that experience that is going to come forward with you into this case if you're seated on the jury and influence you in any way?
MR. TATMAN: No. I wouldn't hold that against --
MS. MELNICK: Anybody here.
MR. TATMAN: -- it's -- that and anybody here, no.
MS. MELNICK: Okay. Was your issue with the court about a sentencing issue?
MR. TATMAN: In a way, yes.
MS. MELNICK: In a way?
MR. TATMAN: Yeah.
MS. MELNICK: All right. Does everybody here understand that sentencing is not an issue for the jury, number 1. Does everybody understand that? Nod of heads? Okay. And that that -- is that a yes, sir?
PROSPECTIVE JUROR: No. I'm still on your last question. I'm guilty.
MS. MELNICK: Oh, you're going back. All right. Mr. Goldschmidt, what were you guilty of?
PROSPECTIVE JUROR: OVI last year, and I was definitely guilty. And I pled guilty.
MS. MELNICK: Okay.

PROSPECTIVE JUROR: And I have no problem -- I was definitely guilty.
MS. MELNICK: All right. You took responsibility --
PROSPECTIVE JUROR: Yes, I did.
MS. MELNICK: -- for what you did?
PROSPECTIVE JUROR: Yes, I did.
MS. MELNICK: All right. You don't hold any ill will against anybody?
PROSPECTIVE JUROR: No.
MS. MELNICK: Can I ask you what jurisdiction that was? Where were you?
PROSPECTIVE JUROR: Well, it was I think the same court, but it was in Huber Heights; it was Judge Cox.
MS. MELNICK: Okay. Okay, so it was Montgomery County --
PROSPECTIVE JUROR: It -- I was arrested in Mad River Township.
MS. MELNICK: Okay.
PROSPECTIVE JUROR: Over on Burkhardt I think it was.
MS. MELNICK: Okay. But you don't hold any ill will --
PROSPECTIVE JUROR: No.
MS. MELNICK: -- against anybody involved in that? Okay.
PROSPECTIVE JUROR: After I watched the bodycam videos, it was pretty obvious.

MS. MELNICK: All right. Fair enough. You think you can be fair and impartial in this case?

PROSPECTIVE JUROR: Yeah, I do.

MS. MELNICK: All right.

Anybody else with a prior conviction? No? All right. Everybody understand that sentencing is an issue for the judge and not for the jury? That the jury's sole responsibility is to weigh the facts from the evidence that you hear in the courtroom to the charges?

And the Court's going to give you what we call jury instructions. So the Court's going to instruct you on the law. And your job as a jury is to apply the facts to the law and decide if the State has proven its case or not. Does everybody understand that? Okay.

Now, Mr. Cunningham, you knew I was coming back to you. You are a criminal defense attorney, correct?

MR. CUNNINGHAM: That's right.

MS. MELNICK: How long have you been doing that work?

MR. CUNNINGHAM: Eight years.

MS. MELNICK: Okay. Have you ever done any work on the other side doing prosecution work?

MR. CUNNINGHAM: No.

MS. MELNICK: Okay. And how long have you been a practicing attorney?

MR. CUNNINGHAM: 2007.

MS. MELNICK: Okay. So you have, correct me if I'm wrong, fair to say that you, obviously, in looking at a factual scenario, are going to judge it from the defense prospective first; that's what you do.

MR. CUNNINGHAM: Probably.

MS. MELNICK: Okay. And in this particular case, now, are there times, as a defense attorney, that you look at a factual scenario in a case that may come your way and you say, they got all the evidence to prove this. Provided everybody shows up and says what they're supposed to say, the facts are there. Does that happen in some cases?

MR. CUNNINGHAM: Yes, obviously.

MS. MELNICK: Okay. And if that occurs here, if you are seated on this jury, and the State provides you with evidence beyond a reasonable doubt, which we'll talk about here in a minute, to each and every element that the State is required to prove, as a criminal defense attorney, can you and will you still vote guilty?

MR. CUNNINGHAM: Yes, if it's proven. Yeah.

MS. MELNICK: Okay. Now, I want to talk to everybody else. And I know that you understand it, so I'm excluding you from answering this question right now, Mr. Cunningham, because it's kind of a give me for you.

I want to pick on somebody. Mr. Parker, you look like very nice man who's trying to kind of fly under the radar. Let

me ask you, sir, what does beyond a reasonable doubt mean to you?

MR. PARKER: Beyond a reasonable doubt, it means to me that the evidence that's presented is overwhelming and there's no reason to doubt it.

MS. MELNICK: Okay. Do you agree with me that beyond a reasonable doubt doesn't mean 100 percent?

MR. PARKER: I believe it means 100 percent.

MS. MELNICK: Okay. Who here agrees that beyond a reasonable doubt means that it's 100 percent? I have to prove it to you where there is absolutely nothing that could have possibly every occurred except what I'm telling you. Who here believes that's what beyond a reasonable doubt means?

Sort of? Sort of kind of? All right. Ms. Vaughn --

MS. VAUGHN: Uh-huh.

MS. MELNICK: -- tell me what do you think?

MS. VAUGHN: I think the evidence has to be there, I mean, you can't leave one little minute out of anything that could change the whole trajectory of something, so.

MS. MELNICK: Okay.

MS. VAUGHN: Like, it has to be there.

MS. MELNICK: All right. And I'm sorry, the on and -- I lost my bifocals, so I apologize.

Is it [Blah-ja]?

MS. BLAJA: [Blah-ja], yeah.

MS. MELNICK: Okay. What do you think?

MS. BLAJA: I think evidence has to be there. I don't think you could, like, leave areas uncovered to -- where there could be questions. I think that's what it means, beyond a reasonable doubt. If everything's covered, I think that's -- yeah, I think that would be. Sorry. I'm kind of a nervous speaker.

MS. MELNICK: Let me -- that's okay. I'm going to keep picking on you, so--

MS. BLAJA: No, you're fine.

MS. MELNICK: Let me ask you this, what does the word "reasonable" mean to you?

MS. BLAJA: I think if it's, like, logical, like, that it's factual. Reasonable to me could be completely different to her. So I think that something that's factual and that is logical more so than what, like, I would personally believe. Like, looking at it factually and logical. And if it's reasonable to that extent, I think that --

MS. MELNICK: Okay.

MS. BLAJA: -- would qualify.

MS. MELNICK: All right. So the Court is going to instruct you. And I'm not going to read to you the full definition from the Court, okay? The Court is going to instruct you that beyond a reasonable doubt does not mean 100 percent, okay?

It's impossible for me to prove to you 100 percent beyond any single doubt in the world. That's an impossible task that I -- there's no way I could ever overcome that burden. Somebody's going to be able to think of some doubt. It may not be reasonable doubt, but it could be some possible doubt, okay?

So that is not my burden. My burden is to prove this case to you beyond a reasonable doubt. Now this is going to be a really stupid example. But I do it to make a point, okay? And this comes from the days of me growing up watching cartoons.

Who here thinks the moon is made of cheese? See, you laugh. But does anybody here think that? No. Right? How do you know?

Mr. Bruner, how do you know what the moon is made of?

MR. BRUNER: I don't.

MS. MELNICK: All right. If somebody tried to -- if I stood here and tried to convince you that the moon was made of cheese, would you believe me?

MR. BRUNER: Not at all.

MS. MELNICK: Okay. Because it's not reasonable, correct?

MR. BRUNER: Right.

MS. MELNICK: All right. That's -- I mean, that's a ridiculous example. But I make it because that's the point. You can't just make up anything and say, well, she didn't prove the moon wasn't made of cheese. All right, people, come on.

It's based on reason and common sense, okay.

Is there anybody here would disagree with that? No? All right. I think we can all agree that all of us, based on our life experiences, have certain kinds of biases and prejudices. And by "prejudices" I'm not speaking of racial prejudices. I'm speaking of you like provolone cheese better than mozzarella.

Everybody has certain things that are their preferences and their biases, okay? And what the state is asking everybody to do today is bring in your life experiences. But try to leave the biases and the prejudices in the hallway.

Listen to what you hear on the witness stand, okay? It is your job as a jury to weight the credibility of each witness; that mean police officers; that means doctors; that means what we refer to as lay witnesses, which are by-standing witnesses; they're not a particular profession.

It is your job as jurors to use the skills you've learned throughout your lives to determine the credibility of each of these witnesses, okay? Is there anybody here who thinks they can't do that?

MR. PETTIT: Can we have a --

MS. MELNICK: A sidebar?

MR. PETTIT: Yeah.

MS. MELNICK: Certainly, sir.

(At sidebar)

THE COURT: Just come right up here, sir.

MR. PETTIT: Yes, sir.

THE COURT: Okay. You're Mr. Pettit; is that --

MR. PETTIT: Yes, sir.

THE COURT: -- right? Okay. What do you want to tell us?

MR. PETTIT: In roughly around seven or eight years ago, Trotwood Police put a warrant out for my arrest. And I got arrested by Miami's Police Department picking my wife up from work. I spent seven hours locked up. By the time it was all said and done, my attorney and I just went after the City of Trotwood Police Department; settled the case out.

But that's very frustrating, because there was nothing I did. I was never in trouble, never had any issues. Never had any issues with law. And there I was, locked up for something I had no idea what I did. So to me, that's frustrating. Wasn't convicted, but I just wanted to let you guys know before (indiscernible) that I have that issue in my background.

MS. MELNICK: Well, I appreciate that. Is there -- that was Trotwood?

MR. PETTIT: Uh-huh.

MS. MELNICK: We're not talking about --

MR. PETTIT: Correct.

MS. MELNICK: -- you heard my list. There --

MR. PETTIT: Yeah.

MS. MELNICK: -- are no Trotwood officers involved

here. Is there anything about that that you're going to hold against law enforcement in general?

MR. PETTIT: No. No, I just --

MS. MELNICK: Is there anything about it that you think would cause you to not be able to be fair in this case?

MR. PETTIT: I don't think so.

MS. MELNICK: Okay. I appreciate your candor; thank you very much.

MR. PETTIT: Actually --

MS. MELNICK: We need people like you to come forward --

MR. PETTIT: Right.

MS. MELNICK: -- with that kind of thing. So I appreciate that.

THE COURT: Mr. Cass, you have any questions?

MR. CASS: No questions.

THE COURT: Thank you, sir. We appreciate --

MR. PETTIT: Okay.

THE COURT: -- you coming up and telling us.

MR. PETTIT: No problem.

(End sidebar)

MS. MELNICK: All right. Who here has had to work in a group setting in the type of setting where you have to come to a consensus in order to move forward on things? Anybody?

Mr. Thern, tell us about that.

MR. THERN: Well, actually, I'm a project manager for a very large restaurant in (indiscernible). So I'm constantly (indiscernible) information from different departments and (indiscernible) businesses, and putting them together to reach a (indiscernible).

MS. MELNICK: Is that sometimes a difficult task --

MR. THERN: Very.

MS. MELNICK: -- to accomplish?

MR. THERN: Very difficult.

MS. MELNICK: All right. Can you share with us, some of the hardships that you have in trying to do -- just in a general sense, I don't want you to --

MR. THERN: Just different perspectives. Trying to get different perspectives to (indiscernible) same directions. There's 360 degrees you can go. And you got to get the one degree point. So sometimes that requires more of it than others.

MS. MELNICK: Do you sometimes run into people that kind of dig their heels in and don't want to discuss things?

MR. THERN: Not in the situation of don't want to discuss things (indiscernible). But yeah, there are some times when people dig their heels in, yeah.

MS. MELNICK: All right. Does it sometimes take longer than others to get to a final decision?

MR. THERN: Yes.

MS. MELNICK: All right. And do you have to really listen to everybody?

MR. THERN: Yes.

MS. MELNICK: Is that kind of one of the most important aspects --

MR. THERN: It's paramount.

MS. MELNICK: -- to make sure everyone is heard?

MR. THERN: Correct.

MS. MELNICK: And then make a decision together?

MR. THERN: Correct.

MS. MELNICK: All right. That's going to be a similar situation being on a jury, okay? At the end of the day, if you're on this jury and you are deliberating on this case, the verdict must be unanimous, okay?

There will be 12 people that are deliberating on this case. And the verdicts have to be everyone agrees, okay? Is there anybody here who is not comfortable or does not feel like they can work in that kind of an environment? No? Okay.

All right. Who here watches CSI or some kind of show like it? All right. I used to be guilty of this, too. But it's gotten to the point where it's so frustrating for me, I just can't do it anymore.

Who here actually believes that you can find a knife in a drain spout that was there for three years and life 14-layers of fingerprints from it and then get DNA afterwards? Anybody?

No. That was the episode that threw me over the edge.

So I bring this up because you are going to hear some testimony, I expect, in this case from, in particular, a forensic chemist from the Miami Valley Regional Crime Lab regarding DNA, okay? So I want to make sure that everybody understands that these are people, too.

You will hear some results. But I don't want you to think that everything that these people do is just as easy as you see it on TV, okay? Does everybody understand that these shows that you see on TV are for entertainment? And that includes some of these forensic file shows that are supposed to be documentaries and that sort of thing.

Does everybody understand, those, too, are also put out for entertainment. And they pick and choose what they air. They give you the good parts, the spicy parts. But they don't always give you the full picture. Does everybody get that? Okay.

All right. Now, you have heard based on the charges, that we are going to have the coroner testify; there was a death involved in this case, okay? There are going to be photos from the coroner that will have to be displayed as the coroner demonstrates some of the injuries that occurred to one of the individuals involved in this case.

Is there anyone here -- and they're -- I mean, they're autopsy photos. So you know, they are what they are. Is there

anyone here who feels that they cannot look at that kind of thing in order to weigh the evidence or hear the evidence? Anybody? And I say that because it's very important that you do look at it. You can't sit and just put your eyes down and listen.

The photos are being used by the coroner during testimony to explain injuries that are important for you to understand, okay? So if there's anyone here, now is the time. Anyone here that feels they cannot look at anything like that, you need to let us know.

Ms. Vaughn?

MS. VAUGHN: Yes.

MS. MELNICK: You don't think you can look at --

MS. VAUGHN: Not real, no.

MS. MELNICK: Not real?

MS. VAUGHN: No.

PROSPECTIVE JUROR: I don't I can either.

MS. MELNICK: Is this a situation where you feel like you would have to look away? That you just don't --

MS. VAUGHN: Yes.

MS. MELNICK: -- think you could look at it?

MS. VAUGHN: Yes.

MS. MELNICK: Do you think that that would be a fair thing to do if put on this jury to not view all of the evidence?

MS. VAUGHN: Absolutely not.

MS. MELNICK: Okay. And Ms. Wilson, what about you? You feel the same way?

MS. WILSON: I feel the same way, yeah.

MS. MELNICK: Okay. Anybody else in the front row or the jury box? No. Okay. Now, you are going to, obviously, not be able to hear from the person who died in this case. You're not going to be able to hear from her, what her version of events were, because we don't have her.

What if I tell you that the other two people that were in the car, you're not going to hear from them, either, even though they were not killed? Does that cause anybody immediate pause?

PROSPECTIVE JUROR: It makes me wonder why not.

MS. MELNICK: Yeah. Okay. All right. And what if I can't answer why not?

PROSPECTIVE JUROR: I still have that thought.

MS. MELNICK: Okay. What if I can present you with evidence, otherwise. Let's assume for the moment, and thankfully it didn't happen, that all of the other individuals in the car died. Would you still be able to make a determination on this case from everything else that you saw?

PROSPECTIVE JUROR: I think so. If it's a reasonable -- if it's been reasonable proven. Yeah. Yeah.

MS. MELNICK: Okay.

PROSPECTIVE JUROR: I think I could.

MS. MELNICK: Okay. So I bring this up because you aren't allowed, as jurors, to speculate on things that you don't hear evidence about, okay? So if these other two individuals that were in the car do not come in and testify to you, you are not allowed to speculate as to why.

You only are allowed to say, look, here's the evidence the State gave us. The State proved the case that these two other people were in the car and that they sustained serious physical harm as a result of this incident, okay? You can't speculate on what they may have said. So is there anybody here who doesn't think they can do that?

MS. EPPERLY: I have a question about that.

MS. MELNICK: Yes, ma'am.

MS. EPPERLY: I mean --

MS. MELNICK: You are Ms. Epperly?

MS. EPPERLY: Yes.

MS. MELNICK: Okay. What's your question?

MS. EPPERLY: We, as possible jurors, have to go through all this entire -- (indiscernible) questioning --

MS. MELNICK: Uh-huh.

MS. EPPERLY: -- so that we can be fair on both sides?

MS. MELNICK: Correct.

MS. EPPERLY: I still feel like that's leaving out an element for us.

MS. MELNICK: Okay. Because you can't hear from them?

MS. EPPERLY: Why would it -- I mean, they could bring something to the table.

MS. MELNICK: Okay. And maybe it's out of the State's control. Does that make a difference?

MS. EPPERLY: Then I don't understand because I'm not used to the whole lawyer --

MS. MELNICK: Sure.

MS. EPPERLY: And I don't understand why it would be like that. Why it would be out of control. Because they were there at that -- they were part of it as -- because they were there.

MS. MELNICK: And I don't disagree with you, okay? What if you hear evidence that nobody knows where they are?

MR. CASS: I'm going to object.

MS. EPPERLY: Okay. That would sway me.

THE COURT: Wait just a minute, ma'am. Overruled. (Indiscernible).

MS. EPPERLY: That would sway me.

MS. MELNICK: Okay.

MS. EPPERLY: I --

MS. MELNICK: Sway you in -- what do you mean, it would "sway"?

MS. EPPERLY: That would give me so many doubts and lean me one way or the other.

MS. MELNICK: Okay. And I understand. But you understand you can't speculate as to what they would say?

MS. EPPERLY: Yes, I know that.

MS. MELNICK: Okay. So my question for you is, if you agree not to speculate; and you hear evidence from the witness stand; video evidence; all kinds of evidence as to what occurred; who was where; what happened.

Are you telling me because they don't come to court, for whatever the reason would be, that you would not be able, if the State has otherwise proven every element of the charges that it has to prove, that you could not find someone guilty because there are witnesses that you wanted to hear from but you didn't hear from?

MS. EPPERLY: Are you telling me these people literally could not be found?

MS. MELNICK: Well, that's going to have to come from the evidence. And you -- trust me. In this case, there will be evidence put forth. So my question to you is --

MS. EPPERLY: I cannot give you an answer. I could not give you an answer until I was put in that position. I just I don't know how I'll react.

MR. GOLDSCHMIDT: And I agree --

MS. EPPERLY: I just don't think that's right.

MR. GOLDSCHMIDT: -- with her.

MS. MELNICK: Okay. Is there anybody else who has

those concerns? Okay. Everybody else think that they can look at the evidence that's presented and make a decision? Now, the State's not telling you, I'm telling you you've got to find this -- that's not what I'm up here doing right now.

This is not argument. You haven't heard any of the evidence yet, okay? This is voir dire.

I'll get to you in just a minute.

So my question is, if after you hear all of the evidence, and you -- there -- I expect you're going to see video evidence. You're going to hear testimony of people that were there to even describe some of that video evidence. But there's going to be a lot of video evidence.

You're going to hear information. And at the conclusion of that, all of the testimony, if you feel the State proved this case, the State has certain things they have to prove in this. And everything they gave me proves this case.

I mean, it's clear that this case has been proven. But darn it, they didn't find these two other people and I really want to hear from them. Even though I don't know what they're going to say, the State's clearly proven their case. Are you going tell me that you cannot find someone guilty if the State has clearly proven their case? And that is my question.

MS. EPPERLY: So it's also in the opposite thing. If the majority finds them not guilty.

MS. MELNICK: Oh, correct.

MS. EPPERLY: I don't --

MS. MELNICK: I mean, let me put it this way --

MS. EPPERLY: I don't want that thought of those people could've been found. And this gentlemen -- I don't want that on my -- I couldn't do that knowing that I'm -- that is going to be in the back of my mind. What if? What if? What if? Then I -- that's not fair to this gentlemen here.

I can't get past that. I'm --

MS. MELNICK: Okay.

THE COURT: Ms. Melnick, let me interject here just a second. I'm going to give you an instruction on what the law is. And it's basically going to say, as a jury, you have to take what is said from the witness stand.

You cannot add or delete anything from this witness stand; it's what you hear. There may be reasons that you'll never know why a particular piece of evidence or a witness was called or not called. That is not for your concern. Your concern is to listen to the evidence.

And if the State has proven beyond a reasonable doubt each and every element of the offense, it is your duty to find the Defendant guilty. On the reverse side, if you find beyond a reasonable doubt that the State has not met the burden based on the evidence presented to you, then your verdict must be not guilty.

It's pretty simple when you boil it down. But that's, in

essence, what the law says. So you cannot say, well, what if this, what if that. What if this person testified? It's what you hear. And if there's enough, you go one way. If there isn't enough, then you go the other. That's what it boils down to.

I don't know if that helps you or not, but that's basically what the law is.

MS. MELNICK: So my question is can everyone follow that law?

Ms. Epperly?

MS. EPPERLY: I would give it my all. But I just -- I can't do it.

MS. MELNICK: Okay. And Mr. Goldschmidt?

MR. GOLDSCHMIDT: I've read too many stories about people being 30 years in jail and they --

MS. MELNICK: All right. I don't --

MR. GOLDSCHMIDT: -- DNA --

MS. MELNICK: -- want to get into --

MR. GOLDSCHMIDT: That's why I can't. I'm with her on this and I can't do it. No, I can't do it.

MS. MELNICK: Okay.

MR. GOLDSCHMIDT: Because --

MS. MELNICK: And that's fair.

MR. GOLDSCHMIDT: -- the judge --

MS. MELNICK: Okay. Well, let me stop you, okay?

MR. GOLDSCHMIDT: Okay.

MS. MELNICK: What your opinion -- you're entitled to your opinion. What I don't want you to do is sit here and try to convince everybody else.

MR. GOLDSCHMIDT: Okay.

MS. MELNICK: They're also entitled to their opinion.

MR. GOLDSCHMIDT: I get you.

MS. MELNICK: Okay.?

MR. GOLDSCHMIDT: I get you.

MS. MELNICK: So does anyone else -- and I respect that you have that opinion. This is what voir dire is about.

MR. GOLDSCHMIDT: Okay.

MS. MELNICK: Okay? We need to find the people -- and again, I respect your opinion. We need to find the people that feel like they can be fair and impartial for this case. Just because you may not be the right juror for this case does not mean you're not the perfect juror for another case, okay?

We all have our experiences that might make us good for one case and not another one. So there's no judgment here. No one's judging. No one's judging, okay? The whole purpose of doing voir dire, what we're here for, is to try to get a fair and impartial jury.

And if you're saying, look, this is not the one for me; I can't do it. Then I respect that, and I think you for coming forward and letting us know that, okay? Is there anyone else

who feels the same way?

PROSPECTIVE JUROR: My question would be is there going to be evidence during the trial pertaining to those people --

MS. MELNICK: Yes.

PROSPECTIVE JUROR: -- and their injuries? And you have the evidence for the injuries as well?

MS. MELNICK: Of course.

PROSPECTIVE JUROR: Would be --

MS. MELNICK: There will be evidence presented.

PROSPECTIVE JUROR: Because my mind goes to it's a minor and you can't bring them forward is where --

MS. MELNICK: No. And again, don't speculate.

PROSPECTIVE JUROR: But that's --

MS. MELNICK: That is not the case.

PROSPECTIVE JUROR: -- on my mindset.

MS. MELNICK: Okay. You heard me read the witness list. Dr. Walusimbi will be here to testify to the jury as to the injuries that occurred to the other individuals, okay? You will hear from the doctor that treated those individuals as to what their injuries were.

You'll hear other evidence in this case, which I cannot go into detail in because we're in voir dire. As to what occurred, okay? So my question is, if hearing what the injuries were and hearing the evidence of what occurred proves the case beyond a reasonable doubt, can you and will you find

him guilty if you otherwise feel the case is proven beyond a reasonable doubt?

Or are you just going to say I still wanted to hear from them. Since I didn't, I can't find them guilty no matter how much other evidence you've put on. And the reason that I ask that is it's no different, you can't hear from the other victim who passed away. This is no different.

We still have to put on evidence of what happened to her. You still, as a jury, have to make a decision as to guilt or not guilt based on what happened to her in exact same way the State that we'll be asking you to make the same determinations as to the other people.

The State either has the other evidence or they don't. But if they do, if the State proves it, I need to have assurances from each and every one of you that if the State has proven their case beyond a reasonable doubt, that you will find him guilty.

If you feel the State has not proven its case beyond a reasonable doubt, then it is your duty to find him not guilty, okay? But it cannot be based on the speculation of what these witnesses may or may not have said. It's got to based on the evidence that has been presented to you. There's either enough or there's not enough. Does that make sense?

Is there anybody else here who takes issue with that at all? No? Okay. All right. Last question. Is there anybody

here who's just anti-law enforcement? Don't care. Don't care why. Just not a fan of the police. I mean, there are a lot of people that feel that way. Nobody likes them until they need them, right?

Nobody wants to be followed by a police officer. I don't, and I know most of them. I still want them driving behind me. I don't want him driving behind me either. Nobody really wants the police to be around unless they need the police to be around. But is there anybody who just inherently has had some kind of bad experience or knows someone who's had a bad experience that just inherently is anti-law enforcement?

Anybody? Okay.

If I can have just a moment, Your Honor.

All right. Mr. Elrod, this is just really pure curiosity more than anything else. What is CHCFab?

MR. ELROD: CHC Fabricators.

MS. MELNICK: Okay. It's a fabrication company?

MR. ELROD: Yep.

MS. MELNICK: All right, Your Honor. I'm not sure how you want me to word it, but I --

THE COURT: We'll do everything in chambers.

MS. MELNICK: I am done. Thank you, Your Honor.

THE COURT: Mr. Cass, you may inquire.

MR. CASS: Good morning once again. I'm Bill Cass, representing Caleb Whitfield.

So, the only good thing, I'm not going to talk as much as Ms. Melnick did. But it does give me an opportunity to take off my mask, so I may even stand up here a little longer than normal for that purpose.

Many of you have got the idea that this -- or the voir dire or jury selection is kind of like a job interview. Although, no one here actually applied. And as you know, or may soon know, the pay stinks. But a lot of it is to try to determine if you are -- can be fair and impartial in this case.

I've listened to everything that everybody said. So again, I will not cover all the things Ms. Melnick did. And one thing, though, I'll tell you, as the case goes on, you'll find out the State always gets the opportunity to go first. And they also get the opportunity to go last in the end.

And the State read you a list of witnesses. And I can tell you in advance that they're going to call more witnesses than we are. Anybody, based on that alone, would hold it against the Defense if we didn't call any witnesses at all? No witnesses.

The term fair and impartial has been mentioned quite a bit here. And that is a objective of the selection. And because we want jurors that have no preconceived ideas or prejudices that would affect their ability in this case to decide it on the facts and evidence as presented to you. Kind of like starting with a clean slate, that's what we want here.

But fair and impartial also applies to you need to listen to both sides and you know, hear everything both sides have to say. But one thing in a criminal case, there is not -- being fair and impartial, the State has the burden of proof. And so there is, like, a one-sidedness to the proof.

And so to be fair in this case, you have to respect that. You have to presume Mr. Whitfield innocent. That term, presumption, means that he is innocent until and unless the State meets its burden of proof and proves every element beyond a reasonable doubt.

And Mr. Parker, I know you were asked about the beyond a reasonable doubt and what it meant to you. And I think you indicated 100 percent. And the judge will give you an instruction, trust me, that it doesn't mean 100 percent, but it means beyond a reasonable doubt. Obviously, it's an important decision.

Will you -- are you willing to accept the instruction as given by the Court as to what the definition of the burden of proof is?

MR. PARKER: Yes.

MR. CASS: Okay. And so can everybody agree or is there anybody that has a problem with this burden of proof that the State bears completely the burden of proof; the Defense bears no burden at all.

I mean, we don't have to present any evidence or

witnesses. We will, but does anybody have an issue with that? That they think the Defense should be required to prove something? Prove innocence or bring witnesses in? Anybody feel that way? Okay. Everybody's silent; we'll assume that you can accept that.

Because usually, when you're making a decision of this importance, you want to hear both sides. How many of you have children?

Mr. Elrod, we didn't hear a lot from you. So I'll ask you a question. So your children come to you -- you have more than one?

MR. ELROD: No.

MR. CASS: Okay. Well, let's say that they're with -- in dispute with somebody else. You usually want to hear both sides of the issue before you make a decision as to what you should do?

MR. ELROD: Yes.

MR. CASS: Okay. And I think that's common reason or belief for everybody to hear both sides. But understand in a criminal case, you -- the Defense has no obligation to present its side. No obligation to call witnesses. And the burden, again, is strictly on the State.

Now, the -- it was asked earlier about crime shows. And how many, again, people watch crime shows? Okay. So Ms. Jackson?

MS. JACKSON: Yes.

MR. CASS: Ms. Jackson, why do you like to watch the crime shows?

MS. JACKSON: I don't know. They're just very entertaining.

MR. CASS: Okay. And the entertaining -- would you agree with me the entertaining part is that you kind of get to see the whole crime? I mean, you get to see, usually, what happened? You know, what the crime was. Sometimes you get to hear -- you get to see the trial and then there's a decision in the case?

MS. JACKSON: Yes.

MR. CASS: Okay. Everybody agree, I guess it might not be as exciting or interesting to see those crime shows if you never got to know in the end what the decision was. Everybody agree with that? Well, in this case, we have a (indiscernible) that there was a death of a young lady, a tragic death.

And that can make anybody sad or maybe even angry. And possibly, because of that, want to hold somebody responsible. But you understand that you can only hold Mr. Whitfield responsible if you find every element beyond a reasonable doubt.

Can you all accept that the fact that at the end of the case you might not know that in this case who was driving this car that caused the death of this young woman? It may not --

you may not have an answer. Can everybody agree that they could accept that?

And Mr. Goldschmidt, if that occurred, what -- if you can't at the end of the case decide who was the driver, what would you do?

MR. GOLDSCHMIDT: If the Prosecution proved their case by a reasonable doubt, I'd vote guilty.

MR. CASS: But at the end of the case, let's say you didn't know. You know, part of their case, one of their --

MR. GOLDSCHMIDT: Well, then it wouldn't have been proven guilty.

MR. CASS: Right.

MR. GOLDSCHMIDT: Or beyond a reasonable doubt.

MR. CASS: Right. And understand, one of their elements in this case is identity of the person who was driving this car, who is responsible for that. So that, at the end of the case, what I'm saying, can everybody accept the fact that if they don't know, or they can't come to a conclusion, that their decision in that situation has to be not guilty. Can everybody accept that?

I guess my point being, can everybody -- anybody who thinks, well, we got to come to some resolution as to who did it in this case because we have a young lady that died. Anybody feel that way that they feel like that they'd have to come up with a result in this case.

Everybody accept the fact that sometimes, unlike on TV, you don't know who did it? Anybody have an issue with that? And I know this has been mentioned a couple times and that there will be law enforcement, multiple law enforcement officers testifying, deputies, in this case.

And the judge mentioned this earlier, can we all agree that law enforcement officers are no more believable than any other witness? Anybody feel because they're law enforcement or because of their training that they're likely to be more truthful than any other witness? Anybody feel that way?

Can we all agree that police officers have the same flaws as far as memory or truthfulness that any other witness can have?

And Ms. Warren, you shaking your head; you can agree to that?

MS. WARREN: Yes.

MR. CASS: Okay. One of the things that'll come up in this case -- well, let me go back to that; just a minute.

Mr. Thern, I know we went over with you your relationships with some of the deputies, even that may be testifying in this case. Again, I guess -- I know you said it before that you didn't care what they thought of your opinion, but could you -- if you actually were hearing their testimony and didn't believe them, could you give them that same scrutiny that you would give any witnesses?

MR. THERN: Oh, yeah.
MR. CASS: To make sure that they -- that you believe their testimony?
MR. THERN: Yes.
MR. CASS: Was it Ms. Wilson, I don't -- did you mention that you knew some law enforcement officers; is that right?
MS. WILSON: I'm sorry?
MR. CASS: Did you mention that you knew law enforcement officers as well?
MS. WILSON: Yes.
MR. CASS: And the same question, are you able to give an officer here the same scrutiny and subject under the same test as to their believability that you would any other witness? You have to answer so we get a record.
MS. WILSON: Oh, yes.
MR. CASS: All right. Thank you.
Now, one issue that I want to address is in a criminal case, the defendant has an absolute right not to testify against himself or in their case. However, in this case, Mr. Whitfield will testify.
Now, one thing I want to tell you upfront is that Mr. Whitfield does have a prior felony conviction. And I tell you that because I want to ask or get an assurance just -- and the judge will instruct you as to how you can use a conviction --

on the conviction an determining a person's credibility, believability.

But just knowing the fact that he has a prior felony condition, is there anyone that would just disregard his testimony, who would not listen to him or not believe him just based solely on the fact that I'm telling you that he has a prior felony conviction?

You all agree to subject him to the same test and -- of credibility that you would any other witness but be fair and listen to his testimony? Everybody agree to that? All right.

Ms. Christiansen?

MS. CHRISTIANSEN: Yes.

MR. CASS: Good morning.

MS. CHRISTIANSEN: Good morning.

MR. CASS: I don't think we heard much from you or if we heard?

MS. CHRISTIANSEN: No.

MR. CASS: Okay. Anything that's been raised that you would let us know about you? And Ms. Melnick mentioned, this is the time that if there's something that you -- maybe we haven't even asked the question but you're thinking, well, I have an issue with this, being here or deciding this case based on what I've heard so far, that you let us know now before you end up on the jury and then maybe it comes up later.

It'd kind of be too late then. We need to know now. And

I'm not saying that you have anything. I'm just saying if, to everybody in general, that this would be the time to raise that issue. Anything that we've discussed?

MS. CHRISTIANSEN: Nothing.

MR. CASS: Okay. Just a couple questions here. So I saw on your -- just (indiscernible) that you were a bartender manager?

MS. CHRISTIANSEN: Yes.

MR. CASS: Are you retired now or you're still doing that?

MS. CHRISTIANSEN: I'm retired.

MR. CASS: Where did you work at?

MS. CHRISTIANSEN: Shamrock Athletic Club.

MR. CASS: Pardon me?

MS. CHRISTIANSEN: Shamrock Athletic Club.

MR. CASS: Oh, okay. Where is that located?

MS. CHRISTIANSEN: In Dayton.

MR. CASS: Okay. How long were you there?

MS. CHRISTIANSEN: 10, 15 years. I worked in different things there. I worked in the kitchen as a cook and --

MR. CASS: Oh, okay.

MS. CHRISTIANSEN: -- so I just moved around there. (Indiscernible) probably about 10, 15 years.

MR. CASS: And the club, are the same people come in on a regular basis, that type of thing?

MS. CHRISTIANSEN: Yes.
MR. CASS: Kind of a friendship type --
MS. CHRISTIANSEN: Yes.
MR. CASS: -- of place? Okay.
And Mr. Cunningham, you've been -- you've had jury trials before?
MR. CUNNINGHAM: Yes, sir. Yes, I have.
MR. CASS: I guess, from my perspective, it might be interesting to be on the inside. And obviously, I mean, you're an attorney. So even though you do defense work, do you believe that you have the ability to listen to both sides in this case and be fair to the State as well as the Defense?
I know you mentioned, maybe I'd look at it from the Defense side, but you'd also look at it in the overall picture?
MR. CUNNINGHAM: Yes.
MR. CASS: Okay. So you believe you could be fair and impartial in deciding this case based on the facts?
MR. CUNNINGHAM: I'd do my best, yes.
MR. CASS: Okay. Mr. McDonald, how are you again?
MR. MCDONALD: Hello.
MR. CASS: I know you mentioned your concern about your job and your patients. And also, you mentioned something about your wife and you were on the same jury time or selected --
MR. MCDONALD: Yeah. Yes. She's in a -- she's down there.

MR. CASS: She's in this courtroom today?
MR. MCDONALD: Yes.
MR. CASS: Okay. You might have a lot, eventually, to talk about; although, you're not going to be allowed to talk if you're both selected in the jury.
MR. MCDONALD: Oh, I know. I know.
MR. CASS: Is that the perfect storm there, if that would happen?
MR. MCDONALD: Yeah, that's a -- that wouldn't be good.
MR. CASS: Okay. Well, but I guess, given that, are you willing -- you're able to sit on this jury to make a decision to be fair and impartial in this case? I know you may not want to.
MR. MCDONALD: Right. Well, there's more than that. For seven years, there's been a law passed that has a -- they call us MFLCs, Military and Family Life Counselor. We are essential workers, considered essential workers. And the law says I don't have to be here if I must work.
At least that's what my boss says, and she's the one who -- I trust her.
MR. CASS: You didn't bring you along, did you?
MR. MCDONALD: No, but I have her phone number. The other thing is we talked about biases and prejudices and we all have them.
MR. CASS: Right.

MR. MCDONALD: Whether it's bias towards oranges or tomatoes. My bias, which I can't just get rid of because it's there, is that if somebody gets this far, that person's probably guilty. That's my bias.

MR. CASS: But you realize --

MR. MCDONALD: So even though I try as hard as I can, my bias will remain.

MR. CASS: Okay. And I appreciate you. And that's, I think, something that people feel is that, you know, why else would Mr. Whitfield be sitting here if he didn't do something wrong. Is that a legitimate reason or a concern of anybody else? Anybody else want to mention that?

And I appreciate that. I guess you understand, as the judge said, that he's here because of any indictment, which is just a piece of paper that charges somebody.

MR. MCDONALD: I understand.

MR. CASS: And as far as him doing anything, what the law says or -- is that he's totally innocent as he sits there. That's what you have to believe. And only if the State meets its burden of proof, which is again, entirely up to them, can you change that or remove that presumption of innocence?

So can you sit here, I guess, starting out with not hearing anything and give him that benefit or that privilege that he has, that presumption of innocence?

MR. MCDONALD: I will try. But just listening to all

of the people who are going to testify or possibly testify for the State, already has increased my prejudice towards guilty.

MR. CASS: Because they're what, majority are law enforcement? Or because they --

MR. MCDONALD: No, just --

MR. CASS: -- have more witnesses?

MR. MCDONALD: a lot of witnesses.

MR. CASS: Right. And I guess, understand that those witness -- those are just people that could be involved for minimal reason. I mean, some of them just might be mentioned in a report, so now they're on the witness list so that if they needed them.

And you know the number of witnesses might be or should be, hopefully, considerably smaller than what that list is. And kind of going in my first thing I started out, the fact that they call more witnesses or call all the witnesses, would that affect your ability to be fair and impartial?

MR. MCDONALD: I don't know. Maybe.

MR. CASS: Fair enough.

MR. MCDONALD: I'd do my best to be fair and impartial.

MR. CASS: Okay. And that's all we can ask of anybody is to do your best.

Mr. Bruner, I didn't have a questionnaire for you, but you know, you answered a few questions. Anything that we've raised that you want to discuss or didn't get to?

MR. BRUNER: No, not offhand.
MR. CASS: Okay.
Ms. Wilson, we covered you pretty good.
Mr. Pettit? Let me find you here. And you work for -- is it the C Martin --
MR. PETTIT: Yeah.
MR. CASS: -- Company?
MR. PETTIT: C Martin Company. We're a contractor at the base.
MR. CASS: At the base?
MR. PETTIT: Yeah.
MR. CASS: Okay. But you're a civilian working at the base?
MR. PETTIT: Yes.
MR. CASS: Okay. How long you been doing that?
MR. PETTIT: Started in August.
MR. CASS: Anything that would affect your ability -- I know we had a discussion at sidebar. Other than that, anything that would affect your ability to be fair and impartial?
MR. PETTIT: No.
MR. CASS: All right.
Mr. Goldschmidt, I'm going to go back to you for a minute.
MR. GOLDSCHMIDT: Okay.
MR. CASS: First, I like the Bengals. We got two of you in the front rows.

MR. GOLDSCHMIDT: I'm kind of mad at them.

MR. CASS: Keeping your support, yeah, it's a little disappointing. But you wouldn't -- at the beginning of the year, I don't think you would expect to be watching them in the Super Bowl. At least I wasn't, so. At least that made it more interesting.

And they always seem to find a way to make it interesting and then lose in the Super Bowl, but. Anything -- well, we've covered a lot of areas with you. I guess the bottom line is, you know, can you listen to the all the evidence that's presented without, you know, what might be presented, what might not be presented and make a decision, a fair and impartial decision on --

MR. GOLDSCHMIDT: I think I could, yeah.

MR. CASS: Okay. You can give Mr. Whitfield the presumption of innocence that he deserves, correct, everybody deserves?

MR. GOLDSCHMIDT: I think I could.

MR. CASS: And the fact that the -- require the State to meet its burden in this case, understanding that they're the only person that has a burden in this case to prove; we have no burden.

MR. GOLDSCHMIDT: I understand.

MR. CASS: I know you kind of mentioned you

wouldn't -- you might be troubled by the fact that --

MR. GOLDSCHMIDT: Well, the --

MR. CASS: -- somebody wasn't called.

MR. GOLDSCHMIDT: If the Prosecution proved their case even though the big argument there --

MR. CASS: Okay.

MR. GOLDSCHMIDT: If the Prosecution proved their case, I would find the -- guilt --

MR. CASS: Guilty by it. Okay.

MR. GOLDSCHMIDT: If the Prosecution proves their case.

MR. CASS: Okay.

MR. GOLDSCHMIDT: That would just cause me a little doubt. That's -- I never really got to say that, but.

MR. CASS: Okay.

MR. GOLDSCHMIDT: But it would -- I mean, you know, I'm a human being, you know?

MR. CASS: Right.

MR. GOLDSCHMIDT: Why are --

MR. CASS: Everybody --

MR. GOLDSCHMIDT: If they prove they couldn't be there for a reason --

MR. CASS: Yeah. I think we all respect the fact that this is not an easy job for everybody. You know, you're coming in out from your daily lives, missing work, or what have you, your family. And then you're going to make a decision in this

case. And it's tough.

But everybody's willing to do that; to give Mr. Whitfield all the presumptions that he deserves because he is innocent as he sits here right now. And we submit that he will be innocent. But you will hold that State to its burden.

Ms. -- it Brenner or --

MS. EPPERLY: Epperly.

MR. CASS: Epperly, I'm sorry. You're okay with that if you're up there in the box? Okay.

Just a minute, Your Honor. I'll put this back on. Your Honor, I (indiscernible).

THE COURT: Thank you.

Ladies and gentlemen, the Court and Counsel is now going to go through a process for the selection of jurors. Some of you may be excused for unknown reasons. Some of you may be excused for no reason whatsoever.

Please understand these are simply the rules by which we operate it is no way in reflection of your ability to be a juror. And while we're doing this, I'm going to give you a break. And we're going to do this in the courtroom. So I am going to ask all of you to please vacate the courtroom

Before you do so, let me just give you instructions. Do not discus this case among yourselves or with anyone else. Do not permit anyone to discuss it with you in your presence. Do not form or express any opinion on this case or the morning

proceedings with anyone. And the case the will be submitted to those jurors later on.

Now, for -- if you need restrooms, there's restrooms outside the door here. There's restrooms one floor up. And there's restrooms down on the first floor. Also, for those of you that may need a little snack here before lunch, there are some vending machines in the basement in this building if you do go down.

What I'd like you to do is be back in the hallway in about 15 minutes, at 11:35. Don't come in the courtroom. Mr. Schmidt will come out and get you. But we'll be in recess until then. And Counsel, if you'd just take a couple and come back.

(Prospective jury exiting courtroom)

(Recess taken)

(Outside the presence of the prospective jury)

THE COURT: We are on the record in the courtroom outside the presence of the jury. We've completed voir dire examination. Now, we're going to proceed with the selection of the jurors. To let Counsel know it's the Court's intention to seek two alternates in this case.

We will begin with challenges for cause, starting with the State then Defendant. So is there any preliminary matters before we begin, Ms. Melnick?

MS. MELNICK: I only have one question. Are you

allowing us to excuse anybody on the chart? Or are we going with only the first 12?

THE COURT: Good question. I forgot that it's been awhile since you've been in my courtroom.

MS. MELNICK: Yes, it has. I apologize.

THE COURT: Challenges for cause are anyone within the first 21 that's actually on your panel sheet.

MS. MELNICK: Okay.

THE COURT: So we'll do all the challenges for cause. Now, when we get down to peremptory challenges, it'll be for the first 12 --

MS. MELNICK: Okay.

THE COURT: -- that we'll have. And the replacements will just go in order of the number of the jurors. I think we have -- we put number 22 into Juror Number's 6 seat. So if we do call anyone else, it will be number 23 and so forth from there. So that's the selection process we'll go through. Does that answer your question?

MS. MELNICK: Yes, I believe so.

THE COURT: You look confused.

MS. MELNICK: Well, are you saying that we would move whoever's in seat 13 into the 12 and then 23 would tag onto the end, or?

THE COURT: No. We won't do that until we've exhausted this list.

MS. MELNICK: Oh, okay.

THE COURT: We will exhaust this list. They will just move up one spot. That's what --

MS. MELNICK: Okay.

THE COURT: -- we will do.

MS. MELNICK: Perfect.

THE COURT: And once we've exhausted this list, I'm just telling you where they would come from.

MS. MELNICK: I --

THE COURT: If we exhaust this list. We may not get there.

MS. MELNICK: I agree.

THE COURT: All right.

Mr. Cass, any preliminary matters before we begin?

MR. CASS: No, sir.

THE COURT: All right. So we'll start with challenges for cause. We'll start with the State's first challenge for cause, if any.

MS. MELNICK: Honestly, the only one that I would challenge is Ms. Epperly. She seems pretty adamant that if she didn't hear from the two witnesses that she was going to speculate and not be able to fulfill her duties.

I know Mr. Goldschmidt also did, but he seemed to kind of rehabilitate himself at the end. I don't feel Ms. Epperly did that.

THE COURT: Okay. Any objections, Mr. Cass?

MR. CASS: Yes, I would objection. I think at the end she -- I asked her, specifically whether she could be fair and impartial. And she rehabilitated herself as well. I don't believe there's a basis for cause.

THE COURT: I'm going to overrule the exclusion. And the only reason I'm doing that is that her last statement, I think, as a whole, I have doubts. But I think her last statement she did say that she could be fair. So I'm going to overrule that.

Any other challenges for cause from the State?

MS. MELNICK: No, sir. Thank you.

THE COURT: Any challenge for cause from the Defendant?

MR. CASS: Well, just for the record, I -- Mr. Thern, who expressed his relationships with various deputies, some of which who will be testifying in the case. Although, he would -- you know, he did state that he could put that aside.

But given the fact that he has personal relationship with some of the witnesses, I think is cause to excuse him.

THE COURT: Any objection from the State?

MS. MELNICK: The State would object. While he did say he knew these people, he, in no uncertain terms, said he didn't care what any of them thought. And he would weigh the evidence fairly and impartially and do his job, so.

THE COURT: And again, based on what come out of Mr.

Thern's mouth that he could be fair and impartial, I'm going to overrule that objection.

Any other challenges for cause, Mr. Cass?

MR. CASS: No.

THE COURT: Now, I will turn to peremptory challenges; each side can have up to four. We'll do alternated challenges. And again, these challenges will be for the first 12. And then we will move them up accordingly as we go along.

So of the first 12, Ms. Melnick, any challenges -- peremptory challenge?

MS. MELNICK: Yes, Your Honor. Juror Number 2, John Cunningham.

THE COURT: Mr. Cunningham will be excused. And to Mr. Cunningham's place then would go Juror Number 13, which would be Courtney Vaughn.

Mr. Cass, I'll turn to you. Your first peremptory challenge?

MR. CASS: Your Honor, we'd excuse Juror Number 3, Mr. McDonald.

THE COURT: Mr. McDonald will be excused. And in Juror's Number 3 spot, then, would go Juror Number 14, Debbie Christensen. And if I make any errors as I go along, please, somebody speak up and let me know.

Turning back to you, Ms. Melnick, your second peremptory challenge, if any?

MS. MELNICK: That would be Juror Number 5, Dana Bruner.

THE COURT: Juror Number 5, Dana Bruner, will be excused. And into that spot, then, would go Juror Number 15, John Tutalo.

Mr. Cass, back to you for your second peremptory challenge, if any.

MR. CASS: Juror Number 6, Peggy -- or Barbara Wilson.

THE COURT: Juror Number 6, Barbara Wilson will be excused. And into that spot, then, would go Juror Number 16, Rita Schweiser.

All right. Back to you, Ms. Melnick, for your third peremptory challenge, if any.

MS. MELNICK: Juror Number 10, Walter Goldschmidt.

THE COURT: Juror Number 10, Walter Goldschmidt, will be excused. And into Mr. Goldschmidt's spot, then, would go Donald Schmidt, which is now Juror Number 17.

Back to you, Mr. Cass, for your third peremptory, if any.

MR. CASS: And we're just getting three; is that correct, Your Honor?

THE COURT: You get four.

MS. MELNICK: You get four.

MR. CASS: Four.

THE COURT: A total of four.

MR. CASS: I would excuse Juror Number 11, Linda

Jackson.

THE COURT: Juror Number 11, Linda Jackson, will be excused. And into that spot, then would go Juror Number 18, which is Patrick Tatman.

MR. CASS: I thought -- what happened to Donald Schmidt?

THE COURT: Donald Schmidt went into number 10.

MR. CASS: Oh, did? I'm sorry. Oh, you're right. Sorry, Judge.

THE COURT: I -- and before we go to the final peremptory challenge, I'll have my staff attorney read the first 12 that we have and remaining jurors that we have (indiscernible).

STAFF ATTORNEY: Justin Elrod; Courtney Vaughn; Debbie Christensen; Christopher Parker; John Tutalo; Rita Schweiser; William Pettit; Michelle Warren; Laura Porter; Donald Schmidt; Patrick Tatman; and Addie Blaja.

THE COURT: And that leaves three remaining; 19, 20, and 21.

All right. I will now go back to the State for your fourth and final peremptory challenge, if any.

MS. MELNICK: I think we'll pass.

THE COURT: State passes.

Mr. Cass, I'll turn to your fourth and final peremptory, if any.

MR. CASS: I'll pass.

THE COURT: Pass? So we do have our 12 seated jurors as previously read. We will now proceed to the alternates. Each of you will have one peremptory challenge for any of the three alternates that we have remaining here.

So I will turn first to Ms. Melnick. Do you have a peremptory challenge for any of the alternates?

MS. MELNICK: I do. Juror Number 20, Ms. Epperly.

THE COURT: Juror Number 20, Ms. Epperly, would be excused.

I will now turn to you, Mr. Cass. Do you have any peremptory challenges for the remaining two alternates?

MR. CASS: Yes, Juror Number 21, Taylor Thern.

THE COURT: And Mr. Taylor Thern will be excused.

So we are left with having to fill one other additional juror spot. And in order to do this, we will call Juror Number 23, which on my list, is Laura Scarzinski. And I will allow -- well, we're going to call more than that. But that would be the next one in line.

I would think if we bring in three additional jurors, there will be four and we could get one more out of that, I do believe. Does Counsel agree?

MS. MELNICK: Yeah, I think we could. I know that the Juror Number 24, we don't have a questionnaire -- am I -- you don't have one for her, do you? Mr. -- or Ms. --

MR. CASS: Gagonzali --

MS. MELNICK: -- gonzali?

MR. CASS: I do not.

THE COURT: All right. So you may need to inquire a little bit further.

MS. MELNICK: Yeah. I just wanted to make sure I wasn't missing one.

THE COURT: And then what I will do after you have the opportunity to inquire, I'll have Counsel come to sidebar. We won't move the jurors again. And you will have an opportunity for challenge for cause for those new jurors that you are questioning.

And then we'll have -- well, you've both had your peremps. So we just need to have one more seated. And it would just be a challenge for cause.

MS. MELNICK: I would agree with that.

THE COURT: Does Counsel have an opinion? Am I correct on this, that the only reason to excuse the next one would be a challenge for cause?

MS. MELNICK: I would agree.

MR. CASS: Yes.

THE COURT: Okay. Very well. Then what we'll do, Mr. Schmidt, is to bring all the jurors in, instruct them -- well, you need to seat them, don't you?

THE BAILIFF: And to do the musical chairs with them.

THE COURT: Yeah. Do the musical chairs. And then have Jurors Number 23, 24, and 25 have seat in the front row. Then we'll do the short inquiry and then we would complete that at sidebar.

Anything else from the State?

MS. MELNICK: No, Your Honor. Thank you.

THE COURT: Mr. Cass, anything further?

MR. CASS: No, sir.

THE COURT: I want to just take a moment and address Mr. Whitfield.

Mr. Whitfield, I noticed during the questioning that you raised your hand when you did not want to look at the autopsy photos. I appreciate that, but that's not appropriate for you to raise your hand; it was only for jurors, okay?

THE DEFENDANT : Yes, sir.

THE COURT: So I'm not upset. I'm just telling you for your own sake, you're bringing attention to yourself and you may not want to do that.

Also, when you talk to Counsel, you have an absolute right to talk to you counsel anytime you want. Try to keep your voice down a little bit, because I can almost hear you up here. And you don't want something that you say in confidence to go out. So get closer to your counsel if you need to talk to him or write it down, one or the other, okay?

THE DEFENDANT : Okay.

THE COURT: All right. If nothing else, I'm going to go in the back and let Mr. Schmidt seat the jurors. And then we'll come back out and proceed with the final voir dire.

Okay.

(Recess taken)

(Within the presence of the prospective jury)

THE BAILIFF: (Begins midsentence) -- is back in session. Please be seated.

THE COURT: Okay. We're making some good progress here. And let me do some housekeeping here first so we can clear out a little bit from the jurors. Those individuals that are standing right now, you have been excused, and you're free to leave.

You can be paid if you want to wait outside in the hallway. Mr. Schmidt will join you here momentarily. I do want to thank you for your service. Please do not turn away from serving on a jury. You'll find it is a rewarding experience.

So if you ever get an opportunity, don't shy away from it. So thank you for being here. But everyone that's standing can leave. Everyone else has to stay for a little bit.

Okay. Ladies and gentlemen, our next step is to do some additional inquiry. It won't take nearly as long as it did earlier. But there is three jurors that we have seated on the row behind counsel table.

The Counsel is going to ask you some questions, only you three. So everyone else in the courtroom can relax. You don't have to raise your hand or do anything.

So those three, Ms. Melnick, you may inquire.

MS. MELNICK: Thank you, Your Honor.

All right. So we have -- let me see. We have Laura, Dawn, and Alyssa, right? Okay.

Dawn, I do not have a questionnaire for you. So I'm going to very quickly just run through, again. I know they get misplaced.

So how old are you?

PROSPECTIVE JUROR: I'm 41.

MS. MELNICK: 41, all right. And are you currently employed?

PROSPECTIVE JUROR: Yes.

MS. MELNICK: Where --

PROSPECTIVE JUROR: I work for Clark County Child and Family Services, Child Support Division.

MS. MELNICK: Okay. What do you do for them?

PROSPECTIVE JUROR: I work in child support.

MS. MELNICK: Okay. And do you have any close -- well, I'll ask all three of you. Do any of the three of you have close friends in law enforcement?

PROSPECTIVE JUROR: No.

PROSPECTIVE JUROR: I have a cousin.

MS. MELNICK: You have a cousin? And is it local? Is your cousin local?

PROSPECTIVE JUROR: He's up in Toledo.

MS. MELNICK: He's in Toledo --

PROSPECTIVE JUROR: Ohio State Police.

MS. MELNICK: Okay. Does he discuss cases with you at all? Are you close with him?

PROSPECTIVE JUROR: Not super close. He's told me about one car accident. It's all he ever really told me. He's in the drug enforcement side.

MS. MELNICK: Okay. And is there anything about your relationship with your cousin that would cause you to think that you would kind of be weighing one side versus the other?

PROSPECTIVE JUROR: No.

MS. MELNICK: You think you can be fair and impartial?

PROSPECTIVE JUROR: Yeah.

MS. MELNICK: Okay. What about victims of crime? Have either of the three of you been a victim of crime? Or had a close family member that was a victim of crime?

PROSPECTIVE JUROR: My parents had a car stolen --

MS. MELNICK: Okay.

PROSPECTIVE JUROR: -- when I was an infant.

MS. MELNICK: Okay. So you're going to be the one, aren't you? So you may hear, again, when we talked about -- a little about this earlier. You may hear some testimony about a

theft that might've been involved in this case.

Again, this Defendant is not charged with that crime. But you may hear some testimony about that. Is that going to cause you any reason to think you're going to be swayed one way or the other?

PROSPECTIVE JUROR: No.

MS. MELNICK: Okay. All right. So I think one of the, obviously, the main conversation that we had earlier, is about whether or not the State may put on a couple of witnesses. And if the State proves all of the elements that the State is required to prove, and we will go through all of those with you at the end of the case, as will the Court, okay?

You're not going to have any question about what the State was required to prove, okay? And if the State is able to prove that without those other witnesses beyond a reasonable doubt, can all three of you agree that you would find the Defendant guilty?

(Nods in affirmative)

PROSPECTIVE JUROR: Yes.

MS. MELNICK: Okay. If the State doesn't prove its case, obviously, then I would expect that you would find the Defendant not guilty. Can you all agree with that?

PROSPECTIVE JUROR: Yes.

MS. MELNICK: Now, do any of you have a problem with what we talked about regarding the beyond a reasonable doubt,

that it's not 100 percent. Do you all agree with that?

(Nods in affirmative)

MS. MELNICK: That it's based on reason. It's based on common sense. If the doubt that you're coming up with is farfetched or not logical or not reasonable under the circumstances, you understand that kind of doubt, whether it comes from you or another member of the jury can be pushed aside.

It's got to be a doubt based on reason and common sense. Does that make sense? Okay. Can you all do that? Okay. And I guess, really, lastly, group setting, working together with 11 other people. I know that that can be extremely difficult when you have to come to a consensus. So this is why I started asking this question.

It's not something when I used to ask when I was younger. But I have learned that it can be extremely difficult. Do any of the three of you think you would have a problem with that? No? All right.

And then is there anything I haven't asked you? You've heard all of the stuff we've talked about all morning, both myself, Defense counsel. Is there anything that hasn't been asked that sitting in here that you're like, she's not asking but she might. She should be asking this question, but she's not asking.

Well, now I'm asking. I don't know what the question is,

but I'm asking if there's anything else that you've got going on in here that you think we need to know about based on what you know of this case and whether or not you would be the right juror for it. Anything?

Go ahead, Dawn.

MS. GONZALI: I have, you know, as the other gentlemen in here, you know, a bias. You know, knowing that there was fleeing and eluding from a police officer, to me, that doesn't sit well. To me, that's you're running from something. You're admitting guilt even when you're not.

I'm a big believer of, you know, you're supposed to stop when a police officer's telling you to stop. You know, you do it.

MS. MELNICK: Okay.

MS. GONZALI: And I have a big issue -- a big bias against the fleeing and eluding.

MS. MELNICK: Okay.

MS. GONZALI: You know, yeah, there might be scared circumstances happen. But I am -- I'm a big believer. If you're not stopping, you're admitting something.

MS. MELNICK: Okay. So it's fine to feel strongly about a kind of a charge, okay? The question is, because of what the charge is, are you automatically thinking that this Defendant is guilty before you hear the evidence?

MS. GONZALI: Probably, yes.

MS. MELNICK: Okay.

MS. GONZALI: You don't run unless you're hiding -- trying to hide something.

MS. MELNICK: I guess my point is, until you are presented evidence that he actually ran, it's just a charge on a piece of paper. I understand you may have a strong feeling about people who might be convicted of that charge at some point.

And that's completely fair. But my question for you is, before you have heard any evidence, I just told you he's charged with running. I haven't presented you a shred of evidence that he actually did. Okay, now, I tend to do so, but right now, as we sit here, I haven't presented any evidence to you.

So are you telling me just because of the nature of the charge, you have a bias in this case?

MS. GONZALI: I would say yes.

MS. MELNICK: Okay. That's fair.

Anything else from either of you? No, nothing? Do you have anything else you wanted to ask? Lisa?

PROSPECTIVE JUROR: No.

MS. MELNICK: Okay.

Your Honor, the State passes.

THE COURT: Mr. Cass?

MR. CASS: Is it Gonzali?

MS. GONZALI: Gonzali, yes.

MR. CASS: So remember I simply talked about the presumption of innocence that Mr. Whitfield starts out here, as everybody in any case does. We presume that he has not done anything at all. And that, I think what Ms. Melnick was eluding to is that there's an issue as to whether he was the one who fled from the police in this case. And there may be evidence that there was some kind of fleeing.

But whether Mr. Whitfield was responsible for it is an issue that will be contested, as well as the fact that he starts out that it's presumed that he was -- he is not guilty of anything at all, let alone that -- I guess, given that, you think you still would have an issue giving him that presumption and starting with, you know, relying solely what on -- what is presented on the stand and in the case?

Just because that -- I know and people can have an issue with people fleeing from the police that they're -- should stop when they're asked to do so; that's what the law requires. But would you hold it against him just because he's charged with that and not being able to be fair to him. That's the question.

MS. GONZALI: I mean, I could be fair to it. But I'm still having, you know, I have it in my head, that's, you know, (indiscernible) issue.

MR. CASS: The fact that he's sitting here charged with

that? All right. Fair enough.

Anybody -- and the other two, do you feel any similar thoughts in that area?

PROSPECTIVE JUROR: No.

MR. CASS: Okay. And both of you have no issue with the holding the State to their burden of proof in this case? That they solely have the burden of proof to prove every element beyond a reasonable doubt, you'll require them to do so?

PROSPECTIVE JUROR: Yes.

MR. CASS: And do you understand that we have no burden at all? We don't have to present any evidence, and you're okay with that? You could still find the Defendant not guilty even though no evidence is presented on his behalf? Both of you could do that? All right.

That's all, Your Honor.

THE COURT: May I see Counsel at sidebar?

(At sidebar)

THE COURT: I need you up here, too, Bob, in case.

All right. Before we get to the challenge for cause, I want to bring something to Counsel's attention. Mr. McIntosh, which is our first alternate, told Bob at the beginning that he's got Parkinson's and that he shakes badly.

So I thought it would come out once we did voir dire. It did not come out. He told Bob, again. And I think he said

that he was a little bit weak or could get weak. Again, he did not bring it out. So I'm bringing it out now to see whether or not you want to inquire of him. I'll allow that to go back to him, or we just ignore it and we go on.

I'm a little bit concerned about getting into the trial and something happening to him since we only have two alternates. So I wanted to bring it to your attention. I notice he is shaking a lot. Bob could relate to him because Bob's got Parkinson's and but I don't know why he didn't bring it up when we asked.

MS. MELNICK: (Indiscernible).

MR. CASS: And who (indiscernible).

MS. MELNICK: Well, I mean, we've got three people sitting here and --

MR. CASS: Right. I wouldn't be opposed.

MS. MELNICK: (Indiscernible) with the other two.

MR. CASS: (Indiscernible).

MS. MELNICK: Yes.

MR. CASS: The other two? Yeah --

MS. MELNICK: Yeah, that's fine.

MR. CASS: -- I'd be okay with that if (indiscernible).

MS. MELNICK: We can just excuse --

THE COURT: Okay.

MS. MELNICK: --him. And that's Scarzinski and you can make your motion on Gonzali. The State notes that she really

didn't have much (indiscernible) --

THE COURT: Okay.

MS. MELNICK: (Indiscernible) --

THE COURT: I want the record to be very clear. The only statements that this juror has made is to my bailiff and my personal observations of him.

MS. MELNICK: Okay.

THE COURT: So and --

MS. MELNICK: We can --

THE COURT: -- Bob, come here just a minute. What exactly did he tell you when he talked to you about his Parkinson's?

THE BAILIFF: Well, he told me (indiscernible) that he's got Parkinson's. And I told him, I said, I do, too. And you know, I watched him; he is shaking, like, actually a little more so. And he just said he -- sometimes it makes him weak; it does me, too.

MS. MELNICK: If you would like us to inquire him, you can call him over. I don't know. I don't have any problem with agreeing excusing him.

THE COURT: I don't want him raising an issue, I guess, more than anything that, you know, he was here and wanted to sit as a jury and we let him go. I mean, that's the only thought in my mind.

MS. MELNICK: Do we want to bring him up?

THE COURT: Well, that's what I was thinking to see what --

MR. CASS: That seems fair.

THE COURT: Okay. Have Mr. McIntosh come over here. I don't want --

THE BAILIFF: Mr. McIntosh, just come up and (indiscernible).

THE COURT: Come right up here, Mr. McIntosh. Come right up here. Come -- so get closer to the mic.

MR. MCINTOSH: Oh, okay.

THE COURT: That's the only reason I want you up here. Mr. McIntosh, I didn't want to embarrass you or anything, but my bailiff did tell me that you informed him that you've got Parkinson's.

MR. MCINTOSH: Right.

THE COURT: And that sometimes you get weak. Counsel has agreed to excuse you if you'd like to be excused from this jury.

MR. MCINTOSH: I want to.

THE COURT: Okay. That's all you need to say. You can go ahead and you are free to go. And you are excused. And we thank you for being here.

MR. MCINTOSH: Thank you.

THE COURT: Okay.

MS. BRUDER: Thank you.

MS. MELNICK: Thank you.
THE COURT: Bye-bye.
Okay. Counsel, then, we have potential alternates. And I will first start with challenges for cause for any of them. Let's do that.
State?
MS. MELNICK: The State doesn't.
MR. CASS: (Indiscernible) asked her a number of questions about the failure to comply (indiscernible).
MS. MELNICK: Yeah --
THE COURT: Any --
MS. MELNICK: -- and I have no objection.
THE COURT: All right.
MS. MELNICK: I tried to rehabilitate and she had a problem with that, too, so.
THE COURT: And the Court agrees. And I will excuse, for cause -- joint cause, or a cause by the Defendant without objection, Juror Number 24.
Any other challenges for cause from either side?
MR. CASS: No.
MS. MELNICK: No.
THE COURT: So we are in agreement, then, that we have our jury panel; that the first alternate is Laura Scarzinski and the second is Alyssa Schulte; is that correct?
MR. CASS: Yes.

THE COURT: And do both parties agree that we do have the jury seated in this case?

MS. MELNICK: Yes.

MR. CASS: We do.

THE COURT: All right. What I plan on doing here is excusing everyone else. I'd like to go ahead and read the preliminary instructions to them before we break for lunch.

MS. MELNICK: Okay.

THE COURT: Then maybe start back up at 1:30. Would that work?

MS. MELNICK: I think our witness -- our first witness is due at 1:30. So we can start off, do openings, and roll right into testimony.

THE COURT: Okay. That's what I plan on doing --

MS. MELNICK: Perfect.

THE COURT: Yeah. I'm not going to do openings this morning.

MS. MELNICK: Yeah.

THE COURT: I'm just going to read the instructions and we'll start right at 1:30.

MS. MELNICK: That's just perfect.

THE COURT: Okay.

MS. MELNICK: Yeah.

THE COURT: All right. So you want to have those two ladies seated up in the jury box.

UNIDENTIFIED SPEAKER: Okay.

THE COURT: You know which ones, right?

UNIDENTIFIED SPEAKER: Yes.

THE COURT: Okay.

(End sidebar)

THE CLERK: Laura Scarzinski, I'm going to have you take a seat right here in this first chair next to Ms. Blaja.

And Alyssa Schulte, I'm going to have you sit right next to her.

THE COURT: Okay, ladies and gentlemen. I got good news and bad news for you. Good news is we have a jury. Bad news is we have a jury, depending on which side you're on, okay? But we do have a selection of the jury present. So here's what we're going to do.

Everyone who's not seated up here in the box, I am going excuse you at this point in time with our thanks. I'm going to send you out in the hallway and Mr. Schmidt will join you momentarily. He's got a function to perform in here in the courtroom real short. And then he'll be out and direct you where you can get paid.

We certainly appreciate you being here. But we wanted to get you out of here before the lunch hour and not hold you over. So everyone in the back's free to go. You folks over here just hang on a minute.

(Pause)

THE COURT: Okay. Ladies and gentlemen, let me explain to you where we're going to go from here. The first thing that's going to happen is my bailiff is going to swear you in as the jurors for this case.

I am, then, going to give you a short explanation of what the trial is about just so you've got an idea of what to expect. Then, I'm going to release you for our lunch hour. Mr. Schmidt will take you back to the juror room. He will give you passes and give you instructions of how to get in and out of the courthouse and let you know where you can go eat and so forth.

We will probably feed you Thursday. Don't get mad at me if something falls apart. But that -- I usually try to do that. It's hard to do it the first day because we don't know where we're going to be at or where we're going to end up. So we're going to release you to go get something to eat.

He will give a list of every place right around us to get something to eat. And then, what we're going to do is we're going to reconvene at 1:30 this afternoon. And at 1:30 we will go into the trial. We will begin with opening statements by both sides. And then we will begin the testimony.

So with that, I'm going to ask all the jurors in the box to please stand and raise your right hand as the bailiff administers the oath.

(Jurors sworn)

THE BAILIFF: Please be seated.

THE COURT: And so you've all taken the oath. You all are jurors. I want to go over with you a little bit of explanation. Jury service may be strange to you. So a short explanation of certain fundamentals and rules of procedure are in order.

Those that participate in a trial must do so in accordance with the established rules. That is true of the witnesses, lawyers, and myself as judge. It is equally true as you as jurors. For instance, jurors are not permitted to take notes during the course of the trail.

The taking of notes may distract you from evidence as it is presented. Also, no matter how much you would like to ask another question or two of the witnesses. It is the responsibility of the lawyers to present all the evidence necessary for you to decide the issues in the case.

The lawyers present the evidence according to the rules. The judge enforces the rules and determines what evidence may be admitted. From time to time, objections may be made by Counsel. It is the duty of the Court to rule on what evidence is admissible.

You must not draw any inference for or against any party from questions which the Court does not permit to be answered. Nor should you concern yourselves with the reason for that rules by the Court. Since you did not know the answers to such

questions, to speculate on what the might have been is tantamount to inventing evidence and being unfair to one of the parties.

Further, you must disregard any of the evidence which the Court orders to be stricken. You'll be the sole judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony and exhibits.

Later, the Court will instruct you regarding the law. And you will apply that law to the facts. It is your sworn duty to accept the law as given to you by the Court. The procedure for the trial is as follows: first, Counsel will outline what they expect their evidence to be. These are called opening statements.

Opening statements are not evidence. But they are a preview of the claims of each party designed to help you follow the evidence as it is presented. Second, the State will then present its evidence. Third, the Defendant will follow the State if he wishes to present evidence.

Fourth, the State has a limited right to present rebuttal evidence at the end of the Defendant's case. Last, the trial concludes with the arguments of Counsel and the instructions of law by the Court.

From time to time, during the trial, the Court may call a recess for reasons not readily apparent to you. Sometimes questions of law arise which must be discussed by Counsel and

the Court outside of your presence. We may try to resolve these questions in what we call bench or sidebar conferences that you've already seen this morning.

Also, the Court may be required to dispose of other business not connected with this case. We will try to keep these interruptions to an absolute minimum. An example of that will be on Wednesday. Tomorrow we won't be in trial because the Court has other duties that I must attend to.

This explanation is made to you now so that if these incidents do occur, you understand and appreciate the necessity of a delay or interruption. We try to adhere strictly to the schedule as set. So please be prompt in arriving for the beginning of each session.

Our sessions will begin the morning. And I will tell you the day before what time to be here. Generally, that'll be around about 8:30, the same time that you were to be here today. We'll go up to about noon thereabouts, depending on where we are with the witness.

We'll take our lunchbreak, which is about an hour. And then we will conclude in the afternoon, somewhere around 4:30, 5:00. Again, that depends on where we are on the testimony. It could be a little sooner; it could be a little bit later.

There will be a recess in the middle of each session for your personal comfort and convenience. Now, it is important that you be fair and attentive throughout the trial. Do not

discuss the case among yourselves or with anyone else. Do not permit anyone to discuss it with you or in your presence.

Do not form or express any opinion on the case until it is submitted to you. You will receive the opening statements, the evidence, the arguments, and the law, in that order. It is unfair for you to discuss the case among yourselves before you receive everything necessary for your discussion.

You should explain this rule prohibiting discussion of the case to your family and friends. When the trial is over, you'll be released from this instruction. At that time, you may, but are not required, to discuss the case and your jury experience.

Do not converse with the attorneys, parties or witnesses until the trial is completed. Likewise, the participants in the trial must not converse with you. If you happen to pass one of the attorneys on the street or in the hall in the lobby during the course of the trial and they do not speak to you or just nod their head, don't be offended.

They're not being rude; they're simply following the instructions of the Court. If anyone does attempt to discuss the case with you, report that incident immediately to the Court, the bailiff, or the Court's technician officer.

Now, you may not investigate or attempt to obtain additional information on this case outside this courtroom. All of us now use internet services, I do believe. But you may

not attempt to search for or obtain any information on the world wide web.

You may not use any electronic device or media, such as the telephone, cell phone, smartphone, iPhone, Blackberry, computer, the internet or any internet service, any text or instant messaging service, any internet chatroom, blog or website, such as Facebook, Myspace, LinkedIn, YouTube, Twitter, to conduct any research about this case.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate.

My instruction is probably a little bit old because some of the devices I don't know if they even make them or not. But I do emphasize this greatly because it is our common nature now, then when we have a question, we pick up our phone, talk to Siri, talk to Alexa, get information. You absolutely cannot do that. That's a violation of law and a violation of the order of the Court to do any research whatsoever.

Any violation of these orders may cause for a new trial or may require the imposition of a penalty for disobedience. If you experience a personal problem, you may explain the matter to the bailiff or the Court's technician officer. The Court will be informed promptly.

Now, portions of these instructions will be repeated at each recess. However, even if not given at each recess, they will apply to your conduct throughout the trial.

Ladies and gentlemen, that concludes my preliminary instructions. I'm going to release you to the bailiff. He's going to give you some additional instructions back in the jury room. And if you would be back in the jury room a couple minutes before 1:30 so we can try to start promptly at 1:30.

We'll be in recess until then.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Outside the presence of the jury)

THE COURT: All right. Jury has departed.

Anything further from the State?

MS. MELNICK: The only thing I was going to do while we're on the record, so I don't lose this, is mark the stipulations as Joint Exhibit 1 and turn those over to the Court.

THE COURT: Very well. And we've gone over that this morning and I -- all of the signatures of Counsel are on those. And at the appropriate time, Ms. Melnick, you can just read those to the jury.

Ms. Melnick, is there anything further from the State?

MS. MELNICK: No, Your Honor. Thank you very much.

THE COURT: Mr. Cass, anything further from the

Defense?

MR. CASS: No, sir.

THE COURT: All right. See you all back at 1:30.

(Proceedings adjourned for lunch at 12:15, recommencing at 1:28 p.m. in Volume II)

* * *