5/17/2022 COURT SUBMITTED ELECTRONIC TRANSCRIPT OF PROCEEDINGS FILED
36317981

ELECTRONICALLY FILED
COURT OF APPEALS
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Tuesday, May 17, 2022 12:30:11 PM
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

**IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO**

**STATE OF OHIO,**

**Plaintiff,**

**-vs-**

**CALEB WHITFIELD,**

**Defendant.**

**CASE NO. 2021-CR-01185**

**CA No. 029442**

**TRANSCRIPT OF PROCEEDINGS**
**(SCHEDULING CONFERENCE/ FINAL PRETRIAL/JURY TRIAL)**

**VOLUME II OF IV**
**(Pages 144 - 378)**

PRESIDING: Hon. Dennis J. Adkins

APPEARANCES:

ON BEHALF OF THE STATE
Kimberly Melnick, Esq.
Lisa Bruder, Esq.
Montgomery County Prosecutor's Office
301 West Third Street
Dayton, Ohio 45402

ON BEHALF OF THE DEFENDANT
John Pinard, Esq.
Pinard and Bryan Law
120 West 2nd Street -Suite 603
Dayton, Ohio 45402

William O. Cass, Jr., Esq.
Law Office of William O. Cass, Jr. Ltd
1250 West Dorothy Lane - Suite 203
Kettering, Ohio 45409

J. David Turner, Law Office
J David Turner, Esq.
101 Southmoor Circle NW
Kettering, Ohio 45429

DATES: September 16, 2021; October 13, 2021; October 27, 2021; February 16, 2022; February 22, 2022; February 24-25, 2022; March 16, 2022

ELECTRONICALLY
RECORDED BY: Electronically Recorded

TRANSCRIBED BY: Michelle Serdynski Oh; Linda McCurdy

* * *

TABLE OF CONTENTS

Opening Statement by the State........................ Page 159
Opening Statement by the Defense...................... Page 162
Testimony............................................. Page 215

* * *

## INDEX TO EXAMINATIONS


| State's Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| 1) Donte Dixon | 216 | 223 | | |
| 2) Bryan Statzer | 225 | 262 | | |
| 3) Bryan Casto | 166 | 187 | | |
| 4) Mbaga Walusimbi | 189 | 208 | 212 | 215 |
| 5) Jay Vitali | 282 | 308 | | |
| 6) Benjamin Hale | 311 | 331 | 335 | 336 |
| 7) Kent Saunders | 338 | 355 | 361 | |
| 8) Steve Parin | 363 | 374 | 376 | 377 |

* * *

| Defense Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| None | | | | |

* * *


## INDEX TO EXHIBITS


| State's Exhibit: | ID | ADM |
|---|---|---|
| 1 through 16 - Photographs | 171 | XX |
| 17 through 21 - Photographs | 236 | XX |
| 22 - Video | 245 | XX |
| 55 - Photograph | 219 | XX |
| 23 - Video | 292 | XX |
| 24 - Video | 317 | XX |
| 25 - Video | 325 | XX |
| 26 - Photograph | 370 | XX |
| 27 - Photograph | 370 | XX |

INDEX TO EXHIBITS (CONTINUED)


| State's Exhibit: | ID | ADM |
|---|---|---|
| 28 - Photograph | 370 | XX |
| 29 - Photograph | 370 | XX |
| 59 - Video | 304 | XX |

* * *

| Defendant's Exhibit: | ID | ADM |
|---|---|---|
| A - Photograph | 265 | XX |

* * *

(Tuesday, February 22nd, 2022, at 1:28 p.m.)

(Outside the presence of the jury)

(At sidebar in chambers)

THE COURT: Okay. We are on the record in State of Ohio vs. Caleb Whitfield case, I have Juror Number 12, Ms. Plachette (phonetic) in my chambers, along with counsel.

Mr. Cass, first of all, you waive your client's appearance for the purpose of this inquiry?

MR. CASS: I do.

THE COURT: Ms. Plachette, it was brought to my attention by my bailiff during the break that you brought some issues up to the bailiff that you failed to bring up during the voir dire this morning that may cause you some concern you believe sitting as a juror. Would you please tell me what those concerns are?

MS. PLACHETTE: Yeah, so I have severe PTSD from being sexually abused as a child and I really was like okay the whole morning and I like answered every question honestly.

I genuinely believe I was okay with seeing like the pictures from the coroner and stuff, and then I got to my car and I had a panic attack and I just became really overwhelmed thinking about all the process of it, and then I also have an adopted nephew who's African American and I just kept looking at that young man in there and I just don't know if I can make a decision.

Like I don't know. I just kept seeing my nephew in him and that just really -- I don't know. It was really hard for me to process and I don't know if it's just overwhelming because I had time to sit and like think about every. But I just I don't know. The more I think about it, just sitting in there and having to see those pictures and stuff it's just really getting to me.

So I wanted to talk to your guys and I don't know what -- I don't know.

THE COURT: Well, you put me in a very difficult position to be honest with you --

MS. PLACHETTE: Yeah.

THE COURT: -- because that's what why we go through voir dire. Because we only have two alternates and this is something you should have brough up when we were out there, and I understand how these things can be triggered. But the only thing we're asking of you and it's the same with anyone, all of us has baggage that we carry with us. All of us have issues that affect us in our --

MS. PLACHETTE: Yeah.

THE COURT: -- daily lives, me included. But this is just a matter that you've just got to listen to what the evidence is from the State as matter of fact and decide this case based on what you hear. You've got to set aside any emotions that you've got and just hear the evidence.

MS. PLACHETTE: Yeah.

THE COURT: It's not that difficult of a job. It's you looking, you listen to the evidence, you decide collectively with the other members of the jury whether or not the State has met their burden or not --

MS. PLACHETTE: Yeah.

THE COURT: -- and it's a simple as that. Now, in any trial especially when you have a homicide there are some things that are unpleasant. There's going to be some unpleasant testimony that probably you're not going to like, I'm not going to like, and the attorneys aren't going to like them hearing, but that's just the nature of what we do and you're just as qualified as anyone to hear this case.

And I just need to know is this something that is really going to put you over the edge, then let me know, or if it's something that you think you can handle, I need to know that too.

MS. PLACHETTE: I really thought I could handle it and that's why didn't say anything because I am an adult and I sat and that I made that decision because I genuinely didn't have any issues, but I don't -- I don't know. I'm sorry. I'd really like to get it together.

THE COURT: If you're having trouble breathing, you can lower your mask if need to.

MS. PLACHETTE: Thank you. I don't want to put you

guys in a bad position, you know what I mean?

THE COURT: Well, if you can't do it, you can't do it. You -- it is difficult and I'm being honest with you. That's why we --

MS. PLACHETTE: I know, I understand that.

THE COURT: That's why we spent all morning --

MS. PLACHETTE: I know --

THE COURT: -- asking questions.

MS. PLACHETTE: -- and that's why I'm just beating myself up, but I genuinely did not feel any of those feelings until I like got my lunch and I sat in my car, and then it just really, really hit me.

THE COURT: You think with a little bit of time you'll be okay?

MS. PLACHETTE: I don't know. I think I need to just like -- I don't know. I think I need to leave. I don't think I can do it and I'm really sorry because like I always thought like this is --

THE COURT: Let me ask you a question.

MS. PLACHETTE: -- your job as a United States citizen.

THE COURT: What's going to happen if I don't release you and you're allowed to sit there?

MS. PLACHETTE: I'm worried I'm going to have panic attacks and I don't want it to cause issues in the trial if like (indiscernible) and have panic attacks where I become very

upset and have to like sometimes I hyperventilate to the point to where I sometimes go to a hospital. Like I don't want to be in a position where it becomes like an even bigger ordeal than if I was just --

THE COURT: What normally would happen we'd remove you to the hospital, we suspend the trial, and we'd bring you back once you have been treated.

MS. PLACHETTE: Yeah.

THE COURT: So if that happens that's what we would do.

MS. PLACHETTE: I'm sorry.

THE COURT: Like I tried to explain to everyone out there, trials are very, very serious business and that's why we go through this process and spend so much time to get people to be honest with us out there when we ask questions. I understand you didn't feel the need to do it at the time, this has come onto you afterwards, but I've got to suspect that you had some inkling of this. You certainly knew about you have an African American as a child you've adopted.

MS. PLACHETTE: I nephew. Yeah.

THE COURT: A nephew.

MS. PLACHETTE: And (indiscernible)

THE COURT: Do they live with you?

MS. PLACHETTE: Yeah, we live in -- I live in the household with him. Yes.

THE COURT: Okay. Well, obviously you -- how old is

your nephew?

MS. PLACHETTE: He's seven.

THE COURT: Well, you leave me in a very difficult situation here, ma'am. I'm going to let the attorneys ask you some questions.

MS. PLACHETTE: Okay.

THE COURT: I'll start with you, Mr. Melnick, do you have any questions?

MS. MELNICK: I do, Your Honor. Thank you.

I guess my question is if you look at the photos and you need a minute to gather yourself, is that going to be helpful. I mean the coroner is going to be on and off early in this case and those are the only terrible pictures that you will have to see.

MS. PLACHETTE: Okay.

MS. MELNICK: There will be some photos of other people that I mean they're injured people, but it's --

MS. PLACHETTE: Yeah. No.

THE COURT: -- it's not, you know, awful. It's the coroner pictures that are -- that are the hardest so, you know, if we get through the coroner and the Court were to take a break and give you a chance to calm down, would that be helpful?

MS. PLACHETTE: Yeah, I would say so.

MS. MELNICK: And then my other question is, and I

think honestly a bigger concern for me is that you're telling us that your -- before you've heard any evidence on this case, you're feeling sympathy towards the Defendant because you have an African American nephew.

MS. PLACHETTE: I wouldn't say that. I truly believe that I would listen to all the evidence and come up with -- like I would only base my opinion on the facts. But like there's going to be like I feel emotion with it, but I don't think I'm going to base my decision off of emotion, if that answers your question.

MS. MELNICK: Well, it does, but it doesn't because --

MS. PLACHETTE: Okay.

MS. MELNICK: -- you said you don't think you will.

MS. PLACHETTE: Yeah.

MS. MELNICK: And we need assurances that you're not going to base your decision off emotion. This is purely has the State --

MS. PLACHETTE: No, I get what you're saying.

MS. MELNICK: -- presented the facts --

MS. PLACHETTE: Yeah.

MS. MELNICK: -- that are beyond a reasonable doubt, and your nephew can't come into play. There are some African American people on the jury, they're going to have to look at this --

MS. PLACHETTE: (Indiscernible)

MS. MELNICK: -- they have African American family members --

MS. PLACHETTE: Yeah.

MS. MELNICK: -- and they are left on the jury. This isn't about race --

MS. PLACHETTE: Yeah.

MS. MELNICK: -- so you cannot equate it to that.

MS. PLACHETTE: Yeah.

MS. MELNICK: I mean if -- do you have any other nieces and nephews?

MS. PLACHETTE: No, he's my only one.

MS. MELNICK: Okay. Well, my question is are you going to be able to separate the emotions you have about your nephew? He's not the Defendant.

MS. PLACHETTE: Yeah.

MS. MELNICK: Your nephew is seven years old he -- you know, the State's going to present evidence to you that --

MS. PLACHETTE: Yeah.

MS. MELNICK: -- we believe that this person did certain things. No one is claiming your nephew did any of those thing.

MS. PLACHETTE: No, I understand that.

MS. MELNICK: So my question is can you set that aside and stop feeling some kind of connection between your nephew and this Defendant so that we have confidence that your verdict

is based on the facts and not your emotions about your nephew?

MS. PLACHETTE: Like, yes, I think like I don't know. I'm sorry. I'm like a little (indiscernible)

THE COURT: Mr. Cass, do you have any questions?

THE WITNESS: I'm sorry.

MR. CASS: I think we all appreciate this is difficult. I guess your -- I think the big question Ms. Melnick asked you whether you can just decide the case on the facts --

MS. PLACHETTE: Yeah.

MR. CASS: -- and not let, you know, what your -- you know, what you have at home come into play in making your decision here and sympathy because every juror --

MS. PLACHETTE: Yeah.

MR. CASS: -- is asked to put that aside and even on the opposite side if they feel for the victim or what have you. But and it seems like when you sit here for a minute and you can collect yourself some and better once you got this off your chest and, but if you -- I think what the Judge needs to know or we need to know is that you can sit in there and kind of listen to everything and at the end of the day, make a fair impartial decision on this case.

MS. PLACHETTE: I want to say I can because I don't want to put your guys in a bad position, but don't also want to be in a bad -- like I want to be what's fair to you guys.

MR. CASS: Right.

THE COURT: All right. Let's forget about putting us in a bad position. Okay. That's for me to worry about.

MS. PLACHETTE: Okay.

THE COURT: I need to hear from you whether or not you think you can do this or not.

MS. PLACHETTE: I don't think I can. I'm really sorry.

THE COURT: All right. (Indiscernible) out here in the back and stay here (indiscernible) stay right here.

(Jury Number 12 exiting chambers)

THE COURT: Well, I'm still on the record and I will say this. I don't believe her, I think she's making it up, but I think that she will continue to do this and be a disruption and she's not saying the words that we need to have to have a fair and impartial juror. Ms. Melnick, your response?

MS. MELNICK: Yeah, I agree with you. She's able to calm down when she needs to. I think she's just having second thoughts about wanting to do this, what her actual reasons may be we'll never know. But I agree she's not saying -- she's saying that she can't do it, and if she's saying that she can't set his stuff aside and be fair and impartial, I don't know how we can leave her on.

THE COURT: Mr. Cass?

MR. CASS: I'll defer.

THE COURT: Okay. You're not objecting (indiscernible)

MR. CASS: (Indiscernible)

THE COURT: Like I said I hate to do it. She's really put us in a bad position and I'm saying this clearly on the record I do not believe her, but I -- it's better to be safe than sorry. I've got to look out of for the Defendant's rights, and I think that she could have an affect upon the other jury pool. That concerns me so with that, I am going to excuse her. Anything before we go off the record?

MS. MELNICK: No. Thank you.

MR. CASS: No.

(End sidebar in chambers)

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: Thank you. Ladies and gentlemen, the record should reflect that that all members of the jurors are back. Ladies and gentlemen, I have to start out I don't -- I hate to do this start out with apologies to you about the delay in starting. There was a matter the Court had to resolve and that's been taken care of so as I said before lunch we're going to begin with opening statements from both parties and then we will begin with the testimony thereafter.

So with that, I'll turn to the State, you may proceed with your opening statement, Ms. Bruder.

MS. BRUDER: Thank, Your Honor. Please the Court,

Counsel, ladies and gentlemen of the jury, thank you for your time today. I'm here before you today to tell you about Rodnesha Thompson. We are here today because Rodnesha Thompson was killed in a horrible car crash. We're also here for Joseph Hespeth and Jelani Shackelford. Those two individuals were also involved in the same car crash and suffered severe physical injuries.

You will hear testimony from Det. Statzer that on June 25th of 2020 he was on patrol. He was near North Dixie Drive in Harrison Township, about 3:45 in the afternoon when he noticed a black Ford 500, and Det. Statzer will tell you that he recalled seeing that vehicle listed as stolen. As he approached the vehicle, he was able to confirm that that vehicle was indeed stolen.

You will hear how Det. Statzer and Sgt. Vitale attempted to pull that vehicle over and the driver of that vehicle fled. That vehicle fled down North Dixie Drive in excess of speed of 80 to 100 miles per hour in crowded traffic. That reckless speed was unable to be maintained, and that driver of that vehicle skidded, struck a building, crashed and landed on the hood of the vehicle on the corner of Hillsdale and North Dixie Drive.

About six to seven seconds later this Defendant, Caleb Whitfield is seen emerging from the driver's side of that vehicle. He continues to flee on foot and deputies give chase

who eventually tase and apprehend him. We know this because the crash itself is captured on video and we will show you that video.

We know that Rodnesha Thompson was the front seat passenger in this vehicle and she was trapped inside, and you will hear from the coroner regarding her fatal injuries. Joseph Hespeth and Jelani Shackelford were occupants in that vehicle and you will hear about their severe physical injuries.

You will hear about how DNA was collected and from the DNA expert.

The only issue in this case as Defense has pointed out during voir dire is who was driving, and the State will prove to you beyond a reasonable doubt that this Defendant, Caleb Whitfield was the driver of that vehicle, as a result of Defendant's actions, he was charged with one count of vehicular -- excuse me -- of aggravated vehicular homicide for causing the death of Rodnesha Thompson

He was charged with two counts of vehicular assault, one for the severe injuries called -- caused to Joseph Hespeth and one for severe injuries cased to Jelani Shackelford. He was charged with failure to comply with the order or signal of a police officer when he drove in excess of 80 to 100 miles per hour, and for resisting arrest when he fled from the police.

Ladies and gentlemen of the jury, the Defendant's actions are so reckless that when drove at such high rates of speed

down North Dixie Drive in crowded traffic he could not maintain control and control he did not maintain. He caused that vehicle to crash and by doing so he caused severe physical injuries to Joseph Hespeth and Jelani Shackelford and he caused the death of 18 year old Rodnesha Thompson.

Thank you for your time.

THE COURT: Mr. Cass.

MR. CASS: Ladies and gentlemen of the jury, good afternoon. On behalf of Caleb and myself I thank you in advance for the time and effort that you're going to put into this case. I know this is an inconvenience for all of you to be here, but I think you all know how important jury duty is to our American criminal justice system and hopefully I think at the end of it you're going to feel rewarded for your experience and, but we thank you in advance for your time.

So some facts are not in dispute. I mean June 25th, 2020 there was car chase. Det. Statzer saw a stolen car and chased it as along as you'll hear with other officers that led to a crash and it was a terrible crash, you'll see it. If you watch NASCAR, it looks reminiscent of one of the worst crashed you might see in NASCAR event with the car flipping and at a high rate of speed and tuning over onto its hood.

I think you can -- you will get a good idea of what that kind of crash would do to the occupants inside and unfortunately one of the occupants and the passenger -- front

passenger seat was Rodnesha Thompson who lost her life as a result of that crash and -- you know, and ironically, she was only -- I think the evidence will show she was the only restrained passenger in the car.

But where were other people in the car and it's not disputed Caleb Whitfield was in the car, but there's two other occupants as well, Jelani Shackelford and Joseph Hespeth. They -- those three -- they have to show one of them was driving, wasn't Rodnesha Thompson. We know that she was restrained in her seat.

But just because Mr. -- that Caleb was the first one out of the car doesn't mean he was the driver, and again this is an issue that the Stage bears solely the burden to show beyond a reasonable doubt. And Caleb did get out of the car and ran away, but we'll submit the evidence will give you other reasons why Caleb got out of that car and why he ran.

But I think maybe tragically or unfortunately for Caleb what happened then was that the police in this case, the sheriff's office automatically rushed to a judgement that because Caleb was out -- got out of the car and ran that he was the driver even though there were two other people in that car. Now, they're both injured, but I think when you see that wreck you can understand why any one was injured. Maybe Caleb just luckily wasn't injured as bad.

But regardless instead of conducting an investigation -- a

complete investigation, I think the evidence will show they didn't, the deputy sheriff's office did not. They did not conduct a complete investigation, they stopped almost the second that Caleb Whitfield got out of the -- out of the wrecked can and ran.

So what I want you to focus on when you hear the evidence and testimony in this case is focus on the investigation. Focus on what evidence they actually have, what witnesses they actually have, who they talked to, who they didn't talk to, what the sheriff's office did to verify or prove their assumption that Caleb Whitfield was the driver. What did they have available to them to investigate, what tools did they use or didn't use to conduct that investigation and look at what evidence corroborates their initial judgement because Caleb got out of the car and ran that he was the driver.

And look at the credibility and believability of all the witnesses that testify and I submit that when you heard all the evidence and you've seen all the testimony, and remember in this case, a criminal case it is the State who bears the burden of proof. It's all on them. We have to prove nothing. It's all on the State to convince each and every one of you beyond a reasonable doubt of every element of the charges that they have indicted Caleb for.

And I submit when you have heard all the evidence and you've considered the investigation that you will not be firmly

convinced. You will not be convinced beyond a reasonable doubt that there is enough evidence to find Caleb guilty of any of these charges. The sheriff's office was just wrong when they made that rush to judgment on June 25th, 2020 that Caleb was the driver of that stolen car that wrecked.

And the Judge will instruct you on this, and I think y'all know that -- this that we covered it in jury selection that when the State cannot meet its burden of proof, you have only one choice. That choice is to find Caleb not guilty, and I submit that after you heard everything that will be the conclusion that all of will come to.

Thank you.

THE COURT: Thank you, Ms. Cass.

All right. The State may call its first witness.

MS. MELNICK: State calls Dr. Brian Casto.

BRYAN CASTO

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE BAILIFF: Please be seated.

THE COURT: Doctor, while you're testifying you can lower your mask.

THE WITNESS: Thank you.

MS. MELNICK: May I proceed, Your Honor.

THE COURT: Yes.

///

DIRECT EXAMINATION

BY MS. MELNICK:

Q Sir, can you please state your name and spell your name for the record, first and last.

A Yeah, Bryan, B-R-Y-A-N, Casto, C-A-S-T-O.

Q And can you tell the ladies and gentlemen of the jury please where you're currently employed and in what capacity?

A Sure, I'm employed just down the street at the Montgomery County Coroner's Office. I'm a deputy coroner and forensic pathologist there.

MS. MELNICK: And do you want to stipulate to his qualifications?

MR. CASS: Yes.

BY MS. MELNICK:

Q Can you tell us, do you have a specific title?

A Deputy coroner.

Q Deputy coroner.

A Yes.

Q And if you were to be testifying as an expert today, which I'm hoping that you will, what would you be an expert in?

A Forensic pathology.

Q All right. I believe Mr. Cass would stipulate to the qualifications of Dr. Casto as a forensic pathologist.

THE COURT: Is that correct, Mr. Cass?

MR. CASS: Yes, Your Honor, for (indiscernible)

THE COURT: Ladies and gentlemen, just so you know a stipulation is an agreement between counsel that certain facts are to be accepted by you. If the State proceeded, they would list all of the credentials of the doctor to render his ability to render a expert opinion in this case. So he is recognized as an expert and he will offer opinions to that effect.

You may proceed.

MS. MELNICK: Thank you, Your Honor.

BY MS. MELNICK:

Q Dr. Casto, how long have you been with the Montgomery County Coroner's Office?

A Since 2002.

Q And what are your day to day functions, what do you do?

A The bulk of my job is to actually perform forensic autopsies on individuals who have died by traumatic means or other -- or otherwise might have a public interest.

Q Okay. Now, you don't perform autopsies on all deaths --

A No.

Q -- correct?

A No.

Q Is there a certain criteria that needs to be met in order for an autopsy to be performed?

A Basically we're going to get involved with any unnatural death so it's going to be a suicide, homicide, accident. We do get involved with some natural deaths in young apparently

healthy people, and then, of course, any suspicious death we're going to get involved. Of course, by getting involved, that just means we're going to do an investigation, doesn't mean were necessarily going to perform an autopsy.

So we do handle quite a variety of cases from all over the state, but they are limited by our -- our mission of -- of being forensic -- forensically oriented.

Q Now, forensically oriented, does that mean for purposes of the ladies and gentlemen on the jury, you're trying to find out what happened. Is that --

A Correct.

Q -- a fair assessment so?

A So we're trying to find out not only cause of death, but also help determine manner of death, manner would be homicide, suicide, accident, natural undetermined, and then, of course, collect evidence and document evidence during that process.

Q Okay. and can you tell me at some point on June 30th of 2020, did you have an occasion to perform an autopsy on female you came to know as Rodnesha Thompson?

A I did.

MS. MELNICK: All right. For purposes of the record, Your Honor, I'd like to read State's -- or the joint stipulation Number 1.

I will explain to the jury, you'll hear these throughout the trial, but this is Number as they came up.

"Number 1, the parties agree and stipulate to the identification of Rodnesha Thompson, dated of birth September 10th."

I missed a date here. What's her year?

MS. BRUDER: 2001.

MS. MELNICK: 2001, write that in, Bill, just so you know it had a 0 and no 1.

"As the front seat passenger in a Ford 500 that crashed on June 25th, 2020 at North Dixie Drive and Hillsdale Avenue, in Harrison Township, Ohio, at approximately 3:43 p.m."

BY MS. MELNICK:

Q So as I understand, you performed the autopsy on June 30th of 2020, correct?

A That's right.

Q Now, can you explain when you perform an autopsy, what are -- what are the things that occur? Kind of explain what you do in that scenario.

A Sure, so the first thing that we're interested in is actually getting the story, what -- what is the known history of the incident taking a place. We don't -- we don't do autopsies in vacuums without information so that usually comes through a telephone call or it may come through a scene visit by one our investigators. I think in this case it was probably due to a telephone call due to the decedent dying in a hospital.

Q Okay.
A Following getting that information, once we feel like we know the basics of the story that are available, then the actual morgue examination begins and so that's going to require external examination where we just document various things, trauma, identifying feature on the outside of the decedent's remains, and we also collect evidence at that time.
Following that step, we are going to remove any clothing, medical equipment. We wash the decedent and take another series of photographs further documenting any trauma or items of interest, and then at that point is actually where we're going to start what most people think of as an autopsy where we do surgical incisions, removing all the major organs, and further documenting not only injury, but natural disease.
We're also going to collect specimens for drug testing at that time, and DNA testing if necessary, and then ultimately, we're going to generate a report that I will state my cause of death opinion in that, and if it's a Montgomery County death, that's also going to get a manner of death opinion.
Q Okay. And we'll talk a little more about that as we get there.
A Sure.
Q Is that the procedure you used in this particular case?
A Yes.
Q Okay. And would the photographs that were taken assist

you in your testimony today?
A Yes.
MS. MELNICK: May I approach the witness, Your Honor?
THE COURT: You may.
MS. MELNICK: Do I need to mask to give him these?
THE COURT: Yes.
MS. BRUDER: Here you go.
THE COURT: Sorry.
MS. MELNICK: There it is. No, it's all right, I just couldn't see it real quick.
BY MS. MELNICK:
Q All right. Dr. Casto, I'm going to hand you what's been marked as State's Exhibit 1 through 16. If you'll just take a moment and look through those and tell me if you recognize what those are.
(Witness reviews photographs)
A Okay.
Q And do you recognize what those are?
A Yes.
Q What are those?
A These are a portion of the autopsy photographs taken during the autopsy of Rodnesha Thompson.
Q And is this the portion that you and I discussed would be helpful in your testimony?
A I believe so.

Q Okay. And are those photographs accurate to what you saw and are able to describe as occurring during the autopsy?
A Yes.
Q All right. I'm going to hand you a clicker.
A All right. The red is a pointer, otherwise you should be good to go if we can -- is it up still? Yeah.
THE COURT: Vicky, put that screen down all the way.
THE CLERK: Yeah, I'm getting it. It's kind of slow right now.
MS. MELNICK: There we go. Okay.
BY MS. MELNICK:
Q So you can -- yeah, hit the next slide and that will take you to the first photograph.
A Okay.
Q Maybe, is it not working? (Indiscernible)
MS. BRUDER: Want me to do it?
MS. MELNICK: Yeah, why don't you do it.
BY MS. MELNICK:
Q I'm going to give you this pointer instead then.
A All right. All right.
Q Come prepared with a backup. Now, referring to State's Exhibit 1, what is the purpose of this particular photo?
A Okay. So these are -- this is an as received photograph. In other words, this is how Ms. Thompson looked the first time I saw her, nothing has been changed, she hasn't -- nothing has

been removed. So this is full length picture of the left side of her body, obviously she's in a hospital gown and she has abundant medical equipment with her related to resuscitative efforts.

Q So if I were to tell you that the incident she was involved in occurred on June the 25th, which was five days earlier, does that make sense based on your records? She was delivered to your office from the hospital.

A Yes.

Q And so there had been medical intervention.

A That's right.

Q So what we're seeing here is a full picture, but it's also demonstrating evidence of medical intervention, correct?

A Correct, due to the clothing and medical intervention, you really can's see many of her injuries in this photograph.

Q Now, in a situation where you receive an individual from the hospital, is toxicology run on that person?

A If we have what we call admission blood so when somebody comes in the hospital obviously one of the first thing often done is they would draw -- the hospital personnel would draw their blood.

And so like in a case like this that's really the blood that needs to be tested because I'm seeing her on the 30th, you know, five days later. That blood really isn't helpful to understand what was going on on the day of her trauma. So

sometimes the hospital saves that blood and we're able to due drug and alcohol testing on the admission blood, other times it's thrown away. In this case I think the hospital had thrown it away or just exhausted the specimens.
Q So if you were to take blood from Ms. Thompson's body, it would show what probably occurred at the hospital versus what the situation was at the time of the incident.
A Right, and we still do -- we still did draw fluids just like we always do, but they're just put in storage because they really don't have any good purpose in this setting because of her delayed death.
Q Okay. The next slide so moving onto State's Exhibit 2, what is the nature of this?
A So this is the same view, just the upper body only, also from the left side, also as received. One thing I maybe should have mentioned, the first picture is this little black placard, 3298 that's our case number for the year 2020, and then MW is just the initials of the photographer taking the photos.
Q Okay. And are we seeing the evidence here of the medical intervention that is left --
A Correct.
Q -- on Ms. Thompson?
A That's right.
Q So when a patient dies at the hospital, do they leave all of that on the patient in order for you to know what there was?

A Right, that's at our request. It's a lot easier to interpret artifacts or even injuries caused by medical treatment when all that stuff is still in place versus removing everything, then you don't know what was there, what tape was positioned where. You know it just makes it a lot harder and so they do that at our request.
Q Okay. All right. And State's Exhibit Number 3.
A Okay. So this is the first time you can actually see the decedent's right side of the body and face. This is a half upper body view from the right side, also as received with medical equipment in place.
Q All right. And State's Exhibit 4?
A Same side of the body except full length as received.
Q All right. And so this is done to just document everything as it comes into the coroner's office.
A Correct, these are standard photos.
Q Okay. State's Exhibit 5, what is the purpose of this photograph?
A Okay. So at this point clothing and medical equipment has been removed. If we collected any evidence, it would have already been done at this point and so this is a full length view of the decedent.
One thing that might catch your attention is this blue item right over the belly so basically she had had emergent surgery on her abdomen and is many times the case in

traumatic -- emergent traumatic surgeries it's not wise or not even able to sew the decedent back up so they got to wait for some swelling to take place and so that is a blue surgical cloth with a sealed membrane over it, which ultimately if she would have survived, all this would be removed and she would eventually be sewn back normally. But that's why that's there --

Q Are there any --

A -- that's part of the surgery.

Q I'm sorry to interrupt you.

A That's all right.

Q Are there any other visible injuries that we can see in State's Exhibit 5 of note?

A Nothing really of note. She has had her right side of her scalp shaven. She's had -- she's had an injury there that was repaired, a laceration or tear to the skin. She has some bumps and bruises there on the right elbow. She's got a little scab or something here on the (indiscernible) of the right foot. The pelvis area, this bluish discoloration is a large area of bruising to her pelvis and I would consider that to be a trauma.

Q And State's Exhibit 6, what are looking at here?

A So this is the half view of the upper body. It's a little bit hard to see, but there's a --

MS. MELNICK: Can we turn the lights down?

THE WITNESS: -- laceration to her scalp here about an inch and a half that's been closed surgically with sutures.

BY MS. MELNICK:

Q And what is this?

A Okay. So that's a central venous catheter. It's just a IV that multiple lumens inside of it to help them administer medications during her critical care.

Q Okay. State's Exhibit 7.

A Okay. So this is the left side of her body. One thing that you can see, obviously you can see this blue membrane covering the abdominal surgical would as we discussed.

You also see a tube with a bandage along the left side of the chest, the right side of the chest also had a similar thing so these are actually plastic tubes that have been inserted in the -- through the chest wall to relieve any blood or air caused by her chest trauma. She has fair -- a fairly extensive number of chest injuries including multiple rib fractures.

Q Okay And State's Exhibit 8.

A So a full length view. Again, you can't see it as well as on the right, but on the left underneath her arm is another are of these fair extensive contusions or blood pooling around her pelvis.

Q Would those contusions be consistent based on your experience with potentially having a seatbelt on during a car crash?

A Yes, that's a common seat belt injury.
Q Okay. And State's Exhibit 9.
A Okay. So this photograph shows a couple injuries. Again, you can see the bruising to the pelvis a little better. There is a -- you know, a tear to the left buttock here that's healing. There's an injury here to the right buttock that's also healing, and then up here you see a similar area of bruising that is related the chest tube placement most likely.
Q State's Exhibit 10, what's the purpose of this photo??
A So this is called a identification photo so the purpose of this photo is basically to show the identity of the decedent being autopsied.
Q State's Exhibit 11, what are we looking at here?
A Okay. So this is the first of the major injuries that we've seen. This is a picture of the brain, so the top of the skull has been removed after reflecting the scalp forward or backward and I -- you know it's hard to appreciate because there's really no normal here to compare to for you, but her brain is very swollen so again, this is a function of her head trauma.
Q And does this area up here demonstrate some of that swelling?
A Yes, it shows it pretty well here. It's kind of bulging and there's somewhat flattened surface versus more lumpy bumpy which would be more normal.

Q Now, can this type of injury to the brain cause death?
A Yes.
Q Okay. And is it in this particular case do you believe that it contributed to her death?
A Yes.
Q Okay. State's Exhibit 12, what are we looking at here?
A This is portion of her pelvic organs including the part of her large intestine, and the purpose of this photograph is to show this greenish area lining her intestine. Normally that would be pink or purple. This should not be there. This is due -- mostly likely due to lack of blood supply to her bowel.
One of her injuries was, in fact, injury to her bowel and she has had a bowel surgery removing that injured portion. But anytime the bowel is injured you can also have other areas that don't get enough blood supply to them and that's probably the explanation for this greenish growth on the lining of her large bowel.
Q So the scaring to her -- or the open wound to her abdomen that showed the blue covering on it --
A Yes.
Q -- because it was left open, would that demonstrate where they went in to do any kind of surgical intervention --
A Yes, that --
Q -- in her bowel area?
A That incision is where they did the surgery on the bowel,

and you can tell by how protruding it is that there's a lot of swelling still going on. That swelling can, in fact, cause lack of blood supply to other portions of the abdominal organs including the bowel, which I think this is evidence of that.
Q Okay. State's Exhibit 13, what is this?
A Okay. So this is cross sections and slices of the liver, and the purpose of this photograph is to show that she does, in fact, have some liver injuries, these little blue disruptions here and here. So the outside of her liver looked normal, but on the inside, she does have tears on the inside of the liver. Again, very consistent with bunt force trauma of a car crash.
Q Would that call -- cause bleeding into her abdominal cavity?
A Not in this case because the capsule that surrounds the liver is actually intact, that has not been disrupted so all the bleeding from these injuries is going to remain within the liver and that's why there's not a lot.
Q So were these injuries survivable injuries.
A Yes, definitely.
Q Okay.
A They repair well.
Q And State's Exhibit 14.
A This is a close up of her esophagus and, you know, normally this is where food travel to our stomach. Since she's in a critical care setting she's not eating or drinking, but

they would have a tube down here esophagus for secretions and other things and so it's not uncommon for those tubes to actually create injury themselves just because they stay in one place for a long period of time and so that's what we're seeing here. This little linear erosion to the lining of the esophagus is most likely due to her feeding tube.

Q So that was more due to medical intervention, not due to the traffic crash.

A Right, I would expect this to not be due to actual trauma of the crash, and again this is a very common finding of somebody who's been in intensive care and often this will repair just fine on its own.

Q What are we looking at here in State's Exhibit 15?

A Okay. This is a photograph of the chest cavity to the skin and fat have been reflected, the chest plate -- the breast plate has been removed, all the organs have been removed, and so now what we're looking at for orientation the tag up here would be towards the chin. This structure going down through here where the pointer is that's the spine, and the purpose of this photograph is to show multiple rib fractures along the right posterior chest wall.

Fractures in the back like that are more typical of trauma rather than just CPR, and she has numerous fractures there, they are protruding through the lining of the chest wall. These fractures are the reason why she would need the

chest tubes that we described earlier.
Q So they would have caused the bleeding into her chest cavity.
A Yes.
Q What about all this dark area, is that something that you normally see?
A No, that's all blood due to basically bruising of the chest wall.
Q Okay.
A Rib fractures can bleed a fair amount.
Q All right. State's Exhibit 16, what are we looking at here?
A Okay. So this is still on the right side, and we've already talked about these fractures of the ribs in the back. Well, she also has fractures out here towards the side of the chest wall. Again, you can see like with this one it's protruding through the lining of the chest wall. Again, this is going to create not only bleeding, but an air leak requiring chest tubes be placed.
Q Okay. Now, what about these areas here, is that significant?
A Yes, so one, sometimes when you have hard enough chest trauma you can actually split the lining itself. One of these holes is due to where they put the chest tube through. Okay. So that's an artifact of the resuscitation. The other hole is

trauma here you just base -- your ribs push through the lining or the lining gets stretched so badly that it actually tears.

Q All right. So at the conclusion of your autopsy where you have removed the organs, you've examined now the body of Ms. Thompson, what do you do next?

A So the next step during the autopsy I'm going to remove small portions of tissue to be able to look under the microscope at a later date. We don't do that on all cases, I did do it on the case of Ms. Thompson because I felt like it would be useful in further documenting the complications of her trauma.

Q So can you tell me, based on the examination of all those tissues that you did microscopic examinations of, did you find any underlying medical conditions in your evaluation of her tissues, as well as were you given any information from the hospital or anything of that nature of any underlying medical conditions for Ms. Thompson?

A Unrelated to her trauma you mean.

Q Yes.

A No.

Q Okay. And as a result of the microscopic examination, tell us what if anything of significance you found that would be related to the trauma?

A So the two most significant things on the microscopic exam, there's one grossly I felt like she was going to have

pneumonia. The microscopic exam confirmed that she has wide spread lobar pneumonia. Pneumonia is a known complication of having extensive chest trauma with rib fractures, it's also a known complication of being intubated for a period of time and both of her lungs are heavily involved by pneumonia.

She also -- I was able to also confirm by microscopic exam that she has extensive damage to her brain due to lack of blood supply slash lack of oxygen related to the swelling. She as a number of areas of her brain that are no longer going to be viable. They're going to be -- if she would survive, she not be without, you know, noticeable defect in her abilities due to brain injury.

And then I also looked at the portion of the large bowel that we talked about, large intestine with that greenish lining. Again, microscopically that confirms that to be a -- what we call a membrane or pseudo membrane due to -- most likely due to a lack of blood supply. You can also get that with antibiotic use and they look very similar, but I think in her setting the lack of blood supply is probably the best explanation.

Q So and what you were looking at, specifically what you were just referring to in the colon area where we had that tissue in that photographic that was discolored from --

A Uh-huh.

Q -- lack of blood supply, is that something that could

have caused death?
A The ischemic bowel. Yes, absolutely.
Q Okay.
A That's a medical emergency.
Q Okay. And can you tell me were you at the conclusion of all of your autopsy, your microscopic examinations, were you able to determine a cause of death?
A Yes.
Q And what was that?
A Complications of multiple blunt force trauma.
Q And were there specific contributing factors that you believe were the main contributing factors to her death?
A Yeah, so when I say complications of her trauma, these are the things that I'm associating that she would not have days later without the trauma. For example, I don't think she was walking around with multi lobar pneumonia. Okay. Five days earlier, that is a complication of her chest trauma. Her brain injury is a complication of her chest trauma. The bowel finding, again is a complication of her chest trauma so -- or of her trauma so that's why it's worded that way.
All of those things can be life threatening. There's no reason to just pick one when they're all happening in, or initiated literally in a split second of one another so we group them together saying that his person is deceased due to complications of all of the trauma that happened to her head,

chest, and abdomen.
Q All right. And were you also able to determine a manner of death?
A I'm sorry. I didn't hear you.
Q A manner of death.
A Yeah, manner of death would be accident.
Q Now, what exactly does that mean in the forensic pathology field?
A Okay. So manner of death, we only have five choices. This is for a death certificate purpose. So accident, natural, suicide, homicide, and then the fifth would be undetermined, we can't -- can't fit the case into a specific manner. And so there's many cases where the manner might be an accident, but the legal charge would be something other than accident and it can go the other way. Something that I may call a homicide, death at the hands of another, you know, may be prosecuted in a different legal term. Okay. That's unrelated to my medical opinion.
Q So the terminology you're using is medical terminology, not necessarily legal terminology.
A That's right, and it's solely for the purpose of the death certificate.
Q All right. And is there anything about your findings from the autopsy of Ms. Thompson that was inconsistent with a high speed car crash?

A No.

MS. MELNICK: If I can have just a moment, Your Honor.

(Pause)

MS. MELNICK: Nothing further, Your Honor. Thank you.

THE COURT: Cross-examination.

MR. CASS: Thank you.

CROSS-EXAMINATION

BY MR. CASS:

Q Good afternoon, Dr. Casto.

A Afternoon.

Q You've used the term blunt force trauma, and I guess when I think of blunt force trauma, I think of like something hitting something else. Can blunt force trauma also be caused by just like violent being thrown around? I mean without actually -- like let's say restrained in a seatbelt.

A Sure. Yeah, blunt force trauma is -- is just way of -- is a general term. It's a way of separating an injury from say sharp force trauma like a knife, or a gunshot wound or something like that. So blunt force trauma does encompass a lot of different types injuries.

Q So in the case where a passenger is restrained in a -- by a seatbelt in a car and the car is tumbling and rolling upside down, just the -- like the -- just them being restrained by that and the violence of the moment of the car can cause the blunt force trauma.

A Oh, absolutely.
Q And so as far as like the head trauma, can that just be by the head -- the brain actually just moving back and forth inside the skull or not actually hitting something as (indiscernible)
A No. No, she hit her head. She has a laceration to her head. I mean she clearly hit her head. But, yeah, I mean this is a lot of energy being applied to the body in a very complex way. Wearing your seatbelt is a good thing, but it's not -- not -- you know, is not surety against severe injury.
Q And so the seatbelt, I guess itself could cause some of the blunt force trauma because of the restraint and being thrown violently against --
A Sure.
Q -- it, torso --
A Sure.
Q -- blunt force trauma.
A Yeah, we see seatbelt related trauma all the time.
Q And I guess it would have to be though a lot of force or a lot of, I don't know, think of the word turbulence or of the car spinning around or turning upside down type thing for that to happen.
A Yeah. No. No, we see seatbelt injuries in head on collisions, roll overs. We -- it happens all the time.
Q Okay. So it's just not all banging into something inside

the car. It can just be being restrained --
A Sure.
Q -- can cause it.
A Sure.
MR. CASS: Okay. That's all I have.
THE COURT: Any redirect?
MS. MELNICK: No. Thank you, Your Honor.
THE COURT: Thank you, Doctor. You can step down, you're excused.
THE WITNESS: Okay.
THE COURT: Next witness, please?
MS. MELNICK: Your Honor, the State calls Dr. Mbaga Walusimbi.

MBAGA WALUSIMBI

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:
THE BAILIFF: You may be seated.
THE COURT: Doctor, if you like feel free to lower your mask while you're testifying, it's up to you.
MS. MELNICK: May I proceed, Your Honor?
THE COURT: Yes.
MS. MELNICK: Thank you.

DIRECT EXAMINATION

BY MS. MELNICK:
Q Doctor, can you state your full name and spell your first

and last names for the record?
A Mbaga Walusimbi, that's M-B-A-G-A W-A-L-U-S-I-M-B-I.
Q Okay. And if I could ask you, we've got a lot of people in here and these things really dim your voice so if I could ask you to try to speak up as much as you can so that all the jurors can hear you. Can you tell us, sir, tell me a little bit about your education? Where did you get your education?
A Oh, if you want to start with kindergarten that was in --
Q I'm sorry.
A If you want to start with kindergarten, that was in (indiscernible)
Q Let's start with college education.
A Oh, college, Walsh University in Canton, Ohio.
Q Okay.
A Wright State University I did my chemistry graduate degree. University of Illinois College of Medicine in Chicago, and residencies in University of Illinois, hospitals in New York, Lincoln Memorial and SUNY Buffalo
Q When did you graduate college?
A 1980.
Q And where did you go on from there?
A I came to Dayton, Wright State University.
Q All right. And is that were you went to your undergraduate degree or was that a postgraduate degree?
A That is postgraduate.

Q And what degree did you obtain from Wright State?
A A masters in biochemistry.
Q Masters in biochemistry.
A Yes.
Q I'm sorry. I -- these things are terrible so I apologize. And what year did you receive your masters in biochemistry?
A 1983.
Q Now, tell us a little bit about what biochemistry is if you would?
A The study of biology and chemistry of biological chemistry.
Q Okay.
A Chemistry in your body and cells. Yeah.
Q Okay. After you graduated with your masters, where did you go then onto school? Did you go to medical school --
A Yes.
Q -- immediately after that?
A I spent -- I taught college for three years.
Q You taught college.
A Yeah.
Q And did you teach the biology?
A A combination of biology, chemistry, and some others.
Q A little bit of everything.
A Yeah.

Q Okay. And after three years of teaching, where was that?
A I lectured at Wilberforce University.
Q Wilberforce.
A Yeah.
Q And did you then go onto medical school?
A Yes.
Q And you said that was in Chicago.
A Chicago, University of Illinois.
Q Okay.
A Yeah.
Q And when did you graduate with your medical degree?
A 1992.
Q And is it -- do you have your MD or DO.
A MD
Q MD. And do you have any specialties, did you specialize?
A I specialized in critical care trauma. I do hand surgery wound so special (indiscernible)
Q Okay. And how long have you been practicing under your specialty of critical care?
A Close to 20 years.
Q Close to 20 years.
A Yeah.
Q And where are you currently working, what hospital do you work out of?
A Mainly at Miami Valley.

Q Miami Valley.
A Yes.
Q The one downtown or south?
A I work at both, but mainly downtown.
Q Mainly downtown.
A Yes.
Q And how long have you been with Miami Valley Hospital?
A It's about -- gosh, I have to count. Maybe 19 -- 18 years. Yeah.
Q Okay. So the majority of your time --
A Yeah.
Q -- in critical care has been at the Valley (sic)?
A Yes.
Q Okay. And can you tell me have you been published in anything?
A Several areas.
Q What types of areas have you been published?
A Biochemistry, if you're really interested (indiscernible)
Q Okay.
A Yeah.
Q And do you belong to any professional -- what's the word I'm looking for, associations of any kind?
A American College of Science, the American Association of Surgery For Trauma, Society of Critical Care Medicine, American Society of Program Directors, Society of Gastroenterology

(indiscernible)
Q Okay. All kinds of.
A Yeah.
Q Okay. Let me ask you this. At the Valley when you indicate you're specialized in critical care. What exactly do you do on a day to day basis, what is your job in treatment of patients? What do you do? Are you in the ER, are you in the ICU, are you in all kinds of areas? What are you doing on a day to day basis?
A It all depends. I am in -- I go to the emergency room to see people who may present there who are injured or who are critically ill from whatever. I may be in the operating room. I may be in the -- seeing patients in the floor. I may be teaching so it's various things that I do.
Q Is Miami Valley a teaching hospital?
A Yeah, I would like to think. Yes.
Q You would like to think. All right. And can you tell me -- can you put this down. I apologize. And so I understand that you are an associate professor of surgery as well; is that correct?
A Yes.
Q And so you're teaching other medical students methods in surgery.
A Uh-huh.
Q Okay.

A Yes.
Q You did I believe two fellowships; is that correct? One at Lincoln Hospital in the Bronx and for hand surgery and another for critical care; is that correct?
A Correct.
Q How long ago was that?
A A long time ago.
Q Long time ago. Don't want to date you.
A All right. That's okay (indiscernible)
Q And then you did two residencies as well; is that correct?
A No, just one residency that was just in two different places.
Q Oh.
A Yeah.
Q During a single residency --
A Yeah.
Q -- you did some time in Buffalo and --
A Yeah.
Q -- then you did the rest of the time in Illinois.
A Yeah.
MS. MELNICK: Okay. Your Honor --
BY MS. MELNICK:
Q Can you me, sir, have you ever testified in an -- as an expert in critical care?

A I don't know that as an expert, but I was called as to -- as --
Q Let me back that up.
A Yeah.
Q Okay. Let me -- let me -- have you ever testified before as an expert in the field -- in the medical field as an emergency room treating physician?
A Yes.
Q All right. And how many times have you testified in that capacity?
A One.
Q One time.
A Yes.
Q And where was that do you recall?
A That was in the Bronx in New York.
Q Okay. Have you ever testified here in Ohio before?
A No.
MS. MELNICK: Okay. Your Honor, I would tender Dr. Walusimbi as a medical doctor for purposes of being an expert in the treatment of critical care patients at Miami Valley Hospital.
THE COURT: Any objection, Mr. Cass?
MR. CASS: I do have an objection. Can we approach?
THE COURT: Yes.
(At sidebar)

MR. CASS: (Indiscernible) treating physician (indiscernible)

MS. MELNICK: He was the attending.

MR. CASS: (Indiscernible)

MS. MELNICK: Of both.

MR. CASS: (Indiscernible) attending (indiscernible)

MS. MELNICK: He was both of their attendings.

MR. CASS: (Indiscernible)

MS. MELNICK: No, he was on both.

MR. CASS: (Indiscernible) not the attending on both (indiscernible)

MS. MELNICK: Do you --

THE COURT: Are you withdrawing your objection then?

MR. CASS: Yes.

MS. MELNICK: Do you have an objection to me giving him those medical records to use during his testimony? I'm not going to enter them, but I mean they're medical records. He's going to need to be able to look at them as an expert to recall the findings of them.

MR. CASS: Yeah, he can (indiscernible)

MS. MELNICK: Okay.

THE COURT: Thank you.

(End sidebar)

THE COURT: Mr. Cass, you have withdrawn your objection; is that correct?

MR. CASS: Correct, Your Honor.
THE COURT: All right. You may proceed.
And ladies and gentlemen, the doctor has been offered as an expert witness, and the Court will grant that motion and he can render an opinion along his medical expertise.
MS. MELNICK: Thank you, Your Honor.
BY MS. MELNICK:
Q Now, Dr. Walusimbi, do you recall treating a patient by the name of Joseph Hespeth back in June -- I'm sorry -- June of 2020?
A I can't go by memory, but I can go by records.
Q Okay. And did you and I meet prior to you --
A Yes.
Q -- coming here today?
A Yes.
Q And did you review some records at that time --
A Yes.
Q -- for Joseph Hespeth? And were you the attending physician for that patient?
A Yes, I was.
Q Can you explain what does it mean to be an attending physician, can you explain that to the jury?
A Well, to be an attending physician you -- you have the duty to assess -- lead the team in assessment of whoever comes to the hospital whether it's the emergency room or

(indiscernible) responsible for their care and coordinating their care.
Q So a patient comes into ER may need to be seen by several different types of doctors. Is that a fair assessment?
A Yeah, eventually they may need several doctors.
Q And you as the attending physician, do you help coordinate all of that?
A Yes.
Q And do you monitor the progress of that patient even though they may be being seen by other doctors?
A Yes.
Q Okay. And were you -- did you also review records before for a Jelani Shackelford when we met?
A Yes.
Q And were you the attending physician of Jelani Shackelford as well?
A Yes, I have to see those so I remind my and go -- go by memory.
Q Or the admitting provider I should ask you?
A Yeah.
Q He's the admitting. Let me ask you what is in -- when records have you listed as an admitting -- let me get it right. Admit provider, what does mean?
A It means that I'm (indiscernible) something I -- somebody is admitted, there has to be one person who is -- who is

admitting that individual.
Q All right. And are you, again responsible for their care at that point?
A Yeah, to -- to a certain extent.
MS. MELNICK: Okay. All right. I'm going to start with Mr. Hespeth. May I approach the witness, Your Honor?
THE COURT: You may.
BY MS. MELNICK:
Q Would review -- having the records in front of you assist you in your testimony?
A Absolutely.
Q Okay. So in looking at Mr. Hespeth's records and take your time if you need to look through to answer the questions because I know it's impossible for you to remember all these details. Can you tell me what date was he brought into the hospital?
(Witness reviews documents)
A On June 25th, 2020.
Q All right. And was -- as a result of him arriving, was it Miami Valley North, the one downtown?
A Yes.
Q Okay. As a result of him arriving at Miami Valley, was he ultimately admitted to the hospital?
A Yes, he was admitted.
Q And in looking at the records, can you tell me how long

he was in the hospital?

(Witness reviews documents)

A He was discharged on the -- on July 5th, 2020, that's about five days in the hospital.

Q Okay.

A Correction, that's five, maybe two weeks roughly.

Q Roughly --

A Yeah.

Q -- two weeks. Okay. And can you tell me when he arrived at the hospital, how did he present? What were his obvious injuries at the time?

(Witness reviews documents)

A He had hemopneumothorax, that is blood and a collapsed lung on both sides. He had many broken ribs on both sides of his chest, many spine injuries. He had wing bone left scapula fracture. He actually burns to scapula on the left side, burns to the left chest. He had a cut on his -- yeah, he had an adrenal gland injury. He had small intestinal injuries.

Q Now, when you say he had -- he had both of his lungs collapsed.

A Yeah, partially. Yes.

Q Okay. And you indicated multiple injuries to his spine.

A Correct.

Q Can you tell me what types of injuries did he have to his spine?

A Broken spinal column.
Q Broken spinal.
A Yeah.
Q How many places did he have fractures to his spine?
A Yeah, I have to go through to tell you how many, but it's necessarily summarized here.
(Witness reviews documents)
Q Let me see if I can help you because I think I know.
A Yeah, this one.
Q Did you find it?
A I don't (indiscernible)
(Counsel reviews documents)
Q See if that page helps you.
MS. MELNICK: And for the record it's page 20, Bill, that I'm looing at.
(Witness reviews documents)
A He had a Cervical Number 7 transvers process on the left. He had a thoracic spine transvers process, the first transvers -- the first thoracic spine. He had the sixth thoracic spine factures six, and actually on the seventh transverse on the -- the seventh thoracic spine he had both sides were broken. So that's as far as the spine fractures.
Q So he had multiple spinal --
A Yeah.
Q -- fractures on both sides of certain --

A Yeah.
Q -- areas.
A Yeah.
Q Okay. And two collapsed lungs. Are there any other notable injuries that you said that he had? You said he had some other internal type injuries.
A He had an adrenal gland.
Q Adrenal gland.
A Yeah.
Q What is that? What does the adrenal gland do?
A It produces things like adrenaline, cortisol, you know.
Q And you talked about burns. Can you describe what you mean by burns? Do you mean like fire, like he was burned by fire? Or if you can describe a little bit about what you mean by the burns?
A Yeah, burn can be from anything. I think the best way to think of burn is because there's a very high -- a high -- a high temperature whether that's from a flame, or you can have it from friction, you can have it from a very hot object, you know, hit by the sun or electricity, you know, (indiscernible)
Q So when you friction burn, something that the common person might think of as road rash.
A Correct.
Q If you fell of your bike when you were a kid and you skinned your knee really bad.

A Yes.
Q That's something that would be what you're referring to as a friction burn.
A Correct.
Q Is that the type of injuries that Mr. Hespeth had?
A Yes.
Q And how extensive were those friction burns, and I believe towards the very back?
A On the back. Okay.
(Witness reviews documents)
A (Indiscernible) other one was on the left chest right extending from above the armpit all the way down to --
Q On the right side.
A On -- yes, I think this is on the right side.
Q Okay.
A He had one on is -- he had one on his back, I think. Yeah, on his back from the upper arm and --
Q And you -- armpit to where?
A Well, this one is on the right so you have the back of the upper arm.
Q Okay.
A On the back of the -- the this side.
Q Okay.
A So if somebody was you know -- yeah, and then the other one was on -- I think this is on the -- yeah, I think all of

them seem to be on the right side. Yeah.
Q Okay. Let me ask you this. Were the -- were these friction burns extensive enough that aside from maybe cleaning them out --
A Uh-huh.
Q -- did they need any medical intervention?
A Yeah, I think the burn surgeon took -- took him to the operating room to debride, meaning removing any dead burned skin and -- and I think he did a skin graft.
Q Okay.
A (Indiscernible) correct. Yeah.
Q All right. Now, would those kind of injuries cause a person pain?
A Yeah. Yeah, painful.
Q Especially burn type injuries.
A Yes.
Q Are those painful injuries?
A Yes.
Q And he was in the hospital from the 25th until July 5th. June 25th until July 5th, I believe --
A Yea.
Q -- you said. All right. Did he -- aside from the surgical intervention to those burns to remove that skin, did he require any other surgery or was he allowed to just rest and heel eventually.

A Besides the debridement, you mean for other injuries?
Q For his other injuries?
A He had chest tubes to -- to remove the blood and the -- in the both sides and also to re-expand the lungs.
Q Okay.
A I can't -- I don't recall if he had any. I don't think the -- yeah, those I think are the main. The others did not require surgery.
Q Okay.
A The fractures.
Q Okay. I'm going to approach you again. Would looking at Mr. Shackelford's records also assist you in your testimony?
A Absolutely.
Q All right. Can you tell me Jelani Shackelford when did he present to Miami Valley Hospital?
(Witness reviews documents)
A He presented on the 25th of June, 2020 and --
Q Same day.
A Same day.
Q Okay. And was he also ultimately admitted due to his injuries?
A Yes.
Q And do you have a discharge date on there for him?
(Witness reviews documents)
A He was discharged on June 27th, 2020.

Q So he was there for just a couple of days, correct?
A Correct. Yes.
Q And can you tell me were you also involved in his care?
A Yes.
Q And what were his injuries that he ultimately was diagnosed with?
(Witness reviews documents)
A He had a small cut on the chin. He had fractures of the 11th and 12 ribs on the left. He had broken vertebrae, the thoracic Number 3, and Number 4, Number 7, Number 8.
Q Are those spinal fractured again?
A Yes.
Q Okay. And did those -- did he have surgical intervention on his chin? Did he have --
A Yeah, he had a repair of the laceration. Yes.
Q Okay. It had to be either sutured or --
A Yeah --
Q what happened to repair?
A Had to be sutured. Yeah.
Q Okay. And what about the spinal fractures? He was released in two days so --
A Yeah, he --
Q -- did he need surgery for those, or was that again, just down time and healing?
A Yeah, they are not -- they didn't require any surgery for

those. No.
Q Okay. All right.
(Pause)
Q When someone has the type of spinal fractures that you have seen in each one of these patients, Mr. Shackelford and Mr. Hespeth, are those injuries that are also painful?
A Yes.
Q And are -- were both of these patients prescribed pain medication to help them manage the pain that they were in?
A I'm sure they were.
Q Okay.
A Yeah.
MS. MELNICK: Nothing further, Your Honor.
THE COURT: Cross.
CROSS-EXAMINATION
BY MR. CASS:
Q Doctor, you were asked about these two patients. Jelani Shackelford you had never met him before. You did not know him, correct?
A No.
Q So the thing you know as far as who he was is from that record, correct?
A Correct.
Q And the same with Joseph Hespeth, the other person that you testified to, you didn't -- you never met them, correct?

A No.
Q You wouldn't know who they were other than reading their medical record, correct?
A (Indiscernible)
Q On Mr. Shackelford, you testified to this, I think it's described as a complex chin laceration; is correct?
A I said a chin laceration.
Q And that I think in the records, and if you need to look at them, it indicates that it's 8.5 centimeters long. Do you recall that?
A If the records say. Yes, then that's (indiscernible) was.
MR. CASS: Okay. What did you do with those records? Are they marked?
MS. MELNICK: No.
BY MR. CASS:
Q All right. On Mr. Shackelford though, it was necessary that he get stitches on his chin. Is that correct to close the wound?
A Yeah, (indiscernible)
Q And this -- and Mr. Shackelford also had, I think you testified with fractures that were to his spine and -- correct?
A Correct.
Q And then he had injuries to his chest, would it be the front of his chest?

A I'm sorry.
Q Would it -- he had injuries to his chest, correct?
A Now, which one are we talking about?
Q Mr. Shackelford. I'm sorry.
A Is that the last person?
Q The last one you were just talking about.
A Yeah, he had the spine fractures, and I think he had broken ribs. Yes.
Q Okay. And he also -- it's also described as a hemothorax injury, which is blood in between the lung and the -- and the chest?
A You have to really -- I -- you know, may be mixing up the two so.
Q Okay. I understand.
A Yeah.
Q Would looking at the records help you?
A Yeah.
Q Okay. Let me show you Mr. Shackelford's records. All right. Let's back up.
(Witness reviews documents)
A Yeah, Mr. Shackelford had -- Mr. Shackelford --
MS. MELNICK: What page are you on, Bill?
MR. CASS: The front, first page.
THE WITNESS: He had the broken ribs on both sides, he had spine process fractures, and he had the chin laceration. I

don't see the documentation of the collapsed lung on this particular discharge summary so.

BY MR. CASS:

Q And he, Mr. Shackelford was the one that you were only the admitting physician I want to say, right?

A Both of them.

Q Both of them.

A Yeah.

Q Okay. Which one were you the attending physician on?

A Both of them.

Q Both of them.

A Yeah.

Q All right. Go ahead. I'm sorry. On this one when it indicates up there at the top that the attending was doctor.

A Yeah.

Q Okay. But who is the -- who's listed at the attending?

(Witness reviews documents)

A Well, I think what -- well, I don't what -- you know, you have an admitting attending and (indiscernible) may have been the one that discharged and that's why it may have (indiscernible)

Q Okay. Is it your testimony your worked on both of them at some point in time?

A Yeah. Yeah.

Q Okay. The injuries that both of them had, Mr. Hespeth

and Mr. Shackelford, were they consistent with being an unrestrained driver in an automobile accident?

MS. MELNICK: Objection.

THE COURT: Sustained.

BY MR. CASS:

Q Well, have you worked on patients who have been injured in automobile accidents?

A Yeah.

Q And have you worked on patients that have been unrestrained in those -- in those accidents?

A Yeah, they come restrained, some unrestrained. Yes.

Q But let me ask it this way. Are they consistent with what you've seen in automobile accident injuries the injuries that they --

A Yes.

Q -- suffered?

A Yes.

Q Okay.

(Pause)

MR. CASS: That's all.

THE COURT: Any redirect?

MS. MELNICK: Very briefly.

REDIRECT EXAMINATION

BY MS. MELNICK:

Q Doctor, I want to hand you back the records for Joseph

Hespeth. Can you tell me as a matter of fact at some -- was he able to speak to hospital staff?
A I think. Let me see.
(Witness reviews documents)
Q And did he identify himself is my question?
(Witness reviews documents)
A That is hard for me to say when people arrive in emergency unless I have very specific, you know --
Q Okay.
A He -- it doesn't say here whether he was unconscious or not. Let me look at my own H and P (indiscernible) if I can find it.
(Witness reviews documents)
Q Are your -- well, let me ask it this way. Are your records attributed -- the records you're looking at there to refresh your memory and to assist you in your testimony, are those records for Joseph Hespeth?
A Yes.
Q And what date of birth do you have for him?
(Witness reviews documents)
A January 27th, 1998.
Q All right. And as a result of his injuries, was he actually admitted to the ICU?
A He was admitted to the ICU. Yes.
Q All right. And ICU, meaning the Intensive Care Unit.

A Intensive Care Unit. Yes.
Q All right. That's good. And with respect to Jelani Shackelford, can you tell me are those -- the medical records that you were using to assist you in your testimony, are those his medical records?
A Yes, and what date of birth do you have for him?
(Witness reviews documents)
A 2/12/2000.
MR. CASS: Objection, Your Honor. It's beyond the scope of my cross-examination.
MS. MELNICK: If I may.
THE COURT: No, that's overruled.
Go ahead, you can answer.
BY MS. MELNICK:
Q So you don't remember what these two individuals looked like, do you?
A I couldn't.
Q You see too many patients --
A Yeah.
Q -- to know.
A Yeah.
Q All right. You're going by the records kept by the hospital in order to refresh your memory and that's why you have them.
A Right.

MS. MELNICK: All right. Thank you. Nothing further, Your Honor.

THE COURT: Any recross?

RECROSS-EXAMINATION

BY MR. CASS:

Q Just, Doctor, as far as the records, you rely on them totally as to whether they're accurate or not, what's in those records. You have no independent knowledge of the accuracy of the information in there as to the identity, and date of birth, and all that of the individuals, correct? You only know what's in the records.

A Yes.

MR. CASS: All right. That's all I have.

THE COURT: Thank you, Doctor. You can step down, you're excused.

THE WITNESS: Thank you.

THE COURT: This would be a good time for our afternoon break I do believe.

MS. MELNICK: Perfect.

THE COURT: All right. Ladies and gentlemen, we're going to take our afternoon recess at this point in time. I do want to remind you to please do not discuss the case among yourselves or with anyone else, do not permit anyone to discuss it with you or in your presence. Do not form or express any opinion on this case until it's finally submitted to you.

We'll be in recess for about 15 minutes.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Recess taken)

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session, please be seated.

THE COURT: Call your next witness, please.

MS. BRUDER: State would call Donte' Dixon.

THE BAILIFF: Raise your right hand for me.

DONTE DIXON

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE BAILIFF: Please be seated.

THE COURT: You need to turn around. There you go. Sir, if you want to lower your mask while you're testifying, that's perfectly okay.

THE WITNESS: Okay.

THE COURT: You can take it off or leave it on, either way you want to.

You may proceed.

MS. BRUDER: Thank, Your Honor.

DIRECT EXAMINATION

BY MS. BRUDER:

Q Good afternoon.
A Good afternoon.
Q We're recording in here so I just need you to speak up when I -- when you give an answer. Can you tell the Court, what is your name, and spell it for the record.
A Donte', D-O-N-T-E-apostrophe, Dixon, D-I-X-O-N.
Q And Mr. Dixon, at one time did you own a 2006 back Ford 500?
A Yes.
Q And did anything happen to that Ford 500?
A It was stolen.
Q It was stolen. Do you recall when that car was stolen?
A It was June, I'm not for sure of the exact date, but June in 2020.
Q Does June 23rd, 2020 sound about right?
A Around that time. Yes, ma'am.
Q Okay. And did you report that car stolen?
A Yes, ma'am.
Q And did you report it to the Dayton Police Department?
A Yes, ma'am.
Q Do you know where you were when the car was stolen?
A It was at Sunoco Gas Station on Wayne Avenue. Wayne and Wyoming I believe.
Q You were at Sunoco Gas Station on Wayne Avenue near Wyoming.

A Yes.
Q And that's in Dayton.
A Yes.
Q Do you remember about what time of day or night that was?
A It was at night around 10:05 because I was headed to work.
Q And so you were headed to work around 10:05 at night, you stopped at the Sunoco. What happened next?
A I went inside to get me a energy drink because I work third shift and I just -- as I'm walking to the counter to pay for my drink, I see somebody hop in my car and that's when I run out, get in front of the car. Once I heard the car go into drive, that's when I kind of just stepped out the way because I didn't want to get hit or ran over or what not so.
Q So you were inside the Sunoco and you saw someone enter your vehicle.
A Yes.
Q Where were the keys to the vehicle?
A The keys was left in the ignition.
Q Was the car running?
A Yes.
Q So it's fair to say you left the car running while you went into the Sunoco?
A Yes.
Q And did you know who that person was who got into your

vehicle?
A No, ma'am.
Q And you said you raced out to try to stop that person, but were unsuccessful.
A Yes.
Q And you said that you tried to get out of the way. Were you stuck by the vehicle by any chance?
A Not majorly struck, but just like a little nip, but --
Q And after that person drove off, then you called the police.
A Yes.
Q And you made that report.
A Yes.
MS. BRUDER: Your Honor, may I approach the witness?
THE COURT: Yes.
BY MS. BRUDER:
Q I'm showing you what's been marked for identification purposes State's Exhibit 55. Will you take a look at that, sir? Do you recognize anything in that picture?
(Witness reviews photograph)
A Just my hat and, of course, the folder with my name on it
Q Okay. Do you recognize anything else in that?
A No, ma'am.
Q Okay. And you said there is a folder with your name on it. Does it have your full name on it?

A Yes.
Q Okay. And would that folder have been in your black Ford 500?
A Yes.
Q And you said there was a hat in there as well.
A Yes.
Q Okay.

MS. BRUDER: (Indiscernible) can I publish that picture? Permission to publish, Your Honor?

THE COURT: Yes.

BY MS. BRUDER:

Q If you use this, you can use the pointer. Can you just point out the items to the jury that you recognize?

(Witness indicating)

A (Indiscernible)
Q Wait. Wait. You have to press the button.
A Oh, I'm sorry.
Q You're fine. My apology.
A This folder --

UNIDENTIFIED SPEAKER: Turn it around, the end with the button closest to it is the end that the laser comes out.

THE COURT: That'll help.

BY MR. CASS:

Q All right. So it doesn't show up from this frame.

UNIDENTIFIED SPEAKER: No, he's got --

BY MR. CASS:
Q You have to point it up there.
UNIDENTIFIED SPEAKER: -- to point it up there.
BY MR. CASS:
Q Point it up there if you can. Okay. So that's your folder, and then where is your hat?
(Witness indicating)
A And that's my hat.
Q Okay. And just to be clear these were things that would have been in your vehicle, correct?
A Yes, ma'am.
Q I'll take that. I'll just leave that actually up here.
MS. BRUDER: One minute, Your Honor.
(Pause)
BY MS. BRUDER:
Q I just want to clarify something. When you mentioned about being in the Sunoco, how long were you in there before you noticed someone had gotten into the vehicle?
A It wasn't more than 30 seconds to a minute.
Q Okay
A So.
Q So then when you saw someone get into your car, you raced out.
A Yeah.
Q Okay. And where did you go?

A As I ran into the front hoping that, you know, he'd stop. Once I realized he stop -- he wasn't going to stop, I moved out of the way so I wouldn't get hurt or anything like that. As he sped off, I just I'm in the process as he sped off, another kid had came up to me on a bike and --
Q Okay. Before we get to that, I kind of want -- kind of have a visual for the jury.
A Okay.
Q So the person in your vehicle got into the driver's side.
A Yes.
Q Was the door to the driver's side still open when you came out?
A No, it was closed.
Q It was closed. Did that person put the vehicle in reverse?
A Yes.
Q Okay. And as they were then about to go forward, you stood in front of the vehicle --
A Right.
Q -- is that right?
A Right.
Q And did that person strike you with the vehicle?
A He nipped me a little bit, but nothing major so.
Q Okay. So you said that the vehicle did make contact did make contact --

A Yes.
Q -- with your body.
A Yes.
Q Okay. And caused some pain, but not enough of an injury --
A Right.
Q -- to go to the hospital.
A Right. Yeah, I was able to get out the way quick enough before it was like drastic where I got really hurt by it so.
Q Okay. All right. And you were concerned that if you didn't move out of the way --
A Right.
Q -- you probably would have been --
A Right.
Q -- hit full on.
A Right.
Q And this may seem like a silly question, but you didn't give that person permission to take your car; is that right?
A No, ma'am.
Q All right. Thank you.
MS. BRUDER: No further questions, Your Honor.
THE COURT: Cross.

CROSS-EXAMINATION

BY MR. CASS:
Q Good afternoon, Mr. Dixon. Your Ford 500 it had tinted

windows.
A Yes.
Q And they were tinted, what, all the way around?
A I believe -- I believe so. I'm not for sure.
Q (Indiscernible)
A I want to say one of them -- like one of my windows the tint was off, but I -- it was two years ago. I can't recall.
Q All right. But it did have windows that were tinted.
A Yes.

MR. CASS: Okay. That's all I've got.

THE COURT: Any redirect?

MS. BRUDER: No, Your Honor.

THE COURT: Thank you, sir. You can step down and you are free to leave.

THE WITNESS: Okay.

MS. BRUDER: Thank you. Thank you for being here.

THE COURT: Next witness, please.

MS. BRUDER: We would call Det. Bryan Statzer to the stand.

THE COURT: Well, I guess I'll do my bailiff's job. Raise your right hand.

BRYAN STATZER

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: Have a seat.

You may proceed.
MS. BRUDER: Thank, Your Honor.

DIRECT EXAMINATION

BY MS. BRUDER:
Q Good afternoon.
A Good afternoon, ma'am.
Q Can you state your first and last name and spell them for the record?
A My name is Bryan Statzer, my first name is spelled B-R-Y-A-N, my last name is spelled S-T-A-T-Z-E-R. I'm a detective with the Montgomery County Sheriff's Office located here in Dayton, Montgomery County, Ohio.
Q And how long have you been a detective?
A About 12 years now.
Q And have all 12 of those years been with the Montgomery County Sheriff's Office --
A Yes.
Q -- as a detective?
A Yes, I was during that time frame for a few years assigned over to the U.S. Marshal's Fugitive Taskforce as a taskforce officer, but I was still connected the sheriff's office during that time frame.
Q And you said that were -- have been a detective for about 12 years, but how long have you been employed with Montgomery County Sheriff's Office?

A Well, since 1995 I have been a deputy for them and prior to that, I had about three years of law enforcement experience with New Lebanon Police Department, which is located in a little small community here on the western side of Montgomery County.
Q Okay. Thank you. And were you working in your capacity as the detective with Montgomery County Sheriff's Office on June 25th, 2020?
A I was.
Q Okay. And what shift were you working that day if you recall?
A We call it the day watch or second watch, it's 0800 hours to 1600 hours, which in civilian time is 8:00 in the morning until 4:00 in the afternoon.
Q Thank you. And on that particular day, can you tell the jury what you were wearing?
A Plain clothes, probably my patented North Face no sleeve jacket with a -- probably a dress shirt with probably no tie on and probably a pair of Dockers and a pair of shoes.
Q Okay. And do you recall what you were driving in that day?
A It would have been my assigned patrol vehicle, which is an unmarked, I believe it's a 2019 Dodge Charger, blue in color with dark tinted windows. There's no markings on it whatsoever.

Q Okay. And can you briefly describe what your duties and responsibilities are as a detective?
A I'm assigned and have been for 2014 to the criminal investigation side for Harrison Township Substation. It -- Harrison Township has a contract with the sheriff's office for patrol responsibilities to also include, obviously detective responsibilities investigating crime.
So I would get anything for a simple criminal damaging all the way up to we would investigate violent crimes of -- crimes of violence to include shootings. We -- I have a specific area geographically that I'm responsible for the crimes that occur within, but I also have a what I call subset category of responsibilities or collateral duties. I am the GTA, or the Grand Theft Auto detective for the agency in that sense so I handle most of the grand theft auto investigations that the sheriff's office handles.
Q And as part of your duties, you called them sub-duties as a GTA detective. Do you make yourself familiar with police logs that may list stolen vehicles?
A I do, I receive updates through my email system through the county on a daily basis. Several times a day I get what we call police radio logs from the City of Dayton who constantly throughout the 24 of the day do an updated running sheet of information that occurs in the City of Dayton to include anywhere from people wanted for domestic violence, for

aggravated robberies, for missing juveniles, and to also include stolen cars and other crimes.

Q Okay. And I'd like to go back to June 25th of 2020, you said your shift that day was from about 8:00 to about 4:00 p.m. So shortly before the end of your shift that day, do you recall what you were doing?

A Well, actually we have to go back to June 24th because on June 24th I read through my emails that came through the City of Dayton, the police radio log and there was a vehicle that had been reported stolen in an aggravated robbery and I was made aware of that through -- through reading that at that point.

On June 25th, 2020 I was working in Harrison Township, Montgomery County, Ohio and I -- what I would usually do is at some point in time during the day I would leave my office and I would go drive around doing some follow ups, as well as I would be observing for entered stolen motor vehicles within our jurisdiction.

About maybe around the 1330 time frame, which is 1:30 in the afternoon, I ran that vehicle, the -- the -- the vehicle that was taken in the aggravated robbery in the City of Dayton through what we call a database, a national database called NCIC and it still showed that the vehicle was an entered stolen vehicle taken in aggravated robbery reported by the City of Dayton from, I believe it was two days prior.

So I had verified that that was still an active car, it was still outstanding, and it was still somewhere obviously in the community.

Q And just to be clear the car you're talking about was a black Ford 500, correct?

A Correct, I believe it was a 2006 model Ford 500, black in color. I believe the license plate was Henry Zebra George 1451. The vehicle is a unique vehicle. The Ford Motor Company during the middle of the 2000s did not like the Ford Taurus it didn't -- wasn't a very popular model.

They changed up the name and the design a little bit for about two years, called it a Ford 500. I didn't not make any -- have any sales any better and they ended up stopping and not producing it anymore. So it's very rare model, you don't see it around very much or anymore these days so.

Q So is it fair to say based on your experience, that this Ford 500 was a unique vehicle to see on the road?

A Yes, ma'am.

Q And just to clarify, you did say in your testimony that you came across this 2006 Ford 500, which you believed was a stolen vehicle that was reported the day before.

A Correct.

Q All right. And approximately what time of day did you see that vehicle?

A It was -- it was around 3:45 in the afternoon, I was

traveling in my unmarked patrol vehicle, I was in plain clothes, westbound in Needmore Road, which as you cross through the township, and then cross the city, and then back into the township again it changes names a couple times.

It's Needmore, and then it switches in Shoup Mill Road as it winds around the -- the fox -- Foxton Courts Apartments area, and the Stillwater River area, and then becomes Turner Road once you get to North Main Steet. So I was traveling westbound Needmore, through Shoup Mill Road as I was approaching the Stillwater River.

Q All right. And where did you see this vehicle?

A The vehicle was passing me going the opposite direction on Shoup Mill so it would have been in essence been going eastbound on Shoup Mill Road, heading toward Frederick Pike, and ultimately towards North Dixie Drive.

Q And what did you do once you saw the vehicle?

A I saw the black Ford 500. I immediately recognized it as a good possibility that it may be that stolen vehicle that was reported taken in the aggravated robbery from a couple days previously. I did a U-turn in the roadway and I was eventually to catch up with the vehicle as we proceeded eastbound right around the Needmore Fredrick Pike area there right -- right inside the -- the City of Dayton before you go back into the Harrison Township jurisdiction.

Q So is it fair to say that you turned around to get a

closer look at the vehicle?
A I did, and upon coming up to that intersection I was able to tell that the license plate did match, it was HZG1451 tag on it.
Q All right. Once you discovered that that license plate matched the list of a stolen vehicle, what did you do next?
A I quickly just to check again to verify through our records channel before I initiated anything or got anything moving along, I wanted to verify once again that the vehicle was still an entered stolen vehicle. So I switched over to my radio -- on my radio to our records frequency, and once again they confirmed that the vehicle was still entered stolen.
I switched back to our primary channel. I radioed out to dispatch my observations of the fact that I was behind a vehicle taken in an aggravated robbery out of the City of Dayton and gave an update as far as direction we were going, as well as a description of the vehicle to dispatch and any crews that may respond to assist me.
Q So is it fair to say that when you got on this primary channel you were asking for assistance?
A That is correct.
Q Okay. And after you made that call for assistance, what did you do next?
A We traveled -- continued to travel eastbound on Needmore, now Needmore Road as we cross into Harrison Township proper. I

continue to give updates over the radio where we were going. The vehicle turned, made a left off of Needmore Road into a parking lot of a shopping center that has an O'Reilly's Auto Parts in it, as well as a kitchen -- kitchen -- industrial kitchen warehouse on the northside of Needmore Road.

So in essence it made a left-hand turn off the roadway and into the parking lot of the shopping center of the north side of Needmore Road just before you get to North Dixie Drive. I went ahead and followed along with that vehicle. Nothing -- as well as I obviously updated over the radio now where we were located at.

At that point in time the vehicle was being driven in a manner that did not lead me to believe that I had been detected as a law enforcement officer or led me to believe that the -- the driver of the vehicle knew that they were being followed by law enforcement.

We continued through the lot to -- to the east, and a quick north back behind and Advanced Auto Parts store, and then another -- another back -- a jog back to the east, in which it put the -- the stolen vehicle in the parking lot area between the north side of Advanced Auto Parts and what is now a -- an abandoned nightclub on the north side called The Harem, and that butts up right to the North Dixie Drive are north of Needmore Road.

Q And at some point, did that Ford 500 exit out of the

parking lot on to North Dixie?
A Eventually it did, but prior to that it did come to a complete stop. As pulled up on my vehicle -- pulled up with my vehicle back towards the rear of the vehicle, there were crews responding to assist me from our actual substation there in Harrison Township, which ironically is about maybe four to five hundred feet just north of that location in the fifty-nine hundred block of North Dixie Drive.
I noticed one or two marked patrol units coming up southbound on Dixie approaching where the vehicle was now stopped at, and at that point in time, based upon my observations of what the first lead marked vehicle was doing, I decided to go ahead and tried to go ahead and make an apprehension while it was stationary.
Q Okay.
A And what we attempted to do and what we -- what I did, as well as my observations from the other -- on the other side of it was I at that point in time went ahead and I have lights and sirens. I have emergency equipment on my car. I have lights and sirens on my car.
I immediately turned on that equipment as I pulled up towards the back of the -- of the suspect vehicle or the -- or the stolen vehicle. At the same time that was being done, Sgt. Vitale (phonetic) in his marked patrol vehicle lit up his emergency lights and pulled up into the front -- front of the

vehicle.

As that -- at that happened, the vehicle -- the suspect vehicle went ahead and was thrown in reverse and went ahead and ran into the front end of my car at a pretty good force, enough that it threw me forward in my car and I was actually -- the vehicle was actually pushed back a little bit.

At that point in time Sgt. Vitale had exited his motor vehicle, and I could see that he was standing almost in front of the motor vehicle off to the -- the -- the left-hand side of his patrol vehicle and he had placed the occupants of the motor vehicle who were still inside at gunpoint.

At that point in time the vehicle -- the 500 lunged forward and around both Sgt. Vitale's vehicle as well as another marked patrol vehicle that was just, I believe off to the left-hand side of that vehicle, and then the stolen -- stolen 500 then fled southbound on North Dixie Drive. And I was able to observe several patrol vehicles after that give -- give chase to the suspect vehicle.

Q Okay. So I just want to be clear. You gave us a lot of information there. So you had an opportunity to go confirm that that black -- 2006 black Ford 500 was indeed the stolen vehicle used in an agg (sic) robbery.

A Correct.

Q And that you followed it, and at one point you did activate your lights to stop the vehicle; is that correct?

A My lights and my siren.
Q Lights and your siren. Did the vehicle stop?
A No.
Q Did not stop, and then you said Sgt. Vitale came up alongside you to try to -- and also attempted to stop the vehicle; is that correct?
A He did not come alongside me. He actually approached the suspect vehicle from a front. It was --
Q Okay.
A In essence it was an attempt for us to box in the motor vehicle to keep it from being able to go mobile and in essence to prevent a -- the vehicle to flee and as well as kind of lessen the danger of unfortunately of what happens when we have to deal with people in -- in a felony vehicle such as this so.
Q So is it fair to say that the vehicles were maneuvered to box in the suspect vehicle?
A That is correct.
Q And the suspect vehicle -- correct me if I'm wrong. You said that that suspect vehicle put the car in reverse, and then backed into you, rammed into you. What happened?
A Yeah, it's a fair assumption that it -- it purposely threw the vehicle into reverse backing up behind me. I have a hard time believing with the -- I have two sirens on my vehicle and my lights that -- that I wasn't -- they were not aware that I not back behind them.

Q And to your knowledge was there damage done to the front of your vehicle from that?
A Slight damage. Yes.
Q All right. And did the vehicle become incapacitated after it was struck by the suspect vehicle?
A It did.
MS. BRUDER: Okay. Your Honor, may I approach the witness?
THE COURT: Yeah, it's your witness, you don't need to ask.
MS. BRUDER: Thank, Your Honor.
BY MS. BRUDER:
Q So I'm going to hand what's been marked for identification purposes State's Exhibit 17, 18, 19, 20, and 21. Can you please take a look at these.
(Witness reviews photographs)
Q Do you recognize those photos?
A Yes, that is my unmarked patrol vehicle that's assigned to me.
Q Okay. And are these pictures a true and accurate copy of your vehicle from that day?
A Yes, ma'am.
Q Okay. I'm going to put under here what's been marked as State's Exhibit 17. Can you just briefly identify this for the jury?

A That is my assigned unmarked patrol vehicle.
Q And in there you can see that it is equipped with lights. There's a little blue light in the back window there.
A Yeah, at the moment it captures it. Yes, it's -- it's -- it has multiple wigwags in the back. But, yes, as you can see it does have emergency -- emergency equipment on it.
Q Okay. And just to be clear that is a fair and accurate picture of your car.
A Yes.
Q Okay. What's been now marked as Exhibit 18, is this another view of your -- of your car?
A Yes, it is obviously the right side of my patrol vehicle.
Q I don't know why we have that glare. There's no damage to this; is that correct?
A No, you -- there's nothing observed on this side.
Q Okay. Now I'm going to show you what's been marked State's Exhibit 19. Can you tell the jury what you see in this picture?
A This is the front bumper, the front facia area of my -- my patrol vehicle. Just above it you can go ahead and see that there is emergency equipment just above it.
Q If there's a -- there is a pointer right there if you want to use that (indiscernible)
A Oh. As you can see right here this is emergency lighting that is present on the vehicle. You -- you can also note that

there is crush damage on my -- on my bumper that is pushed up into the grill area as well, there is -- which is also fresh and came from this incident.

There is also -- it's hard to tell because of the dirt -- dirt on here, but there is slight imaging or you can actually see marks acrost here, and here, as well as in this a rea as well where the -- the rear of the Ford 500 struck my car as well.

Q Next, what's been marked State's Exhibit 20. Can you explain what's on there?

A This is a close up here of the damage, the crush damage to my -- to my front bumper from the -- the actions of the Ford 500. I also might point out too, I know I noted the two emergency lights that were in the grill. I also have emergency lights also in the front windshield of my motor vehicle as well, as well the lights -- the headlights on the front of my car also have wigwags and flash alternatively as well.

Q And just to be clear this damage to your vehicle wasn't there before the Ford 500 struck you; is that correct?

A That is correct.

Q And then finally what's been marked as State's Exhibit 21, is this another picture of your vehicle?

A It is, it's a little bit closer up of the -- the hazing, the lines in the area where the actual -- the rear of the Ford 500 struck my vehicle and then left the imprint. Again, it's

hard to see with the dust and the dirt that's on there.

I do want to point out just so you know that this stuff here, I believe is actually a bug so, but -- but other than that a lot of this is dirt, but there is actually imprints there.

Q Thank you. And after the suspect vehicle struck your car, were you able to pursue immediately?

A No.

Q Okay.

A I attempted to place my car into gear and the car would not go into gear. Something -- something was disabled from the strike with my transmission. I got out -- due to the -- the ferocity of the -- of the strike of my motor vehicle, unable being able to place it into drive to -- to move along, I thought that maybe something was disabled. So there was kind of major structural damage to the front of my car.

So I got out of actually my patrol car, ran around to the front, noted nothing major damage that would have stopped me from being able to get the car out and drive. Once again, tried to put the car back into drive. It would not go into drive. I turned the car off, turned it back on, and apparently that had did something because I was finally able to go ahead and actually place the car in drive and actually leave the parking lot.

Q And when you did that, where did you go?

A By the time that happened and as I went southbound on North Dixie Drive with my emergency equipment, I didn't get probably to the intersection of Needmore and Dixie when the radio traffic came over the radio that the vehicle had been involved in a motor vehicle accident somewhere near the area of North Dixie Drive and I believe it's Hillsdale, which is near the intersection of the Greenleaf Inn bar and across the street there's some used car lots that are over there.
Q And that corner is located in Harrison Township, within Montgomery County, Ohio.
A Yes, ma'am.
Q Okay. And you did -- even though you heard that the vehicle had crashed, you still went to the scene; is that correct?
A Absolutely.
Q Okay. A question about the suspect vehicle, the Ford black 500, were the windows tinted?
A Yes, they were dark.
Q Were you able to see how many occupants or who was in the car?
A I knew that there was at least somebody seated in the backseat because at some point time right before my vehicle was struck, I was able to go ahead and see a silhouette of a person in the backseat through the sunlight coming in through the front windshield through the vehicle and see that there was

somebody kind of moving around kind of in the center area between what would be the silhouette of the front seats of the vehicle. So I could tell that there's somebody seated in the back -- back area somewhere around the middle so.
Q So you maybe could see a shadow or outline of somebody, or some blockage of light, but you couldn't --
A Correct, well I could it was definitely a silhouette of a -- of a person --
Q Okay.
A -- back in the backseat.
Q But you couldn't clearly identify who was there.
A No, ma'am.
Q Okay. All right. And after you arrived at the crash site, what did you observe when you first got there?
A Upon my arrival, I was just seeing them place hand restraints -- well, as I pull up, I travel down there and I park off to the -- the right-hand side of the crash scene. As I look off to my left-hand side I see deputies in the parking lot of the Greenleaf Inn, what would be on actually the west side of the business actually placing handcuffs on the Defendant, Mr. Whitfield over here. They were placing handcuffs on him.
I obviously could see the wreckage of the motor vehicle. It was on its top overturned facing to the west and with its rear facing to the east and it was resting up against, not

laying entirely on it -- on against the house, but there was a house that was there at that -- at that intersection, which would be the southeast corner of Hillsdale at North Dixie Drive.

There's an abandoned house that's still -- still there. It's heavily damaged from the tornado that we had back in 2019, and it appeared that the -- the vehicle was resting right beside it, and based upon the damage that I'd seen, it looked like it had struck the building.

Q Did you see anybody else around the vehicle?

A I did, Dep. Bone (phonetic) at that point in time was -- was over on the -- what would be the driver's side of the vehicle. Now, remember the vehicle is now overturned so it's on its top so what would be conceived as the right-hand side is actually the left-hand side, or the left-hand side is on the right-hand side of the vehicle.

So the vehicle is facing to the west and the -- and Dep. Bone is over here near the driver's side door, which is the only door that is ajar of the vehicle. I also see two people over here to the rear of the vehicle close to what would be the -- the rear trunk area and what be also considered the left rear door area of the vehicle.

I circled around and came around the side of the vehicle where there was heavy crush damage on what was now the passenger side of the vehicle but was facing to the south. I

come back around the side and then I get a very clear view of seeing one of the -- one of the occupants of the vehicle who turned out to be Jelani Shackleford (phonetic).

He is seated right back behind the back window on a corner of a -- of a step right there at that vacant -- that vacant house. He has a very significant wound to the -- to the chin that is there on his chin. He's -- he's actually seated, but he's trying to stand up. I have him take a seat, and then told him that a medic was coming to -- to help him out.

Right in front of him laying on the ground on his right-hand side in the fetal position in a big pile of glass was Mr. Hespeth (phonetic). He was there, he had noticeable bleeding injuries to his head and his feet were just near the -- the window, the -- the left would be the -- excuse me -- the driver's side rear passenger window. His feet were just right outside of that -- that area so. Again, the driver's side door was the only door that was ajar, it was wide open.

As medics came on scene, they started doing triaging the -- the two gentlemen what were on the ground in front of me. I was made aware by Dep. Bone that there was actually a female still inside the vehicle that was still seat belted in, in the right front passenger seat, but that she was unconscious and unresponsive at that -- at that time.

I subsequently at that point walked away from the immediate scene and we started divvying up duties to who was

going to do what at that point in time, and I immediately told --
Q Before you get to that, you mentioned Dep. Bone several times --
A Correct.
Q -- is that right? He was on scene before you; is that correct?
A Correct.
Q And is Dep. Bone available at this time to testify?
A He's not, he's also a reserve in the United States military and he -- unfortunately he is orders right now out of the state.
Q Okay. And you were starting to talk about you were going to divvy up duties or responsibilities while at the crash site. What were you charged with at that point?
A I decided to immediately go ahead, and I'm kind of the tech -- techo (sic) guy for also the -- for the -- for the office as far as up there in Harrison Township so I decided I'm going to start looking for video cameras of the incident that occurred. So I started doing a cursory look upon all the business and the homes over there in the area that anybody that would have surveillance cameras, Ring cameras, bling cameras, Blink cameras, whatever you call them, just to see what video that we could capture of the incident.
Q And was there a business Keowee Auto Sales located in the

area?
A Yes, it is. That -- that company is a used car lot, it's across the street. It's owned by Mr. Casey Skapik who I've known for about 25 -- 30 years now. He has a pretty good security system and he had camera that was pointing in that direction. Casey actually -- Mr. Skapik actually approached me as I was walking up to him and he told me that he had video of the incident and he allowed me to come back and view the video that was captured on the surveillance camara.
Q And did you go back and review that surveillance video?
A I did.

MS. BRUDER: Okay. At this time, Your Honor, I'd like to read Stipulation 2.

THE COURT: Go ahead.

MS. BRUDER: "The parties agree that Keowee Auto Sales is located at 4111 North Dixie Drive, that Keowee Auto Sales had video camera and recording equipment in operation on June 25th, 2020, that this video camera equipment was kept in the ordinary course of business at Keowee Auto Sales, that the video camera equipment completely and accurately captured the crash of the Ford 500 at North Dixie Drive and Hillsdale Ave on Juned 25th, 2020, and marked as State's Exhibit Number 22.

The partied further agree that the zoom version of the video is complete and accurate and the parties have no objections to its use."

BY MS. BRUDER:
Q All right. Detective, you indicated that -- didn't mean to put my back to you. Sorry. You indicated that you went to the Keowee Auto Sales and you reviewed video that the owner of the Keowee Auto Sales said he had; is that correct?
A Correct.
Q And did you make plans for Mr. Skapik to download that video to preserve it?
A We spoke about it and made -- made it known that we would need to go ahead and download the video. I do not know what person eventually did do that, but it was -- it was completed.
Q Okay. And so that video was completed and in the custody of the Montgomery County Sheriff's Office --
A That is correct.
Q -- is that correct? All right. And you've had an opportunity to watch the video from beginning to end; is that correct?
A Yes, ma'am.
Q And when you watched it, it was a true and accurate copy --
A Yes, ma'am.
Q -- of what you saw that day when you were in Keowee Auto Sales; is that correct?
A That is correct.
Q And do you know if that video was enlarged to show the

crash site in a bigger picture frame; is that correct?
A It was.
Q Okay. And have you had an opportunity to review that enlarged portion of the video?
A I have.
Q And when you viewed it, is it a true and accurate copy of the original version other than it just being enlarged?
A It is.
Q Okay. All right. I'm going to play. I don't know if this this one. Okay.
UNIDENTIFIED SPEAKER: Do the other one first.
(DVD played at 4:07 p.m., ending at 4:07 p.m.)
MS. BRUDER: You want the other one first.
UNIDENTIFIED SPEAKER: Yeah.
MS. BRUDER: That's okay.
THE WITNESS: So this video here that you see, the still shot here before the video starts is going to be a camera off of the Keowee Auto Sales structure that is facing in a northeasterly direction. I'll point out here with the pointer the -- this is the vacant building, that vacant house that I spoke of that was damaged in the tornado back from 2019.
Right here this street right here you see is actually Hillsdale. It goes the east off of North Dixie Drive. Obviously, what we're looking at here is northbound and southbound North Dixie Drive. This is north, and this area is

south.

Across the street is the Greenleaf Inn, it is a bar that sits on the -- on the northeast corner of North Dixie Drive and Hillsdale.

BY MS. BRUDER:

Q Okay. And on this video, there are some numbers up there on the top left, it looks like it says 6/25/2020.

A Yes

Q That's the date; is that correct?

A That is correct, as well as the time.

Q And the time says 1546 or 3:46 p.m. at 55 seconds.

A That is correct.

Q Okay. And to your knowledge that was the accurate time when this occurred.

A It's a fair representation of the time that it occurred.

Q Okay. All right. I'm going to play the video. Can you tell me what direction we would expect the Ford 500 to come from?

A Okay. The Ford 500 is -- excuse me. The Ford 500 is going to be coming from the north to the south at a very high rate of speed. It's going to be -- you're going to have to really look for it here and it's going to -- well --

Q We'll play --

A -- I would look in this area right in here to watch it.

Q Okay.

A Watch for it.

(DVD played at 4:09 p.m.)

Q What's happening over here? Do you know what happened over here, what was going on?

A Right here is the area that I -- when I spoke about just earlier when I came up on the scene. That is where the Defendant, Kaleb Whitfield was subsequently apprehended after he was seen fleeing the driver's side of the vehicle, and as he makes his way in the white T-shirt on foot around the back of this residence here, and then crosses through the back yard, and then runs back across over Hillsdale over in the Greenleaf lot.

Q All right. And to be fair you have not arrived on scene yet; is that correct?

A Yes, ma'am, you fair. It's a fair statement.

Q Okay. So you are still enroute to the crash site; is that correct?

A Correct.

Q And if you could point out Dep. Bone if you see him, may not be able to though.

A At this point I can't tell you.

Q Okay. Fair enough.

A This is Dep. Bone.

Q Over there.

A Yes.

Q Okay.
A That's one of the -- one of the places he can be seen at throughout this video.
Q Fair enough. Maybe we'll play the other version --
A Okay.
Q -- and then you may be able to see it.

(DVD ends at 4:11 p.m.)

(DVD played at 4:11 p.m.)

Q And that's Caleb Whitfield running?
A Yes, ma'am.
Q Okay.

(DVD ends at 4:12 p.m.)

MS. BRUDER: Your Honor, I'd ask the witness for an identification. We ask that the masks be pulled down for him to make an ID.

THE COURT: You can do that.

MS. BRUDER: Okay. Everyone pull their masks down.

THE COURT: Just pull your mask down, just for a second.

BY MS. BRUDER:

Q Detective, do you see that same individual in the courtroom today?
A Yes, he is wearing the blue shirt seated next to Mr. Cass at the Defendant's table.

MS. BRUDER: All right. Your Honor, I'd like the Court

to reflect that the detective has identified the Defendant as the individual in the video as Caleb Whitfield.

THE COURT: So ordered.

Thank you, Mr. Whitfield. You can put it back on.

MS. BRUDER: Thank you.

BY MS. BRUDER:

Q Okay. All right. So I'm going to let this continue to play.

(DVD played at 4:13 p.m.)

Q And if you could point out Dep. Bone when you see him?

A That's Dep. Bone right here. .

(DVD ends at 4:13 p.m.)

Q All right. And can you tell me what side of the vehicle is he on at this point?

A At this point he is actually on the passenger side of the vehicle right this moment.

Q Because it's flipped upside down; is that correct?

A That is correct.

Q All right. And so then this side where we saw Mr. Whitfield get out, that's the driver's side --

A That is --

Q -- is that correct?

A -- the driver's side.

Q Okay.

(DVD played at 4:13 p.m.)

A Now, the passenger side over here has severe crush damage to it --
Q Okay.
A -- where it had struck the building. The trunk area was also damaged as well, but the window area -- the rear window area on the back of that was still most in -- the window was broken out, but the window opening was still for the most part not --
Q (Indiscernible)
A -- intruded -- intruded upon.
Q Okay. All right. And you still haven't arrived on the scene yet; is that correct?
A I can't really tell at this moment here because we're on the -- on the close up here, but I'm going to say --
Q Who just pulled up in --
A -- you'll be able to --
Q -- that vehicle?
A This is the --
Q Do you know who that is?
A Somewhere in here you'll see me arrive here. I arrive with somebody else at the same time.
Q Would it be fair to say that it was a couple of minutes after the crash that you arrived?
A I'm going to say --
Q Do you remember?

A -- probably about a minute and a half after the crash.
Q Okay.
A That's me right there.
Q All right. In the blue vehicle with the door open right here.
A Correct.
Q All right. So you get out of the vehicle, and then can you kind of point out where you see everybody when you were just testifying?
A Obviously, Mr. Whitfield and several deputies are over at this location here as I'm walking up. You have one deputy that just walked away from that side and another deputy that's over here. I believe this is going to be Dep. Bone that's actually in the -- in the shorts, and then I will walk to the rear and walk around and that's when I will make contact with the -- Mr. -- Mr. Shackleford who is seated on the -- on the stoop of the house, and then Mr. Hespeth who is laying in the fetal position in the glass right --
Q All right. When you say the stoop of the house, there's like a raised cement apron would you say --
A Correct.
Q -- that comes out, and is the car kind of resting on that apron or is it off to the side?
A It's just off to the side.
Q The side and so both Jelani Shackleford and Joseph

Hespeth were laying on those or on that cement apron.
A Correct.
Q Okay.
A And I believe at this point in time also Dep. Bone actually entered into the motor vehicle in an attempt to go ahead and -- and cut the victim free from her seat -- not able to go ahead and get both the straps cut loose.
Q And do you know, or did you make a call for emergency services to come to assist the injured passengers?
A No, that was already done before I even arrived on scene.
Q Okay. After you saw the injured passengers in the back, did you go and check on the Defendant at all?
A I don't recall walking over to actually to the Defendant or not.
Q And is fair to say as part of your duties and responsibility as a detective that you would write a report and memorizing -- memorializing everything that occurred that day; is that correct?
A Yes, ma'am, and that's exactly what I did.
Q All right. And on this day you weren't assigned as the lead detective, were you, or were you?

(DVD played at 4:18 p.m.)

A No, it was decided at that point since I was intimately a part of the incident because my -- what I had -- my observations and me being struck that Det. O'Connell, my

partner --

Q Uh-huh.

A -- would actually handle the criminal investigation aspect of it or handle it. But I did initiate the primary case report for the -- for the event, for the incident.

Q Okay. And then later you were assigned as the case detective; is that correct?

A I did. Dep. O'Connell has retired from the Montgomery County Sheriff's Office back I believe in October or November of this year, and so with that said, I took over the handling of the case for the -- for the Prosecution -- excuse me -- the Prosecution side of things at this point in time.

Q In addition to going to Keowee Auto Sales, were you also charged with going to Greenleaf Auto to look at that video --

A No, I did not.

Q -- or was that somebody else?

A I did not go to Greenleaf Auto. I believe Det. Saunders may have stopped by there and made contact with them and -- and found out that there was video.

MS. BRUDER: Okay. One minute, Your Honor. At this time, Your Honor, I'd like to read stipulation Number 3.

THE COURT: Go ahead.

MS. BRUDER: "The parties agree that the Greenleaf Inn is located at 4200 North Dixie Drive, that Greenleaf Inn had video camera and recording equipment in operation on June 25th,

2020, that this video camera equipment was kept in the ordinary course of business at Greenleaf Inn, that the time stamp on the Greenleaf video is approximately one hour early, and that the video camera equipment completely and accurately captured the Ford 500 sliding out of control at North Dixie Drive and Hillsdale Ave immediately prior to the impact Juned 25th, 2020, and marked as State's Exhibit Number 22."

BY MS. BRUDER:

Q Detective, have you had a chance to review the Greenleaf video?

A I believe we've seen it before. Yes, ma'am.

Q Okay.

MS. BRUDER: Do you have them in order, Kim?

MS. MELNICK: No.

MS. BRUDER: Just start from the bottom.

MS. MELNICK: Start with the one in the middle.

THE WITNESS: Vicky, can I get some water, please?

MS. MELNICK: No.

THE WITNESS: Can I get some water, please? Thanks.

MS. MELNICK: No, go to the bottom.

MS. BRUDER: All right.

THE WITNESS: I believe it's the second one or maybe the third one. There it is, that's afterwards.

MS. BRUDER: All right.

MS. MELNICK: Oh, that is afterwards. I'm sorry. It

was the middle one.

MS. BRUDER: It was the middle one.

MS. MELNICK: Yeah.

MS. BRUDER: Okay. You were right the first time.

MS. MELNICK: Yeah. There we go.

BY MS. BRUDER:

Q Okay. So can you describe what you see up here on the screen?

A This is going to be a fixed surveillance camera off of the Greenleaf Inn bar. That sits again south -- excuse me -- northeast intersection of North Dixie Drive and Hillsdale. It facing obviously to the northeast almost back towards -- just out of the frame on the left-hand side would be Keowee Auto Sales. The -- here -- the wrong way. This will be to the south and this will be to the north right here as far as direction is concerned.

Q And where will the suspect's vehicle come from?

A You'll actually see two -- you'll actually see two -- two vehicles of -- of -- you will see the stolen GT -- or excuse me -- the stolen Ford 500, again high rate of speed emerge into and slide in front of a pickup truck that is traveling northbound on North Dixie Drive and slide right past the front of it almost striking it head on.

And I'm not sure how you have this setup, but I think just prior to this you will see Det. Saunders assigned patrol

vehicle, it's an unmarked Chevy Impala. You will actually see Det. Saunders who is coming back from court traveling northbound on North Dixie just heading back to the -- to our office as this situation emerges.

Q So you're saying that we'll see Det. Saunders come in the opposite direction across the video before we see the suspect vehicle.

A Yes, ma'am.

Q Okay. And also on this vehicle (sic) we have a date and timestamp on there. I know we stipulated to it, but if you'd point it out where it says, "Recorded on June 25th, 2020," the time is recorded as 1442 at 34 seconds, but that really should be 1342 at 34 seconds.

MS. MELNICK: No, it should be 15.

THE WITNESS: No, it should be actually 1542.

BY MS. BRUDER:

Q Fifteen. I'm sorry. Fifteen.

A Yes, ma'am, the --

Q Military time always is --

A Yes.

Q I apologize for that.

A Yeah.

Q So yeah. So again, that again this about 3:45.

A About 3:42 --

Q 3:42.

A -- and 34 seconds right there.
Q Okay. And you've watched this video before; is that correct?
A Yes, ma'am.
Q Okay.
(DVD played at 4:23 p.m.)
MS. BRUDER: Do you want me to play it out, I think it's --
MS. MELNICK: It's towards the end, but it's only a five minute thing, but you can forward it a bit. You can farther than that. Yeah, don't (indiscernible)
THE WITNESS: That's Det. Saunders' car that just -- that just traveled northbound. .
(DVD ends at 4:25 p.m.)
THE WITNESS: And that is Det. Saunders' vehicle that is now southbound just off to the --
BY MS. BRUDER:
Q This one right there.
A -- right-hand side --
Q Okay.
A -- of the Chevy Silverado that's sitting right there.
MS. BRUDER: Do you want to play the other ones?
MS. MELNICK: Play it out. Play it out.
MS. BRUDER: I'm sorry.
MS. MELNICK: Go ahead and play it out.

(DVD played at 4:25 p.m.)
BY MS. BRUDER:
Q And this is the truck that we just saw that the suspect vehicle just --
A That is correct.
Q Right in front of --
A And you can see Det. Saunders pull his vehicle up right up to that driver's side area of the -- of the vehicle that's now on its top.
(DVD ends at 4:26 p.m.)
MS. BRUDER: Do you want to (indiscernible)
MS. MELNICK: Yeah.
BY MS. BRUDER:
Q All right. In addition to that clip, were there other clips that were captured from Greenleaf video?
MS. MELNICK: Play the next one down, the bottom one.
THE WITNESS: Yes.
(DVD played at 4:26 p.m.)
BY MS. BRUDER:
Q And again, this is the vehicle. Who is this?
A That is the Defendant, Mr. Whitfield.
Q And who is chasing him?
A It's -- that would be Dep. Hale, and I believe he was also followed eventually by Capt. Peran (phonetic).
Q Don't guess if you don't know.

A Yeah.
Q That's fine.
A I don't know the other people there.
Q But it was clear that there were deputies in uniform chasing the Defendant, Caleb Whitfield.
A That I correct.
Q And this is one view from the Greenleaf in; is that correct?
A Yes.
(DVD ends at 4:27 p.m.)
Q And then this real quickly would be another view from the Greenleaf Inn, correct?
(DVD played at 4:27 p.m. ending at 4:27 p.m.)
A That is correct, this camera is affixed to the Greenleaf Inn property, the structure, it is facing on the -- what would be the west side of the -- of the business facing North Dixie Drive.
Q All right. And it played real quickly.
A Yes.
Q But if you could describe what you see?
(DVD played at 4:27 p.m., ending at 4:27 p.m.)
A You see Mr. Whitfield fall to the ground as Dep. Hale who is the gentleman -- the deputy that's standing over the top of him has just utilized his taser and has gone ahead and been able to effectively get a strike on the Defendant, which causes

his body to lock out and fall to the ground and be subdued.

MS. BRUDER: Okay. And I have marked all these videos on a flash drive for identification purposes as State's Exhibit 22. I'm going to show them to Bill. No further questions, Your Honor.

THE COURT: Cross-examination.

MS. BRUDER: Do you want me to leave that in there?

MR. CASS: Yeah, go ahead.

MS. BRUDER: Take it.

MR. CASS: No, leave it in there.

MS. BRUDER: Okay.

CROSS-EXAMINATION

BY MR. CASS:

Q So Det. Statzer, you saw this stolen vehicle on the 25th and you actually got fairly close to the vehicle, correct?

A Intimately close after the car was -- the car struck me. Yes.

Q And you were at the bumper -- the rear bumper of the car was up against your front bumper --

A That is correct.

Q -- at one point and that at best you could see through the tinted windows was a silhouette of somebody. Was that your testimony?

A It was prior to me being struck that I could see a person, a silhouette of a person in the backseat that was

seated or moving around in between the driver's -- front driver's seat and the front passenger seat so I could see a silhouette of a person so I knew that there was somebody seated in the back.

Q But at no time could you ever see anybody inside as far as to identify anybody.

A No, sir.

Q And then this impact, the car -- the 500 backed into you in your front bumper --

A Correct.

Q -- correct? And you said that you were thrown forward by that impact.

A Correct, right before -- before the impact happened it was -- I had taken off my seatbelt and -- and because I was going to exit my vehicle and place the -- the occupants of the vehicle at gunpoint. But just prior to me opening up the door is when the car went into reverse and -- and stuck me.

Q And we saw the damage to your vehicle, but I mean I wouldn't characterize it as major damage. It was minimal damage by that impact.

A Minimal damage that we see frequently for -- for strikes from vehicles that close a proximity to one another. Yes.

Q Okay. And then you said that Det. O'Connell; is that right, retired?

A He did retire I believe it was October or November of

this years -- of this past year.
Q And then you became the lead detective on this case.
A Yes.
Q Okay. And as the lead detective in charge of the case, did you review the evidence, and the report, and everything as part of your duties as the lead detective?
A In most of -- most of the -- yes, most of the evidence.
Q And helped assemble and prepare the case for trial --
A I did.
Q -- with the Prosecutors. So that when then 500 came to rest at the -- at the vacant house there it's actually it's on its roof, correct?
A Correct, it's on its roof.
Q And I think you indicated that the only door that was open or ajar was the driver's door, correct?
A That is correct.
Q And would it be accurate that that was -- out of the vehicle that was the only door capable of opening at that time, the rest of them were all damaged?
A I would say that clearly the passenger side had significant crush damage that neither door could be opened -- opened -- or opened up at all.
Q Okay. And the passenger door on the driver's side though was not open and damaged as well, correct?
A The passenger door on the driver's side, the rear you

mean.
Q Rear.
A You're talking about the rear pass --
Q Correct.
A The rear passenger door on the driver's side was --
Q Right.
A It was not -- it was not open.
Q Okay. And the -- you mentioned a window was out, was that the -- did you -- which window did you say was out but intact?
A The window -- the window of the back window if your --
Q The rear window.
A Rear window that obviously over the trunk area had been broken -- had been broken out and, but for the most part most of the rear window was still -- the framing of it was still pretty -- pretty wide open.
Q Okay. Let me show you. All right. Now, let's see if I can get this to work.
MS. MELNICK: Is that A, your A?
MR. CASS: Yes, it's A. All right. How do I switch out this.
THE COURT: That's not one that's already been used, right? Is this a new photo that hasn't been --
MS. BRUDER: Correct, it's a new photo.
THE COURT: All right. And the exhibit number would be

what, Mr. Cass?

MR. CASS: A.

BY MR. CASS:

Q Let's me show you what's been marked as Defendant's Exhibit A , and actually let me before I put it up there, I think it's easier for you to look at it somewhat clearer when you look at it. Let me hand it.

MR. CASS: Is it okay if I show it to the witness, Your Honor?

THE COURT: Yes.

(Witness reviews photograph)

BY MR. CASS:

Q And Det. Statzer, that is a photo of the 500 on its roof, correct?

A That is correct.

Q Let me direction attention the rear, it would be the passenger door --

A Okay.

Q -- the driver -- that's the driver's side. Looking at the driver's side, correct?

A Yes, sir.

Q And that has the driver's door ajar as you mentioned before.

A That is correct.

Q And then if you look to the driver -- the passenger door,

does there appear to be damage at the -- at the edge of it right there where it would be the seam to open?

A It does appear that there is some damage right around the seam where it meets the wheel well, but I'm not sure if that actually -- from this photo if I can tell whether or not it actually prevents the door from coming -- coming open so.

Q Okay. Let me just put that up for a minute so --

A Okay.

Q -- we can show it to the jury what we're talking about since (indiscernible) this photo, but --

MS. MELNICK: Hit the auto button, Bill --

MS. BRUDER: Yeah.

MS. MELNICK: -- and it might focus better to get better light. There should be one that says auto.

THE WITNESS: There you go.

MR. CASS: Thank you. Okay.

BY MR. CASS:

Q So the area that we're talking about is right in here. That's the passenger door to the driver's side and the damage you just --

A Correct.

Q -- looked at. Okay. And let me show you what's been marked as Defendant's Exhibit B. Again, I'm going to hand it to you first. Again, that's another picture of the driver's side of the Ford 500.

Case: 3:24-cv-00330-TMR-MRM Doc #: 14-2 Filed: 06/05/25 Page: 125 of 235 PAGEID #: 766



(Witness reviews photograph)
A Yes, sir.
Q Okay. And then in that picture can you see the rear, the passenger window to the door there?
A Yes. Yes.
Q And that appears to be intact at least as far as the structure of it.
A Well, the frame is still intact --
Q Right.
A -- and almost in -- in -- in the manner of how it was built, designed. The window appears to be missing out of it.
Q Let me just put that up so we can show that. Well, they'll have this back there, but the area that we're talking about is the window that's right down here; is that correct?
A Well --
Q I know that's not (indiscernible)
A I mean --
Q It's hard to tell on there.
A Yeah, if you can auto correct that there.
Q Yeah, I don't know if it'll get any better than that.
A Right below that -- well, from what I observed when you handed it to me right -- right there that's where the glass was at.
Q Let's use maybe that. There is this blue item that they can reference that is right by the window that we're talking

about.
A Yeah, I believe that's a discarded medical -- medical -- stuff that medics were using to treat Mr. -- Mr. Hespeth who was laying right below where that window frame is at in that pile of glass, which was missing from that driver's side rear window.
Q Again, we'll just try and fix that, but we're talking about this area right here where the window is.
A Yeah, it's -- yeah.
Q Okay.
A It's just a little bit to the -- to the left of where that blue --
Q Again, it's much clearer on this --
A Yes, sir.
Q -- than what's up there.
A Yes, sir.
Q Okay. And there were four occupants of the vehicle, correct?
A Correct.
Q And as part of your investigation only one of those occupants had -- was using a seatbelt at the time, or only one seatbelt was in use.
A I can't say that for -- we know at least one person was.
Q Okay. And that was Rodnesha Thompson.
A Yeah, the deceased.

Q Now, you mentioned Mr. Hespeth who you saw injured there. You did not know him prior to that, correct?
A No.
Q Okay. And pursuant to your review of the case, isn't it true that there is no report of any interview with Joseph Hespeth who was there?
A That is correct.
Q Okay. And you heard the doctor testify that he was in the hospital from, I think June 25th to July 5th, 2020. Do you recall him saying that?
A I do.
Q Okay. So there is no written record of any law enforcement officer interviewing him; is that correct?
A That is correct, you'd have to talk to Det. O'Connell to speak further about -- about that.
Q And one of the things that was done by the evidence technician in this case is there was a DNA swab of the steering wheel. Did part of your investigation reveal that?
A There was a DNA -- there was a DNA analysis completed.
Q And that was done to see if they could come up with any DNA on the steering wheel to show -- to match it to some -- one of the occupants of the car.
MS. BRUDER: Objection, Your Honor. He's not the one who took the DNA swab and can testify about the results of it.
MR. CASS: Well, I'm not asking about the --

THE COURT: He's not asking. I'm going to overrule it, if he knows.

THE WITNESS: Where was a search warrant drawn up by Det. O'Connell, it was subsequently executed, and there was DNA. There was analysis completed on the vehicle to include, it's my understanding the steering wheel of the vehicle.

BY MR. CASS:

Q Right. I guess and the point of that though was to see whether they could get DNA off the steering wheel and match it to one of the occupants in the car, correct?

A That is correct.

Q All right. And I think you mentioned that there was a search warrant. That search warrant was executed on Caleb, correct?

A Well, I'm talking about the search warrant on the actual stolen -- or on the vehicle. But yes, now that you bring that up, there was also a search warrant that was completed and served upon the Defendant for his --

Q To take his DNA.

A -- for his -- for his search warrant or --

Q Okay.

A -- for his DNA as well.

Q And isn't it true that there was no search warrant or a sample ever taken of Mr. Hespeth to compare to the DNA that was taken from the steering wheel?

A I'm unaware either way.
Q Okay. Are you aware that there was also a search warrant to take the blood and urine of Caleb?
A I am unaware of that.
Q Okay. And are you aware whether there was ever a search warrant to take the blood and urine of Joseph Hespeth?
A I am unaware of that.
Q And then going to Jelani Shackleford, isn't it true that there is no report in -- that was done of any interview ever done with Jelani Shackleford?
A I cannot tell you either way.
Q Okay.
A I am unaware of -- of whether -- whether or not there was an interview done.
Q Okay. And while as part of being the lead detective, have you ever seen one in the case --
A Well, I was only --
Q -- a report that --
A -- the lead detective because the -- within the past couple of months after the detective originally assigned to it was -- was assigned to it. So it's my understanding that -- that -- that there is not one that exists what -- what I -- what I've seen.
Q There's not one that exists that shows an interview with Jelani Shackelford. Is that what you said?

A As far as I know. Right.
Q Okay. And that are you aware that there was ever any DNA swab of Jelani Shackelford?
A I am unaware of one.
Q And whether there was ever a search warrant for the blood and urine of Jelani Shackelford.
A I was -- I am unaware of -- of one with him as well.
Q Are you aware of any drugs like Xanax ever being found in the -- in the stolen Ford?
MS. MELNICK: Objection, Your Honor. Can we approach?
THE COURT: Yes, you may.
(At sidebar)
THE COURT: Thank you. I know your basis, but go ahead.
MS. MELNICK: Well, they're getting into statements that the Defendant made and there's no charges surrounding any drugs. No drugs were found in (indiscernible) the Defendant made some statements at some point about that, and that's not for Bill to enter and we're not getting into that.
MR. CASS: As far as his statement, on Friday we had the ruling that statement was ruled to be the statement was made for the purposes of a medical diagnosis.
MS. MELNICK: I understand that.
MR. CASS: The exception to hearsay would be (indiscernible) says that there's 40,000 (indiscernible)

MS. MELNICK: But you can't enter it. Only I can enter it. It's still a statement by your client, you can't enter is statements.

THE COURT: Bill, you --

MS. MELNICK: He can take the stand.

MR. CASS: And he can still testify as to whether they found Xanax.

THE COURT: Well, we'll cross that bridge when we get to it, but right now you can't ask that question. I'm going to sustain the objection, but you may be able to get into it later, but not right now.

(End sidebar)

MR. CASS: Just a minute, Your Honor.

THE COURT: The jury will disregard the last question that was asked.

MR. CASS: That's all I've got.

THE COURT: Any redirect?

MS. BRUDER: I have nothing further, Your Honor.

THE COURT: Thank you, Deputy. You can return to your --

THE WITNESS: Thank you, Your Honor.

THE COURT: -- to your table.

Do we have about a ten or fifteen minute witness --

MS. MELNICK: I don't --

THE COURT: -- or not?

MS. MELNICK: -- know that the next witness -- we have one more witness here, Your Honor, but I don't know that --

MS. BRUDER: He will -- he'll take longer than that. There is cruiser cam that he would have to -- would watch and authenticate and it would take longer than that.

THE COURT: Okay. Because I wanted to go no later than 5:00 today so we probably ought to adjourn for the day, is that --

MS. MELNICK: That would be fine. He can come back on Thursday morning.

THE COURT: All right. Ladies and gentlemen, I don't want to inconvenience you on the first day. I may inconvenience you on another day, but not the first day so we're going to go ahead and conclude for this evening. Again, remember we are not in trial tomorrow so you got the day off, but you need to be back on Thursday and we'll start at 8:30 so if you can be back ready to go in the jury room at 8:30, I would appreciate it on Thursday.

Please remember my admonitions to you. Do not discuss this case among yourselves or with anyone else, do not permit anyone to discuss it with your or in your presence. Do not form or express any opinion on this case until it's finally submitted to you.

Have a good evening and a good day off tomorrow and I'll see you bright and early Thursday morning.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Outside the presence of the jury)

THE COURT: Anything else before we go off the record?

MS. MELNICK: I don't think so.

MR. CASS: No.

THE COURT: Okay. Very well. Have a good evening.

(Proceedings adjourned at 4:44 p.m., recommencing on Thursday, February 24th, at 9:29 a.m.)

(Thursday, February 24, 2022, 9:29 a.m.)

(Outside the presence of the jury)

THE COURT: Okay. We are on the record in State of Ohio v. Caleb Whitfield, 21-CR-1185. We're outside the presence of the jury. And Counsel has advised they want to put something on the record.

MS. MELNICK: I believe Mr. Cass.

MR. CASS: Your Honor, just that there will be a witness coming up, Det. Joseph Solomon, who is at the hospital with Caleb and will testify, you know, to overhearing a statements that he made; one being that he was -- admitted being the driver of the vehicle; the other that he stated to a nurse who asked him why he drove away from the police at such high rate of speed.

And he answered that he had 40,000 bricks in the trunk of the car, which is relevant, in my mind, to the Defense that

there were not 40,000 bricks in the car, which the deputy took to mean Xanax. And that it goes to my client's state of mind at the time that he made this statement to the nurse -- both statements that he was not in his right mind at the time.

So it's not being as offered for the truth of the matter asserted, but to show his state of mind. Also, I have submitted that it's a statement against interest and that it should come in under the -- one of those two reasons. I know the State opposes that. I don't want it -- I didn't want it come up when he was testifying so that there's this long delay.

If the Court made a ruling on it, then I'd at least have a record in advance of what the reasons were for asking the statement.

THE COURT: So if I understand, you want one statement that allegedly your client made about the reason why he ran from the police was related to potential drugs in his car; is that correct?

MR. CASS: Correct.

THE COURT: And your reason to exclude that is what?

MR. CASS: I --

MS. MELNICK: He doesn't want it excluded; he wants to enter it.

THE COURT: Oh, you want --

MR. CASS: Yeah.

THE COURT: -- to add it. Oh, you want that to be

admitted? The State wants this excluded, right?

MR. CASS: I think it --

THE COURT: You want it there because it -- you believe it goes to the state of mind of your client, correct?

MR. CASS: Right. Because there -- eventually, there is no drugs found in the car -- no Xanax found in the car.

THE COURT: Okay. I understand where you're going. But obviously, if you're going to allege his defense is some form of intoxication, I don't know that is a defense.

MR. CASS: I'm not that -- it is not going to be used in that manner.

THE COURT: All right.

MR. CASS: It's just more of that when he was talking to the nurse at that time, statements that he made were not reality based. I mean, that they were not -- there was no factual basis. That there was no Xanax in the car. Not that he was on Xanax or that that was the reason for doing anything. In fact, we deny -- we'll deny that he was even the driver.

But I think it's also in the contents -- context of the statements. First, he says he admits being the driver. Then a minute later, he says that there was -- the reason he ran was because of this 40,000 bricks in the trunk of the car which end up not being true.

So the argument being if he said that, then the first statement's not true, either.

MS. MELNICK: Can I respond, Your Honor?

MR. CASS: There was at least evidence there.

THE COURT: Okay. There was no comment about what the bricks were; it's just bricks.

MR. CASS: Right. I -- the deputy had made an assumption that he was talking about a drug. But that -- he never used the word "Xanax" in as to the bricks being in the car, just 40,000 bricks.

THE COURT: Okay. Ms. Melnick?

MS. MELNICK: Your Honor, it's very clear that Mr. Cass is attempting to enter a statement by his own client without his client taking the stand. It is the State's position under, boy, multiple rules; 802, I believe. Hold on one second here.

Under 801(d)(2), admissions are only non-hearsay if they are entered by the party opponent, not the party themselves. I know Mr. Cass is trying to slide this under Evidence Rule 804, that it is a statement against interest. What I will tell the Court is that caselaw indicates a party may not introduce his own statement as an admission of a party opponent under Evidence Rule 801(d)(2) or as a statement against interest under Evidence Rule 804(b)(3).

And this is *State v. Gatewood, Hamilton 1984 15 Ohio App 3d 14.* This is well-settled caselaw. I indicated to Mr. Cass that it is well-settled that a defendant cannot enter his own statements through other means because it is merely an

avoidance technique for him putting in his version of events without taking the stand and being subject to cross-examination.

I believe Mr. Cass has already indicated to this jury that his client intents to testify. So if he takes the stand, he can testify. Mr. Cass indicates that he doesn't remember making the statement to medical personnel, so he can't testify to it.

The State's position in that regard is there are ways to refresh his memory and it's through either if there's something in writing that he wrote, he can refresh his memory with that or there is a recorded recollection. We don't have that in this case. So it is the State's opinion, as happens to the State, all the time in cases that you're stuck.

You can't use anything else extrinsic to get your client's statements into the record; that is hearsay. The caselaw indicates that the defendant cannot enter his own hearsay. So we would object to that.

MR. CASS: I think if Your Honor -- well, it's not hearsay, one, because it's not being offered for the truth of the matter asserted. But there weren't 40,000 bricks. Also I would indicate that I did not basically say that he did not remember. But I gave the example of what if he did not remember making the statement.

THE COURT: Okay. Let me just address that issue.

I -- the law is very clear on this. And so this is an easy call. The statement is not going to come in under 801(d)(2). A defendant cannot offer a statement under these circumstances.

Now, he has a right to testify and it may very well come out on testimony. But until he does, I'm not going to allow his testimony to be offered through other people. That's a violation of 801(d)(2). There is caselaw that supports that. This Court had ruled upon this issue many, many times before; it comes up. And so I think it's very clear.

So at this point in time, I'm not going to allow that question to be asked. Now, obviously, that may change if Mr. Whitfield testifies and we'll address it at that point in time, but not until then. Okay? Anything else?

MS. MELNICK: No, Your Honor.

MR. CASS: No.

MS. MELNICK: Not from the State.

THE COURT: Bring the jury in, please.

THE BAILIFF: All rise for the jury, please.

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: This Common Pleas Court and for Montgomery County, State of Ohio is now in session. The Honorable Dennis J. Adkins presiding. Please be seated.

THE COURT: Thank you. Moring, ladies and gentlemen. Let me first start off by apologizing. I was ready to go at

8:30 as I promised. We were going to come back and bring you in. We had a juror that was given some misinformation when he called in.

Going forward, let me make it very clear to the jury. It's what I tell you that trumps everything. If I tell you to be here at a certain time, that's going to happen. So I don't know a message was on the machine telling you not to be here. But please follow my instructions as I give you each day to be her.

So we're going to start up exactly where we left off on Tuesday in the State's case.

So you may call your next witness.

MS. BRUDER: Thank you, Your Honor. We would call Sgt. Jay Vitali.

JAY VITALI

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: Sergeant, you can lower your mask if you're more comfortable while you're testifying.

SGT. VITALI: Thank you, Your Honor.

THE COURT: Okay.

MS. BRUDER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. BRUDER:

Q Good morning.

A Good morning.
Q Can you state your name and spell it for the record?
A Yes, it's Jay Vitali, V as in Victor, I-T-A-L-I.
Q Great. And can you tell the jury where you work?
A The Montgomery County Sheriff's Office.
Q And what do you do there?
A I'm a sergeant for road patrol.
Q And how long have you been a sergeant with the sheriff's office?
A 11 years.
Q 11 years. And how long have you been with the sheriff's office?
A 23.
Q All right. And prior to being a sergeant, what title did you hold?
A Detective.
Q Okay. And how long were you a detective?
A Approximately eight years.
Q And prior to that, what was your title?
A Road patrol deputy.
Q Okay. And that would get us the total of 23 years with the sheriff's office; is that --
A Yes.
Q -- correct?
A Correct.

Q And can you briefly identify what your duties and responsibilities are as a sergeant?
A Sure. I manage my deputies. I do scheduling. Just day to day assignments. Take -- make sure that things get done. I also take care of discipline.
Q Would it require you to respond to any callouts?
A Yes. Law enforcement is a part of my job.
Q Okay. And on June 25th of 2020, were you working that day as a capacity as a sergeant?
A Yes, I was.
Q Okay. And what were you wearing that day? Were you wearing uniform of the day, or --
A Yes.
Q -- plain clothes?
A Just like this.
Q Okay. And what were you driving, if you remember?
A I was driving a Ford Interceptor; it's an SUV.
Q Okay. Is it clearly marked as a sheriff's cruiser?
A Yes, it is.
Q And is it equipped with lights and sirens?
A Yes.
Q Okay. And to your knowledge, were they working that day?
A They definitely were; I tested them.
Q Thank you. And does your cruiser have capabilities to record?

A Yes.
Q And does that recording capability, does that happen the moment you start the car? Or when does it start recording? If you know.
A Well, it's always recording; however --
Q Okay.
A -- what happens is, is when you activate it by either turning your lights on or by manually pushing the record button. It goes back 30 seconds to when it wasn't on and it actually gets that into the record. Everything before that isn't caught. But 30 seconds before you activate it, and the after from there on, it's recording until you turn it off.
Q Okay. So if you started recording -- you started the car up at 1 p.m., it would automatically record, but it wouldn't retain any recording unless you specifically request is or your lights and sirens are activated?
A Correct.
Q Okay. And do you recall what hours you were working that day?
A Yes, from 3:15 p.m. to 11:45 p.m.
Q And when I say "that day", I mean on June 25th of 2020.
A Yes.
Q Is that correct? Okay.
A We called that third watch.
Q Okay. And when you arrived on duty that day, what did

you initially do?
A What I always do, I look at the schedule and just make sure there's no conflicts. Then I go to the roll call room, make sure all my patrol deputies are there and ready to go. I hold roll call.
We talk about what we need to do that day; if there's any particular people that we're looking for or just things that need to be addressed or the weather or whatever. And so I was holding roll call.
Q Okay. Is it common to let your deputies know about stolen vehicles or other crimes in the area or what to be on the lookout for?
A Yes, we do. We have bulletins and BOLOs and stuff that they're there in roll call.
Q And while you were at roll call, did you receive a callout from somebody?
A I did.
Q Can you tell the Court what that was?
A Yeah. So while I was holding roll call, Det. Statzer, he came across the radio. He contacted dispatch and came across the radio. And he indicated that he was behind an entered stolen vehicle that had been taken in an aggravated robbery.
Q And do you know about what time that was? I know you said you started at 3:15 p.m.
A Yes.

Q But approximately, what time do you remember that call coming in?
A That came out at 3:46 p.m. I believe.
Q And when you heard that call, what did you do?
A Well, I listened to the call. And then I just, you know, adjourned roll call and proceeded out to my cruiser to try to help Det. Statzer.
Q Did Det. Statzer give you a location where he was at?
A He did, yeah. He said he was -- he said that he was in his blue Dodge Charger and that he was behind the suspect vehicle. And that he was in the old parking lot -- the old Harem parking lot, and they were getting ready to pull out onto North Dixie Drive.
Q Okay. And you said he was behind the suspect vehicle. Do you remember what kind of vehicle that was?
A Yeah. He specifically -- he said it was a black -- I believe he said 2005 or perhaps a 2006 Ford 500. I think he gave a registration; it was Ohio Henry-Zebra-George, I think, 1451.
Q Okay.
A If I recall.
Q And to the best of your recollection, was that call reported stolen prior?
A Well, Det. Statzer said it was.
Q Okay. And how far away were you from Det. Statzer?

A At that time -- now, this is just an estimate, maybe a half-a-mile north of his location on the same side of the road.

Q So I believe you said that you got into your clearly-marked cruiser and started to proceed in that area; is that correct?

A Yes, that's correct.

Q All right. When you did, can you tell the Court what you saw?

A Sure. So I got in my car and then I proceeded -- then I turned right and proceeded south on North Dixie. I was in the right lane. I had to wait for traffic to get out of my way, but then I pulled out.

And then as I approached the area, I saw the black vehicle. It was first in line to get out -- to pull out onto North Dixie. Then I saw Det. Statzer's familiar car behind it.

Q All right. And when you saw that, what did you do?

A Well, I pulled up to it. I used the front of my bumper on my vehicle. I pulled up to get as close to his vehicle as I could to actually make contact with it. And then I activated my lights, made sure my car was in park, and I very quickly got out, drew my service weapon, pointed it at the driver and the occupants and told -- and then ordered them to put their hands up.

Q Okay. When you said you made contact with his vehicle, which vehicle are you talking about?

A The Ford 500.
Q Okay. And before you existed your vehicle, you said your lights were already activated?
A Yeah. At that point, yes.
Q Were your sirens activated, too, or just the lights?
A I believe just my lights.
Q Okay. And you said you exited your vehicle and drew your service weapon?
A Yes.
Q And why did you do that?
A For protection.
Q Okay. Were you able to see inside that Ford vehicle?
A No.
Q Why is that?
A The windows were tinted really dark.
Q Okay. And did you give commands to the people in the vehicle to do anything?
A Yes, to put their hands up.
Q Hands up? Did you order them to get out of the vehicle?
A I never got that far.
Q Okay. Why is that?
A The driver put the vehicle in reverse and backed into Det. Statzer. Basically, got away from my car; created room by backing into Det. Statzer; colliding with him; and then put it back in drive; and then pulled out to the right; and then

headed south on North Dixie.
Q And as that suspect vehicle headed south on North Dixie, did you observe other vehicles following him?
A Yes, I did.
Q All right. About -- were they deputy vehicles?
A They were, yes.
Q Okay. And do you remember about how many were following?
A Well, I got back into my cruiser and then pulled back into traffic. And then I was passed by Dep. Bone. And then I was passed by Dep. Hale.
So Dep. Bone was the first vehicle that I saw. And then Dep. Hale was the next vehicle. And I was right behind Dep. Hale.
Q And that was because you were already outside your vehicle and it took you some time to get back into yours?
A Right. I had to get back to my car, you know, get back in drive and pull out and not hit anyone.
Q All right. And based on your observations, you were the third vehicle in pursuit of this Ford 500?
A Yes.
Q Okay. How fast were you driving?
A You know, I didn't look at my speedometer at the time. I had a lot going on. But later I reviewed my video, and my video it has GPS coordinates and speeds in it. And it said my maximum speed was 93 miles an hour.

Q And when you say "video", that's the video recording you were testifying about that your cruiser has the capability to --
A Yes.
Q -- do; is that correct?
A Yes.
Q And while you were doing such high speeds of 93 miles per hour, were you gaining any ground on the Ford vehicle?
A No.
Q Okay. So in your estimates and your experience, how fast do you think that Ford vehicle was traveling?
MR. CASS: Objection. Calls for speculation.
THE COURT: I'm going to overrule for foundation -- or sustain it, I'm sorry, for foundation. Lay the foundation.
MS. BRUDER: Okay. Thank you.
BY MS. BRUDER:
Q In your experience as a detective, a sergeant, patrol officer, have you -- are you familiar with how fast your vehicle travels?
A Yes.
Q And based on that experience, have you been in pursuit of other vehicles and be able to estimate their speeds of travel?
A Yes.
Q And can you explain how you do that?
A In this particular case, the way I was able to estimate

it is I simply looked at the camera system. I looked at Dep. Bone's camera system. I looked at Dep. Hale's camera system, their video footage.

And in the video footage, it actually shows their GPS coordinates, which change over time because they're moving. But it also shows their calculated speed. And Dep. Bone's top speed was 98 miles an hour. And Dep. Bone wasn't gaining on that vehicle at all, based on what I could tell.

So in my estimation, the vehicle had to be going faster than 98. I cannot tell you how fast the vehicle was going exactly, except to say that in my opinion, it was going over 98.

Q Thank you.

MS. BRUDER: May I approach the witness, Your Honor?

BY MS. BRUDER:

Q All right. I have what's marked for identification purposes State's Exhibit 23. I'll hand it to you. Do you recognize that exhibit?

A Yes, it's a video.

Q Okay. And how do you recognize that?

A I reviewed this video in your office and authenticated it. And I put my initials and the date on it.

Q Okay. So you said you watched that?

A Yes.

Q And you know you watched it because your initials on

there, correct?
A Yes.
Q And what's the date that you initialed it?
A February 17th, 2022.
Q All right. And you watched that video; is it a true and accurate copy of what occurred that day?
A Yes.
Q Thank you.
MS. BRUDER: Permission to publish, Your Honor?
THE COURT: Yes.
(Videotape played from 9:52 a.m. to 9:55 a.m.)
BY MS. BRUDER:
Q All right. I'm going to stop it right here. For the record, can you cite what the date is on this recording?
A June 25th, 2020.
Q And what is the time that this is being recorded?
A 3:45 p.m.
Q And is this taken from your cruiser?
A Yes.
Q And can you tell the Court where you are, physically, at this point?
A I'm pulling out of the District 10 substation. There's a -- we have a drive -- private drive that pulls out. And in this particular case, I'm driving out of the police station facing east, due east. And what you see there is North Dixie

Drive.
Q Okay. And are you going to be traveling south?
A Correct. I'm going to be turning to the right and traveling south in the right lane.
Q And at this point, all you know is, is that Det. Statzer is behind the suspect vehicle that was reported stolen in an aggravated robbery; is that correct?
A Yes.
Q And you are going there to assist Det. Statzer, correct?
A Yes.
Q Does it take some time for the sound to come on as well?
A 30 seconds. This is the portion where it's recording before I activated it. If that makes any sense.
Q So once we hear the sound, that's when your lights go on or when you --
A Correct.
Q Okay.
A My light -- the camera gets activated when I turn my overhead lights on, which won't be for a few more seconds.
Q Okay.
A But what you're getting is that 30 seconds beforehand; there's no sound.
Q Okay. So we're approaching, it looks like a street. You see that white vehicle to the right?
A Yes.

Q Okay. Do you know what street that is? Do you remember?
A That's a private -- I believe that's a private drive there.
Q Okay. And is that where your --
A It's a parking lot.
Q -- cruiser's going to start to turn?
A Yes.
Q Okay. And is this where you indicated that you were trying to block-in the suspect vehicle?
A Yes.
Q At this point, your lights are activated. (Indiscernible) All right. So that was somebody coming through your radio inside your vehicle?
A Yes.
Q Okay. And at that point, the vehicle had already crashed; is that correct, before you arrived?
A Yes.
Q Okay. I'm going to play this through, if you could just walk us through where you end up going; what you see.
A There's the suspect. I'm trying to use my vehicle to (indiscernible).
THE COURT: I am concerned that we're not going to make a good record of this.
MS. BRUDER: Right. I --
THE COURT: If he's talking over this. So --

MS. BRUDER: Right, Your Honor.

THE COURT: --if there's something you want him to explain, please pause it. And then --

MS. BRUDER: Then we'll do that.

THE COURT: -- go back to it, okay?

MS. BRUDER: Absolutely.

THE COURT: Thank you, very much.

MS. BRUDER: I wasn't prepared for it being so loud. But thank you, Your Honor.

BY MS. BRUDER:

Q All right. So the video we just watched, you said that you saw the suspect as you approached?

A Yes.

Q Okay. And what was he wearing again?

A He had on a white shirt.

Q All right. And do you recognize that individual in the courtroom today?

A Yes, he's seated there next to Defense counsel.

Q Can you identify what he's wearing?

A Yes, he's wearing a nice white button up with a tie.

Q Okay.

MS. BRUDER: Your Honor, I'd like the Court to reflect for the record that the witness has identified the Defendant, Caleb Whitfield.

THE COURT: So ordered.

MS. BRUDER: Thank you.
BY MS. BRUDER:
Q All right. And you indicated that when you arrived on the scene, the car had already crashed, correct?
A Yes.
Q It was resting on its hood?
A yes.
Q And you saw the Defendant running down the street, correct?
A Correct.
Q Did you see the Defendant before he was running down the street?
A I'm sorry, can you rephrase that?
Q Sure. When you arrived, where did you -- when did you first see the Defendant?
A I just saw him running across the road.
Q Okay. And you try -- and when you saw him running down the road, because I don't know if the jury heard you, what did you do? What did you attempt to do?
A Well, I attempted to apprehend him.
Q And you did that by trying to cut him off with your cruiser; is that correct?
A Correct. Yeah. I tried to use my cruiser as a way to corral him and you know, to subdue him if I could with it. But that didn't turn out to work out that way.

Q Okay. And why didn't it work out that way?
A Well, he was on foot running behind a business there on the east side of the road. He initially ran west across the road. And then he turned back and then ran behind this house. And when he did that, I pursued him as far as I could with my car.
I wanted to use -- I wanted to make advantage of the speed of my car. So I went as far as I could with my car. But then there was obstacles and things in my way. So at some point around the rear of the house, I had to put it in park and get out and then start a foot chase.
Q And this view is from your cruiser where you put your cruiser in park and then you leave at that point to pursue the --
A Yes.
Q -- Defendant on foot? And where did you chase him on foot?
A Northeast.
Q Can you be more specific as to exactly where? Did you go behind the building? Did you go back around the building to cut him off?
A Just -- we see the fence; northeast would be to the left of that. So basically, I ran northeast around the backside of this house. And then we came back into a parking lot area north of this house.

And by that time, I didn't make much -- I really didn't get that far. I mean, he was pretty fast.
Q Okay --
A And he had the advantage of getting beyond me before I even got out of my car.
Q I'm going to -- you were kind of pointing there. So here's the pointer if you just hit that red button.
A Okay.
Q Can you point where -- does he go behind this fence or this building at all?
A He goes --
Q So it'd be that red -- there you go.
A There we go. So as I pull up, he runs this way.
Q All right. So he goes to the left of that fence as we're facing it?
A Correct, yeah.
Q And that's behind the building where the car crashed into --
A That's right. And --
Q All right.
A -- he is basically coming out back towards North Dixie.
Q Okay. And when you catch up to him, tell us what you saw.
A Well, Dep. Hale had -- who was also on foot pursuit, I saw Dep. Hale chasing him. Dep. Hale was a lot closer. And

Dep. Hale had tased him using a taser. And so he had a taser usage on him.

And when I came up upon him, he was on the ground in a prone --

Q "He" being Defendant on the ground?

A The Defendant was on the ground in a prone position. And along with Capt. Parin, and Dep. Gebhart and Dep. Hale, we placed handcuffs on him, put him in the recovery position and went from there.

Q All right. And after the Defendant was secured, did you talk to him?

A I did, yes.

Q And did he provide you with his name?

A He did.

Q And what did he tell you?

A He said he was Caleb Whitfield.

Q All right. Did he provide you any other information?

A I believe he gave his date of birth. I don't recall what it was at this time. But he did provide that.

Q Okay. And you were able to confirm that was indeed Caleb Whitfield?

A Yes.

Q Thank you. And after the Defendant was secured in handcuffs, what did you do next?

A Well, I looked at him. We put him in the recovery

position; turned him on his left side so that, you know, he could breathe a little bit better instead of being on his -- in the prone position, it's difficult to breathe when you're handcuffed.

So I put him on his left side. I assessed him for injuries, kind of looked at him. We lifted up his shirt to make sure he didn't have a handgun or something tucked in his waistband. We always do a standard pat-down search for weapons, stuff like that for officer safety.

And I notice that he had some injuries on his forehead, his chin, his abdomen, and his -- one of his legs. I think his right leg had an abrasion on it.

Q Did you call for a medic to one look at the Defendant?

A One was called, yes.

Q Okay. And after that was done, did you go assess the crash scene?

A Yes.

Q Okay. And can you tell us what you did?

A Mainly, I was just trying to -- being the supervisor, I was just trying to make sure, really, I was trying to look at the whole big picture. I didn't do any one specific thing with that. I was just mainly seeing, you know, who I had on-scene and what they were doing.

You know, where all -- where the crash victims were; what resources I had to best investigate this at the time; what

needed to be done; things of that nature.
Q All right. Did you instruct any of your deputies to go to the hospital where any of the injured parties were at, if you remember?
A I didn't give that specific instruction.
Q Okay. When you got to the crash scene where the vehicle was, did you observe any injured parties?
A I recall the deceased victim still in the car and the fire department trying to get her out.
Q Where was she in the car?
A The front passenger seat.
Q Did you see any other injured passengers, or?
A Yes, there was two other individuals --
MR. CASS: Objection.
A -- they were actually outside of the car.
THE COURT: Just a second, sorry.
MR. CASS: To the characterization of it.
THE COURT: Overruled.
BY MS. BRUDER:
Q You may answer.
A Okay. There as two other individuals who were outside of the car. One was sitting on the stoop of the house that the vehicle was next to. And there was another individual kind of laying the grass area.
Q Okay. And were these individuals laying behind the

crashed vehicle --
A Yes.
Q -- where you described them? Okay.
MS. BRUDER: One minute, Your Honor.
BY MS. BRUDER:
Q On June 25th, 2020, did your sheriff's office, were they -- were you equipped with body cameras?
A No.
Q Okay. So the only video footage that the sheriff's office had at this time were the cruiser cameras, correct?
A That's right.
Q Okay. And you stated that Dep. Bone was the first deputy to arrive -- or excuse me, the first deputy that was pursuing the suspect vehicle, correct?
A Yes.
Q And to your knowledge, did Dept. Bone's cruiser have video capabilities?
A Yes, it did.
Q All right. And to your knowledge, was it working on June 25th of 2020?
A Yes, it was.
Q All right. And have you had an opportunity to view Dep. Bone's cruiser video?
A I have.
Q Okay. And when you viewed it, was it a true and accurate

copy of what occurred that day?
A Yes.
Q Okay. If I showed you the video again, would you recognize it?
A Yes.
Q Okay.
MS. BRUDER: Your Honor, permission to publish the video?
MS. MELNICK: For the record, State's Exhibit --
MS. BRUDER: 59 for identification purposes.
THE COURT: Is this the same exhibit number as he testified to earlier?
MS. MELNICK: No, this is a different video. This would be a --
THE COURT: And what was the --
MS. MELNICK: It's 59. This is one you'd have to write in, Your Honor.
THE COURT: Okay. What was the exhibit number of the first video you --
MS. MELNICK: The other exhibit was 23.
THE COURT: Yeah, I don't think that's part of the record, so.
MS. MELNICK: Oh, okay.
THE COURT: I wasn't sure of it.
MS. BRUDER: I apologize. I thought I had stated that.

But the video that I showed you, Sgt. Vitali, it's marked as State's Exhibit 23 for identification purposes.

THE WITNESS: Okay.

THE CLERK: Thank you.

(Pause in proceedings)

BY MS. BRUDER:

Q All right. Well, thank you for helping us with the technology. Do you recognize this?

A Yes, it appears to be 8476, I believe that's Dep. Bone's cruiser, 8476.

Q Okay. And do you know where he is right now? Where the cruiser is, if you remember?

A Oh, this would be between the police station and the detective section in the parking lot.

Q Okay. And this is a true and accurate copy of the cruiser video you had watched earlier --

A Yes.

Q -- from Dep. Bone's cruiser? Okay. I'll play it.

(Videotape played from 10:10 a.m. to 10:16 a.m.)

BY MS. BRUDER:

Q All right. So before we go any further with this, can you tell me what's on the bottom of the cruiser cam there? Where the date is, 6/25/2020. Can you see that?

A Yes.

Q And then there's a bunch of windows that has numbers and

other information.
A Yes.
Q Do you know what those -- what that means?
A Yes.
Q Okay.
A So --
Q And that GPS box, what's inside that box?
A You don't actually have that on this particular video. What you have on this video is the date, the time in 24-hour time, so that's 1500 hours, 46 minutes, 56 seconds. The "L" means lights are activated; "S" means sirens are activated; 8476 is the cruiser number; and Harrison -- "HA" stands for Harrison.
Q Okay. So right here, what is this?
A Oh, okay. I see that. Okay, yeah. So right there at the very bottom, you have 90 miles per hour --
Q And is that --
A -- that's the speed.
Q And that's the speed of what?
A That's the speed of Dep. Bone's cruiser.
Q Okay. And at this point where I paused the video, the cruiser's traveling at 90 miles per hour?
A Yes.
Q And can you see the suspect vehicle ahead of him at any point in this view?

A I don't see it at this particular frame, no.
Q Okay.
MS. BRUDER: Continue playing again.
BY MS. BRUDER:
Q So can you point out where your vehicle is?
A That's --
Q With the pointer.
A -- the vehicle that you see -- that is my vehicle there. That's Dep. Hale.
Q Okay.
MS. BRUDER: Will you rewind it a little bit, Kim? Right before he -- stop right there. A little bit more, sorry.
BY MS. BRUDER:
Q Do you know whose vehicle this is right here that pulls right in front of the crashed vehicle? And if you don't, that's fine.
A If you could advance it a little bit further, maybe I can see it in a different --
Q Okay.
A -- frame. I think that's Det. Saunders' vehicle.
Q Okay.
MS. MELNICK: Do you want me to play?
MS. BRUDER: Yeah, please.
BY MS. BRUDER:
Q And that's your vehicle there over on the right?

A The SUV is (indiscernible).
Q And then the vehicle that you drove around, do you know whose vehicle that was?
A if you can go back.
Q Back and play it. It's right here.
A That's Dep. Hale.
Q Do you see him exit his cruiser at that point?
MS. BRUDER: Okay. Thank you.
No further questions, Your Honor.
THE COURT: Cross?
MS. MELNICK: Do you want this video up for (indiscernible).
MR. CASS: (Indiscernible).
MS. MELNICK: I guess, yeah. So if you want it up.
MR. CASS: No, I don't want it up.
MS. MELNICK: It won't play on the Court's computer.
MR. CASS: Right. I don't need it right now. I might wait. Thank you.
MS. MELNICK: Yeah.

CROSS-EXAMINATION

BY MR. CASS:
Q Sgt. Vitali, so you were -- you actually got out of your cruiser once the stolen car was stopped in front of Det. Statzer's vehicle, correct? Did you get -- and pulled your gun; is that correct?

A Yes. Yes.
Q Okay. And you said you were behind your door for protection at that time?
A Not my door, the engine itself.
Q Engine itself, okay.
A Yeah.
Q And you -- your testimony was that the windows were -- the tinted windows were so dark you couldn't tell where anybody was in that, correct?
A That's true.
Q Or see anybody?
A Yep.
Q Now, in your experience as a law enforcement officer, have you chased cars before like this?
A Yes.
Q And it's not unusual when the subject car that you're chasing comes to the stop that the occupants get out and run, correct?
A Yes.
Q You've seen that happen before?
A yes.
Q Okay. And in this case when Caleb, you saw him, he got out -- or he ran around, kind of in a circle. Would that be fair to say? He went -- from where the car was, he went around the building and then started to come back towards Dixie where

the wreck had happened, right?
A Yes.
Q Okay. How many -- at the time that he did that, how many, I guess, deputies or law enforcement personnel would you estimate were on the scene right then?
A I would estimate -- it's just an estimate, minimum, five.
Q Okay. And most of them -- I know you pulled around and were out in the Dixie area, correct -- had pulled their cars up out where the crash had occurred?
A I'm not really sure exactly where they were.
Q Okay. Well, we saw a couple on the video --
A Yes.
Q -- that were already parked --
A Yep.
Q -- right out there and --
A Beyond what we see --
Q on Dixon.
A -- in the video, yeah, I'm not sure.
Q Okay. And then when you did observed Caleb after he had been tased and I guess, being handcuffed, you did observe injuries to his face, correct?
A Yes.
Q And his chin?
A Yes.
Q Okay. Have you seen the video where he is actually tased

and falls kind of face first onto the cement?

A Yes.

Q Okay. And those injuries were at least consistent that you saw kind of fall?

A Yes.

MR. CASS: That's all I have, Your Honor.

THE COURT: Any redirect?

MS. BRUDER: No, Your Honor.

THE COURT: Thank you, Sergeant. You're excused.

SGT. VITALI: Thank you.

THE COURT: Next witness, please.

MS. MELNICK: The State calls Dep. Benjamin Hale.

BENJAMIN HALE

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: Detective, you can lower your mask if you need to while you testify.

DIRECT EXAMINATION

BY MS. MELNICK:

Q Good morning, sir.

A Good morning.

Q Can you please start by stating your full name and spelling your first and last name for the record?

A Benjamin Hale. B-E-N-J-A-M-I-N. Last name, Hale, H-A-L-E.

Q And can you tell the ladies and gentlemen on the jury, please, where you're currently employed and in what capacity?
A I'm currently employed with Montgomery County Sheriff's Office as a deputy sheriff assigned to road patrol in Harrison Township.
Q Okay. And how long have you been employed with the sheriff's office?
A Seven years.
Q Okay. Do you have any law enforcement experience prior to that time?
A I do.
Q And where was that?
A City of Germantown.
Q How long were you there?
A A year.
Q Was it also a road patrol job you were doing there?
A Yes, ma'am.
Q Okay. Now, for the sheriff's office, can you explain, when you're on road patrol, what are you normally wearing?
A Uniform of the day. Regular deputy uniform like the two gentlemen sitting in the back; same uniform.
Q Okay. And what are you normally driving?
A A marked Dodge Charger.
Q Okay. Is it clearly marked "sheriffs" on the side like we would normally see a police car?

A Yes, ma'am.
Q All right. Overhead lights on top?
A Yes, ma'am.
Q Sirens?
A Yes, ma'am.
Q Okay. Can you tell me, were you on duty back on June 25th of 2020?
A Yes, ma'am.
Q And were you on duty in the capacity road patrol that you were discussing?
A Yes, ma'am.
Q All right. Were you wearing that uniform and driving that marked cruiser?
A Yes, ma'am.
Q Were you a one or a two-man crew that day?
A One-man crew.
Q All right. And is there a particular area of town that you are assigned to patrol?
A I'm typically assigned the westside of Harrison Township, which would be everything west of Riverside Drive.
Q Okay. And do you have a particular police station that you're, like, homebased? Where you go every day to report in for work?
A Yes, ma'am.
Q And where is that?

A 5945 North Dixie Drive --
Q All right. And what --
A -- Harrison Township Government Center.
Q Is that called D or District certain number?
A District 10. We refer to it amongst ourselves at D-10.
Q D-10, okay. And what shift were you working on that day, July 25th (sic)?
A 3:30 to midnight.
Q I'm sorry, June 25th. I want to get that right.
A It's all right.
Q 3:30 in the afternoon to midnight?
A Yes, ma'am.
Q All right. And tell us, when you go in at 3:30, what do you do?
A We go in, we load -- get our car, load up our equipment required for the day. We have roll call, which is just a pass-on between shifts or pass-ons from our administration; just a share of information.
Q Getting everybody up to speed on anything that might be going on?
A Yes, ma'am.
Q Okay. And on that day, June 25th of 2020, did you respond to work at 3:30? And did you go into roll call?
A Yes, ma'am.
Q All right. What happened while you were in roll call?

A From roll call that day, a broadcast was made form Det. Statzer advising he was behind an entered stolen and felony vehicle.
Q Okay. And do you recall approximately what it was at that point?
A Between 3:30 and 3:45.
Q Okay. Is that usually how long roll call takes?
A Roll call is approximately 15 minutes.
Q Okay. So was this towards the end of your roll call that this call came out or the beginning? Or do you not remember?
A I believe it was somewhere in the middle.
Q Okay. And so what do you do when this call comes out? What do you guys do?
A We all exit the District into the parking lot. We enter our prospective vehicles, and we went toward the last location that was broadcast over the radio.
Q All right. So at that time, were you equipped with any kind of body cams?
A At that time, our agency did not have them.
Q Okay. What about cruiser cams?
A Yes, ma'am.
Q All right. And did -- are you assigned to a particular cruiser? So when you run out to the parking lot, you know what car you're getting in?
A Yes, ma'am. I have an assigned car.

Q Okay. And was your car equipped with video equipment that was operational on that day?
A Yes, ma'am.
Q All right. Now, tell us, when you go out to the parking lot from roll call after this broadcast is made, you get in your car. Do you automatically turn on your cruiser video?
A Immediately, no.
Q Tell us what you do.
A I exit the parking lot behind another deputy. We exit the parking lot; we turn right to travel south. We travel approximately 200 yards until we see the vehicle in question. Once within maybe 100 feet of the vehicle, I activated my emergency equipment, overhead lights --
Q All right.
A -- which activates the camera.
Q And would you agree with me that when you active the camera, it actually backs up by 30 seconds or so? When you pull that footage -- so you're actually getting footage from 30 seconds earlier than when you activated the camera?
A Yes, ma'am.
Q Okay. Now, have you viewed your cruiser cam?
A Not since the incident.
Q Did you review it in my office?
A Yes, ma'am.
Q Okay. Do you remember when that was?

A Maybe --
Q You don't have to remember. Did you write the date on this disc when you reviewed it?
A I did.
Q All right.
A Maybe two weeks ago.
MS. MELNICK: For the record, this is State's Exhibit 24.
BY MS. MELNICK:
Q I'm going to hand you what's been marked as State's Exhibit 24. Tell me, if you would, take a look at that disc for me. Tell me if you recognize that disc.
A I do.
Q All right. And are your initials on that disc?
A Yes, ma'am.
Q And is there a date that goes along with them? Yeah, you can take it out.
A February 8th --
Q February 8th?
A -- of '22.
Q Okay. So just not too long ago, you placed your initials and that date on that video, correct?
A Yes, ma'am.
Q Did you review it at that time?
A Yes, ma'am.

Q Is that a complete, true and accurate copy of your cruiser cam video from June 25th of 2020?
A Yes, ma'am.
Q All right. Thank you.
A No worries.
MS. MELNICK: Permission to publish, Your Honor?
BY MS. MELNICK:
Q All right. I'm going to leave this with you. If you push the red button --
A Uh-huh.
Q -- that is a laser pointer. You can see it's going to the ceiling right now.
A Okay.
Q So if I ask you any questions, if you'll point to that big screen, and you can point some things out, okay?
A Yes, ma'am.
(Videotape played from 10:27 a.m. to 10:33 a.m.)
BY MS. MELNICK:
Q All right. First of all, does that have your name on it?
A Yes, ma'am.
Q Is that what this is right here?
A Yes, ma'am.
Q Hale, and then your first initial, B?
A Yes, ma'am.
Q All right. And do you know whose cruiser is in front of

you?
A That would be Sgt. Vitali.
Q Okay. So you're right behind Sgt. Vitali?
A Yes, ma'am.
Q Leaving the parking lot?
A Yes, ma'am.
Q All right. And just to make sure we're clear, what road is this?
A North Dixie Drive.
Q And which way are you going to turn, right or left?
A I'm going to turn right.
Q And what direction does that leave you traveling in?
A South.
Q Okay. All right. I'm going to back this up for just a second here. Do you know whose car this is?
A That would be Det. Statzer.
Q All right. And what about this car? Is that the suspect vehicle?
A Yes, ma'am.
Q All right. So on your camera, I'm going to back it up just a little bit more. Did you see that suspect vehicle back into Det. Statzer's vehicle?
A Yes, ma'am.
Q All right. Now, do you know whose cruiser this is?
A That would be Dep. Bone.

Q Where was he just prior to coming around you? Did you know where he was?
A I believe he was directly to the rear of me.
Q Okay. So leaving the parking lot, was it Sgt. Vitali, you, and then Dep. Bone?
A Yes, ma'am.
Q All right. And with that little backup that occurred there, bone got out in front of everybody?
A Yes, ma'am.
Q Okay. Can you tell me, approximately, how fast you were driving at this point?
A At this point, approximately 95 miles an hour.
Q All right. And do you know whose car this is?
A The black impala would be Det. Saunders.
Q Okay. Now, do you know who this individual is right here?
A That would be our suspect in question.
Q All right. And did you end up having direct contact with that suspect in question?
A I did.
Q And do you recall his name?
A Initially, no. But I later learned him to be identified as Caleb Whitfield.
Q All right. Do you see Caleb Whitfield in the courtroom today?

MS. MELNICK: Could I ask that all parties remove their masks, Your Honor?

THE COURT: Yes.

A I do.

BY MS. MELNICK:

Q And can you point to him and tell me what he's wearing for the record please?

A It looks to be a light-blue shirt and dark purple tie -- or dark blue tie.

MS. MELNICK: For the record, Your Honor, I'd like to note he's identified the Defendant.

THE COURT: So ordered.

MS. MELNICK: Thank you.

BY MS. MELNICK:

Q Now, your cruiser, as you're pulling up, do you have a wider field of vision, obviously, than what your camera is showing?

A Yes, ma'am.

Q All right. So I want to rewind this just a tiny bit. All right. So all right. Now, could you see, as you were pulling up, where this person was existing from in the car?

A From what I believe to be the driver side door.

Q Okay.

A Or window, rather.

Q Okay. Was that you yelling at the suspect, stop?

A Yes, ma'am.
Q Okay. Tell us what happened there. When he goes out of view, but you know, obviously, you're still driving. You can look out your driver window. What's going on?
A So initially, as he's exiting the vehicle, he tries to run westbound across North Dixie. I intersected his path of travel with my vehicle and gave him commands to stop. After intersecting his path of travel, he doubles back to run back eastbound.
He runs around the building just out of frame that you initially saw. We run around the rear of that building, foot pursuit, calling it out on the radio, updating dispatch my location and suspect description.
Q Okay.
A We run across Hillsdale, back northbound into the parking lot of, I don't recall the name of the business currently --
Q Okay.
A -- into a parking lot of the business. His path was intersected again, at which point, I give -- I continue to give him verbal commands, stop or I'm going to tase you. He continues running; I deployed my taser.
Q Okay. And did it work?
A Yes.
Q Okay. And we'll show you some other stuff, too, all right? But for now, let's play -- are you out of your vehicle

at this point?
A At this point, yes.
Q All right. Now, did you get back in your vehicle anytime soon?
A No.
Q Does another deputy get in and move your vehicle?
A Yes.
Q All right. So when your car starts moving, again, that's not you?
A Correct.
(Videotape played from 10:35 a.m. to 10:38 a.m.)
BY MS. MELNICK:
Q Whose vehicle is that?
A Det. Saunders.
Q All right. So he's now moved from where we saw him earlier in the video and come around?
A Yes.
Q All right. So was that Det. Saunders who then moved your car?
A Yes, ma'am.
Q And was he blocking traffic with it? Is that what he was doing?
A Yes, ma'am.
Q Okay. Now, you're not visible in this part of the video that we can see; is that correct?

A Correct.
Q All right. After you indicate you chase down the Defendant and tased him, did you ever go back to the crash scene there?
A Yes, I didn't leave the crash scene until it was cleared after our traffic investigators completed their investigation.
Q All right. So do we -- can we see here an individual out of the car? Did you go back and see any of those individuals?
A Yes.
Q Okay. And this person that we see here in the white shirt -- and I'll -- let me kind of back this up, because as your car's backing up. Let's see. Can you see any of the individuals? Or do you recall where they were by looking at this video?
A By this video, no.
Q Okay. Now, did you have an opportunity to also review another video, Dep. Gebhart's video when you came to my office?
A Yes, ma'am.
Q And are you, yourself, in frame on Dep. Gebhart's video?
A Very briefly.
Q Okay. But are you able to identify yourself in that video?
A Yes.
Q And did you know that to be Dep. Gebhart's cruiser at the time?

A At the time of the initial incident, no.
Q Did --
A Not until the -- Mr. Whitfield was already secured.
Q Okay. Once he was secured, did Dep. Gebhart come and assist you?
A Yes, immediately following my taser deployment.
Q Okay so at that point, you knew whose cruiser that was?
A Yes, ma'am.
Q All right.
MS. MELNICK: Let me just double check before we --
BY MS. MELNICK:
Q And what's Dep. Gebhart's first name?
A Hank.
Q Okay.
MS. MELNICK: This is going to be State's Exhibit 25.
BY MS. MELNICK:
Q I'm going to hand you what's been marked as State's Exhibit 25. Can you take a look at that and tell me if you recognize what that is?
A Cruiser cam video.
Q All right. And do you know whose cruiser cam video that is?
A Dep. Gebhart.
Q All right. And did you view that in my office on February 8th --

A Yes, ma'am.
Q -- of this year? And are your initials and that date on there?
A Yes, ma'am.
Q Is that a complete and accurate copy of the cruiser cam footage from Dep. Gebhart's cruiser?
A Yes, ma'am.
Q All right.
MS. MELNICK: Permission to publish, Your Honor.
THE COURT: You may. And the exhibit number, again, is what?
MS. MELNICK: It is 25, Your Honor.
THE COURT: Thank you.
(Videotape shown from 10:40 a.m. to 10:47 a.m.)
BY MS. MELNICK:
Q So where is he parked right now? Is that at D-10?
A Yes, ma'am.
Q All right. So that's kind of in the back area? Is -- between these two buildings, is this street right here, is that North Dixie?
A Yes, ma'am.
Q Is that how you would pull out of the parking lot?
A Yes, ma'am.
Q All right. Does it appear that Dep. Gebhart was a little bit behind the rest of you guys leaving?

A Yes, ma'am.
Q You and Vitali? And Bone would've been behind you pulling out all at the same time. He was a little behind you?
A Yes, ma'am.
Q All right. Was that -- was this you?
A Yes.
Q All right. So you're the one who was chasing the Defendant, correct?
A Yes, ma'am.
Q And do you recall who these two people are?
A That would be Dep. Gebhart and Sgt. Vitali, I believe.
Q Okay.
A Yes, that's going to be Sgt. Vitali.
Q All right. All right. Now, you testified earlier something about the recovery position. I don't know why this is showing up kind of dark. But can you explain what that means to the jury and why you do that?
A So the recovery position -- given the fact that the Defendant was just involved in a car crash, a foot pursuit, and having been tased, once he was secured of weapons, the next order of business is to make sure he can oxygen and make sure he can breathe. And we start to assess what injuries he has. And --
Q All right. So what we just watched prior to him being rolled up on his side, is that -- rolling him up on his side,

is that the recovery position?
A Yes.
Q Kind of like a fetal -- almost fetal position?
A Yes.
Q All right.
A Rolling him up on his side, and we did that for two reasons: to check his waistband for any guns or knives; and then, two, to keep him from swallowing his tongue.
Q Okay. And did he appear to be breathing? Was he conscious and able to speak to you?
A Yes.
Q All right. In the period of time prior to him being rolled up, because he fell face-down, correct, when he was tased?
A Yes.
Q What was going on with the three of the officers that were dealing with him? What were they doing to him at that point?
A Securing his hands and checking his person for weapons.
Q All right. Were any weapons found?
A No.
Q Okay. And so once that was done, he was rolled-up onto his side. Were medics called?
A Immediately.
Q Okay. Now, I want to back this up a little bit. All

right. Now, this house right here, is that the house that was struck by the vehicle?
A Yes.
Q What street is this?
A That would be Hillsdale.
Q All right. And where did he come running out from? You can use the pointer to kind of show me where he had come from.
A He would've been coming from -- so that is a second building. So the space in between here would be a vacant lot.
Q Okay. And he came out through there?
A Yes.
Q All right. So he came out from there and you're right here, correct?
A Yes.
Q So you're right on his tail?
A Yes.
Q Okay. And when Dep. Gebhart's cruiser comes around, does he kind of do what you did with yours and try to block his path?
A Yes, ma'am.
Q All right. Now, while you were dealing with the Defendant when he had been tased and he was being apprehended at that point, did he make any statements aside from who he was or anything of that nature?
A Not that I recall, no.

Q Did you ask him, specifically, any questions?
A I was more concerned just trying to identify who he was.
Q Okay.
A Just ask him his basic identifying information.
Q Okay. You weren't questioning him about what had occurred. You were just trying to figure out what -- who he was so that you can identify him?
A Correct.
Q Okay. Now, did you stay with him until medics arrived?
A Yes.
Q All right. And was he transported to the hospital by medic?
A Yes.
Q Okay. So let me ask you this, when you see the suspect coming from the car, can you tell what side of the car he's coming from?
A Driver's side.
Q Okay. Can you specifically tell what door or when I say "door", I mean, driver's side door, driver back rear door, windows, what have you. But do you know which door he came out of?
A I could say if the door was open or if he crawled through the window, but driver's door.
Q Okay. You're not sure which way he got out the driver's door, but he came from the driver's door?

A Correct.
Q You could see it was the pass -- the rear passenger door still closed? Or do you even know?
A That I don't remember.
Q Okay. When you saw him, could you see him running around the door or you're not sure? You just know he came right from that part of the car?
A Right from that part of the car.
Q That's fair.
MS. MELNICK: Nothing further, Your Honor.
THE COURT: Cross?

CROSS-EXAMINATION

BY MR. CASS:
Q So we saw on the video, Det. Hale, when you pull up, I mean, he's already standing up from that driver's side, which is the side that's facing you when you're coming down on Dixie, correct?
A Correct.
Q Prior to that, you couldn't see where he was in the car, correct?
A Correct.
Q Because -- and do you recall that the driver's door was open by -- at the time that he emerged, it was already -- the door was open and the --
A I don't know if the driver's door was open or if he

crawled through the window.
Q The window of the driver's door?
A Correct.
Q Okay.
A Due to the damage of the car.
Q And if that drive -- if there's photos that show that that driver's door was still intact, then he wouldn't have -- that wouldn't have been where he came from, correct?
A Fair to say.
Q And do you recall if this vehicle had tinted windows?
A Correct.
Q On the driver's door as well as around the passenger's sides. Do you recall that?
A Correct.
Q All right. And the vehicle is upside down, correct?
A Correct.
Q Now you've -- have, in your experience as a law enforcement officer, have you chased cars like this before?
A Yes.
Q Okay. Whether they're stolen or whether you're just trying to stop them?
A Correct.
Q For whatever reason? And it's not uncommon for the occupants to get out of the car and run, correct? Once it comes to a stop?

A Correct.
Q All right. And I think you -- the video showed or you testified you shot your taser into the -- into Caleb as he was running, correct?
A Yes.
Q All right. And one of those tasers hit him in the head; is that correct?
A Yes.
Q All right. And I guess what we saw there is what's called a full lockdown or where his -- can't use any muscles in his body, basically --
A Correct.
Q -- to prevent his fall. And he skidded face-first onto the concrete, correct?
A Correct.
Q It was concrete there? And it is true that you never got your -- you never didn't -- you didn't pull your taser out while you were there. In fact, I think it said in your report, you never got the taser back or know what happened to it; the probe, I'm sorry.
A The taser probes -- due to where it struck him, accompanied with everything else that had happened prior to, it was best to leave them intact.
Q Okay. And do you recall -- I think you were asked that you waited with Caleb until the medical personnel got there?

A Correct.
Q And do you recall that Caleb, during that time, struggled to remain conscious -- those are your words, in your report?
A Correct.
Q That he was falling -- well, when you say "conscious", he was nodding out or something of that effect --
A Yes.
Q -- during that time? And when you pulled up, he was already -- he kind of ran, like, almost a circle around the building, correct?
A Yes.
Q And how many law enforcement officers were on the scene at that time?
A At least seven.
Q Okay. And the majority of them were back on Dixie, correct? Where --
A Yes.
Q -- the stop out in the street in front of the crash?
A Yes.
Q Which was the direction he ended up kind of heading before you tased him, right?
A Yes.
MR. CASS: Can I have a moment, Your Honor? That's all, Your Honor.
THE COURT: Any redirect?

MS. MELNICK: Yes, Your Honor. Just briefly. Just one moment.

REDIRECT EXAMINATION

BY MS. MELNICK:

Q Sir, I'm going to hand you what's been marked as State's Exhibit 39 for identification. Can you tell me, do you recognize what that is a photograph of?

A That is a -- this is a photograph of the vehicle we were pursuing.

Q All right and is that the vehicle after the crash?

A Yes.

Q All right. And can you -- is that an accurate photograph of what the vehicle looked at after the crash?

A Yes.

Q Can you tell me, is the driver's side of the vehicle in view in that photograph?

A Yes.

Q And can you tell us the condition of the door on the driver's door?

A It is open.

Q Can you tell whether or not the window to that door is intact or whether it's broken?

A It is intact.

Q Okay. So based on your testimony, you said he got out of the driver's door. Would he have had to have gone around the

door in order -- he couldn't crawl through the window; is that a fair statement?
A Correct, with it being intact.
Q It's intact and it's -- I mean --
A It would be --
Q -- I know the car's upside down. But --
A It would be --
Q -- it's rolled up, correct?
A Yes, ma'am.
Q All right. Let me put this --
MS. MELNICK: I don't know if this is going to show. You'll see it better later, I promise. There's got to be a better a way to do this. All right. Well, that's fine. We have a better way to show this later in another witness. I'll hold off on that.
THE COURT: If you want to show it --
MS. MELNICK: I have nothing --
THE COURT: -- to the jury, you can.
MS. MELNICK: You'll see this bigger on the screen, digitally, later. Thank you, Your Honor.
Nothing further, Your Honor.
THE COURT: Any recross?

RECROSS-EXAMINATION

BY MR. CASS:
Q Just to show you, again, Det. Hale, State's Exhibit

Number 39.

MR. CASS: May I approach, Your Honor?

THE COURT: Yes.

BY MR. CASS:

Q So you testified that that driver's door is open and it also has the tinted window, correct?

A Yes.

Q Upside down. And that -- fair to say that door and the window would've blocked your view as to the inside of the vehicle, correct, as you're coming down the street?

A Yes.

Q And so basically, what you saw is him stand up behind that door, correct?

A As I approached -- are you referring to what I saw as I approached?

A When he -- when you first saw him, he was coming up from behind that door, correct?

A The video shows him coming up from this -- from that -- behind that door, yes.

Q Behind the door in the exhibit? Okay.

MR. CASS: That's all, Your Honor.

THE COURT: All right. Thank you, Officer. You can step down. You're free to go.

THE COURT: Just lay that photograph right there on the rail or give it back to the Prosecutor.

THE COURT: Ladies and gentlemen, we're going to take our midmorning break. Since we got a late start, I'd like to just keep it ten minutes. So if you can be back we'll start -- reconvene at five after 11 (indiscernible).

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Recess taken)

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: Thank you, ladies and gentlemen.

You may call your next witness.

MS. BRUDER: Thank you, Your Honor. We would call Det. Kent Saunders.

KENT SAUNDERS

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: And Detective, feel free to lower your mask while you're testifying.

THE WITNESS: Thank you, sir.

MS. BRUDER: Your Honor, may I question the witness? Thank you.

DIRECT EXAMINATION

BY MS. BRUDER:

Q Good morning.
A Good morning.
Q Could you state your name and spell it for the record?
A Det. Kent Saunders, S-A-U-N-D-E-R-S. I'm a detective with Montgomery County Sheriff's Office, assigned to Harrison Township Investigations.
Q And your first name, is it K-E-N-T?
A Yes, it is.
Q Okay. And you said that you are a detective with the Montgomery County Sheriff's Office, correct?
A Yes, ma'am.
Q And how many years have you been a detective with the sheriff's office?
A Since March of 2003.
Q And were you employed with the sheriff's office prior to that?
A Yes, I was.
Q And how long have you been employed with the sheriff's office in total?
A I've been employed with the sheriff's office since July of 1994. And I've been assigned a deputy as with the sheriff's office since December of 1995.
Q So it's fair to say you've been in law enforcement with the sheriff's office since 1994; is that correct?
A Yes, ma'am.

Q And during that time, you've been a road patrol officer and a detective?
A Yes, ma'am.
Q All right. Thank you. Any other titles that you held during that time?
A I was a school resource officer at one point as well.
Q Okay. And can you describe what kind of duties and responsibilities that you have as a detective?
A Basically follow-up investigations, contacting victims, interviewing witnesses, crime scene investigations, various things.
Q Fair enough. And were you working in your capacity as a detective for the sheriff's office on June 25th of 2020?
A Yes, I was.
Q And do you recall what shift you were working that day?
A My shift is what we call second watch, which would be day shift. For the detectives, it would be 8 to 4.
Q 8 a.m. to 4 p.m.?
A Yes.
Q Okay. And what were you wearing during your shift of 8 a.m. to 4 p.m.?
A Basically what I am right now. Not the same suit, but I typically wear a suit every day except for when there's snow on the ground, I still have a pair of corduroy boots.
Q Okay.

A So basically, just a regular suit.
Q Fair enough. So it's fair to say that your capacity as a detective, you would be -- what we call plain clothes?
A Yes.
Q You weren't wearing a uniform identifying yourself as a sheriff --
A No.
Q -- or a deputy or --
A No, ma'am.
Q -- officer? Fair enough. And what were you drive -- what type of vehicle were you driving that day?
A A black Chevy Impala.
Q And on that day, June 25th of 2020, near the end of your shift, do you recall what you were doing?
A Yes. I was actually southbound on 75. I had needed to stop downtown, and then I was going home from downtown.
Q So it's fair to say you were at near the end of your shift and heading home that day?
A Yes.
Q All right. What prevented -- did you make it home --
A No.
Q -- at that time? Okay. What prevented you from doing so?
A As I was getting on -- turning onto southbound 75, I heard the radio traffic regarding an occupied stolen vehicle

that was there in the parking lot. Okay. There's a huge parking lot that extends from the actual city, township limits that goes all the way over to Dixie.

There's, what you would call, it's not really a strip mall, but it's -- you have, one, two, three, four businesses across. And then, there's another row of empty businesses that kind of goes south. And it's all one big basic parking lot.

I heard the radio traffic of the vehicle there in that parking lot. Shortly thereafter, I heard that the vehicle had struck one of our unmarked vehicles and then was fleeing southbound on North Dixie Drive.

Q Okay. And once you heard that a detective -- another detective vehicle was struck, do you know any details about that suspect vehicle at that time?

A To be honest, no, I did not.

Q Okay.

A I just got off of the exit as quick as I could. That was the first exit that I could get off of.

Q Uh-huh.

A I just got off of the exit --

Q Uh-huh.

A -- and proceeded on Wagner Ford to get back up onto North Dixie to go northbound.

Q So would it be fair to say that instead of going home, you made the decision to go help your fellow officers in a

situation?
A Yes.
Q Okay. And you said you got off on 75 at Wagner Ford?
A Yes, ma'am.
Q And approximately how far of a distance would that exit be to the location that you believe the suspect vehicle was at?
A Maybe one mile.
Q About one mile? And does your chevy impala have recording capabilities?
A No, it does not.
Q Okay. Does it have lights and siren capabilities?
A Yes, it does.
Q And do you recall activating your lights and sirens that day?
A Yes, I did.
Q And when did you do that?
A Basically when I got off of the highway and I had gotten onto Wagner Ford. Prior to turning onto North Dixie, I had activated my lights. I'm not 100 percent sure if I activated my sirens or not. But I know that I had activated my lights.
Q All right. And even though your vehicle doesn't have video capability, were you aware of other deputies' vehicles having recording capabilities?
A Yes.
Q And did you learn that Dep. Hale's vehicle was in pursuit

of this Ford?
A Yes.
Q Okay. And did you know that that cruiser, Dep. Hale's cruiser, had recording capabilities?
A Yes.
Q And did you have an opportunity to review that video?
A Yes, I have.
Q Okay.
MS. BRUDER: Your Honor, if I may approach the witness?
BY MS. BRUDER:
Q Okay. I'm going to hand you what's marked State's Exhibit 24 for identification purposes. Can you tell me if you recognize that?
A Yes, this'll be the disc with Dep. Hale's cruiser cam.
Q All right. And is that the exact disc that you viewed the video on?
A Yes, it is.
Q And how do you know that?
A I initialed and dated it.
Q And that indicates that the date in which you viewed that --
A Yes, it does.
Q -- video? And what is that date?
A March the 17th of 2022.
Q March 17th?

A I'm sorry.
Q February.
A February 17th.
Q That's okay. So you viewed it on February 17th, 2022 in my office; is that correct?
A Correct.
Q All right. And when you viewed that disc, was it a true and accurate copy of what was depicted that day?
A Yes.
Q Thank you.
MS. BRUDER: Your Honor, permission to publish?
THE COURT: Yes.
(Videotape played from 11:20 a.m. to 11:33 a.m.)
BY MS. BRUDER:
Q Okay. I'm going to stop this right here before we get it started. Do you recognize this screen right here?
A Yes.
Q All right. And right up here, what does it say?
A That would say Montgomery County Sheriff's Office, or they abbreviate it MCSO. Harrison 321, which would be the crew number that Dep. Hale would be running that day, and "haleb", which would be for Dep. Ben Hale.
Q All right. And it has the date of June 25th, 2020, at approximately 3:45 p.m.?
A Correct.

Q Okay. All right. So I'm going to briefly stop it right there. Can you tell me what direction were you coming from?
A I would've been initially coming northbound --
Q There is a -- if you press the red button, you can show.
A Do you want me up there or down here?
Q Up there and -- then this way down --
A There we go.
Q Okay.
A I would've been in, initially, in this lane here traveling northbound. When the vehicle passed me traveling southbound, which would have been approximately, I'm going to say, about 300 yards. Approximately 200 to 300 yards to the north of where this location actually is.
Q Okay. So are you saying that you were traveling in the opposite direction of the suspect vehicle?
A Yes, I was.
Q And that before it crashed, you actually passed it?
A Yes.
Q And did you also pass deputies that were following that suspect vehicle?
A No.
Q Okay. So when you came across the Ford -- black Ford 500 that you believed to be the suspect vehicle, what did you do?
A I immediately did a U-turn and followed the vehicle.
Q And when you did that, did you keep your sights on that

vehicle the whole time?
A Yes.
Q Okay. And then when you made that U-turn, were you -- how close were you to that Ford vehicle?
A Maybe about 100 yards.
Q All right. Were you the first vehicle in pursuit at that point?
A At that point, yes.
Q All right. So then Dep. Hale was directly behind you?
A Yes.
Q So it'd be fair to say --
A Well, I don't know if he was directly behind me, but I know that there were marked cruisers that were coming behind me.
Q My mistake. Fair to say that Dep. Hale was one of the cruisers behind you --
A Yes.
Q -- correct? And that his cruiser video would capture you on his cruiser cam; is that correct?
A Yes.
Q Okay. So let's go back and play that.
A I think we have to go back -- were you trying to look for me northbound?
Q I think I can -- yeah. I'm trying to see how far back that is. I don't think we see you --

A No, it --
Q -- yet. Is it further back? Do you believe it's further back?
A I can't be 100 percent sure --
Q Yeah, I know.
A -- but it looked like prior to this, it may have showed me making the U-turn.
MS. BRUDER: It might be -- just give me one minute, Your Honor.
BY MS. BRUDER:
Q I'm just going to take it to where we get to the scene, and then I'll stop it. Okay.
A This would be my unmarked vehicle --
Q Okay.
A -- right here.
Q On the other side of your vehicle is what? Is --
A On the other side?
Q Yes.
A That would be the vehicle that had crashed.
Q All right. So when you pull up, you -- what side of the vehicle are you facing?
A The driver's side.
Q The driver's side, right here?
A Yes, ma'am.
Q All right. And who is this right here?

A That would be Mr. Whitfield.
Q All right. Do --
MS. BRUDER: Your Honor, for identification purposes, I ask that we remove our masks.
BY MS. BRUDER:
Q Do you see that same individual in the courtroom today?
A Yes.
Q Okay. Can you point him out and identify what he's wearing?
A He would be sitting at the table to my right; blue shirt and a tie.
Q Thank you.
MS. BRUDER: Your Honor, I'd like the Court to reflect for the record that the witness has identified the Defendant --
THE COURT: It will --
MS. BRUDER: -- Caleb Whitfield.
THE COURT: -- once again.
MS. BRUDER: Thank you, Your Honor.
BY MS. BRUDER:
Q All right. So as you pull up, what do you see?
A As I'm pulling up, I see the door open. Mr. Caleb Whitfield exit through that driver side area of the vehicle. And this is prior to me actually getting to this position where I'm currently at right now.
Again, I had clear vision of the vehicle as we were

traveling southbound where I saw it lose control and then flip, hit the building, and then come straight down. So I have clear vision of the vehicle and that side of the vehicle from the whole time of the flip, rotating, hitting the building, and then coming down.

Q All right. And when it came down and it stopped after it landed on its hood, your vehicle is actually pointing right at the driver's side?

A Correct.

Q And you have clear vision of that entire driver's side, correct?

A Correct.

Q And you said you saw the door open?

A Yes.

Q And from there, you saw the Defendant emerge?

A Correct.

Q And that would be from the driver's seat? Driver's side?

A That -- he comes out of that area of the vehicle.

Q Okay. Not the back window?

A No.

Q Not the passenger side?

A No.

Q Okay. And he's running; is that right?

A When he comes out he's actually low to the ground when he exits out the vehicle. And then he comes upright and then he

takes off running as I'm pulling up.

As he's running, the cruisers are also coming and he just kind of does a, you know, a 360 and heads back -- or 180 and then heads --

Q Back to --

A -- back the other way. He runs to --

Q Well, before we get to that, I just want to --

A Okay.

Q -- clear up something. You said you saw the door open and the Defendant actually crawls out from the driver's side --

A Yeah, he's --

Q -- but then gets up?

A -- low to the ground as he's coming out.

Q Okay. And then he jumps up, and then he starts to run, right where you see him right now?

A Correct.

Q Okay. I'm going to play the rest of the video for you. And this is Dep. Hale's cruiser, correct?

A Yes, ma'am.

Q Do you at some point go in that cruiser and move it? Do you back it up at all? Do you remember?

A No, I don't remember.

Q You don't remember? Fair enough.

A At this point, I've moved my vehicle. (Indiscernible).

Q All right. Before this vehicle, Dep. Hale's vehicle is

being moved, do you move your vehicle?
A Yes, ma'am.
Q Okay, can you tell me when what you did?
A I'm sorry?
Q What did -- I'm sorry. When you moved your vehicle, where did you move it to?
A Initially, my vehicle would've -- because I drove down to this side of the residence or structure. And then I moved it to this location and watching the video, I did back this vehicle up.
And the reason why, I can tell you that I backed that vehicle up is, I remember now that I didn't know how to turn the sirens off when I was backing it up.
Q Fair enough. And when you turned -- can you point where your vehicle was when you first arrived?
A You -- when I first arrived -
Q Right there. Right there.
A -- it would've been right here.
Q And then afterwards, you backed it up and you went down Hillsdale?
A No. As he exits the vehicle --
Q Uh-huh.
A -- and is running this way --
Q Uh-huh.
A -- I stayed in my vehicle. I never exited my vehicle.

Q Right.
A I drove and I tried to come and cut him off on this area of Hillsdale in case he cut back through this direction.
Q Right.
A This was one of the affected areas of the tornado. Which, this --
Q Uh-huh.
A -- structure was pretty much wiped out. So the only way for him to have ran would've either been to continue running southbound in this direction, or to cut back behind here. And I was trying to cut back to seal from coming back this way.
Q And when you did that, did you come across the Defendant?
A Yes, I did.
Q What did you see?
A He ran into my passenger side door, knocked my window down, spun, rolled, and continued to run. And at that point in time, Dep. Hale was continuing to chase after him. I exited my car and also engaged in the foot pursuit. And then he was tased by Dep. Hale.
Q All right. And he was being secured by other officers?
A Yes.
Q Okay. And I'm going to show you been what's marked Exhibit 39 for identification purposes. Do you recognize this?
A Yes.
Q All right. And how do you recognize that?

A This would be a photograph of the vehicle in its resting place.
Q Okay. And is that a true and accurate copy of what you saw that day?
A Yes, it is.
Q Okay.
MS. BRUDER: See if I can get this to work and show it to the jury. Very challenging to see.
MS. MELNICK: (Indiscernible).
MS. BRUDER: All right.
BY MS. BRUDER:
Q So I'm going to hand you the picture back. And can you tell me what side of the vehicle is being shown in that picture?
A The driver's side.
Q The driver's side? And is that the -- again, the side that you pulled up to?
A Yes, it is.
Q Okay. And in that picture, is the driver's door opened or closed?
A It is opened.
Q All right. And is the passenger door opened or closed?
A It's closed.
Q Can you describe the condition of that passenger side door?

A I really can't see it because it's kind of smashed.
Q It's smashed?
A Yes.
Q Okay. Does it look like anybody could get through that door in the condition it's in?
A No.
MS. BRUDER: One minute, please.
BY MS. BRUDER:
Q Based on that picture, is the driver's door the only door that you saw the Defendant exit out of?
A Yes.
MS. BRUDER: I'm going to show the picture to the jury.
No further questions, Your Honor.
THE COURT: Cross?
MS. BRUDER: Did you want me to leave this video in?
MR. CASS: Yes, I do.
MS. BRUDER: Okay.
(Videotape played from 10:37 a.m. to 11:44 a.m.)
CROSS-EXAMINATION
BY MR. CASS:
Q Okay. So the scene -- let me go back here.
A I'm sorry.
Q Stop. Is it -- I didn't want -- your rank? I didn't -- I missed that.
A Detective.

Q Thank you. Det. Saunders, okay. So this is the video that's going to show your car, which is right here, correct?
A Yes, sir.
Q All right. And so you're coming in at an angle to the car, correct? Not sideways, but you're kind of coming -- the way the vehicle's wrecked, it's pointed somewhat towards Dixie and you're coming kind of from the front to an angle, right?
A Eventually, but as I'm driving southbound, I'm actually facing southbound.
Q So there's your vehicle right here, correct?
A Correct.
Q All right. And you've testified that you saw the door open, the driver's opened?
A Correct. I have complete vision of that, yes.
Q Are you saying that you saw it actually open or it was open?
A No, I see it as it's opening.
Q It's opening after the -- during the crash?
A While I'm driving.
Q While -- be -- after the car has come to a rest?
A Yes, after it's come to a rest.
Q And at what point, is -- where we're at here, did that occur before this video -- this point in the video?
A Was it opening?
Q Right.

A I can't tell you exactly where I was at because I wasn't looking where I was at. I was focusing on the vehicle. Because again, as I watch -- as I'm traveling southbound, I see when it loses control and then flips up in to the air.
Q Okay.
A And to be honest, that was kind of -- not necessarily traumatic, but it was a -- I'm trying to figure a word to describe it. But it was an -- it was something to see. So I see the vehicle, I'm watching the vehicle. I see the vehicle when it actually hits.
And when it hits, it hits right up on this corner but it's towards the top, not necessarily the lower part; it's actually the top part. So I'm actually watching that side of the vehicle because that's where it landed.
Q And it actually kind of then rotates over onto its roof, correct?
A No, it landed on its roof.
Q Right. And then at what point after it lands on its roof do you see the door opening? Immediately?
A After it had landed.
Q So you can't testify whether somebody opened it or whether the crash itself caused the door to swing open?
A That I can't tell you.
Q And you're aware that the driver's door, shown in States Exhibit 39, the driver's door has a tinted window, correct?

A Yes.
Q And it's still intact in that photo?
A Yes.
Q And so you testified that after the door opens, that you can see around the open door?
A I can see him coming from that area where door opens.
Q From behind the door? Behind the driver -- from behind the driver's door?
A Yes.
Q Okay. And at the point you see him, he's already out of the car?
A No.
Q In the car --
A I see him coming out of the car.
Q Actually, with part of his body still in the car from behind that driver's door?
A Yes.
Q But the door is fully opened at the time he's coming out?
A I can't say whether it was fully opened. I just remember the door opening and seeing him coming from that area.
Q Because you agree with me, by the time -- this is your car again right here, right?
A Yes.
Q (Indiscernible). He -- Caleb is already standing up --
A Yes.

Q -- behind that door?
A He's actually out of that area by the time I come to a stop. I don't actually stop, because like I said, I come to that and then as he's running, I swerve backwards -- not backwards, but I kind of turn to continue down Hillsdale.
Q Okay. But it's your testimony, before you came to a stop, with the driver's door open, and him already standing up, that at some point you saw him crawling out of the vehicle while you were pulling into the car?
A I said I saw him coming out at a low angle, because he was kind of crouched down. I never said crawling. I saw him coming crouched down as he exited out of that area.
Q Okay. But that would've been behind. He would've been exiting behind the driver's door at that time?
A That door area, yes.
Q And then at some point, you pull around and he's running. And he makes contact with your vehicle?
A Yes.
Q Was your vehicle stopped at the time?
A No.
Q In preparing for this, do you -- did you review your report in this case that you made back -- or report you made about what happened?
A Before today? I may have reviewed it last week, but not today.

Q This happened June 25th, 2020. Do you want it -- the date of your report is dated February 16th of 2021. Do you know why, seven months later that you would've made the report?
A Because apparently I hadn't completed a supplement at the time.
Q And when you did that, you had to go back and recollect what happened to make the report, correct?
A I pretty much remembered what had happened.
Q I guess as opposed to having notes or anything from that time to refer to, you went by your memory to make a report on that day, seven months later?
A To be honest, when I did the supplement, I can't tell you whether I went off of memory; whether I rewatched the cruiser videos; I can't tell you. I can tell you that I supplemented an accurate report of what I recalled that -- from that --
Q Okay. I guess --
A -- incident.
Q -- my question is you didn't go off on any prior written notes or anything? Whatever you did, you reviewed or used your memory, correct?
A I hadn't written any notes, no.
Q Up to that -- up to February when you made your report, right? That was the first time you actually wrote on anything about that?
A Correct.

Q Okay.

MR. CASS: That's all I have, Your Honor.

THE COURT: Redirect?

MS. BRUDER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. BRUDER:

Q Det. Sanders (sic), when you were driving your vehicle towards the crash site, you were able to drive and view what's in front of your at the same time, correct?

A Absolutely, yes.

Q So you weren't necessarily looking outside or directly front of you, were looking at the crash site yourself, right?

A Correct.

Q In fact, you had difficulty describing the event other than it was a sight to see, right?

A Correct.

Q Would it be fair to say it was an intense situation to see a crash like this?

A Yes, it was.

Q And that your eyes were focused exactly on that vehicle on the driver's side, correct?

A Correct.

Q And you do recall that that driver's door opened after it had stopped?

A Correct.

Q And that you did see the Defendant emerge from that driver's side; is that --
A Yes.
Q -- correct? Okay. And you came -- and you -- and that driver's door did not block your view of the Defendant, correct?
A No, not at that time.
Q All right. So you were close enough to the vehicle where you could see on the other side of the driver's door?
A From -- I'm sorry. Say that one more time?
Q You were able to see on the other side of the driver's door when we were looking at the car?
A When the door opened, the angle that I had, I was still -- I can't remember where I was actually at. But I could see all of the movement from that area there.
Q And you can from driver's door; is that correct?
A Correct.
Q And "he", being the Defendant?
A Yes.
Q Okay. Thank you.
Nothing further, Your Honor.
THE COURT: Any recross?
MS. BRUDER: I have nothing further.
THE COURT: All right. You can step down. Thank you.
DET. SAUNDERS: Thank you.

THE COURT: I need to see Counsel at sidebar just a moment, please.

(At sidebar)

THE COURT: How long's your next witness?

MS. MELNICK: Pretty quick.

THE COURT: Okay. Call --

MS. MELNICK: I'll let him know.

THE COURT: I don't care if we go a little bit past 12, but I got lunch for them at 12, so let's do it.

MS. MELNICK: Okay. Yeah, we'll get him done.

MR. CASS: Who is it?

MS. MELNICK: Mr. Parin.

(End sidebar)

THE COURT: And call you next witness, please.

MR. CASS: Thank you, Your Honor. We would call Capt. Steve Parin.

STEVE PARIN

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: Captain, feel free to lower your mask while you're testifying.

THE WITNESS: Thank you.

MS. BRUDER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. BRUDER:

Q Good morning.
A Good morning.
Q Can you state your name and spell it for the record?
A My name is Steve David Parin, it's S-T-E-V-E D-A-V-I-D P-A-R-I-N.
Q Thank you. And can you tell the Court where you work and what you do?
A I am currently assigned as a captain with the Montgomery County Sheriff's Office. I'm assigned to the jail division at this time.
Q All right. And when did you start working for the Montgomery County Sheriff's Office?
A I was hired in December of 1993 as a corrections officer.
Q All right. And fair to say you've been employed with the sheriff's office since that time?
A Yes, ma'am.
Q And how long have you been a captain?
A I was promoted to captain in January of 2019, I believe.
Q 2019?
A Yeah.
Q Okay. And on June 25th of 2020, were you working that day?
A I was.
Q Do you recall the shift you were working?
A I was working day shift; typical hours were 8 to 4.

Q Okay. And on that day, were you wearing the uniform of the day as you are dressed now or were you wearing plain clothes?
A I was wearing uniform of the day; it was the summer uniform.
Q Okay. And were you driving a cruiser or a marked vehicle?
A I was driving an unmarked command vehicle.
Q Okay. And does that unmarked vehicle have capabilities for lights and sirens?
A Yes, ma'am.
Q Does it have capability for recording?
A It does not.
Q Okay. And on that day, June 25th, 2020, were the lights working, as far as you know, on that vehicle?
A Yes, they were.
Q Okay. And at approximately 3:45 that day, do you recall where you were?
A I was in my office when I heard a radio dispatch from Det. Statzer as to a -- an entered stolen vehicle that he was behind.
Q All right. Do you recall that location that Det. Statzer had given?
A Yeah. He was in the parking lot, coming through the parking lot of O'Reilly's, Restaurant Depot. There's a strip

center there in Harrison Township at the approximately the corner of Needmore and Dixie.

Q Okay. And when you herd Det. Statzer's callout, what did you do?

A I proceeded to my car to head to that area.

Q Okay. And how long did it take you to get to that area?

A Less than 30 seconds.

Q Were there other cruisers there ahead of you?

A Yes.

Q Do you recall which deputies were in front of you?

A Sgt. Vitali was ahead of me, Dep. Bone and Dep. Hale.

Q Okay. And when did you first see the black Ford 500?

A So as I was coming down North Dixie, turned out from the District, it was in the parking lot just to the north of the O'Reilly Auto Parts there. And it looked like it had cut through that parking lot area to turn onto Dixie.

As I approached the area, Sgt. Vitali was ahead of me, had already activated his lights. I saw movement from the Ford 500 as it shot across traffic on Dixie and proceeded south.

Q All right. Were you -- did you know whether that the reason the Ford was being pursued?

A Det. Statzer had advised that the vehicle was reportedly taken as part of an aggravated robbery the day before in the City of Dayton.

Q All right. And when you saw that Ford 500 go down North

Dixie, what did you do?
A I was behind Dep. Hale and Dep. Bone. We all immediately activated our emergency lights and sirens and pursued the vehicle as it was reported by Det. Statzer that he had been struck by the vehicle.
Q All right. And how fast were you driving in pursuit of that vehicle? If you recall.
A I remember speeds upwards of 85 to 90 miles an hour.
Q And when you were doing that high of speed between 80 and 95 said?
A 85 and 90, yeah.
Q 85 to 90? Were you able to catch up with that fleeing Ford?
A No, we were not.
Q Okay. And about how -- and at some point you had heard that that Ford had crashed, correct?
A That is correct.
Q And about how far away were you from the crash site when you heard it crash?
A I would estimate that I was about a quarter of a mile, maybe a little bit more behind the crash scene.
Q So it'd be fair to say you came upon the scene pretty shortly after it crashed?
A That's correct.
Q All right. And when you arrived on-scene, what did you

observe?
A I observed a black male wearing a white t-shirt running from the crashed vehicle trying to cross Dixie Drive westbound. I saw Dep. Hale in front of me drive towards the individual, which turned him back to the east. Then I saw him running around the back of the house where the car had crashed.
Q All right.
MS. BRUDER: For identification purposes, I'd ask that Court may allow people to remove their facemask?
THE COURT: That's fine.
BY MS. BRUDER:
Q And do you see that individual who you just described as running?
A Yes.
Q And can you point him out and describe what he's wearing?
A It's Mr. Whitfield there. He is wearing a blue-gray shirt and tie.
Q All right.
MS. BRUDER: Your Honor, I'd like -- ask the Court to reflect for the record that the witness has identified the Defendant, Caleb Whitfield.
THE COURT: It will.
MS. BRUDER: Thank you, Your Honor.
BY MS. BRUDER:
Q All right. You said that you saw the Defendant run from

the crash site where the vehicle had rested, ran behind the building. And then that next street, is that Hillsdale?
A That is.
Q Okay. And when you saw the Defendant run onto Hillsdale, what did you see him do?
A So as he ran around the southside of this house, I cut down Hillsdale behind Det. Saunders, assuming that he was going to come around that side. He came around the back of the house, which would be the eastside of the house at a full sprint, ran into the side of Det. Saunders's car, bounced off of the car, ran across Hillsdale.
At that time, I parked my car, got out on foot, and started running after him. And Dep. Hale was close behind him as he entered the parking lot.
Q Did you see Dep. Hale deploy his taser?
A I did.
Q All right. And did it strike the Defendant --
A It did.
Q -- with the desired effect?
A Yes.
Q Okay. And did you assist with apprehending the Defendant?
A I did.
Q Okay. Did you put handcuffs on him?
A I pulled out. He was -- we were trying to get him

handcuffed. He had -- I believe his right arm was underneath of him. So I pulled out that right arm and held it in a control hold while the other deputies, I believe Dep. Hale or Sgt. Vitali pulled out the left arm and applied handcuffs, and then we got the other arm secured.

After securing him, we then assessed him for injuries. He had facial injuries. We rolled him over to his side so that he could properly breathe. And at that time, I called for another medic. Because we -- he needed to be seen.

Q Okay. And did you take pictures while you were on-scene?

A I did take some pictures after we secured Mr. Whitfield.

Q Thank you.

MS. BRUDER: Your Honor, may I approach the witness?

BY MS. BRUDER:

Q I have pictures that I have marked as State's Exhibits, for identification purposes, 26, 27, 28, and 29. Let me hand those to you. Take a look at them, please. Do you recognize those photos?

A I do.

Q How do you recognize them?

A I took them.

Q All right. Are they a true and accurate copy of what you saw that day?

A Absolutely.

Q Okay. The first one, I think, is exhibit -- what's

behind that? What exhibit number is that? I have the exhibit behind the --
A Okay, I'm sorry.
Q -- what number is that?
A 26.
Q 26? And who is that a picture of?
A This is Mr. Whitfield after he was tased.
Q Okay. And is this a picture of Mr. Whitfield with his handcuffs behind his back?
A Yes.
Q And these are the injuries that you saw on him that day?
A Yes.
Q And just to be clear, when you were describing that you were attempting to handcuff him, do you believe that -- or was Mr. Whitfield complying with the commands?
A He was not compliant with the commands.
Q All right. And so you -- were instructions given to him to put his hands behind his back?
A Yes.
Q And did he fail to do that?
A That is correct.
Q And you said based on these injuries, a medic was called to assess them; is that correct?
A Yes, ma'am.
Q Okay. The next one that you have there on the back, what

number is that?
A This is 28.
Q Okay. And on 28, who is that a picture of, if you remember.
A I believe this is Mr. Shackelford.
Q Okay. And where was Mr. Shackelford when you took that photo?
A Mr. Shackelford was seated on a concrete stoop of the damaged house where the car flipped and came to final rest.
Q And where was that concrete stoop in relation to the vehicle?
A It was behind; it was to the rear of the vehicle or --
Q Rear of the vehicle.
A -- as the vehicle landed on its top, the trunk area was right next to that stoop.
Q Okay. And in this picture, do you see any visible injuries of Mr. Shackelford?
A He had some visible injuries. There was a cut on his chin, as I recall. And he was complaining of other injuries, as far as being involved in a serious crash.
Q Okay. And the next one you have, what number is that?
A This is number 29.
Q And who is that a picture of?
A I believe that's Mr. Hespeth.
Q Joseph Hespeth? And what does he have on him?

A He's got a neck brace and a cervical collar to immobilize his head.
Q And where was he when you took this picture?
A He was on a gurney being removed from the scene by medics.
Q Did you see where he was being removed from?
A He was -- when I first encountered him or saw him, he was on the same stoop as Mr. Shackelford.
Q That was at the rear of the vehicle?
A Yeah.
Q And that last photo you have, what exhibit number is that?
A This is number 27.
Q And who is this a picture of?
A This is the female in the passenger seat. I do not recall her name at this time.
Q Would Rodnesha Thompson sound familiar --
A Yes, it --
Q -- to you?
A -- does.
Q All right. And this is a true and accurate picture of her that you took that day, correct?
A That is correct.
Q And where is she when she (sic) took this picture?
A She was being removed by medics; she was on a stretcher.

Q She was being taken into the --
A To the hospital.
Q Hospital?
A Yes.
MS. BRUDER: That's all I have, Your Honor.
THE COURT: Cross?

CROSS-EXAMINATION

BY MR. CASS:
Q Good morning.
A Good morning.
Q After where you said that Caleb was not compliant when you were trying to handcuff him, that was immediately after he had been tased, correct?
A That is correct.
Q And you witnessed that, right?
A I did.
Q And he -- when he was tased, when into this kind of full-body lockdown. Do you recall that?
A Yeah. He was at a full sprint when he was tased and experienced a full-body lockup.
Q Which meant he couldn't -- I think it's even on video, couldn't prevent himself, really, from -- or soften his fall at all, fell just flat, face first.
A That's correct.
Q Do you recall that? And he had also been involved in

this serious car crash, correct, that you described?
A Yes.
Q And then immediately, as upon him stopping his skid there, the deputies and you were on top of him, trying to handcuff him?
A Correct.
Q And apparently, I guess, during that time he resisted, he came out of this full-body lockdown; is that right?
A Yes. He --
Q Okay.
A -- was moving around. But he was facedown and we pulled his arms out from behind him.
Q So fair to say that him coming out of that, the first thing he would've experienced was -- now, how many were there? Three of you on top of him trying to handcuff him, right?
A We were standing around him, yes, attempting to handcuff him.
Q And then you said, I think, that you did request a medic for him because of his injuries, right?
A I did.
Q You saw the photo. Do you recall that he -- at that time, he was not responsive to questions of who he was?
A That's correct. He would not answer any questions as to what his name was.
Q And this is while you're on top of him or trying to

handcuff him, or --
A This was after --
Q -- shortly thereafter?
A -- he was placed into recovery position; he sat up.
Q And that was -- would that have been some time around when this picture was taken?
A Probably, yeah. Before or after, yeah, somewhere around that time.
MR. CASS: That's all.
THE COURT: Redirect?
MS. BRUDER: Just real quickly, Your Honor.

REDIRECT EXAMINATION

BY MS. BRUDER:
Q When you saw the Defendant run, did you hear anyone give him commands to stop?
A Yes.
Q And did he stop?
A No.
Q And then when the plaser (sic) was deployed, was he still actively resisting?
A So when the taser was deployed, he was not able to resist due to the full-body lockup. Once that taser cycle ends, and that instantly releases the muscular contraction so that he can respond. He was not helpful in providing his arms for handcuffs.

Q So it's fair to say once he was tased, he -- his body locked up. It only lasted a short duration?
A Five seconds.
Q Five seconds? And after that, were commands still given to him ---
A Yes.
Q -- to put his hands behind his back?
A Yes.
Q And did he comply with those commands?
A No.
Q And was he actively resisting arrest at that point?
A He was actively preventing his arms from being pulled his back.
Q Thank you.
THE COURT: Mr. Cass, anything further?

RECROSS-EXAMINATION

BY MR. CASS:
Q Just during that time, he -- one of the tasers was in the back of his head. Do you recall that?
A Yes.
Q and it was still in there when you were handcuffing him, correct?
A That's correct.
MR. CASS: Nothing further.
THE COURT: Thank you, Captain. You can step down and

you are excused.

CAPT. PARIN: Thank you.

THE COURT: Ladies and gentlemen, at this time, we're going to take our lunch recess. We do have lunch for you. I want to start right back up at 1:00. So I'd ask you to please be back in the jury room ready to come out a couple minutes before 1:00.

Do not discuss this case among yourselves, with anyone else. Do not permit anyone to discuss it with you in your presence. Don't form or express any opinion on this case until it's finally submitted to you. We will be recessed till 1:00.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Outside the presence of the jury)

THE COURT: Anything before we go off the record?

MS. MELNICK: I don't think so.

MR. CASS: No, sir.

(Recess taken)

(Proceedings adjourned for lunch at 12:07 p.m., recommencing a 1:13 p.m. in Volume III)

* * *