5/17/2022 COURT SUBMITTED ELECTRONIC TRANSCRIPT OF PROCEEDINGS FILED
36317983

ELECTRONICALLY FILED
COURT OF APPEALS
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Tuesday, May 17, 2022 12:30:11 PM
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

**IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO**

| | |
|---|---|
| **STATE OF OHIO,** | **CASE NO. 2021-CR-01185** |
| **Plaintiff,** | **CA No. 029442** |
| **-vs-** | **TRANSCRIPT OF PROCEEDINGS (SCHEDULING CONFERENCE/ FINAL PRETRIAL/JURY TRIAL)** |
| **CALEB WHITFIELD,** | **VOLUME III OF IV** |
| **Defendant.** | **(Pages 379 - 589)** |

PRESIDING: Hon. Dennis J. Adkins

APPEARANCES:

ON BEHALF OF THE STATE
Kimberly Melnick, Esq.
Lisa Bruder, Esq.
Montgomery County Prosecutor's Office
301 West Third Street
Dayton, Ohio 45402

ON BEHALF OF THE DEFENDANT
John Pinard, Esq.
Pinard and Bryan Law
120 West 2nd Street -Suite 603
Dayton, Ohio 45402

William O. Cass, Jr., Esq.
Law Office of William O. Cass, Jr. Ltd
1250 West Dorothy Lane - Suite 203
Kettering, Ohio 45409

J. David Turner, Law Office
J David Turner, Esq.
101 Southmoor Circle NW
Kettering, Ohio 45429

DATES: September 16, 2021; October 13, 2021; October 27, 2021; February 16, 2022; February 22, 2022; February 24-25, 2022; March 16, 2022

ELECTRONICALLY
RECORDED BY: Electronically Recorded

TRANSCRIBED BY: Michelle Serdynski Oh, Linda McCurdy

* * *

TABLE OF CONTENTS

State rests........................................ Page 540
Defense rests...................................... Page 581

* * *

INDEX TO EXAMINATIONS


| State's Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| 1) Justin Bone | 384 | 396 | 399 | |
| 2) Cody King | 400 | 418 | 422 | 423 |
| 3) Joseph Solomon | 424 | 440 | 450 | 452 |
| 4) James Gisewite | 454 | 490 | | |
| 5) Pat O'Connell | 497 | 512 | 515 | |
| 6) Mary Barger | 516 | 534 | 537 | |

* * *

| Defense Witnesses: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| 1) Caleb Whitfield | 543 | 559 | | |

* * *


INDEX TO EXHIBITS


| State's Exhibit: | ID | ADM |
|---|---|---|
| 1-22 - Photographs | XX | 583 |
| 23 - Video | | 583 |
| 24 - Video | | 584 |
| 25 - Video | | 584 |
| 26 - Photograph | | 585 |
| 27 - Photograph | | 585 |
| 28 - Photograph | | 585 |
| 29 - Photograph | | 585 |
| 30 - 50 - Photographs | 461 | 585 |
| 55 - 58 - Photographs | 474 | 586 |

INDEX TO EXHIBITS (CONTINUED)


| State's Exhibit: | ID | ADM |
|---|---|---|
| 59 - Video | | 587 |
| 60 - Photograph | 479 | 586 |
| 51 - Swabs | 484 | 585 |
| 52 - Swabs | 482 | 585 |
| 53 - Swabs | 506 | 586 |
| 54 - Driving record | 510 | 586 |

* * *

| Defendant's Exhibit: | ID | ADM |
|---|---|---|
| C - Photograph | 421 | 588 |
| D - Report | 450 | XX |

* * *

| Joint's Exhibit: | ID | ADM |
|---|---|---|
| 1 - Stipulation | XX | 588 |

* * *

(Recommencing at 1:13 p.m.)

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: Thank you, ladies and gentlemen.

We're ready for your next witness.

MS. MELNICK: Your Honor, the State calls Dep. Justin Bone.

THE COURT: And Justin Bone is up on video on the screen. Let's get him sworn. Then, maybe you can give an explanation of where he's at and why he's doing this.

MS. MELNICK: Yes, I will.

THE COURT: Mr. Schmidt, would you swear in the witness, please?

JUSTIN BONE

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MELNICK:

Q All right. Dep. Bone, can you see me?

A I can.

Q Okay. You don't have to --

A Yep. I can see you.

Q Okay. Can you please start by stating your full name and

spelling your first and last name?
A Justin Bone. J-U-S-T-I-N B-O-N-E.
Q All right. And can you tell us where you're currently employed?
A I'm currently employed with the Montgomery County Sheriff's Office, specifically in Harrison Township. I've been there for 16 and a half years.
Q All right. And You're obviously not here with us today. Can you tell the jury where you are?
A I'm in Fort Indiantown Gap in Pennsylvania. I'm at the Army War College for Battle Staff NCO Course.
Q So are you a member of the Army Reserve? Is that my understanding?
A I am.
Q And you're in a training on military orders, correct?
A Correct. Certified orders about seven and a half hours away, so.
Q Okay.
MS. MELNICK: Your Honor, just for purpose of the record, I'd like to make a record that we have Dep. Bone video that the -- all of the jurors can see Dep. Bone; that I can see Dep. Bone; that the Defendant and Counsel can also see Dep. Bone.
THE COURT: So ordered.
MS. MELNICK: Thank you.

BY MS. MELNICK:
Q So Dep. Bone, I would like to direct your attention back to the time of June 25th, 2020. Do you recall whether or not you were on duty that day?
A I was.
Q And what were your duties at that time with the Montgomery County Sheriff's Office?
A At the sheriff's office, I am a swing shift proactive car and I work from noon to 8 p.m. Specifically, in the area of Harrison Township. And I was on duty that day from noon to 8 p.m.
Q And were you driving a marked cruiser?
A I was.
Q And were you wearing a uniform of the day?
A I was. It was June, so I was wearing my bike uniform, which is a black polo and shorts.
Q Okay. And so we have seen some videos which we can't show you because of the connection that we have. But have you seen those videos in the past? Have you seen --
A I have, yes.
Q All right. And are you the only person --
A I have.
Q -- in those videos that's wearing shorts?
A Yes.
Q Okay. So when we look at those videos again, we'll know

for certain who you are. Can you tell me, were you a one-man crew that day?
A Yes.
Q And at approximately 3:45 in the afternoon, where were you?
A At District 10, 5945 North Dixie Drive, for third watch roll call that starts at 1530 or 3:30.
Q All right. And while you were there at District 10 at roll call, did a call come out from Det. Bryan Statzer?
A Yes.
Q And did you respond to that call?
A I did.
Q And tell me, when you left District 10, where did you go?
A So the radio traffic indicated that the -- that Bryan was behind a possible -- or a stolen car in the Harem lot, which is just directly south of the district. So I pull out on to Dixie, take a right to head south.
You want me to continue from there, or?
Q Yeah, can you adjust your view so that we can actually see your face? There you go. So --
A Yeah, I apologize. We're right next to an airfield so I'm trying to make sure I can hear you.
Q Okay. So when you pulled out onto Dixie, you said you went south?
A Correct, or to the right --

Q Were you --
A -- to go south.
Q Were you with any cruisers that were leaving at the same time you were?
A It was myself, Dep. Hale, and Sgt. Vitali.
Q Okay. And when you went south on Dixie, tell me, what did you see occur at that -- the first thing that you would've seen occur?
A So Det. Statzer's unmarked is a bright blue Charger. I could see the car that he was following. In the video, if you've seen mine, the SUV is Sgt. Vitali who pulls in front of the stolen car. At that point, the stolen car reverses, hit Statzer's, and then takes off south.
So I didn't engage it while I was in the Harem lot. I engaged it as soon as it took a right to go south on Dixie. So I was number 1 in the pursuit.
Q All right. So you went around Hale and Vitali and you, then, got behind the suspect vehicle, correct?
A Correct.
Q And approximately, how fast do you think your speeds got to while you were in pursuit of this vehicle?
A My arbitrator read 98 miles an hour.
Q All right. And can you give us a distance? You patrol that area. Approximately, how far of a distance is it from where you initially began your pursuit to where the vehicle

eventually crashed? Best estimate.
A Like, three miles, maybe.
Q Okay. And when you pursuing the vehicle, did you, at any point in time, see Det. Saunders' unmarked vehicle?
A At the very end I did, yes.
Q All right. And what did you see Det. Saunders' vehicle do?
A So while we're going south on Dixie, it -- I can see the vehicle crash out. Saunders was the first unmarked that comes across Dixie. And he's giving out instructions that the car's wrecked and that someone took off running from the vehicle.
Q Okay. Did you see the actual crash?
A I did, yes.
Q Okay. And were you close enough to see the individual flee the vehicle or where he fled from the vehicle?
A Yes.
Q And where did he flee from? What part of the car?
A He fled from -- the vehicle tries to take a left turn and loses control and flips over. So the -- he flees from the driver's side, which is now up -- vehicle's upside down, so it's on the eastside of the road. He tries to flee westbound across Dixie.
So as soon as I pull up, he runs past my car. And then Dep. Hale comes up to my right side, which makes him run back eastbound and around the house that they hit.

Q All right. And did you see Dep. Hale give chase on foot?
A Yes.
Q And were you able to see Sgt. Vitali arrive at the scene as well?
A Yes. As Dep. Hale's chasing on foot, Sgt. Vitali in his SUV in my cruiser cam video basically mirrors Hale as he's running eastbound and then northbound towards the Greenleaf Inn.
Q Okay. And what did you do? Now, they're all giving chase to the person who fled the vehicle. What did you do?
A I immediately get out and check to see if we had any more people inside the vehicle, which at that time, I located a female hanging upside down on the passenger side of the vehicle, which would be -- it would've been immediately, because it's upside down as soon as I got out of my driver's side door.
Q Okay. And was she in the front or the backseat on the passenger side?
A She's in the front passenger seat, so the front.
Q Was she belted in?
A She was.
Q All right. And after seeing her there, what did you do next?
A I ran around to the opposite side of the vehicle, running around the front of it. And then at that point, I see two

individuals crawling out of the back window or windshield of the vehicle by the trunk.

And the driver's side door's open. And then I can see inside and she's suspended upside down by her shoulder and lap belt.

Q All right. Let me -- I want to talk first about the two individuals that you saw you said crawling out the back window. Were they male or female?

A Two males.

Q Were they white, black, or Hispanic?

A Two black younger males.

Q And when you say they were crawling out the back windshield, I want to make sure there's no confusion here since I don't have you here in person. On a motor vehicle --

A Okay.

Q -- you have four doors on this vehicle. So you have two rear-side door windows. And then you have the actual window that is the rear window that's up over the trunk. Which window are you talking about?

A The window up over the trunk.

Q Okay. So the very back window if you're driving a car and you look in your rearview mirror; that's the window you're looking out, correct?

A Yep

Q Okay.

A The back windshield.
Q And at what stage of crawling out of that window were these two males when you saw them?
A The first one was more so on his knees, almost all the way out. The second one was halfway in and halfway out. And they were both, you know, first appearance, very injured. Obviously, they got in the car wreck where the car flipped over. One of them looked more injured than the other, which was the one that was laying halfway in and halfway out.
Q So the one that was on his knees most of the way out was the least injured of the two?
A Yeah. He had more facial injuries and just cuts here and there. The other one was -- the vehicle got hit -- or the vehicle hit the building with such force, like, it almost like tattered their clothes somehow. I don't know if it was because the window exploded. But his boxer shorts were totally shredded. He was bleeding from several different areas. He was in pretty bad shape.
Q All right. Did you help him exit the car the rest of the way?
A I believe I did and then we had them sit. The house that they hit was one that got hit by the tornado. So it had a concrete slab where the porch used to be. So I had them both sit there. You know, obviously they're asking for help. Fire wasn't on-scene, yet.

So as soon as they came out and sat down, I believe one of them laid down. I tried to tend to the female that was stuck in the car.

Q All right. And when you went to tend to the female, what did you do?

A Her breathing was very shallow. At first, I didn't know if she was alive or not. So I attempted to cut her out with a knife. I was able to cut the shoulder belt off of her. But her lap belt, the way that she was pinched in the car and she was a little bit of a heavier girl, she was still stuck and I couldn't get it out.

I don't know if it was from the position, but at that point, I didn't want to move her because I didn't know what the extent of her injuries. So I just basically tried to talk to her until fire got there to kind of do their thing.

Q Did the medics and fire get there relatively quickly?

A I would assume. At the time, it didn't seem like it. But yeah, I mean, I think they were there pretty normal time, quickly, I would say.

Q Okay. So did you stay over there then with the female until the medics arrived at that point?

A Yes. At that point, Dep. McIntosh showed up on-scene and we were both kind of keeping an eye that got out of the back and then also this female that was hanging upside down in the car.

Q All right. And the two that got out of the back window of the car, did they give you any problem? Did they try to flee or try to go anywhere?
A No, they were both pretty banged up. They just kept asking for help.
Q Okay. Now, at some point in time, the medics do arrive and they begin tending to the female, correct?
A Correct.
Q And what do you do at that point?
A Kind of stay in that general area because obviously, we have the crash scene. We have two possible suspects that are injured. So you've got to kind of coordinate, you know, who's going to go where, hospital-wise, with these two.
And then the one that took off, obviously, was in the Greenleaf parking lot where Hale and Gebhart and Vitali was. So I stayed in that general area --
Q Did you have any con --
A -- and try to just gather information.
Q Okay. Did you have any --
A Excuse me?
Q -- contact with the one who ran at all personally?
A Negative.
Q Okay.
A Or no, sorry.
Q That's okay. Can you tell me, at some point in time, you

said that the male that was more injured, began -- he let -- he laid down at some point; is that accurate?
A Yes.
Q All right. Was he sitting up when he initially got out of the car? Or did he --
A The first one was sitting up. The second one, I don't believe that he was. I think we told him to sit on the thing, but he was so injured, like, he was just, like, just sit -- just lay there, you know, until we can someone to help you.
Q Were you able to identify who those individuals were at any point?
A Yeah, Hespeth and Shackelford, Jelani Shackelford.
Q All right. Jelani Shackelford, was he the more injured or the lesser injured of the two?
A He was the lesser injured of the two.
Q And Hespeth was the more injured of the two?
A Correct.
Q And which one was the first one out of the car?
A Shackelford.
Q Okay. Now you got a good look of the inside of that car when you looked in there, correct?
A Correct.
Q Did you see and can you describe the amount of damage to the backseat area of that car?
A It was totally -- the roof was smashed in, I mean, it was

even hard to try and call in to get help with this girl. You know, the back truck and the window was all smashed. I mean, they hit and flipped with such force, it just crumbled the backend of the whole car.

Q Okay.

MS. MELNICK: I have nothing further, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. CASS:

Q Dep. Bone, so as I understand it, you were the -- one of the first ones up to the car, correct?

A Can you repeat that? Sorry.

Q I said, you were one of the first people that got to the car?

A I was the first person that got to the car.

Q Oh.

THE COURT: The mic will pick you up better (indiscernible).

BY MR. CASS:

Q And when you got there, you went --

MS. BRUDER: Whoops

MR. CASS: I didn't do that.

THE COURT: We'll blame you.

THE CLERK: There you go. Here he is.

THE COURT: No, you did.

BY MR. CASS:
Q When you got to the car, you -- the first thing you did was go to the passenger side which was on the opposite side, I guess, that you pulled in on; is that correct?
A Well, the vehicle was upside down, so the passenger side was on my side.
Q Because you had pulled around --
A So if I pull up to the vehicle, the vehicle was here. It's flipped upside down. So the passenger side was directly to my driver's side.
Q Okay.
A If that makes sense.
Q And so then you went to the passenger's side. And what did you do when you went to the passenger's side?
A I peeked in the window and saw the female. You can see in my video, I'm the guy in the shorts.
Q Right and at that time, you couldn't see any other occupants in the car?
A No
Q Okay. And did you check -- did you do anything to check on the female that you saw?
A Well, I couldn't get in that way. So I went around to, which would be the driver's side, which was on the opposite side because obviously, it's upside down. And at that point, I could see the two crawling out of the back. And I could

actually get access because the only door that could be opened was actually the driver's door.

Q And those -- you said the two -- one was halfway out and one was all -- nearly all the way out? And that -- out the back window?

A Yeah, he was on his knees coming out of the back window, yeah.

Q Okay.

A I mean, he wasn't out standing up if that's what you mean.

Q Did you get him -- did you assist in getting him fully out? Both the suspects that you talked about?

A I believe so. The one, like I said, was in really, really bad shape. So getting them both out, having them sit down on that concrete block that I had mentioned before.

Q And was there any other -- anybody else there assisting you at that time?

A No.

Q And when you assisted them out, how did you get them out? How did they exit the vehicle, the two suspects that you talked about?

A Well, you almost have to pull them out. I mean, there wasn't -- it -- with the situation being what it was, it was pulling the one out and having them both sit there. Obviously, they're both injured. I mean, I don't understand.

Q I guess, did you take them out the back window or did you take them out the side?
A No, sir. It's the back window. They were crawling out the back window.
Q So you assisted them out of that window; is that correct?
A Yeah, they came out the back window.
Q Okay.
MR. CASS: That's all I have.
THE COURT: Redirect?
MS. MELNICK: One question.

REDIRECT EXAMINATION

BY MS. MELNICK:
Q Was the driver's door to the car already opened when you walked around to the driver's side?
A Yes.
MS. MELNICK: Nothing further, Your Honor.
THE COURT: Mr. Cass?
MR. CASS: No, I don't have any questions.
THE COURT: All right. Thank you, Ofc. Bone. We appreciate you appearing by video today. Good luck to you.
MS. MELNICK: Thank you, Justin.
DEP. BONE: Yes, sir.
THE COURT: Okay. You've done what you needed to do, Vickie?
THE CLERK: Yes.

THE COURT: Okay.

Next witness, please.

MS. MELNICK: The State would call Cody King.

CODY KING

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: Sir, feel free to take your mask off, if you want to, while you're testifying.

DIRECT EXAMINATION

BY MS. BRUDER:

Q Good afternoon.

A Good afternoon.

Q Can you state your name and spell it for the record?

A My name is Cody King, C-O-D-Y K-I-N-G.

Q Okay. This proceeding is being recorded. And you have a microphone in front of you, but if you can just raise your voice up a little bit so everyone can hear you.

A Yeah.

Q Tell me, where do you work?

A I work at Harrison Township Fire Department full time.

Q How long have you worked there?

A I've been full time since May 18th, 2018. I worked a year there part time prior.

Q Okay. And while you worked at Harrison Township Fire Department, what is your title there?

A I'm a firefighter paramedic.
Q Firefighter paramedic.
A Yes, ma'am.
Q Okay. And you said you've been working there full time since May of 2018, correct?
A Correct.
Q So is it fair to say you were working there at a part time basis prior to 2018 or working somewhere else?
A I was working there as well as multiple other jurisdictions.
Q All right. And how long were you working there and multiple jurisdictions part time?
A Since 2015.
Q Any prior experience?
A As of before 2015?
Q Yes.
A No.
Q No? Okay. And you need to answer yes or no --
A Oh.
Q -- sorry. And can you tell me what type of duties and responsibilities that you have as a fire -- is it a firefighter paramedic?
A Yes.
Q Okay. Thank you. Tell me what type of duties and responsibilities you have.

A So typically, we start out our day, I'm responsible for checking off all the vehicles, whatever vehicle I'm supposed to ride that day. We're responsible for upkeep of station activities, as well as fire suppression, emergency medical services and transport.
Q Okay. Do you receive specific training?
A Yes.
Q Okay. Could you just briefly tell me what type of training you receive?
A To be a paramedic, you have to take approximately two years of intensive emergency medical service training. Fire is about six months.
Q Okay. And once you engage and successfully complete that type of training, what type of things are you able to do as a paramedic?
A As a paramedic, you're able to assess cardiac rhythms, administer medications, treat, field impression diagnose, almost. We try to stay away from the term diagnose, but --
Q Yeah.
A -- go down a line to --
Q Is it fair to say you have to make a quick assessment based on the injuries that are presented to you --
A Yes.
Q -- at that time?
A Yes. Yes.

Q And in your job, would it be fair to say is to administer the appropriate care for that patient in that moment until you can get him to a hospital to be assessed by a doctor?
A Yes.
Q Okay. And is part of your duties and responsibilities to write reports after you've completed your shift?
A Yes.
Q Okay. And on June 25th of 2020, were you working for Harrison Fire Department?
A Yes.
Q And were you working as a firefighter paramedic?
A Yes.
Q Do you remember what shift you were working that day?
A C shift.
Q And what hour's a C shift?
A What is that? I'm sorry.
Q What hours is that shift?
A 7 a.m. to 7 a.m. So we work 24-hour shifts.
Q 24 hours? Okay. And do you recall receiving a call that dispatched you to the area of North Dixie in Hillsdale in Harrison Township?
A Yes.
Q Okay. And that's within Montgomery County, Ohio, correct?
A Correct.

Q All right. And do you recall what time you were dispatched to that area?
A I know it was daylight time.
Q Daylight? So was it morning, afternoon, late afternoon, around dinnertime?
A Not 100 percent sure.
Q Okay. And if -- when you would keep your reports, would you note the time in which you were dispatched to that area?
A Yes.
Q Okay.
A There would -- all the times would be on there.
Q Okay. And if I showed you a report, would that help refresh your memory --
A Yeah.
Q -- of what time you were dispatched?
A Yes.

(Counsel confer)

MS. BRUDER: Your Honor, may I approach the witness?
THE COURT: Yes.

BY MS. BRUDER:

Q Okay. I'm going to hand you a document. Is that a report that you would've completed?
A Yes, it is.
Q Okay. I don't want you to read it. I want you to look at it and see if you -- it helps refresh your memory about what

time you were dispatched to that area.
A Can I flip?
Q Yes, you may look at it.
A Okay.
Q Yep.
A It would've been around 3 p.m.
Q Around 3 p.m.?
A Early afternoon.
Q Early afternoon? Any later than 3 p.m. from looking at your report? If you don't find it, that's fine. But is it fair to say it was late afternoon that day?
A Yes.
Q Okay. Fair enough. And when you traveled there, were you driving a vehicle --
A Yes. I was --
Q Or --
A -- driving Ladder 95 is its unit. And we --
Q And were traveling alone?
A No, I had a officer in the crew seat, just a passenger.
Q All right. And when you arrived at the area of North Dixie and Hillsdale, what did you observe?
A I observed multiple cruisers, as well as a car that was off the roadway on its top.
Q Okay. You said a pro -- can you be more specific about the car?

A It was on its top. The front of the vehicle was facing towards Dixie. And it appeared that the trunk was laying up against the house or the slab porch in front.
Q Okay. And when you arrive, what was the first thing you did?
A Immediately as the driver/operator of the ladder, with the car with a potential victim's trapped, our -- it is our duty -- my duty, to get all of the equipment that is needed for a rapid extrication of the patient.
So I went to the rear of the ladder and was going to set up the hydraulic tools to gain access to the vehicle.
Q So you got hydraulic tools out of the back of the vehicle. What else? Any other equipment?
A No, when I was doing that, I heard from -- my officer was yelling for me --
Q Okay.
A -- to come assist him.
Q Okay. And where was the officer calling from?
A Lt. Nagel (phonetic) was calling from the driver's side of the vehicle. He was laying down looking in it.
Q Okay. And what did you do?
A He yelled for me to attempt to gain access into the vehicle to determine if the patient was viable.
Q Okay. And so where -- so did you enter the vehicle?
A Yes.

Q Where did you enter the vehicle from?
A From the passenger side rear.
Q Okay. Was the door open?
A No.
Q Okay. So when you said you got through the passenger side rear, what did --
A I believe I crawled through the window.
Q The window?
A I believe.
Q And what did you see?
A I saw the -- a female victim.
Q Well, a female patient laying suspended with her shoulders against the hood of the vehicle. And her -- she was laying on her shoulders and --
Q Uh-huh.
A -- her head was smashed against her breasts. Her nose was implanted into her breasts.
Q Okay. And when you saw that, did you try to assist her out of the vehicle?
A Yes. And I noticed that her lap restraint was holding her -- was stuck. She was stuck because of the lap belt. And so I asked my lieutenant, I asked him if he had a knife available. And he ended up getting it out and handing it to me. So I ended up -- I cut the lap belt to get her out.
Q Okay. And where were you when you were cutting the lap

belt?
A I was laying in the vehicle.
Q Laying in the vehicle to cut her out?
A Uh-huh.
Q Did you help assist taking her out of the vehicle?
A Yes.
Q And was she taken out through the driver's side?
A Yes.
Q Okay, so you were -- crawled in the vehicle. Did you then have to get out then to go help assist her?
A Yes.
Q Okay.
A The way she was when we cut the lap belt, I had to reposition her to get her out.
Q Okay. And after she got out of the vehicle, what did you do next?
A After she got out of the vehicle, I had to stand there until we got her onto the backboard. And then I helped push the backboard completely out of the vehicle. And then I crawled back out and went to go help assist finalizing packaging her up so she could be transported.
Q Okay. And after you were done assisting whatever needed to be done for the female passenger, were you asked to go somewhere else to assist other people?
A Yes.

Q What -- can you tell me what you did?
A The -- someone, well, one of the other firefighters, EMTs, was yelling for my assistance. The battalion chief reassigned me to jump onto Medic 96 to take care of another patient.
Q Okay. Can you tell me what Medic 96 is? Is it, like, an ambulance or?
(Nods in affirmative)
BY MS. BRUDER:
Q Okay. Go ahead.
A Yes, it is a ambulance from 94th District. That's typically staffed with our extra personnel. So other times, it'll be a BLS crew --
Q Okay.
A -- which consists of two emergency medical technicians.
Q And when you went over to Medic 96, did you say?
A Correct.
Q Did you see an injured person over there?
A Yes. I walked up into the medic unit, asked them what was going on. And there was an injured male laying on the cot.
Q He was laying on the cot?
A Uh-huh.
Q Do you recognize that individual in the courtroom today?
A Yes.
Q Okay.

MS. BRUDER: And Your Honor, for identification purposes, I ask that we would remove our masks.

THE COURT: All right.

BY MS. BRUDER:

Q Do you see -- if you see that person in the courtroom today, can you point him out and describe what he's wearing?

A Blue shirt with a tie; oxford blue shirt.

MS. BRUDER: Your Honor, I'd ask --

THE COURT: Identifying the Defendant.

MS. BRUDER: Thank you, Your Honor.

BY MS. BRUDER:

Q All right. And you said you saw the Defendant laying on the cot? Was the cot --

A Uh-huh.

Q -- inside the medic or was it outside the medic?

A Yes, it was inside there.

Q Okay. And when he -- when the Defendant was laying on the cot inside the medic, did he have any -- was any medical -- or strike that.

When you approached the Defendant inside the medic, what did you do?

A As soon as I approached him, I asked what was going on. I was briefed by the EMT basic who does the initial trauma assessment. So I was taking -- I was assuming care that he had already started administering. So I was not aware of any of

the previous details.
Q Okay.
A So I immediately got his report.
Q Okay. And you said that you went -- you were talking to somebody else to get the trauma assessment. And you said this other person had started to administer some care. Can you tell me what care -- what was administered at that point?
A The care that he would've administered was to completely assess a rapid-trauma assessment. But as soon as I walked into the medic, due to the mechanism of injury, I told him to -- the other partner -- my partner --
Q Sure.
A -- to go ahead and put a cervical collar on the patient.
Q All right. So you put a collar on the patient?
A Uh-huh.
Q Did you do anything else?
A After that, I told him that we needed to hurry up and start transporting due to the mechanism of injury. And I started to large-bore IVs.
Q Okay. So did you assess the patient yourself, like, take his vitals, check his breathing --
A Yeah.
Q -- his heart? Did you hook him up to a monitor?
A Yes.
Q Can you tell me specifically what you did? I gave you a

whole list of things --
A Yes.
Q -- tell me what you did.
A So I -- he was already on the monitor prior to me coming in there.
Q Okay.
A So he didn't have blood pressure cuffs, pulse-ox, and they would've put a three-lead on him.
Q What's a three-lead?
A It's a -- leads that give me three views of the patient's electrical conductivity within their heart --
Q Okay.
A -- to assess whether it's beating electrically appropriately.
Q Okay. And when you put the monitor on him and the cuff, did any of the readings come back to indicate that you needed to do additional medical assessment?
A No.
Q Okay. And did you say that there was some bilateral IV given?
A Correct.
Q There was?
A Yes.
Q Did you do that? Or did you instruct somebody else?
A I did one of them and I instructed the EMT to do the --

he was a EMT paramedic student so he was able to do the other one.
Q All right. When you say two, was one in each arm?
A Correct.
Q Okay. And what IV were you putting in the Defendant's arm?
A I put and I instructed for a 16-gauge needle into the IV -- into his antecubital fossa.
Q All right. So is the needle connected to a tube?
A Correct.
Q And that's connected to, I would think, a bag of something?
A Typically, yes.
Q Typically? And in this case, what was it --
A It was a just --
Q -- connected to?
A -- saline lock. So 10ml saline-lock. I did not connect it to fluids because his blood pressure was adequate.
Q Okay. So you were just administering saline to the Defendant; is that correct?
A Correct.
Q At any time, did you administer any other drugs to the Defendant?
A I did not.
Q Did you administer -- strike that. You said that you

assessed the patient. What type of injuries did you see on him?
A I noted that he had multiple superficial tissue -- soft tissue injuries. I remember he had blood and a swollen mouth and --
Q Okay.
A -- nose area, as well as, he had some blood above one of his eyes and a possible swelling to his forehead.
Q Okay. And did you take him to a hospital?
A Correct.
Q Do you remember which one?
A Yes.
Q Which is that?
A Grandview Hospital.
Q All right. And did you accompany the Defendant all the way in the medic to the hospital?
A Yes.
Q And did you physically, with other people, assist him out of the medic on the cot?
A Uh-huh. Yes. Sorry.
Q And was he taken into a what you would a call a trauma room in the ER?
A Yes. They -- I had the driver of the medic unit call and advise Grandview Medical Center that we would be coming and to advise them that there would be a potential -- multiple other

patients coming as well. And they assigned us a trauma room on arrival.
Q All right. And when you got into the trauma room, how long did you stay there?
A Less than five minutes, just to give a report of what I did for the patient and what I noticed. And then typically at that time, many people rush in and we're supposed to exit.
Q Okay. And did you notice any other deputies there at the hospital as well?
A Yes, there was deputies there.
Q Okay.
MS. BRUDER: I need just one second.
BY MS. BRUDER:
Q Back to when the Defendant was in the medic, did he have any probes on his body that you noticed?
A Yes.
Q Did you remove those probes?
A I cannot remember.
Q Fair enough. And do you know where those probes were?
A Yes.
Q Can you tell me?
A One was in his back and one was in the occipital region of his head; in the back of his skull.
Q And where is that? Is that, like, you pointed, like in the back of your head --

A Yep.
Q -- behind your ear?
A Yeah.
Q Okay. And you said that you were asking the Defendant questions. You were -- did he respond to you?
A Not really. He --
Q How would you characterize -- when you say, "not really", how would you characterize his responses.
A He would be -- I would ask him if he was okay or if he had an injury, and he would not respond or he would just, man, and he just kept repeating the same thing over and over.
Q Did he appear confused to you?
A Slightly.
Q Okay, and in your --
A Either confused or stubborn. I could not differentiate.
Q Okay. When you say, "confused or stubborn", what do you mean by stubborn?
A If, like, ask the same question again and over and over, but not getting any result.
Q Oh -- he just -- to you, in your opinion, then, he just was not going to answer you?
A Right.
Q Okay. You weren't sure if that was because he was confused or --
A Right.

Q -- that he didn't want to; is that fair?
A Yes. Yes.
Q Do you remember the Defendant making any other statements after he said, man?
A He just kept asking what happened.
Q He asked you what happened?
A Uh-huh.
Q Would you have made a detail in your report about any statements that were made by the Defendant?
A Yes.
Q Okay. Would it help to refresh your memory to look at your report?
A Yes.
Q I think you still have that. If you could look at it, again, don't read it out loud, just read it to yourself.
A All right.
Q Okay. Did reading your report refresh your memory of what was said?
A Yes.
Q Okay. And what did the Defendant tell you when you asked him questions?
A He just asking what had happened.
Q Did he say anything else to you?

(Nods in negative)

MS. BRUDER: Thank you.

THE COURT: Cross?

CROSS-EXAMINATION

BY MR. CASS:

Q Good afternoon, Mr. King.

A Good afternoon.

Q So when you're called over by the other EMT --

A Yes, sir.

Q -- and you have a discussion with him about his trauma assessment; is that correct?

A Yes, sir.

Q Did you then verify the information that he gave you as far as what he had assessed --

A Yes.

Q -- while you're looking at him?

A Yes.

Q And did you make observations regarding Mr. Whitfield's pupils at that time?

A I would've. Can I?

Q Please. You're welcome to look at your report there.

MR. CASS: If I can, maybe I can withdraw the question and ask it a different way.

BY MR. CASS:

Q Did you -- when you observed him and made your assessment, did you observe that his pupils were dilated and nonreactive at that time?

A I can't remember. In the report, there is -- based off of the EMT starting the care first, his narrative is at the beginning. And then mine starts with a --
Q Okay.
A -- capital.
Q And part of his narrative was that they were dilated and --
A Yep.
Q -- nonreactive (indiscernible).
A He did say that.
Q And what's that a sign of? What can that be a sign of?
A That can be a sign of hypoxia. It can be a sign of some other external use of something.
Q Okay. And when you say "hypoxia", can you explain that for me and the jury?
A Hypoxia occurs when something is inhibiting full --
MS. BRUDER: Objection, Your Honor. Can we approach?
THE COURT: You don't need to. I'm going to sustain your question.
MS. BRUDER: Thank you.
BY MR. CASS:
Q Is that, hypoxia, evidence of a possible head injury? Let me ask it this way. The fact that the pupils were dilated and nonreactive, did that -- can that be an indication of a possible head injury?

A Typically, not. What we look for one pupil to be to dilated.
Q Okay.
A (Indiscernible) --
Q I'm sorry. I didn't mean to cut you off.
A And the other one to be reactive.
Q Okay. How about -- did you ask -- you were asked if you asked him questions, Mr. Whitfield, correct?
A Uh-huh.
Q And what kind of questions did you ask him?
A Sir, do you remember what happened. Do you know what's going on. Where are you at right now. Stuff of that nature. Does this hurt. When I'm (indiscernible) abdomen or his extremities, stuff like that.
Q And he did not answer those questions?
A No, sir.
Q In fact, the only thing that he said to you was he kept repeating what -- asking you what had happened?
A Yes. And he would say, man.
Q Okay. And did you have, in your training, concerns that there was a possible head injury knowing what you did about the crash and how you assessed him?
A Yes.
Q Okay. And that was based on what facts?
A The fact that he was continuously repeating the same

question, the mechanism of injury, not knowing if he was restrained or not in the vehicle.

Q Okay. And I think in your report that you indicated that there were these taser probes in the occipital scalp; do you recall that?

A Yes.

Q And where would that be on? You're pointing to the back of your head there?

A Yes.

Q Okay. For the record. Now, you said that you did put him in a cervical collar?

A Correct.

Q Let me show you what's been marked as Defendant's Exhibit C. Ask you if you can identify that. Does that appear to be Mr. Whitfield in the cervical collar that you just talked about?

A Yes, sir.

Q Okay. Let me just (indiscernible). So that, just so the jury knows, that's what you're identifying as the cervical collar that you put on Mr. Whitfield and then you took him to the hospital, correct?

A Typically, we don't use that. I can't remember completely. But typically, we do not use that tip of C-collar.

Q Yours would've been something similar to --

A Similar --

Q -- that?
A -- to that, yes.
Q Okay. And that, though, is Mr. Whitfield, does that represent the condition that when you saw him?
A He does, in this picture, he looks much more dazed than what he was when I was there.
Q And this would've been after that you saw him, correct?
A Yes.
Q Let me show you what's been marked as State's Exhibit 26. Do you recognize that photo there? This being a photo of Mr. Whitfield?
A Yes.
Q Does that look more like what you saw when you first dealt with him?
A Yes, sir.
Q That fairly, accurately, and correctly depicts him at the time that you initially assessed him?
A (Indiscernible) going in the medic, yes.
Q Okay.

MR. CASS: That's all, Your Honor.

THE COURT: Redirect?

MS. BRUDER: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MS. BRUDER:

Q Defense counsel asked you if you saw -- or if the

Defendant, if there was any mention of hypoxia, right? Did you see any evidence of that?
A No.
Q No? Okay. And --
A Not specifically.
Q -- is it normal standard of care when you arrive on a crash scene to put a person who's injured to put him in a C-collar?
A Correct.
Q And why would you do that?
A To maintain stabilization of their c-spine.
Q Okay. And exhibit -- Defense Exhibit C that was shown to you of the Defendant in the hospital.
A Yeah.
Q Do you know when this picture was taken?
A I do not.
Q But it wasn't -- this isn't what the Defendant looked like when you spoke to him; is that correct?
A No, it is not.
Q Thank you.
MS. BRUDER: Nothing further.
THE COURT: Any recross?

RECROSS-EXAMINATION

BY MR. CASS:
Q Just in that photo, the injuries that you saw are some of

the same injuries present in that photo as when saw him initially at the scene?
A Yes.
Q All right.
MR. CASS: That's all.
THE COURT: All right. Thank you, sir. You can step down. You're excused.
Your next witness, please?
MS. MELNICK: State calls Dep. Joseph Solomon, Your Honor.

JOSEPH SOLOMON

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:
THE COURT: Sergeant, feel free to take your mask off if you need to for your testimony.
THE WITNESS: Thank you.

DIRECT EXAMINATION

BY MS. MELNICK:
Q Sir, can you please state your first and last name and spell both for the record?
A Joseph, J-O-S-E-P-H, Solomon, S-O-L-O-M-O-N.
Q All right. And can you tell the ladies and gentlemen on the jury, please, where you're employed and in what capacity?
A I work for the Montgomery County Sheriff's Office as a sergeant.

Q And how long have you been with the sheriff's office?
A 18 years.
Q All right. And how long have you been a sergeant?
A A year and a half.
Q Okay. And what were you prior to becoming a sergeant?
A A deputy and assigned to road patrol in Harrison Township.
Q Okay. Can you tell me, were you on duty on June the 25th of 2020?
A I was.
Q And in which capacity were you on duty?
A I was assigned as a deputy sheriff on road patrol in Harrison Township.
Q Okay. And do you recall what shift you were working?
A I worked second watch, which was 7:30 a.m. till 4:02 p.m.
Q All right. And were you in a uniform of the day similar to what you have on now?
A Yes.
Q And were you driving a marked police cruiser?
A I was.
Q All right. Were you a one or two-man crew?
A One.
Q All right. Do you recall where you were at approximately 3:45 in the afternoon?
A Yes. I was at the Harrison Township substation.

Q What were you doing there?
A Logging off the computer to leave for the day.
Q All right. And is that what we refer to as D-10?
A Yes.
Q Okay. And while you were there, did you hear a broadcast come out on the radio from Det. Bryan Statzer?
A I did.
Q And did you respond to that broadcast?
A Like, did I talk on the radio?
Q No, did you --
A Okay.
Q -- physical go somewhere as a --
A I did.
Q -- result? What'd you do?
A I turned around in the parking lot and I headed south on North Dixie.
Q So were you in your vehicle getting ready to leave?
A Yes.
Q Okay. So you happen to be in the parking lot already in your car? And so you just went the other way?
A Yes.
Q Okay. And did other deputies leave prior to you leaving?
A Yes.
Q All right. And so I know that we've seen some footage from three deputies that were leaving in a row initially. Were

you after them? Or were a couple of minutes later, or?
A So I was parked parallel to them, you know, my door to their door but facing the wrong direction.
Q Okay.
A To all of three of them.
Q Okay. So when you left the station at D-10, did you head south?
A Yes.
Q All right. What, if anything, did you see as you were approaching the area that Det. Statzer had called out his location to be?
A When I got to the crash, or what did I hear (indiscernible) --
Q No, before. Did you see any of the incident that occurred with Sgt. Vitali --
A No.
Q -- and the suspect vehicle --
A No.
Q -- and Det. Statzer?
A No.
Q That had all been concluded by the time you got out there?
A Yes.
Q All right. And did you see Det. Statzer? Was he still waylaid on the side of the road or had he left as well?

A I didn't pay attention to him.
Q Okay.
MS. MELNICK: No offense.
BY MS. MELNICK:
Q So then I'm assuming you continued down North Dixie --
A Yes.
Q -- in a southerly direction? Tell me, what was going on when you arrived at Hillsdale and North Dixie. Did the crash already occur?
A Yes.
Q Tell me what was happening when you arrived.
A 20-ish year-old black male was running north, northwest on Dixie. He was being pursued by a deputy. And he was tased just a few feet from my vehicle.
Q Okay. And did you deal with that individual?
A No, because there were several officers.
Q That were dealing with him?
A He was handcuffed. I saw that he was secured. I wasn't sure who had been in the crash. And so I responded to the crash. And when I parked, I parked, like, three or four address north of where the crash was.
Q Were you helping block traffic?
A The crash was on the opposite side of the road. So like, the vehicles traveling south and it was the north side of the road, so I blocked any of the traffic from coming past where,

you know, to make it as safe as I could for anyone that's -- any citizens that's driving north on Dixie.
Q Okay. Did you respond up to the actual crash site? That's easier said than done.
A Yes.
Q Okay. What did you observe going on at the vehicle that had crashed when you arrived at the vehicle?
A It was on its roof.
Q Okay. Were there deputies attending to anyone? Were medics on-scene? What was --
A No, neither.
Q -- going on? Neither? What did you do and what did you observe?
A I could see that there was a female still seat belted in and suspended. And I could tell she was young, like a teenager.
Q Okay.
A And I make my way over to her. But before I got to her, there was a young black male, maybe 20, that's getting out of the car. And I grabbed onto him because I wasn't sure if he was going to flee.
But as soon as I grabbed onto him, I could tell that he was bleeding. He had a bloody mouth. He wasn't responding to anything I said. I got him out of the way of the crash. The house that the vehicle crashed into had a concrete porch; I

knew that it did.

I walked him over to the concrete porch and told him to have a seat. And told him that medical help would be coming. And when I got to the concrete porch, I didn't see this gentlemen, initially, there was a younger black male also laying in the fetal position moaning.

And there was glass all over him, and he was bloody. I didn't see, like, how bloody he was. I knew he was in worse shape than the gentleman I had walked over there. Then I responded back to the car, checked for vital signs on the female.

Q Where was Dep. Bone during all this?

A I think he may have been -- he responded about the time I -- I saw him about that time.

Q So he wasn't just in another area of the car? He was very clearly the very first person to arrive per all the videos to the vehicle. So was he still in a --

MR. CASS: Objection. Leading, Your Honor.

THE COURT: No, no. You can rephrase or I'll sustain.

BY MS. MELNICK:

Q Deputy, we have watched videos in this case. And I'm happy to show you any of those videos. Was he dealing with the car in another area of the car when you arrived?

A I don't know where he was at. I was focused on the people that I dealt with. He and I first spoke with the

female. He and I both checked her --
Q Okay.
A -- vital signs. I don't know.
Q At --
A He may have been there, and I just didn't see him.
Q Okay. At some point in time, did the medics arrive?
A Yeah, so I called on the radio and said that we needed at least three medics and they needed to hurry up. And we needed equipment because we had one strapped.
Q All right. And did you stay with the female with Dep. Bone until the medics arrived?
A I heard the medics approaching. And I walked -- because how many vehicles responded, I walked north on Dixie to make contact with the medics as they got there. I notified them that they needed equipment to cut a female out that was trapped in the vehicle.
And I walked them, like, come on, let's go and took them to the gentleman that was laying in the fetal position and told them they needed to take him first.
Q Okay. And did they do that?
A They did.
Q All right. Now, were you able to see -- well, let me do it this way.
MS. MELNICK: Same one I used before, 39.
BY MS. MELNICK:

Q I'm going to hand you what's been marked as State's Exhibit 39 for identification. Can you tell me, do you recognize the vehicle in that photograph?
A Yes.
Q And is that the vehicle that the female was trapped upside down in that you were referring to?
A Yes.
Q All right. Now, what part of that vehicle did you see this guy that you said you had to take a hold of around?
A I saw him on the same side as the female that was trapped.
Q Okay. And are you aware of any interaction that Dep. Bone may have had with that individual prior to your arrival?
A No.
Q Okay. Now, was there a point in time, obviously, that the medics arrived and started dealing with all of these individuals?
A Yes.
Q All right. And did you have occasion to follow one of the medics to a hospital?
A I did.
Q And do you know who the patient was that was in that medic?
A I didn't at the time.
Q Do you now know who the patient --

A I do.
Q And who was it?
A Caleb Whitfield.
Q Do you see Caleb Whitfield in the courtroom today?
A I do.
MS. MELNICK: Masks down, please.
BY MS. MELNICK:
Q Can you please identify him for the record? Point to where he's seated and what he's wearing?
A Yeah, he's sitting right there in a blue shirt with a tie.
Q All right.
THE COURT: Identified (indiscernible).
MS. MELNICK: Thank you, Your Honor.
BY MS. MELNICK:
Q Can you tell me, do you recall what hospital you followed the medic to?
A Grandview Hospital.
Q All right. And did you arrive there at the emergency room like immediately behind the medic?
A Yes. I didn't ride with the medic, but I followed the medic.
Q Okay. And when the Defendant was unloaded from the medic to be taken inside the hospital, were you right there following with him and the medics taking him inside?

A Yes.
Q What was the purpose of that? Why were you there following the medic with this particular individual?
A At the time, I assumed he was in custody.
Q Okay.
A And check on his status as far as injuries.
Q Were you told he was in custody?
A I don't recall that. I assumed he was in custody.
Q Okay. Were you asked to follow that particular medic?
A Yes. Yes.
Q Who were you asked to do that by?
A I would assume Sgt. Vitali, but I don't remember.
Q Okay. So you get there and tell me what happened. You -- he's unloaded from the medic --
A Yes.
Q -- and he is being taken into the emergency room.
A Yes.
Q And you are right with them?
A Yes.
Q Tell me what happens.
A Well, I was told that he was in -- I'm not sure what condition they said. But you know, obviously, he was injured. So it was like a triage team that assessed him right away, so you know, I'm kind of in the way, you know? I'm standing out in the hallway --

Q So --
A -- outside of the room.
Q -- was he -- he was taken into an actual room?
A Like an ER room, yeah.
Q Okay. And you stayed out because he had a team of people in there?
A Yes.
Q Okay.
A But like, directly outside of the glass of the hospital room.
Q Was the door to that room open or is it one that's just got a curtain? Tell me what it's like.
A It's a glass door.
Q Okay. can you see through it?
A Yeah.
Q It's not just like a little bitty window? It's a full --
A No.
Q -- glass door?
A yeah.
Q Okay. And did you -- you watched them, obviously, assess the patient, correct?
A Yes.
Q All right. And approximately how long was the Defendant in that room before he was moved to a different room?
A I didn't note a time; I know it was quick. From there,

they moved him into a scan room, like, CAT scan and x-ray type of room.
Q Give me your best guess on what "quick' means; is it five minutes, ten minutes?
A Five minutes, yeah. That would be --
Q Five minutes.
A -- my guess.
Q Okay. And then you -- did you, when he was removed from that ER room and taken to what I think you just referred to as a scan room?
A Yes.
Q Did you go with him?
A Yes.
Q And was that because you assumed he's in custody at this point?
A Yes.
Q All right. And describe the scan room for me.
A It's not as big as this room; maybe half the size of this room. There's some sort of medical equipment, you know, I don't know. There's an x-ray machine, CAT scan, you know --
Q Is it --
A And then --
Q -- one of those big round things that has the bed that goes inside it?
A Yeah.

Q Okay.
A That's exactly what it was.
Q All right.
A And there's a walled-off area where their offices are.
Q Okay. And were you walking with them as they took him in there, keeping a close eye on him?
A Yeah, so everywhere that he went, I went with maintained constant eye contact.
Q Okay. When you say "eye contact", did he see you as well?
A I don't recall.
MR. CASS: Objection.
THE COURT: Sustained.
MS. MELNICK: Okay. Your Honor, I'm just talking eye contact. Did you see him --
THE COURT: No. You asked him if he saw him. You don't know (indiscernible).
BY MS. MELNICK:
Q Did you see him looking at you?
A I don't recall --
Q Okay.
A -- at that point.
Q All right. Now he goes into the scan room. And you said it's about half the size of this room?
A Yeah.

Q Tell us what happens inside that room.
A Again, you know, there was a team of people. So he's going to be transferred from whatever bed they bring out, gurney, I don't know what the name of it'd be for (indiscernible) to the machine that brings you into -- I don't know what the technical terms are for it, but he's going to be transferred from what they transported him to this room with to the machine.
Q So whatever bed he was placed in in the ER, they wheeled him down the hallway in, right?
A Yes.
Q And then they have to move him from that bed to onto the CAT scan or whatever scan machine that is?
A Yes.
Q And were you right there when they were doing that --
A Yes.
Q -- to ensure that he wasn't going anywhere?
A Yes.
Q When you say "right there", how right there are you?
A Well, I followed -- you know, within five feet --
Q Okay.
A -- of where he was at until we went to that room.
Q Okay. And once he was placed on the scanning equipment in order to have whatever test they were running, where did you go?

A I went back, not quite to where the offices are, so half the length of the room.
Q So if I -- if you're you --
A Yes.
Q -- and I am the Defendant, tell me when to stop.
A Probably like that.
A Okay. All right. So at that point, could you hear conversations being had between medical personnel and the Defendant?
A Yes.
Q And can you tell me, at any point in time, while you were in the room, did the Defendant make any statement as to who was driving the vehicle?
A Yes.
Q What statement did he make?
A They asked him if he was driving and he said that he was.
Q Okay. Did you ask them to ask him that --
A No.
Q -- question? Was that your prompting at all?
A No.
Q Medical staff asked them that on their own?
A Yes.
Q All right. And his answer was, I was driving?
A He said he was.
Q Okay.

MS. MELNICK: Nothing further, Your Honor. Thank you.
THE COURT: Any cross?
MR. CASS: Yes.

CROSS-EXAMINATION

BY MR. CASS:
Q So Dep. Solomon, you're saying that when you got to the scene, is it the first thing that you did was go to the passenger side of the wrecked car?
A I was on the side, yeah, where the female was.
Q Okay.
A Well, that wasn't the first thing. The first thing I did was, I observed a gentleman being tased. And then I responded to the vehicle.
Q You were with Caleb first and then went to the vehicle?
A Yeah, but he was -- I could see that I was not needed where Caleb was at.
Q Okay. So he had already been -- had he been handcuffed by the time that you got to him?
A He was being handcuffed when I was getting out of my vehicle.
Q Okay. And then you went to the passenger side of the wrecked car, correct? And was anybody else there when you went to that side? Anybody outside the car with you?
A Any deputies?
Q Yes.

A Not that I recall.
Q Okay. And it -- and then you looked in the -- well, strike that. And so on the passenger side, your testimony is that one of the occupants was trying to climb out of the car on that side?
A Well, I don't know about climb out, but he -- I was going to check on the vital statistics of the female because I could see she was trapped and I couldn't because there was a gentleman. I don't know if he was standing up. I don't -- you know, he wasn't, like, in the car climbing all the way out.
But I couldn't get to the female because there was a gentleman, what appeared to be, just getting out of the car.
Q And where was he trying to get out of, exactly?
A The same side she was on.
Q Okay. Out of, like, a window or the door or?
A I don't recall that.
Q Okay. But out of that side?
A Yes. I couldn't get to her because he was there.
Q And then you walked around to the other side of the driver's side of the vehicle?
A I grabbed him and walked him over to that concrete porch on the font of the house and told him to have a seat and told him that medical personnel would be coming. Because I could tell he was injured.
Q When you grabbed him, when you say you grabbed him, I

mean, you physical grabbed ahold of him?
A Yeah, just to direct him.
Q And took him out of the vehicle? Removed him from the vehicle?
A Yeah, to the concrete porch.
Q And how did you get him out of the vehicle? What -- how did you remove him?
A I just took ahold of him and walked him around the porch.
Q Okay. I'm -- but I mean, did you take him
A I didn't --
Q -- out the door?
A -- lift him up out of the -- off of the ground. I grabbed him as he was -- like I said, he's like bent over. And I grabbed him and walked him around.
Q Okay. Was he still inside the car when you grabbed him?
A He looked like he was standing up from the car.
Q And where was he stand -- coming out of the door?
A The same side where the female was I couldn't to.
Q The same -- on the passenger side?
A Yeah.
Q Okay. So you grabbed him from the passenger side and then walked him around the car?
A Yes.
Q Okay. And at that time, you saw that the other -- another person was already out?

A Yes, I didn't see him when I walked up to the car initially.
Q Okay. And you did a report back on the day, on June 25th, 2020. Do you remember that?
A I did.
Q Okay. And what you're testifying to this part, is it fair to say, was not in that report, correct?
A Correct.
Q In fact, you just did a report on this part of it on February 18th, 2022?
A I did.
Q Okay. And so you followed Caleb to the hospital and your assumption was that he was under arrest; is that correct?
A Yes.
Q He was not free to leave; is that --
A Correct.
Q -- fair to say? And in your initial report back in June of -- 25th of 2020, you said at approximately 1600 hours that you followed him to the Grandview Hospital?
A Yes.
Q Okay. And can -- what time is 1600 hours?
A 4 p.m.
Q Okay. And so if we saw videos earlier where this accident happened 1547, that'd be 3:47 p.m.?
A Correct.

Q So this would've been roughly 13 minutes after the crash, right?
A Correct.
Q All right. And at the time when you got to the hospital, do you recall that he was in a cervical collar-type apparatus at that point in time?
A Yes.
Q Okay. And you had an opportunity to observe him then?
A Yes.
Q Let me show you what's been marked as Defendant's Exhibit C. Does that look like a picture of the way he appeared when he got to the hospital?
A Yes.
Q Okay. And that fairly and accurately and correctly depicts Mr. Whitfield at that time? You have to answer.
A Yes.
Q Okay. Thank you. And so once he gets there, he goes to this trauma room, but he's not there very long; is that correct?
A He --
Q Where they initially assess him, like the triage room or what have you?
A Yes.
Q Okay. And then he's going to be taken for this CAT scan, right?

A Yes.
Q Okay. Was it your understanding that the CAT scan was to look for some type of head injury?
A I would assume that. The medical team didn't discuss that with me, but.
Q Okay. But you follow him there, correct?
A Yes.
Q And I think you just described when he gets into this room, as far as the width of the room, is the width accurate here?
A I would say it was a pretty square room.
Q Okay. But Ms. Melnick walked back, I'm going to estimate, 20 feet or so from -- you were 20 feet or so from him?
A Yes.
Q Okay. And how many medical personnel were in the room at that time?
A It would be just a guess, but five, four, six.
Q Four to six?
A Yeah.
Q Okay. And --
A Enough to move him.
Q And were there other medical personnel asking him questions during this time?
A There were several.

Q And it's your testimony that he stated he was the driver in response to a question posed by one of the medical personnel?

A Yes.

Q Okay. Can you tell us exactly what he said? What his exact words were?

A I would - -

MS. MELNICK: Your Honor, can we approach, please?

THE COURT: Yes.

(At sidebar)

MS. MELNICK: I'm going to renew this objection because (indiscernible). And so I asked the question (indiscernible) specific as to what is exactly (indiscernible). He's getting into all of the things that we already discussed.

MR. CASS: (Indiscernible).

MS. MELNICK: Right, but (indiscernible).

MR. CASS: (Indiscernible).

MS. MELNICK: (Indiscernible).

THE COURT: Yeah. The way you asked, you asked him -- you wanted to know exactly what he said, which means everything.

MR. CASS: All right. I'll

THE COURT: So you need to --

MR. CASS: -- narrow it down.

THE COURT: -- narrow it down a little bit.

MR. CASS: All right.
THE COURT: Okay.
(End sidebar)
BY MR. CASS:
Q Dep. Solomon, can you tell us specifically what he said about being the driver of the vehicle?
A If you want it to be specific, I'd have to refer to my report. At the time, I had a notebook and I jotted down what he said.
MR. CASS: Showing this to him.
MS. MELNICK: Yeah. Sure.
BY MR. CASS:
Q And I'm talking about in reference to him admitting to being or stating he was the driver.
A So the sentence that I wrote was, nurse asked --
THE COURT: Wait a minute. Wait a minute. Sorry. Wait till there's a question.
THE WITNESS: Oh.
THE COURT: Listen carefully to the question --
THE WITNESS: I'm sorry, Your Honor.
THE COURT: -- answer what is asked, please.
BY MR. CASS:
Q Let me ask you this way, in your report, does it, like, in quotes, state exactly what Mr. Whitfield or what you hear Mr. -- you're stating -- testifying you heard Mr. Whitfield

said?
A No.
Q So -- and do you have a recollection of the specific words that he used to state that he was the driver?
A No.
Q So basically what you're saying is whatever he said, you took that to mean he was stating he was the driver; is that correct?
A Can you ask the question again?
Q I guess, so we don't know exactly what you heard that led you to conclude that he was stating that he was the driver. We don't know the exact words?
A Like direct -- exact words that --
Q Right.
A -- I had a notebook and I wrote down what he said.
Q You had a notebook at the time and you wrote --
A Yeah.
Q -- down what he said? And then you did a report on this, correct?
A Yes.
Q All right. And it's accurate that you did not include those exact words when you wrote your report --
A Correct.
Q -- even though you had them in your notes; is that right?
A Not -- well, I wrote what I wrote down on the report.

Q Well, your report does not reflect any exact words, correct?
A Correct.
Q All right. Now -- and then, after you heard the statement -- so you were there because you assumed that he was under arrest, right --
A Correct.
Q -- for --
A Correct.
Q -- this crash or fleeing from the police, what had happened 13 minutes earlier, right?
A Correct.
Q Okay. And then your testimony is you hear a statement by him that he claims that he was -- or states that he was the driver of this vehicle, right?
A Yes.
Q Okay. Isn't it true that at that time, you did not arrest him?
A No. I was not the arresting officer.
Q Okay. In fact, at some point, you left him, correct, at the hospital?
A Yes.
Q And there was nobody else there; is that right?
A Correct.
Q So just left him on his own at the hospital --

A Yes.
Q -- correct? And I think we've test -- or you've had -- testified that you did a report back on June 25th, 2020.
I'm going to show you what's been marked as Defendant's D to you. Is that a copy of the report that you did on the day that this happened, June 25th, 2020?
A Yes.
Q And when you do a report, it indicates that the time that it's entered, correct?
A Yes.
Q When you put the report in?
A Yes.
Q And isn't it true that the time on that is 3:46 p.m. on June 25th, 2020? That's what your report states?
A It does state that.
Q Which would have been before you even went to the hospital at 1600, according to that report?
A Correct.
MR. CASS: That's all I have.
THE COURT: Redirect?
MS. MELNICK: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. MELNICK:
Q Let's start where Defense counsel left off. Would you disagree with me that this incident occurred at 3:46 p.m.?

A No.
Q Is that the time that was written on your report for that day rather than the time that it was actually entered?
A Right.
MR. CASS: Objection, Your Honor. Leading.
THE COURT: Overruled.
BY MS. MELNICK:
Q Was the report regarding the statement that this Defendant, Caleb Whitfield, made to the medical staff saying that he was the driver of the vehicle? Did you write that in a report on the same day that this incident happened?
A I did.
Q Okay. Was it your decision whether or not to arrest the Defendant, Caleb Whitfield, on that particular day?
A It was not.
Q Were you told at that time you could go ahead and leave the hospital?
A I was.
Q Have you ever investigated vehicle crashes like this before?
A I have not.
Q Okay. So you don't know if this is normal or usual behavior or not?
A Correct.
Q Okay. Now, the other report that you wrote was quite

some time later, correct?
A Correct.
Q As a matter of fact, relatively recently?
A Correct.
Q And you're writing that report from memory that occurred form 2020, correct?
A Correct.
Q And you're doing your best, at that point, to give all the pertinent information that you have in that report to make sure that some things that hadn't been documented before got documented?
A Correct.
Q All right. If this jury has seen videos and sees more videos, would you expect the jury to rely more on what they see in the video than what you may have remembered writing your report just a short period ago?
A Correct.
Q Okay.
MR. CASS: I have nothing further, Your Honor.
THE COURT: Recross?

RECROSS-EXAMINATION

BY MR. CASS:
Q Dep. Solomon, as a deputy sheriff with Montgomery County Sheriff's Office, you certainly have the authority to arrest an individual who's committed a crime, correct?

A Correct.
Q And you did so on that day, June 25th of 2020?
A Correct.
Q And these reports that we've looked at, wouldn't it be true -- isn't it true that the purpose of them is to document things that you've seen for future reference, correct?
A Correct.
Q So that a year or two years later you can go back and try to recall things you've accurately recorded it back when it happened, correct?
A Correct.
MR. CASS: That's all I have.
THE COURT: Thank you, Sergeant. You can step down. If you can hand those reports back to whoever they came from.
MR. CASS: Thank you.
THE COURT: Ladies and gentlemen, we're going to take another short break for this afternoon. Please remember, do not discuss the case among yourselves or anyone else. Don't let anyone discuss it with you. Don't form or express any opinion on this case until it's finally submitted to you. We'll be in recess for about ten minutes.
THE BAILIFF: All rise for the jury.
(Jury exiting courtroom)
(Recess taken)
THE BAILIFF: All rise for the jury.

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: Call your next witness, please.

MS. MELNICK: The State calls Dep. James Gisewite.

JAMES GISEWITE

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: If you'd like, you can lower your mask when you're testifying.

THE WITNESS: Thank you.

DIRECT EXAMINATION

BY MS. MELNICK:

Q Sir, can you please state your full name and spell your first and last names for the record?

A It is James Gisewite, J-A-M-E-S Gisewite is G-I-S-E-W-I-T-E.

Q All right. And can you tell the ladies and gentlemen on the jury, please, where you're currently employed and in what capacity?

A I'm employed with Montgomery County Sheriff's Office. I am a deputy assigned to the forensic services unit and the traffic services unit.

Q All right. And can you tell me, sir, how long have you

been with the sheriff's office?
A Just over ten years.
Q Okay. And how long have you been assigned to the traffic services?
A Traffic services --
Q I'm sorry. I'm reading -- the traffic reconstruction, correct?
A Yes.
Q Or crash reconstruction, I'm sorry --
A Yes.
Q -- I should say. How long have you been doing that?
A I believe it's three years.
Q Okay. And how long have you been doing forensic services?
A I've been assigned to the forensics unit for the past nine years -- eight --
Q Okay.
A -- years, maybe.
Q All right. Do you have any law enforcement experience prior to the sheriff's office?
A Yes, I worked four year -- just four and a half years at Butler Township full time.
Q Okay. Can you tell me -- well, why don't you tell the ladies and gentlemen of the jury, what is forensic services?
A In a nutshell, it's basically CSI.

Q Evidence crew, correct?
A Yes.
Q What we commonly refer to as E-Crew. Maybe not what you refer to it as, but everybody else --
A I believe Dayton refers to it as E-Crew, yes.
Q Okay. And in forensic services, are part of your duties collecting evidence?
A Yes.
Q And can you tell me, do you go through any kind of training in order to learn how to do that properly to preserve evidence?
A I went through the Miami Valley Regional Crime Lab Evidence Technician Course and that was in 2010 when I worked for Butler.
Q Okay. And did you have to do any kind of refresher when you came to work for the County? Or had you been continually doing that type of work at Butler?
A Yes. I did not have to take a refresher course because I been continuing to do it.
Q Okay. And that's an 80-hour program; two weeks, correct?
A Yes.
Q All right. And during that program, what types of things do you learn to do? How do you process a crime scene?
A The class itself, has a lot to do with photography, fingerprint lifting, DNA collection, how to package evidence

properly.
Q Okay. And in your capacity as forensic services through the sheriff's office, when you are on duty, are you solely forensic services? Or are you also taking calls for service? How does that work in your situation?
A Being what a, what we consider County car, I have to wear several hats. I do have to help in Jefferson Township since they only have one deputy, so I do take regular calls. I have to respond to places such as Philipsburg and Verona because they don't have police departments. So I don't solely do forensics but that is my priority.
Q Okay. So if a call comes out when you're on duty and they need you to respond to a scene, that's going to be your priority call?
A Yes.
Q Okay. And can you tell me, what is the crash reconstructionist job that you do? Tell us a little bit about what that is.
Q So I've been through four different levels of crash investigation, which includes reconstruction. After that, I did three different levels that involved commercial motor vehicles. As far as what we do is reconstruct a crash, basically, try to figure out what happened.
Q Do you take measurements of skid marks, for example?
A Yes.

Q Okay. And do you take into account road conditions when you're doing a crash reconstruction?
A Yes.
Q And do you inspect vehicles? Are vehicles inspected as a result of that as well?
A At times they are, yes.
Q Okay. And are all those things taken into account when you are doing a crash reconstruction on a case?
A Yes.
Q Okay. And do you know all kinds of formulas that would turn my mind into goo if you tried to explain them to me based on all the training that you have in order to be able to use those formulas, along with all the other things at the scene in order to make your crash reconstruction?
A That is correct.
Q Okay. Now in this particular case that we are here for today, were you wearing multiple hats in this case as well? Did you do crash reconstruction, to a degree?
A To a degree, we took a measurement of the long skid. Other than that, most of what I did was forensic side.
Q Okay. That was my next question. Did you respond to the actual scene on June 25th of 2020?
A Yes, ma'am.
Q All right. Were you on duty that day?
A Yes.

Q What shift were you working that day?
A Then I was on what we call third watch, which is evenings. So 3:30 in the afternoon to just after midnight.
Q Okay. And did you respond to the location of North Dixie Drive and Hillsdale Avenue?
A Yes.
Q Is that a location located in Montgomery County, Harrison Township, Ohio?
A Yes.
Q All right. And when you arrived -- or when you got called out to the scene, do you recall approximately what time it was?
A It was just -- I believe it was just before 4 when I heard the call going out.
Q Okay.
A Having done it long enough, I knew that I was going to be needed. So then I just started loading up special equipment into my vehicle before I headed that way.
Q Okay. And is that what you did? You loaded up your --
A Yes.
Q -- car and just went ahead and headed there?
A Yes.
Q Okay. And when you arrived, tell me what it was you saw?
A When I arrived, the road was shut down by police cruisers, sheriff's deputies cruisers. There was one vehicle,

it was a black vehicle, that was on its top; that would be on the eastside of North Dixie, close to, I don't know if you'd call it an abandoned house or old building, or -- it was wood.

But it was upside down, close to that. There was tire marks that lead back starting from the curb right by the residence, back through the roadway and then back into the southbound lanes.

Q Okay. And were there still victims on-scene when you arrived?

A No, ma'am.

Q Okay. They had all been transported?

A Yes.

Q What about the suspect? Had he also been transported?

A Yes.

Q Okay. And what was the first thing, then, when you arrived that you did? Who did you talk to first?

A Oh, I don't recall who I talked to first.

Q Were you briefed on the scene? Or had you been listening to radio traffic and kind of knew what was going on?

A I had been listening to most of it. But there wasn't much to tell me, I guess, because most of you could see right there.

Q Okay. What was the first thing that you began doing, then, when you arrived on the scene?

A I used orange traffic paint and started marking tire

tracks, tire marks in the roadway and along with the places that the vehicle struck; curb, there was a concrete, kind of, porch step in front of the house. I marked areas on that as well.
Q Okay. Did you after, did you take photos after that?
A Yes.
Q All right. And when you take -- what's the purpose of taking photos of the scene?
A Well, technically, we're supposed to call them digital images, so.
Q Okay. That's a new one for me, digital images. So you took digital images?
A Yes.
Q What's the purpose of that?
A That just, it -- how do you say -- I mean, it's just a capture of how the scene is. So I mean, it shows you -- I start from beginning to end. So I backed up clear to where I could first start seeing tire marks in the roadway. I started from there and worked my way all the way up to the vehicle.
Q Okay.
A Sorry, I documented the scene.
Q I'm going to hand you what has been marked as State's Exhibits 30 through 50. If you can just take them and flip through those and tell me if you recognize those?
A Yes, ma'am. I --

Q Is --
A -- recognize these.
Q Are those photos that you took? Sorry, digital images that you took?
A So these would be photographs because they are printed off. Yes, these are the ones that I took.
MS. MELNICK: I can't win for trying, can I?
BY MS. MELNICK:
Q All right. So are all of those photographs complete and accurate depictions of what the scene looked like on the day you were there, June 25th of 2020?
A Yes.
Q Okay. I'm also going to hand you State's Exhibits 17 through 21.
MS. MELNICK: Bill.
BY MS. MELNICK:
Q Can you tell me, did you take those photographs?
A Yes, I did take these.
Q All right. And do they accurately depict Det. Statzer's vehicle?
A Yes. I'm sorry.
Q It's okay. All right. Now, I am going to give you this pointer. You use it in this direction, okay?
(Pause)
BY MS. MELNICK:

Q All right. So starting what has been marked as State's Exhibit 30, can you tell us, what was the purpose of you taking this photograph?
A This is the closest intersection to where the tire marks in the road began.
Q Okay. And so you are just documenting the scene as to --
A Location is.
Q -- where that is? Okay. And what are we looking at here in State's Exhibit 31?
A These -- the first -- I'll try to squeeze through here --
MS. MELNICK: Can we turn the lights --
A -- this first --
MS. MELNICK: -- down?
A -- mark here is the first area that I could find a tire mark begin, which is why it looks to be U shaped.
BY MS. MELNICK:
Q Okay.
A From there, each lines of this right side, left side is going to be one tire and this is another tire here.
Q Okay.
A And then so on over here.
Q Does that make sense to you with those being -- well, let's go to State's Exhibit 32. And are those same marks closer up?
A Yes.

Q Okay. And does that make sense to you that you have two tire marks that are that close together?
A Yeah. So what that is, is a separation of tracking between the front and rear wheels. So once you are moving at a great enough speed and you lose that traction, the rear tires are going to slide out away from the front tires and you'll end up with four different tire marks until the car is completely sideways to where they're on top of each other again, that's sideways and not front to back.
Q So this area would depict when the car is starting to go out of control?
A It's starting to rotate, yes. The front end going left and the rear end to the right.
Q All right. And are these depicting the passenger side of the vehicle?
A Yes.
Q All right. And then over here, we have another U shape.
A Yeah.
Q What is that?
A That would be the first mark that I could find for the left side tires.
Q Okay. Moving onto State's Exhibit 33. What do we have here?
A It's continuing, following the tire trails -- or tire marks from where they started. And as I go through these next

few pictures, because it's kind of going the same, I'm just following that -- those tire marks that takes you straight to the scene.
Q Okay. So we, what looks like, have a single row on one side and we have this double; why would that be?
A It could be that one of the tires on the left side just wasn't leaving enough evidence behind for me to be able to mark it.
Q Okay.
A The other thing is that, given momentum, the weight of -- how the weight of the vehicle was now shifted to the passenger's side, which is going to make the left side driver's side tires lighter on the ground, so they might not leave as much evidence.
Q Okay. And State's Exhibit 34. These just closer marks as we're moving closer to the scene?
A Yes, ma'am.
Q Okay. State's Exhibit 35. Again, these are different marks as we come closer. Now --
A Yeah, here you can -- I'm sorry.
Q Go ahead, I was going to ask you, now, we're starting to actually see some lines on the roadway.
A Yes, so you're starting to see now you have -- you can see the four different sets of tires. Here's one here. There's one here. There's one here. And then you have this

continuous one here as well.
Q So does that demonstrate to you that the car is actually rotating more at this point?
A It has rotated further than from the beginning, yes.
Q Okay. Sate's Exhibit 36. Again, are we just getting closer?
A Yes. As you can see, as these start, they widened out. And as they are coming back together, that is the car almost completely sideways.
Q Okay. State's Exhibit 37. What is this depicting?
A This is the intersection right where the vehicle is at final rest, which is actually across the street.
Q This sign is?
A This sign is across the street.
Q This sign is?
A This sign is across the street. You can see the Keowee Auto Sales in the background. That actually is across the street.
Q Okay. So if we go back one, is this Hillsdale here but the sign is over here?
A I actually don't know the answer the that.
Q That's fine. That's a fair answer. All right. So State's Exhibit 38. What do we have here?
A So still continuing along the path of the vehicle, so you can see just two sets of tire tracks. That means this car is

completely sideways. The front end's going to be towards the left; the rear end's on the right. And then you have the marks on the curb where the vehicle struck.

Q Okay. State's Exhibit 39. What side of the car are we looking at here?

A What side of the car?

Q Yes.

A That is the driver's side of the vehicle right there.

Q Okay.

A Yeah, the front of the vehicle is here. The rear of the vehicle is what's up in the air.

Q Okay. And State's Exhibit 40. What are we looking at here?

A These are marks in that concrete front porch, I guess you could call it. I discussed that you could see the fresh marks, especially on the corner over here and along with here where the vehicle had struck.

Q Okay. And we have these marks here where -- are -- is that some tire tracks also --

A Yes.

Q -- going up? Okay. And at this point, are you kind of making your way around the vehicle?

A That's correct.

Q All right. So this is the front of the vehicle?

A Yes.

Q 42, what are we looking at here?
A This is the passenger side of the vehicle. And -- go ahead.
Q No, go ahead if you're --
A From my reconstruction, and what you can see and the amount of damage that's right here to the passenger side, this is where the vehicle struck that concrete front porch. And that's what caused such severe damage there.
Q Okay. And what are we looking at here in State's Exhibit 43?
A This is just another picture of the passenger side of the vehicle.
Q Is it showing more of the rear portion of the vehicle?
A Yes.
Q Okay.
A And then that would be the rear. The trunk had actually come open during the crash and things went flying. So this is actually all out of the trunk. The trunk is open here.
Q Okay. And this is, for the record, State's Exhibit 44. Moving onto State's Exhibit 45.
A This is one of the tires. I believe it is the passenger rear tire that came off during the crash.
Q Okay. And it just --
A Sorry, it may be passenger front.
Q That's where it ended up?

A Yes.
Q All right. State's Exhibit 46.
A It was the passenger front --
Q Okay.
A -- like I thought it was.
Q Oh, because we're looking here and we can see there's no tire?
A Yeah, part of the rim is still attached to the vehicle there.
Q Okay.
A I don't know for certain if there's a closeup of that tire in the roadway. But it would just the outer of the rim with the tire.
Q Okay. and what are we looking at here?
A So this is, obviously, the underside of the car that's sticking towards the air. You can see the amount of force that pushed the passenger side in here. It was hard enough to actually bend out the driver's side.
Q Okay. And for the record, this is State's Exhibit 47. State's Exhibit 48.
A This is right after the tow company had rolled the vehicle back on to its wheels.
Q All right. So we're looking, now, at the --
A You're now --
Q -- the passenger side again, correct?

A Yes. Yes.
Q Okay. State's Exhibit 49.
A This is a fanny pack, I guess you would call it. It actually fell out in the process of the vehicle being rolled back over.
Q And that's what we're looking at right here?
A Yes.
Q State's Exhibit 50.
A So this is the registration that you couldn't see on the trunk lid when it was upside down.
Q So that's just to identify the vehicle?
A Yes.
Q Okay. We're going to move to State's Exhibit 17. Did you also take photographs of Det. Statzer's vehicle?
A Yes.
Q Why did you do that?
A Because I was told that the suspect had rammed the front of his car and then took off at the beginning of this incident.
Q All right. So is this photograph showing the license plates to know whose car that is?
A Yes.
Q All right. And are you familiar with this light, here? Is that part of -- is that a normal police light in an unmarked car?
A yes.

Q And State's Exhibit 18. Was there damage -- just to kind of show the vehicle in this particular picture, was there any damage to any other part of the car besides the front?
A No.
Q Okay. And then State's Exhibit 19, what are we looking at here?
A So you can see -- you might not be able to see it on this screen. But right here and right here are basically two bolt patterns from where the suspect vehicle's license plate had struck and imprinted on there. And then you can see the buckling of the front bumper right here.
Q Okay. State's Exhibit 20. So we've got a closeup; that's the buckling?
A Yes.
Q Okay. And State's Exhibit -- whoops. This should be 21. This should be State's Exhibit 21. Sorry, I just noticed that. What are we looking at on State's Exhibit 21?
A This is just a closeup of where the license plate frame had hit.
Q Is that what this is and this?
A No, the two holes you're just looking at there, those are actually predrilled holes for a --
Q Okay.
A -- front license plate. We were looking here.
Q Okay. All right. Okay. So at the conclusion of taking

photographs, and -- let's kind of -- did you take the photographs of Statzer's vehicle after you were done processing the rest of the scene? Or did you do that all at once because you had the camera out?
A I believe they were all done in a row.
Q Okay. So when you finished taking photographs, what did you do next?
A We have this handy thing called a 3D scanner; it's called a FARO. And the next thing I did was set the FARO up and I began scanning the whole scene.
Q Okay. Does that assist you in your reconstruction as well?
A It can, yes.
Q Okay. Once you've scanned that system, what did you do next?
A I don't recall.
Q Let --
A I mean, at some point there was video taking of the scene as well.
Q Okay. Did you -- was the vehicle towed?
A Yes.
Q Did you process anything on the inside of that vehicle while you were on the scene?
A On the inside of the vehicle?
Q Yes.

A No.
Q Okay. So were you there when the tow truck took the vehicle?
A Yes.
Q All right. We saw in those photos, especially, particularly in the first photos that you were taking of that car and of the roadway and the front porch, we saw debris all over the place from that car.
A Yes.
Q Would you agree with that?
A Yes.
Q What happened with all that debris from the car, generally?
A The vehicle's debris?
Q Yeah.
A Usually, the tow companies are nice enough to just scoop it and just dump it inside the car.
Q Okay. So it gets dumped inside the car and the car gets put up on a tow truck. And where does it get taken?
A It was transported to District 7 where we have our evidence bay and it was secured inside there.
Q Okay. And at some point in time, were you presented, I believe on June 26th of 2020, with a signed search warrant for that Ford 500?
A Yes.

Q All right. You didn't write the search warrant, correct?
A Correct. I did not.
Q You didn't present it to a judge?
A Correct.
Q You just were delivered the final product to tell you now you have authority to look at the car in more detail?
A Yes.
Q Okay. And did you then respond on that day to your evidence bay and process the vehicle?
A I was there when he brought me the search warrant, yes.
Q Okay. Now in a car that's got that much damage, what kind of processing did you do?
A I take more digital images of the vehicle as it sits in the bay after I've got the search warrant. And then from there, depending on cases and sometimes what detectives ask for. In this particular case, I had swabbed the driving -- the steering wheel for what's called touch DNA.
I learned that a lot of the debris and other items that the tow truck had picked up, some of it being the fanny pack and stuff like that, I had taken pictures of and collected it and booked it in as evidence.
Q Okay. I am going to hand you now what has been marked as State's Exhibits 55 through 58. If you will take a look at those and tell me if you recognize what those are.
A Yes, I do.

Q What are those?
A These are photographs that I had took the day of the search warrant inside the evidence bay.
Q All right. So what I -- are those accurate photos of what that car looked like on that day and the day after the crash?
A Yes.
Q All right. So starting with State's Exhibit 55, we're going to try this. If it doesn't work, we'll --
A There it goes.
Q There it goes. Oh, look at that. All right. So what are we looking at here in State's Exhibit 55?
A This is that same fanny pack that was -- that had fallen out of the car when the tow truck rolled it back over.
Q And it was then thrown back in the car and you took a photograph of it?
A Yes.
Q Okay. And was it collected from the car?
A Yes.
Q And I'm going to put up now State's Exhibit 57. Is this a photograph that you took as well?
A Yes. That's the front side of the fanny pack.
Q Now, were there contents inside that fanny pack?
A Yes.
Q And State's Exhibit 56. Was State's Exhibit 56 one of

the contents inside that fanny pack?
A Yes, it is.
Q And was that -- can you tell us whose name is on this?
A Caleb Whitfield.
Q Okay. And that was inside the FILA fanny pack, correct?
A Yes.
Q Now, you don't know what part of the car that came out of because it fell out when the car got flipped over, correct?
A That's correct.
Q Okay. And this area here, what does that say?
A Identification card.
Q Okay. And then I want to move to State's Exhibit 58. So in looking at this picture, I kind of want to zoom this in a bit if I can. Can you tell me, when you processed this vehicle, was the driver seat here intact?
A Yes.
Q Operational? I mean, upright, operational, intact?
A Yes.
Q Okay. And was there severe damage to the passenger seat?
A Yes.
Q Was the back of the seat still in an upright, intact position or was it flopping, if you know what I mean? Did it still --
A I --
Q -- remain upright?

A Yeah, it was upright, but the -- so the passenger's side is on the right side. It was actually rolled towards the center of the vehicle.
Q So the impact from the crash was clearly on the passenger's side. Would you agree with that?
A Yes.
Q All right. So that impact rolled the upper portion of that seat kind of inward?
A Yes.
Q Did it also crush part of the bottom of the seat as well? I don't know if you can see it in that picture.
A I can't --
Q That's fine.
A -- 100 percent recall, no.
Q Let me ask you this, the top of that seat, was it in a stationary upright position? It wasn't broken so that it was --
A Correct, yes.
Q -- going to fall down, correct?
A It --
Q I mean, it was rolled --
A -- was upright.
Q -- it was damaged, but it was upright?
A Yes.
Q Okay. And this area here between the seats, would -- how

would you classify that as far as the space in between those seats?
A I --
Q Let me ask it this way. Let me withdraw that.
A Okay.
Q Is there a console in this car?
A Yes.
Q These -- this isn't one long seat, correct? There are two --
A It is not a bench seat.
Q -- two separated seats?
A Correct.
Q With a console in the middle?
A Yes.
Q All right. So to your recollection, was that console a typical sized console in a sedan?
A Yes.
Q All right. So the spacing between these seats, is that typical sized spacing for a console in between a driver and passenger seat in a normal sized sedan car?
A Yes.
Q Okay. Now we look at this picture, is the roof here crushed down?
A Yes.
Q All right. And on the other side of the car, and let

me -- you know what, let me get the other picture. Hold on one minute, please.

MS. MELNICK: Can you put a sticker on that and mark it 59 for me?

THE CLERK: 60.

MS. MELNICK: Or 60.

BY MS. MELNICK:

Q I'm going to hand you what's been marked as State's Exhibit 60 now. Do you recognize that picture?

A Yes.

Q What is that a picture of?

A That would be the driver's side of the vehicle as it sat in the EV-bay.

Q So that was when you processing the car?

A Yes.

Q That's when this photo was taken? Is that an accurate picture of the driver's side?

A Yes.

Q Okay. So I'm placing State's Exhibit -- oh, here we go.

THE COURT: Excuse me just a minute. Can I see Counsel at sidebar for just a second, please?

(At sidebar)

THE COURT: I thought if I could get you over here, I could wake up the jury. That's the only reason I brought you over.

MS. MELNICK: Okay. Well, these are always hard. Evidence (indiscernible).

THE COURT: I know.

MS. MELNICK: -- normal stuff.

THE COURT: So that's the only way I did it. But it sure beats then calling them out.

MS. MELNICK: Right.

THE COURT: But I may have to do it again.

MS. MELNICK: Right.

THE COURT: Thanks.

(End sidebar)

BY MS. MELNICK:

Q All right. So does this picture fairly represent the driver's side of the vehicle?

A Yes.

Q All right. Can you tell me, is the driver's window intact? Can you see the tint on that window compared to the open window here?

A I honestly don't have an answer for that.

Q Okay. Let me put up State's Exhibit 39. Let me give you State's Exhibit 39. Can you look at State's Exhibit 39? Is that depicting the driver's side of the vehicle?

A Yes.

Q And can you see the driver's door?

A Yes.

Q And is the win -- is the driver's window intact?
A Yes, it is.
Q Okay.
A I believe the crushed windshield was throwing me off here.
Q Okay. That's fair. All right. So do the -- aside from collecting these items, did you find several other items in the car that you collected?
A Yes.
Q All right. Cell phones, things of that nature?
A Yes.
Q And were they in any particular area of the car?
A No.
Q Again, in your other photos, were there cell phones on the ground outside the car at the scene?
A Yes.
Q All right. So they had been tossed back in the vehicle?
A Correct.
Q Okay. So once you finished taking photographs of the vehicle in the evidence bay, you talked a little bit about swabbing the steering wheel. Tell us what your swabbing wheel about.
A Like, the purpose of?
Q Yes.
A It's for searching for touch DNA, much like a

fingerprint. Each person has their own DNA.
Q And that can be left behind when someone touches something?
A Yes.
Q Now, what do you do to swab that DNA?
A So we use -- they are -- there's two cotton applicators inside of a sealed package. We open that, use distilled water to moisten the cotton swabs.
And then you take the cotton swabs and swab all over the steering wheel for touch DNA. They then go into a slide box that I seal up and then package in an envelope, and then I forward to the crime lab.
Q Okay. and did you then swab the steering wheel of this vehicle --
A Yes.
Q -- in hopes to get some touch DNA?
A Yes.
Q Okay. I'm going to hand you what's been marked as State's Exhibit 52. Do you recognize that?
A Yes, ma'am.
Q What is that?
A This is the envelope that I sealed the DNA swab inside of.
Q And that's a -- you used two Q-tips, right?
A Yes.

Q Cotton swabs, whatever you want to call them. And they were inside one box, is that an accurate statement?
A Yes.
Q And that's what's inside there?
A Yes.
Q Okay. And then is that submitted to the crime lab for testing? You don't do anything to test it, correct?
A Correct.
Q You just swab it, send it to the lab?
A Yes.
Q Well, let someone else send it to the lab?
A Yes.
Q All right.
A I complete the lab report and send it to the property room. And the property room manager then takes it to the lab.
Q All right. State's Exhibit 45. Right here on this picture, is that a black shoe? I'm going to try to zoom in for you. Actually, I'm just going to give it to you.
A I believe so.
Q Okay. and I'm going to show you this one, State's Exhibit 39. Is this a white shoe?
A Yes, it is.
Q All right. And did you take swabs of those shoes as well, on-scene, actually?
A Yes.

Q Because they were outside the vehicle. So you went ahead and swabbed those, correct?
A Yes.
Q I'm handing you what's been marked --
MS. MELNICK: Do you want to see that?
BY MS. MELNICK:
Q -- State's Exhibit 51. Can you tell me, do you recognize what that is?
A Yes. These would be the two separate DNA swabs from those shoes.
Q Okay. And so once again, you took separate swabs. So there'd be two boxes in there?
A There is.
Q Did you swab those the same way you swabbed the steering wheel?
A Yes.
Q Okay. Now, did -- were you asked to go back and look at that car again at a later time?
A Yes.
Q What was the purpose of that?
A We wanted to do a documentation of the seatbelts.
Q So tell me what you learned about the driver's seatbelt.
A The driver's seatbelt was buckled straight across the seat. I don't know how else to explain it -- as if nobody was -- it wasn't used to restrain somebody in the vehicle. It

was done, more or less, probably so they didn't hear the dinging the entire time.
Q Okay. So when a vehicle is crashed, do the seatbelts lock in place?
A Yes.
Q At wherever they are, if they're pulled out, they're locked pulled out. If they're not being used, they're locked back in places; is that accurate?
A During the crash, they will lock. At times they will stay locked. But other times, they can retract.
Q Okay.
A Yes.
Q But this one was buckled?
A Correct.
Q But it was retracted? So it had -- nobody buckled that that you're aware of.
A There was no slack in it; is that what you're asking?
Q Yes.
A Okay.
Q To your knowledge, did anyone touch that seatbelt buckle --
A No.
Q -- after crash?
A No.
Q Okay. What about the passenger side seatbelt?

A The passenger side had been cut so there wasn't much left to that.
Q Okay. What about the rear driver side seatbelt?
A It was locked in place, retracted.
Q So it had not been being worn?
A Correct.
Q Okay. And what about the passenger rear side?
A That one I could not access due to the amount of crush on the outside of the outside of that vehicle, it had actually covered it up.
Q Okay. And was that the extent of your involvement in processing the vehicle?
A Yes, ma'am.
Q All right. Now, you talked about doing some reconstruction. In this particular case, you had measured at least -- you had tire marks.
A Uh-huh.
Q With the tire marks with the paint, are those what you refer to as skid marks or are they tire marks? What's the difference?
A Those are tire marks. They're actually critical speed marks because of -- it is actually going out of -- there's no breaking to that.
Q Okay. There was no breaking?
A I'm not good at explaining what those are. I just -- I

know how to do it.
Q So are they marks on the pavement from the tires not just rolling properly?
A Correct. Your general tire or usual tire, rolling straight forward would not leave a mark but -- because that's the way the patterns are made. And once you put force on it outside of its normal pattern wear, it's going to start rubbing onto the roadway because it's -- the car is going this way while the tires are going that way.
Q Did you --
A So that's what starts leaving the marks.
Q Okay. Did you see any marks that, in your opinion, as a crash reconstructionist, were breaking -- were from the vehicle hitting its brakes?
A No.
Q Okay. So all the marks that we saw painted on the pavement all the way up were marks from the car being out of control and skidding but not breaking?
A Correct.
Q Okay. And did you take measurements of certain of those marks in order to attempt to calculate the speed of the vehicle?
A I asked Dep. Fizer, who was out with me to measure the longest tire mark.
Q And did he do so in your presence?

A Yes.
Q And how long was that?
A The exact number, I'm not -- it was over 300 feet. The exact number is written my reports.
Q Okay. Did you -- let me as you this, did you use that number to attempt to use one of these mathematical scenarios taking into account weather and road friction to come up with a speed of the vehicle?
A It's not a -- it's not an exact speed. It's just used for reference, basically. Because there's several different equations and ways that you can calculate these to get the exact -- or minimum speed of the vehicle. The difference is the what's considered f-stops, or the coefficient friction, which would be the asphalt.
Generally, they would give us a rough idea of how fast a vehicle may have been going. I use an equation, and bear with me, it's the square root of 30 times D times F. So 30 being a constant, D's the distance, being the measurement of the length of the skid or tire mark. And then F is going to be your coefficient friction.
For asphalt, it's generally around .8. So as just a general idea of how fast this vehicle may have been traveling, that's the equation you use.
Q And what did you come up with?
A I believe it was around 87 miles an hour.

Q Okay. And was that just prior to impact or was that further back on the roadway?
A So what that speed actually means is -- so it's a skid to stop formula. And what that means is, so a vehicle would have to be traveling at least this fast in order to leave that amount of tire marks.
Q Okay. So that, obviously, it doesn't include the fact that this crash continues past the pavement, strikes the concrete, rolls. I mean, there's a lot of kinetic energy also involved in that. So that -- the 30-D-F is a skid stop.
Q So is that --
A So that just gives us a basic idea of --
Q Is that kind of a minimum speed?
A Yes.
Q It could be higher, but --
A Yeah.
Q -- you can't tell us how much higher?
A Right.
Q Okay.
MS. MELNICK: If I can have just a moment, Your Honor.
BY MS. MELNICK:
Q I do have one other question, you help investigate traffic crashes on a regular basis, correct?
A Yes.
Q These kinds of traffic crashes, do they normally take a

period of time for you to be able to do calculations and in these kind of cases evolve in an investigation?
A Yes.
Q So is it unusual for a person not to be arrested at the beginning of one of these cases based on the length of time it takes to complete an investigation?
A That is not unusual. In fact, I -- it takes so long to get certain things back from the crime lab, not to mention, I have to get medical records of peoples injuries. I mean, and hospitals aren't very helpful most the time.
So there's a lot that has to be gathered before it can really be presented for charges. So I don't typically arrest anybody day of crash, day after. It might usually go to grand jury before a warrant's issued --
Q Okay.
A -- for my crash investigations.
Q Thank you.
MS. MELNICK: No further questions, Your Honor.
THE COURT: Cross-examination?
(Counsel confer)
CROSS-EXAMINATION
BY MR. CASS:
Q So you were shown a couple photos that were taken in the bay of the car --
A Uh-huh.

Q -- correct? Let me show you what's been marked as State's Exhibit 58. You identified that as the passenger's side of the vehicle taken in the bay after it's been towed. And the car was flipped over to get towed, correct?
A Yes.
Q All right. And then this is photo -- State's Exhibit 45, which is at the scene. You agree that the passenger side doesn't look -- when it's in the bay, anything like what it looked like at the scene as far as, I mean, the side is open here, correct?
The passenger side is open. There's things laying there. It doesn't look like that when it's at the scene? It was the same side, right?
A Actually, there should be more photos that would show what you're referring to.
Q More photos at the scene?
A Yes. I believe she showed me a few of them to me that you're showing me, the passenger's side.
Q Okay. Here's a better one, I guess. Let me show you what's been marked as State's Exhibit 42. How about that one?
A Yes, sir.
Q Okay. Again, that -- in that photo, the door, the passenger door, appears to be jammed shut, correct?
A No, you can see the topside of the door is actually opened. That's where you can see the (indiscernible).

Q Right. But it's not laying open like this as it is in the bay. I mean, those two -- these two photos.
A So I get where you're going with that. So this vehicle was rolled towards the passenger side when they up righted it --
Q Right.
A -- yes.
Q Okay. Which, I guess, you're saying that caused this to open up or flop open once it was rolled over?
A That could cause that door to come open more, yes.
Q Okay. Well, I mean -- just, I guess, for point of reference, in this photo, the -- you can't see the same things that are laying on the passenger side as you can see in here. Do you agree with me there?
A Well, that would be because that car's upright and this one is upside down.
Q Right. The car has been changed, the position of it.
A Well, yes.
Q Okay. And so when you went to the bay and examined the seats and everything, at that point in time, the car had already been towed, flipped over, and then towed, correct?
A Yes.
Q Which, could change the seats or anything inside of it by that kind of movement of the car?
A I'm going to say no.

Q It couldn't?
A That takes a bit of force to rearrange the seats inside of a car just from rolling over.
Q Okay. But it definitely changed the appearance of the passenger side from the photo 42, correct, there, to State's Exhibit 58.
A Again, the difference here is that the first photo, the vehicle is on its top. And so this is from a different view now that it's upright.
Q Right. But once it's been rolled over, that changed the appearance of it, correct? I mean, that photo doesn't look anything like the photo at the scene, as far as the door being shut and -- will you agree with me?
A Honestly, no I don't.
Q Okay. These -- you're saying that these two photos -- this photo at the scene, that one there and this phot at the bay of the -- are the same side, correct?
A They are the same side, yes.
Q And your testimony is they look the same?
A They look the same. I'm n to saying they look exactly the same, no.
Q Right. And they don't look the same because it's -- the car's been flipped over and towed?
A Okay. I agree with you on that.
Q All right. And State's Exhibit 60, this is a photo --

can you see that all right?
A Yes, sir.
Q You might -- if you need to look at it. So this is the driver's side, correct?
A Yes.
Q And it appears -- it's kind of hard to see, I know. Let me show it to you. It's easier to -- it appears on 60 that the passenger door to the driver's side is damaged where it meets the frame. Would you agree with me there?
A You talking about -- so the driver side rear door --
Q Right.
A -- had damage? Yes.
Q Okay. And it also looks like the driver's side, even though it's been shut, does not look it normally would shut, correct?
A Correct.
Q Okay. And I think you were -- well, I know you were shown State's Exhibit 47. And I -- just your testimony of -- you made a comment about the driver's side being pulled out there. Can you tell us again, what you saw in that photo?
A Right, the driver's side of the frame is actually bent outwards. So the floors from the passenger side goes across to the driver's side pushing that out.
Q Pushed it out from the -- pushed frame out?
A Yes.

Q Is that -- okay. And then you testified that you -- that there was this fanny pack, that I guess, was outside the car. But then when you went to the bay to photograph if and you actually looked inside it, correct?
A Yes.
Q And that's where you found the piece of paper, the ID with Caleb Whitfield's name in there?
A Yes.
Q Okay. Did you also find in there, some other contents that looked illegal, like, illegal substances in that fanny pack?
MS. MELNICK: Objection.
THE COURT: Sustained.
MR. CASS: Your Honor, can we approach?
THE COURT: Yes.
(At sidebar)
MR. CASS: (Indiscernible).
MS. MELNICK: This is not relevant. No one is charged with the drugs. You can't just --
MR. CASS: (Indiscernible).
THE COURT: Wait, one at a time, guys. Go ahead.
MR. CASS: They're going to argue my guy ran from the scene because he was the driver. He then has, what appears to be illegal substances. It's an explanation as to why he's running from that car. I think that's relevant.

MS. MELNICK: I disagree. I don't think it's relevant. He's not charged with that. It's not part of this case. It wasn't brought up by the State. This is the Defense bringing this up. There was nothing about this. I am still finding irrelevance, Your Honor.

THE COURT: I think it is irrelevant. Sustained.

(End sidebar)

THE COURT: Jury, disregard the last questions asked by Counsel.

MR. CASS: That's all I have.

THE COURT: Any redirect?

MS. MELNICK: No, Your Honor.

THE COURT: Thank you, Deputy. You can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Ladies and gentlemen, I'm going to give you another short break; about ten minutes just to stretch your legs and use the facilities.

Please remember again, do not discuss this case among yourselves, anyone else. Do not let anyone discuss it with you. Do not form or express any opinion until the finally is submitted to you. Take about ten minutes.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Recess taken)

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: Thank you. You can call your next witness, please.

MS. MELNICK: The State calls retired Det. Pat O'Connell

DIRECT EXAMINATION

BY MS. MELNICK:

Q Sir, can you please state your first and last name and spell them both for the record?
A Patrick O'Connell, P-A-T-R-I-C-K O-'-C-O-N-N-E-L-L.
Q All right. And as I had called you, you are currently retired --
A Yes, ma'am.
Q -- correct?
A Correct.
Q Prior to your retirement, where were you employed?
A I was a detective at Montgomery County Sheriff's Office for 17 years.
Q Okay.
A And prior to that, Middletown; 30 years total.
Q Okay. And when did you retire?
A October 15th --
Q Of this past --

A -- 2021.
Q -- year?
A '21, yes.
Q Okay. And can you tell me, in your capacity as a detective with the sheriff's office, were you assigned the case involving a crash that occurred at North Dixie Drive and Hillsdale Avenue?
A Yes, I was.
Q All right. And were you the lead detective on that case up until your retirement?
A I was.
Q All right. Can you tell me, were you -- when did you first learn of this case?
A I was working on that day, monitoring radio traffic. And I heard that radio traffic from Det. Statzer when he located a possible stolen vehicle.
Q So you were on duty?
A That's correct.
Q And as a detective, are all detectives with the sheriff's office, you all wear plain clothes?
A That's correct, suit and tie.
Q Okay. And do you all drive unmarked vehicles?
A That's right.
Q Okay. And so you were at -- were you at D-10?
A I was at District 10, correct.

Q Okay. And you heard the radio traffic? What did you do?
A I monitored the radio traffic. I knew we had uniformed cars moving enroute. A pursuit ensued. I then followed. And I arrived moments after the crash.
Q Okay. So you were there very quickly?
A Correct.
Q Were the victims still on-scene?
A Yes.
Q Was the suspect still on-scene?
A Yes.
Q Okay. What was going on, then, when you arrived?
A When I arrived, the scene, I observed the vehicle turned on its top. There was a female hanging from a seatbelt on the interior of the passenger side of the vehicle.
There were two black males; one black male to the rear left of the overturned vehicle; one lying on a slab, which is at the house where it crashed, lying down. There was -- EMTs were coming. Paramedics were coming. Fire was coming. We were securing the scene, taping it off, and doing first aid.
Q Okay. Now, did you do -- did you approach the female that was trapped in the car at this point?
A I did observe her. But I let other deputies take care of the business.
Q And they were already taking care of her?
A That's right.

Q All right. Did you go and speak to either of the males that you said were towards the back of the car; either the one that was upright or the one that was laying down?

A I did. I spoke to the one that sitting upright.

Q And who was that?

A That was Jelani Shackelford.

Q Okay. And how was his demeanor when you were talking with him?

A He was dazed, somewhat confused. I could smell some alcoholic beverage coming about him. He had a laceration to his chin. He was bleeding, slurred speech, but that could've been due to the crash or anything else; trying to get information from him, but he wasn't very cooperative at that point.

Q Okay. What about Mr. Hespeth, were you able to speak with him?

A I did not. He was lying over -- lying down with I go there. And again, he appeared to be severely injured. We let paramedics take care of their business and treat him.

Q You didn't even attempt to talk to him?

A I didn't even attempt to talk to him there.

Q Okay.

A No.

Q And what about the Defendant, Caleb Whitfield? Did you speak with him on the scene?

A I did not. No, he was --
Q Okay.
A -- taken by ambulance prior to me speaking with him or trying to speak with him.
Q Okay. At any point in time after the scene was kind of wrapped up, the forensic services was there and the car had been towed and all parties had been transported to the hospital, did you respond to the hospital to ever try to speak with Mr. Shackelford or Mr. Hespeth?
A I did not.
Q No that day?
A No.
Q Okay. And why was that?
A They were -- I know Joseph Hespeth was in critical condition; he had coded just getting on the ambulance, going to into surgery and ICU. Shackelford was also unknown, as far as his medical status.
So medical treatment was very important for them. So I didn't even attempt to talk to them. Due to head injury, and if they were under any alcohol, or anything like that. So I didn't want to talk to them until they were coherent.
Q Okay. All right. SO you're giving the medical teams the chance to try to help them?
A That's right.
Q Okay. So what did you do, then, when you left the actual

scene?

A When I left the scene, basically, I get with our road crews, make sure that everybody gets their reports done. There wasn't a lot to do that night. The status of the female at the scene, we had just learned her status. So at that point, nothing happened.

Q Okay.

A It takes a long time to investigate these. So there was nothing to do any more that night.

Q Okay. And when did you learned that she had died, Ms. Thompson?

A We had an idea on the scene, but it was soon after she left that we learned that she had passed away.

Q Okay.

A Disregard that. I went to the hospital to see her; she was on life support prior to passing away.

Q Was that the same day or the next day or --

A It was the next day.

Q The next day?

A That's when I met parents and was checking her medical status.

Q Okay. All right. Now, at the time that this incident occurred, was Caleb Whitfield your suspect?

A Yes.

Q Your suspected driver?

A Yes, he was the suspected driver.
Q Okay. And he was allowed to leave the hospital, though, correct?
A He was.
Q And I believe Dep. -- excuse me, Dep. Solomon was there at the hospital with him for a period of time; is that accurate?
A That's my understanding, yes.
Q And he was released from that duty?
A He was.
Q And no one was sent to replace him?
A That's correct.
Q All right. Whose decision was that? And why are those decisions made in cases like this?
A Ultimately, it was our district commander. At the time, it was Capt. Parin; he made that call. And they base it on the totality of the circumstances and the kind of investigation.

And it's, quite honestly, their call, agree or disagree. Many times with a vehicular homicide, if you will, it's a long-term investigation. There's a lot of things that we have to do. So to have that case ready within a period of time for the prosecutors is not likely.

And then there is a financial aspect of paying for bills for people when we may not have to do so. So he made the decision not to have anybody stay there and ultimately, he was

released.
Q Okay. All right. So whenever he was released from the hospital, he was free to go?
A He was free to go.
Q Okay. At some point in time, did you begin viewing cruiser cams and videos that were collected from the scene?
A Yes.
Q All right. Approximately when was that?
A Probably the next day.
Q Okay. And as a result of seeing the videos and reviewing the cruiser cams and the -- had you spoken with Dep. Solomon about statements that were made by Mr. Whitfield at the hospital?
A Yes.
Q What did you do in -- excuse me -- in response to that, as far as drafting any kind of search warrants?
A I obtained a search warrant for the vehicle.
Q Okay.
A And that was, obviously, based upon the accident and some statements that were made. We went ahead and executed that, photographed the vehicle and processed the vehicle. And crime scene as for forensic and -- our forensic team does that.
And the other search warrants, we had phones, things of that nature, that's when I would draft those but we did it for the vehicle --

Q At that time --
A --specifically.
Q -- you did for the vehicle?
A I did it for the vehicle.
Q Now, were you told -- excuse me. I'm having the same problem.
A Yes.
Q Were you told by Dep. Gisewite that he had swabbed the steering wheel of the vehicle for touch DNA?
A Yes.
Q All right. And was that being submitted to the lab?
A Yes.
Q And obviously you've done that more than once in the past, correct?
A Yes. Yes.
Q And when you have evidence from a scene where you are looking for touch DNA and you have a suspect that you want to compare that DNA to, how do you do that? And what do you do in this case?
A I need a known sample from the suspect or subject. So to do that, I would've (indiscernible), get a search warrant signed by a judge for DNA. And in this case, it was for Mr. Whitfield.
Q All right. And were you -- did it take you some time to locate Mr. Whitfield since --

A It --
Q -- he left hospital?
A It did.
Q And did you eventually locate him on July 15th of 2021?
A That's correct.
Q All right. And did you have that search warrant signed in a timely manner to that date?
A I did.
Q And did you proceed to the location of Mr. Whitfield?
A I did.
Q All right. I'm going to hand you what's been marked as State's Exhibit 53. Can you tell me, do you recognize what that is?
A Yes. It is a one DNA swab known standard from Mr. Whitfield.
Q All right. And did you collect that swab?
A I did.
Q All right. Can you tell us, or tell the jury, please, how do you do that? What -- when you're collecting a known DNA swab. We've heard how they collect the evidence, but how do you get a known swab? What do you do?
A I locate the individual that I want to obtain their DNA. Once I do that, I make contact with them. In this case, I had a search warrant. I served that search warrant. So they -- I can physically show it to the subject and say, I got a signed

search warrant by a judge this date, this time, indicating that I can get your DNA.

I ask for voluntary submission to do so, instead of -- to make it as easy as possible. I then take a swab and I'll swab the inside of the cheek and gums, package it, secure it, sign it, and transport it to property. Then it goes to the lab for analysis.

Q All right. And is that what you did in this case?

A It is, yes.

Q All right. And you filled out the sheets on the front of there?

A That's right.

Q All right. Now, has that been opened by the lab --

A Yes.

Q -- can you tell? All right. North Dixie Drive.

A Yes.

Q You been in Harrison Township for quite some time, correct?

A I have, yes.

Q What is the speed limit in the area where the Defendant was driving that vehicle?

A

MR. CASS: Objection, Your Honor, to the characterization of the (indiscernible).

THE COURT: Overruled.

A I believe it's approximately 35.
BY MS. MELNICK:
Q Okay. And you indicated to us that you couldn't talk to Mr. Hespeth and Mr. Shackelford initially?
A That's right.
Q What efforts did you make to speak to them? And what success did you have at any later point in time?
A I attempted to speak to both of them. I had to call the hospital prior to making con -- physically going to see them. And calling them, I did speak to Mr. Hespeth on the phone more than once. However, he refused to answer any questions and he only wanted his property back.
I wasn't able to ever make contact, verbally, with Jelani Shackelford. He was released from the hospital, and I hadn't been able to find either one of them. I have reached out to other agencies to attempt to locate them. If they're located, to stop and hold the call so I can interview them. And they've never been located since the time this -- until I retired. So I don't know where they're at.
Q Have you checked for warrants issued for either of them?
A Prior to me leaving, I had. And still, they had not been --
Q No warrants?
A -- no warrants that I recall and not in jail that I recall.

Q And had you -- I mean, what do you do? When you're trying to find somebody like that, what kind of resources are you using to attempt to locate them?
A We can have a COP thing put into leads. It's not a warrant; it's not a stop and hold; it's not a BOLO; but it's, hey, if anybody makes contact with Jelani Shackelford, make contact with Det. O'Connell and Montgomery County Sheriff's Office, so I can respond and try to get an interview with that individual.

Also, we can put local flags. So if they're lodged into our jail, our corrections officers will see, oh, there's a flag by O'Connell. They can call me, and I never was notified of any of that.
Q All right. And did you monitor for their locations up until your retirement?
A Yes.
Q And were they ever located anywhere?
A Not while I was working, no.
Q And did you attempt to find them on multiple different dates for other court hearings that had been set in this case for other matters?
A Yes. I attempted to serve subpoenas and was unable to ever locate them.
Q And to this day, do you have any knowledge where they are?

A I don't.
Q Okay.
MS. MELNICK: If I can have just a moment, Your Honor.
Oh, I'm going to do this with you. I'm going to read stipulation number 4 at this time, Your Honor.
The Parties agree and stipulate that the Bureau of Motor Vehicle records in State's Exhibit Number 54 are the certified records of Caleb Whitfield, Jr., the Defendant in this case, that on June 25th, 2020, Caleb Whitfield did not have a valid driver's license.
BY MS. MELNICK:
Q So I want to hand you what's been marked as State's Exhibit 54 for identification, and tell me, is that the certified Bureau of Motor Vehicle records for Caleb Whitfield, Jr.?
A It is.
Q All right. And does it indicate whether or not he has a driver's license --
A It indicate --
Q -- or had one?
A Yeah, it indicates that he does not have a valid driver's license.
Q Did he ever have a valid driver's license?
A It does appear so, no.
Q Okay. Thank you, sir. Did you collect any of the videos

in this case?
A I reviewed them; most of them. They are hard-drive into our server.
Q Okay.
A Capt. Parin had created a lot of those videos. And we did download them as well --
Q Okay.
A -- on DVD. So some I may have, and some -- I don't recall that far back. But on a normal business --
Q But you reviewed them all?
A Yes.
Q Okay.
A Of course. Absolutely.
Q All right. Did you ever have direct contact with Caleb Whitfield?
A Yes.
Q Can you tell me, is he in the courtroom today?
A He is.
Q Can you identify him for the Court?
A Yes, young man with the short dreads and blue shirt sitting next to the Defense attorney.
THE COURT: Identifying the Defendant.
MS. MELNICK: Thank you, Your Honor. Nothing further, Your Honor.
THE COURT: Cross?

CROSS-EXAMINATION

BY MR. CASS:

Q I guess you don't go by Detective anymore?

A You can call me anything you want to.

Q Mr. O'Connell?

A Yes, sir.

Q You said you went to the hospital the next day and Rodnesha Thompson was in; is that correct?

A That's right.

Q And she was in the same one that Shackelford and Hespeth were in, Miami Valley?

A I don't recall.

Q Okay. Are you aware that Joseph Hespeth was in Miami Valley Hospital from June 25th to July 5th?

A I don't know the dates but he was in there for quite a while, yes.

Q And it's your testimony, during that time, you never went to the hospital physically and interviewed him, correct?

A I didn't physically interview him, no. I spoke to him on the phone.

Q And during the time, was he in the hospital at that time or is that after he was released from the --

A He was in the hospital --

Q -- hospital?

A -- when I spoke to him on the phone and advised him I

needed to talk to him. He didn't want to talk to me.
Q And Jelani Shackelford was also in that same hospital for a couple days at Miami Valley?
A Possibly.
Q And again, you never physically --
A I wasn't able to speak to him in person --
Q -- talk to him.
A -- before released. Correct.
Q You mentioned that you got a search warrant for DNA. The only person that you got a search warrant for DNA was Caleb Whitfield, correct?
A That's right.
Q And your testimony that -- from -- when did you put these -- you said this -- you could put out -- you did put out a COP? Is that what it is? C.O.P.?
A C.O.P.
Q Do you know when you put that out?
A I don't know the date. But we were trying to locate them for subpoenas and along with our civil unit and just weren't able to locate them.
Q And was that around the time the case was going to be indicted?
A I don't know the date, sir, off the top of my head.
Q Are you aware that the indictment in this case was done August 11th, 2021?

A That sounds right. I'll take word for it.
Q Okay. And that was before you left the sheriff's office, correct?
A Yes.
Q All right. And that would've been a little over a year after the incident occurred, correct?
A Yep. Uh-huh.
Q And the local flag that you put out, do you have any idea of when you would've put that out?
A Prior to grand jury because we were trying to locate them to -- I needed to talk to them and be -- have them testify.
Q Which would've been sometime in the summer of 2021; correct?
A Sounds right.
Q And is it correct, I guess, you're saying in part that Mr. Whitfield was released from the hospital based on a financial decision that the County doesn't want to pay for the care?
A It's the captain's call. I was giving you reasons why they may do that. But it was the captain's call, ultimately, I believe.
Q That's one of the reasons, though, they let people go? They don't want to pay for it.
A It has in the past, sure.
MR. CASS: That's all, Your Honor.

THE COURT: Any redirect?
MS. MELNICK: Yes.

REDIRECT EXAMINATION

BY MS. MELNICK:
Q Can you explain to the jury why was it that --
MS. MELNICK: I swear that's on quiet. I apologize.
THE COURT: You can pay your $100 fine before you leave today.
MS. MELNICK: I put it on no sound before I came in here. I'm so sorry. I don't know what's wrong. All right. Let me try this again.
BY MS. MELNICK:
Q You testified to Mr. Cass that the only search warrant for DNA you got was for Caleb Whitfield?
A Right.
Q Can you tell the jury why?
A Yes. We had officers on-scene and a lot of video that indicated that he was the driver. And the swabs that we took were from the driver's seat area. Therefore, he was our suspect at that point in time. So to either qualify or disqualify, did a search warrant to see if it was his -- to compare that DNA.
Q All right. And did you also have the information of the statement that he made to medical staff in Dep. Solomon's presence that he was the driver?

A That's correct.
Q Did all of that weigh into your search warrant?
A Absolutely.
Q Okay.
MS. MELNICK: Nothing further.
THE COURT: Any recross?
MR. CASS: No.
THE COURT: Thank you, Detective. You're excused.
MR. O'CONNELL: Thank you, sir.
THE COURT: Enjoy your retirement.
MR. O'CONNELL: Yes, sir. Thank you.
Next witness, please.
MS. MELNICK: State calls Mary Barger.

MARY BARGER

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

THE COURT: And when you get situated, feel free to take down your mask if that's more comfortable for you.
MS. MELNICK: Whenever you're ready; you tell me.
THE WITNESS: I'm set.
MS. MELNICK: Okay.

DIRECT EXAMINATION

BY MS. MELNICK:
Q Can you please state your first and last name and spell both for the record?

A My name is Mary Barger, M-A-R-Y B-A-R-G-E-R.
Q And can you tell the ladies and gentlemen of the jury where you're currently employed?
A I'm employed at Miami Valley Regional Crime Laboratory in Dayton, Ohio.
Q And what is your position there at the crime lab?
A I'm a forensic scientist in the serology and DNA section.
Q And how long have you been employed in that capacity at the crime lab?
A For a little over 19 years.
Q Do you have any prior experience before coming to work at Miami Valley Regional Crime Lab in that capacity?
A Yes, I do.
Q And what's that?
A I spent two years working for a private forensic company doing similar duties to what I currently do at this lab.
Q And how long did you say?
A Two years.
Q Two years? Anything prior to that?
A No.
Q Okay.
MS. MELNICK: Your Honor, I would like to tender Ms. Barger as an expert in forensic chemistry DNA.
THE COURT: Any inquiry or any objection?
MR. CASS: No, sir.

THE COURT: All right. Ladies and gentlemen, once again, this witness is deemed to be qualified to render expert opinions in her field. And you are to accept that she is, in fact (indiscernible).

MS. MELNICK: Thank you.

BY MS. MELNICK:

Q Can you explain to the jury, in layman's terms, what is DNA?

A DNA stands for deoxyribonucleic acid. And it is, essentially, the blueprint for the human body. Just like you have a blueprint with which to build a house, your DNA is going to code and make up everything genetically; hair color, eye color, everything for your health.

Q Okay. And does every individual have unique DNA?

A Every individual has unique DNA with the exception of identical twins. Identical twins will have identical DNA.

Q Okay. And can you tell me, what -- we've heard some testimony from other witnesses referring to something called touch DNA. What are the different types of DNA samples that you can test for at the Miami Valley Crime Lab?

A The DNA that we're testing for comes from the nucleus of the cell and it is found -- and it is the same throughout the body through all fluids and all tissues and your cells. So we can test things such as blood, saliva, semen, urine, feces, any skin samples, and what is referred to as touch DNA.

Touch DNA is exactly what you would think. I have my hand right here, I have no glove on it; so my skin is exposed. I reach out and I touch the banister right here. I would expect, when I swab it, that might pick my DNA up because I have touched it and possible have left my skin cells behind.

Q Now, you, very specifically, I believe, used the word "might" leave my DNA and "possibly" left skin cells behind". We've all seen too much CSI. So do I leave DNA every time I touch something?

A You do not.

Q Okay. And are there different factors that can play into that? Whether or not you've left DNA.

A Yes, there are.

Q What are some of those?

A One of the biggest factors is whether or not your skin is actually exposed. If you were wearing clothing and you brush up against something, I do not expect your DNA to be left behind.

If you have a smooth surface, your skin cells will not slip off when you come into contact with it nearly as much as if you had a textured surface such as a rock, something like that. It's more textured and it grabs the skin. It would collect more DNA behind.

In addition to that, different people leave skin cells behind at a different rate; so some people will leave quite a

lot; some people will leave very little; some people will leave none. You have no way of knowing that. You just swab the area and you determine what you get from that DNA sample.

Q Okay. Now, DNA, what we all hear of, it's the coding for your whole body. When you're testing at the lab to try to determine whether someone's DNA matches something, are you testing every single location on a strand of DN -- how does that work?

A With regards to the testing, what we do for forensics, it is a very unique set of markers that are highly variable for every individual. Which means, essentially, that I expect when I test these markers to have a separate and distinct unique profile for every single human, with the exception of identical twins.

Q So are you testing for the markers for eye color and hair color?

A I am not.

Q You're testing for other markers that would be more individualized?

A Yes, I am.

Q Okay. And how many of these markers are you looking for?

A With regards to the kit that was used with this one, there are 22 markers.

Q 22? And does DNA change -- could -- does a person's DNA develop or change over time?

A No, it doesn't.
Q It stays the same forever?
A Yes, it does.
Q Okay. So when you have evidence dropped off at the lab that has been collected by a police department, what happens with that evidence when it comes into the lab?
A The items of evidence are submitted to our front office personnel; they're what we call our intake personnel. Each case is assigned its own unique case and checked into the computer system where it is logged and tracked. Each item within that case has its own unique submission number or item number.
It is checked in. It is then placed into a secure property room until somebody from the DNA section picks up those items of evidence from that secure property room. They then bring them to the DNA section where they go into another secure property room until the analyst is ready to process the case.
Q All right. So when you're testing for DNA, what are the main steps that you're going through?
A There are several steps with which we use for the DNA. The first step is called extraction and this is getting the DNA out of the cell. If you think of an egg, that is like the cell that we're looking at.
You're going to take that egg, you're going to break it

open, get rid of the shell, get rid of the white. The yolk of the egg would be like the nucleus of the cell. We add some chemicals to that, clean it up, we're left with clean DNA that we've gotten from the cell.

From there, we do something called quantitation. This just tells me how much DNA do I have in this sample. After that, there's a step called amplification. And this makes millions of copies of what the DNA actually has in that sample; it just makes millions of copies of that.

From there, it goes on into an instrument. This instrument separates it out and leaves me with a graph-like profile. From that, I am comparing any known samples. A known sample would be DNA that I know who it came from.

If I were to swab any of your mouths on the jury, that's your known DNA standard. I am comparing those samples to any unknown samples. So it could be a blood sample, cigarette butt left behind, something like that. I make a determination; do I have a match?

And I will write a report with regards to that. Another analyst then looks at it. They look at everything that I've done; make certain that I've followed the appropriate protocols and SOP's; make certain that they agree with my conclusions and then the report is issued to the submitting agency.

Q So basically, you run the testing. The same for the evidence and the known standard, the difference being you know

what this one is and you're going to compare it to the ones that you don't know what they are?
A That's correct.
Q Otherwise, the process is the same?
A Yes, the process is.
Q Okay. Now, what checks and balances do you have for the equipment that they're -- that you're using on a daily basis before some of these tests are run through? I'm assuming you have to make sure your equipment is working.
A With regards to the DNA equipment, we have yearly maintenance and sometimes monthly maintenance on there. But we know that the process is working. Because with every sample that we were running, we have controls that run with it.
If you do not obtain the appropriate control samples that you're expecting, you're not allowed to report out any of the DNA profiles that you have.
Q Okay. And what are the different types of results that you can get when you are testing the DNA?
A There are a variety of results. The first one is called, what is called a single-source sample. This means that I have a profile from one individual and one individual only. I could have something that is a mixed DNA profile.
A mixture means that I have DNA from more than one person present. From that, I might have a major component and a minor component. That means when I'm looking at the sample, I have

peaks that are really, really high, and peaks that are really, really low.

The major component is one that leaves the really high peaks, meaning they've left the majority of the DNA. The minor component would be the lesser, so I know that they left the least amount of DNA behind.

I could also have a mixture where it is even peak heights. So all of the peaks are the same. And that is just the mixture where I know that I have more than one person in there at a fairly equal contribution.

You could also have no DNA present. And this means that when we're looking at it, we have specific thresholds where we determine what DNA is there and it's a cutoff of where we determine we no longer have DNA that we can report on. Or you may home something that is insufficient.

Meaning, while I see indications I have something there, there's not enough that I can actually make a comparison to any standards from that.

Q So what is a partial DNA profile?

A Partial profile means that when I'm trying to develop the DNA profile, I'm attempting to obtain DNA at all 22 locations; however, there's so little DNA that's present that I only obtain DNA at a couple locations. So it's only a partial from what I could've obtained.

Q Is it possible to compare partial profiles to known

standards?
A It totally depends on how partial it is. Sometimes they are so limited, I literally can make no comparisons whatsoever. And sometimes, they're a partial. But I have just enough that I can tell you whether or not somebody may be present.
Q Okay. Now, did you receive evidence in this particular case?
A Yes, I did.
Q All right. And I am going to hand you, first, what has been marked as State's Exhibit 51. Can you take a look at that and tell me if you have seen that before?
A Yes, I have.
Q And how do you know that?
A With regards to the evidence, it has the unique barcode with the case number and submission number that I had indicated the crime lab has. And additionally, the analyst's initials and case number and date of the analysis are envelope.
Q So that's you -- those are your initials?
A They would be our technician's initials who processed the items of evidence under my direct guidance.
Q Okay. And you can go ahead and open that up.
A Do you have scissors?
Q I don't. But I know someone who does.
A Thank you.
MS. MELNICK: Thank you.

BY MS. MELNICK:
Q All right. So what do we have inside there?
A Inside of the main envelope, there are two small boxes.
Q And do they have markings on them?
A Yes, they do.
Q And what do they say?
A One of them indicates that it is a sample that's collected from white Nike shoe and the other one is indicated that it is collected from a black Nike shoe.
Q All right. And you didn't write that on there, did you?
A I did not.
Q That was the way it was received?
A That's correct.
Q Okay. Now, when an evidence technician collects a sample like that and it comes to your lab and you have run your tests on it, what are we expecting to find in that box right now that you're opening it here in trial?
A Right now, I expect to find absolutely nothing inside of it or bare sticks. The reason for that is when we are processing items of evidence at the laboratory, we will keep all of the sample there at the laboratory.
That way, if additional testing ever needs processed on it, it could be 50 years down the road, the samples are available for that testing to be completed.
Q So those are either empty or have just sticks in them,

correct?
A That's correct.
Q You want to check them?
A Yes. They're, in fact, empty.
Q Okay. And that's expected?
A Yes, it is.
Q Okay. You can go ahead and put those back. Now I'm going to hand you what's been marked as State's Exhibit 52. Can you take a look at that and tell me if you recognize what that is?
A Yes, I do.
Q What is that?
A This is the DNA standard that was collected from Caleb Whitfield.
Q Well, is that the case name? Let me --
A I'm --
Q -- show you State's Exhibit 53.
A I'm sorry. It's indicated as the DNA swab. There's -- his names on there. I don't believe it's actually the standard from it.
Q Is there a Miami Regional Crime Lab sticker on it?
A There is, yes. It is submission number 2, which is going to be the sample collected from the steering wheel.
Q Okay. And you recognize that and have seen that before?
A Yes, I have.

Q Okay. You can go ahead and open that.
THE COURT: Exhibit 52, correct?
MS. MELNICK: That is 52, correct.
THE COURT: Yes, thank you.
BY MS. MELNICK:
Q All right. What do you have inside there?
A I have another slide box and it is labeled as steering wheel.
Q Okay. And is there anything in it?
A No, there's not.
Q okay. You can go ahead and put that back. And again, that's expected, correct?
A Yes, it is.
Q All right. And now I'm going to hand you what's been marked as State's Exhibit 53. Can you tell me what that is?
A Yes. This is the DNA standard that was collected from Caleb Whitfield.
Q All right. And do -- does that have a lab sticker on it/
A Yes, it does. It is right here.
Q All right. And that's submission number 9?
A Yes, it is.
Q All right. You can go ahead and open that. And what's inside?
A It is an empty box.
Q As usual correct? And is it marked?

A Yes, it is.
Q And what's it marked as?
A It has our case number on there. In addition to the box inside, there is also what is called a buccal collector, it's right here. And this item of evidence, this is where the actual buccal standard would've been collected from.
There's a small piece of filter paper that goes with -- on it that it goes inside the mouth to collect the sample. And we cut that and preserve the entire item.
Q Okay. So everything in that envelope is what you expect to have in that envelope?
A Yes, it is.
Q Okay. I'll take those back from you. Now, did you do the DNA testing as you had indicated and run through all the steps with all three of those exhibits; States 51, 52, and 53?
A Yes, I did.
Q And were you able to develop any profile from the swabs from the black Nike shoe?
A With regards to the black Nike shoe, I obtained a partial profile. But there is so little there that I cannot make any kind of comparisons to whose DNA that is.
Q Is that something you would expect if somebody wore socks with their shoes?
A Yes, it is.
Q Okay. What about the white Nike shoe, were you able to

determine anything from that shoe?
A From that, I obtained no profile that I'm able to make any conclusions on.
Q Okay. Again, is that surprising if someone wears socks?
A It is not.
Q Okay. Lastly, the steering wheel. Were you able to obtain any type of profile from the swabs from the steering wheel?
A From that sample, I have a mixed standard profile, so as I indicated earlier, it means that I have DNA from more than one person present on that. And from that mixed profile, I cannot exclude Caleb Whitfield as being part of that.
That means that as I'm looking at this mixed profile with more than one person's DNA present, I can see his specific DNA types present in the sample, therefore, I cannot exclude. To exclude would mean that his DNA is not present at all.
I cannot do that, so I state, I cannot exclude this individual because I can see the specific DNA type's present.
Q And how many -- you say it's a mixture, correct.
A That's correct.
Q Can you tell how many people are in that mixture?
A There are at least three.
Q Okay. And when you talked with the jury before and you said sometimes when you have a mixture, you have a major component and a minor component, did you have that in this case

or were they all the same?
A They're all relatively even.
Q And how many -- did you have a full DNA profile to work with?
A Yes, I did.
Q On the known standard, correct?
A On the known standard, yes.
Q What about on the DNA swab? Did you have all 22 points to work with?
A I have all 22 points to work with; however, I don't have all 22 points to work with where I can see the contribution from all three individuals. In order to make a scientific determination and provide a statistic, I have to be the most conservative possible.
So I can only use the locations where I know that I am absolutely accounting for all three individuals. So those are the only locations that I am able to provide a statistic for. So it is less than 22 for that.
Q How many did you have?
A Eight.
Q And how many of those eight matched Caleb Whitfield?
A At each one of those, I am not able to exclude because I can see that the DNA type's present.
Q Okay. So his DNA is at all eight of those locations? A match of his type of DNA?

A That's correct. The specific types that he has are present at those locations.
Q And as a result of that figure, do you -- when you issue your report, give a probability factor that goes along with your findings?
A Yes, I do.
Q And describe what your finding is, first of all, what your probability factor is.
A With regards to this, I am taking in account how rare it would be to see a combination of all three individuals DNA types at these specific locations. And the most conservative statistic on that is 1 in every 402 individuals could potentially also be seen as present in that mixed profile.
Q 1 in 402 Caucasians, correct?
A Correct.
Q How many African Americans?
A 1 in 415.
Q And how many Southwestern Hispanics?
A 1 in 891.
Q All right. So it would take -- and I want to make that the jury understands what that means. And I'm going to use African Americans in this example, merely because Mr. Whitfield is African American. I'm not trying to pick on anything but that's our Defendant sitting here, okay?
How many other African American individuals would I have

to gather before you would find the same type of match that you found in this case?

A Roughly 1 in every 415 individuals could potentially be a part of this profile.

Q Now, if I were to explain to you that the steering wheel that that swab came from, was from a stolen car. Would that make sense to you that you would have a mixed profile like that?

A Yes, it does.

Q And why is that?

A Because the individuals that drive it, I would expect to find their DNA present on that. So typically, when you have a steering wheel and you know that it is a vehicle owned by somebody else, we would request standards to be able to compare that to.

Q Okay. You didn't have that in this case, though, did you?

A I did not.

Q You only had the standard from Caleb Whitfield?

A That's correct.

Q Okay. And at the eight points that you had to test, you saw his DNA types present?

A Yes. I cannot exclude him with his specific DNA types in that mixed profile at those locations.

Q And it would take 1 in 415 additional African Americans

for you to be able to find another person with that same eight profile -- the profile in the same eight locations?

A Yes. Say, roughly 1 in every 415 individuals, I would expect to also not be able to exclude.

Q Okay.

MS. MELNICK: Nothing further, Your Honor.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. CASS:

Q So Ms. Barger, the only DNA -- call it standard, but only the DNA from -- the only person you had to compare it was from Caleb Whitfield, correct?

A The only DNA standard that I processed for DNA analysis it was from Caleb Whitfield, that's correct.

Q And you mentioned that you might expect people that drive a stolen car to leave their DNA. But you -- how do you get DNA on, like, a steering wheel? How can that occur?

A By driving it, touching it, anytime you're handling the steering wheel. I would expect you could possibly be leaving your DNA behind.

Q So you don't necessarily have to be driving it? You could just touch the steering wheel and leave your DNA?

A That's correct.

Q And there's other ways to leave DNA, correct? Like, other than touching? Can you leave it by fluid?

A You could leave it by fluid.
Q Okay. A sneeze or something of that nature?
A It would be possible, yes.
Q And there's also -- is there something called transference with DNA where you can transfer someone's DNA from one -- a person can transfer someone else's DNA to an object?
A While it is possible, any time that that is occurring, it is at a much lesser rate. Because say, for instance, I shake your hand, we can swab each other's hands immediately and we might pick up a little bit of each other's DNA.
But when you then touch another item, you're leaving a lot of your DNA in addition to that. So while you could transfer some, it tends to be in a very limited manner.
Q So it could've been on how quickly, let's say, someone shook hands and then immediately touched the steering wheel, it's probably more like they can leave that person's DNA who they shook their hand because there's not a lot of time elapsing. Would that be a factor?
A It might be possible, depending on how many skin cells they've exchanged.
Q And so the terminology you used is that you cannot exclude him as a possible contributor; is that correct?
A That's correct.
Q But that also means that he is possibly not a contributor, correct?

A No. No, if there was zero possibility of contribution from this individual, my report would've read he was excluded; which means absolutely no chance the DNA was left behind. Because I can see the specific DNA types, I cannot exclude; which means, I see those DNA types present.

Q Now, the 1 in 415. So let's say that you had enough to make a comparison. You know, where you could identify as belong to a specific individual. What is the odds, usually, then as far as the 1 in 415, do they go up?

A With regards to that, any time I'm stating that it matches to somebody, it has to be a single-source profile, which means it's from one individual. Or I'd have a mixture where I have a major component which then becomes, like, a single-source one individual only.

And for those, if I'm matching it to one person and one person only, the statistics would be extremely high. We're talking, octillions, nonillions, decillions.

Q Okay.

A That would, again be -- it could not be in a mixed profile.

Q So in this, if you took 415 African Americans, there's -- one of them could be a possible contributor to that DNA that you found, correct?

A That's correct.

Q And if you double that, 830, two of them could be and on

and on, correct?
A Yes, each -- every random individual of every 415, I could potentially not exclude.
Q Okay. And again, it could be as simple with touch DNA as just touching something and leaving your DNA?
A Yes.
MR. CASS: That's all.
THE COURT: Any redirect?
MS. MELNICK: Yes.

REDIRECT EXAMINATION

BY MS. MELNICK:
Q If you had DNA at all 22 locations, you would have huge numbers, correct, on your probabilities?
A With regards to this profile, because it is a mixture of three people, even if I had all 22 locations where I'm doing a statistic, it is still going to be relatively small because it is a contribution of three distinct individuals all combined together. So the numbers are never going to be what they would be if I'm stating a match with a single person's DNA.
Q So if you have a single-source DNA, the numbers go off the charts, right?
A That's correct.
Q I mean, hugely off the charts because every person, as I believe you testified, has unique DNA.
A That's correct.

Q So you expect that to be off the charts, right?
A Yes, I do.
Q When you have this mixture where you have relatively equal graphs coming out, you don't have a major or a minor contributor, you have relatively equal, and you don't have the whole thing, s this number something that you would expect?
A Yes, I expect it to be fairly minimal.
Q Now, you indicated that your test required to have all three profiles at those eight points. Can you explain that? You found -- you used eight points in this. And can you explain in a little more detail why only those eight points were used?
A When you are looking at a mixed profile and you are stating you have two individuals, three individuals, four individuals and you are doing a statistic with regards to that, at each location that you are doing that statistic, you have to account for every single possible person having their DNA present that you're stating.

So if I state that I have three individuals at each location, I have to see distinctly DNA from three unique individuals present in order to include that. At the other locations, I may have seen DNA from two people only, or maybe only one person.

Because of that, I cannot use those to be more conservative. I can only use ones that account for every

single person being part of that profile.
Q So were there other locations aside from those eight where you saw DNA that could have been consistent with Caleb Whitfield's known profile?
A It may be possible. But because I cannot use that for a statistic, I cannot state that.
MS. MELNICK: Nothing further.
THE COURT: Anything further, Mr. Cass?
MR. CASS: No.
THE COURT: Thank you, ma'am. You can step down. You are excused.
MS. BARGER: Thank you.
THE COURT: I need to see Counsel at sidebar, please.
(At sidebar)
THE COURT: Okay. I'm assuming you're all done?
MS. MELNICK: Yes.
THE COURT: I would need you to rest so I can turn to Bill. And Bill, you ready to immediately proceed? But I probably need to give him some statements her outside --
MS. MELNICK: Yeah.
THE COURT: -- the presence of the jury.
MS. MELNICK: Take a couple of minutes.
THE COURT: So I will just do that. And then that's all that you're going to do today, right?
MR. CASS: Yes.

THE COURT: All right.

MR. CASS: (Indiscernible).

THE COURT: All right. And I don't know if you had any rebuttal or not. We may go --

MS. MELNICK: It depends.

THE COURT: -- depending where we are, if we break late, then I may finish with rebuttal tomorrow.

MS. MELNICK: Okay.

THE COURT: So it depends on where we are. So let me get rid of the jury for five minutes or try to. And then I'll go over things with him and then we can start.

MS. MELNICK: Okay.

THE COURT: Ms. Melnick?

MS. MELNICK: Your Honor, the State rests, subject to the admission of its exhibits.

THE COURT: Thank you.

Ladies and gentlemen, I'm going to need to excuse you only for a couple of minutes. There's something I need to take care of. And we're going to take you out there. Please, if you can, just stay in the jury room. It'll only take me just a few minutes and we'll bring you right back in. Thank you.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Outside the presence of the jury)

THE COURT: Please be seated. We are still on the

record.
Mr. Cass, you indicated that the only witness that you intend to call on your case is your client, Mr. Whitfield; is that correct?
MR. CASS: Yes.
THE COURT: And Mr. Whitfield, I just need to inquire of you. Before we bring the jury back in and before you testify.
THE DEFENDANT: Uh-huh.
THE COURT: I'm sure you obviously know that you have an absolute right not to testify in this case?
THE DEFENDANT: Yes, sir.
THE COURT: You don't have to testify. You can sit right there, you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: On the opposite, you have an absolute right to testify.
THE DEFENDANT: Okay.
THE COURT: You can come up here and you can offer testimony. When you do that, you are subjecting yourself to cross-examination by the State and they will have the opportunity also to ask questions of you. Do you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: Is there any questions you have, at all,

about your rights to testify or not to testify?

THE DEFENDANT: No, sir.

THE COURT: And what is your desire in this case?

THE DEFENDANT: In terms of?

THE COURT: To testify or not testify?

THE DEFENDANT: I'm not -- I do want to tell my side of the story, because I'm right here and I should be heard. So I want to tell my story.

THE COURT: All right. Well, that's just I needed to know. You intend on testifying, right?

THE DEFENDANT: Uh-huh.

THE COURT: And you understand that you're going to be subject to cross-examination --

THE DEFENDANT: Yes, sir.

THE COURT: -- if you take the stand? Okay. Any questions about your rights about concerning you testifying or not testifying?

THE DEFENDANT: I got one question, but it's not particularly in that area. I think it --

THE COURT: Do you want to ask your Counsel there? It may be better for you to do that.

(Counsel confer)

THE COURT: Okay. Was Mr. Cass able to answer your question for you?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And once again, knowing your rights, you are wanting to testify in this case; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Very well.

You can bring the jury back in, please.

THE BAILIFF: All rise for the jury.

(Jury entering courtroom)

(Within the presence of the jury)

THE BAILIFF: Court is back in session. Please be seated.

THE COURT: And Mr. Cass, I will turn to you, and you can present your case.

MR. CASS: Your Honor, I call Caleb Whitfield to the stand.

CALEB WHITFIELD

a witness of lawful age, being first duly cautioned and sworn was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CASS:

Q Please state your name for the record.

A Caleb Whitfield.

Q Caleb, how old are you?

A 22.

Q How old were you back on June 20 -- or June 25th, 2020?

A 20.
Q You remember that day, June 25th, 2020?
A Pretty vividly to a certain extent.
Q All right. What do you remember about that day? Do you remember what day of the week it was?
A Thursday.
Q and why do you remember that?
A Because Thursday and Friday, my mother used always kidnap me. And we would collect cans and pick up trash. I really didn't agree but I complied because it's my mother at the end of the day.
Q So what'd you do that afternoon?
A I mean, like, what I did on Thursday, when I was collecting cans and we was collecting trash what not, I don't know if it was -- I can't specifically recall if it was during or immediately after that I called Jelani Shackelford.
But I did call Jelani Shackelford and tell him, meet me on the strip. The strip is just a terminology that we frequently use in reference to a specific location. In this case, it'd be a vacant house next to (indiscernible) down on Main Street, so -- which is also, additionally next to a auto repair shop. So don't hold it against me, ladies and gentlemen, but I did sell marijuana and I sold methamphetamine at the time.
So being at that specific location, I really didn't have

to go nowhere; people came to me. So during that duration of being there with Jelani Shackelford, I remember Rodnesha, she called me. And she tell me, like -- I remember her telling me that she went to the job interview and she got this job at Molly (phonetic) and she wanted to celebrate.

So I remember congratulating her. I remember dropping my location to her. So after the fact, we're there, me and Jelani are there. And I remember her pulling up. It's just a figure of speech; she was in the passenger seat.

So she ended up pulling up and I remember her getting out the car. I remember hugging her, kissing her on the cheek. So after I remember congratulating her again, but I really -- it was more conversation than that, but I can't remember word from word (sic).

But after that, like, I do remember questioning her, like, who is that in the car? Because I couldn't see in the car because the tinted windows. So she told me, Hood Uber. A Hood Uber -- should I elaborate on?

Q Let me just ask a couple questions before you elaborate on the Hood Uber.

A Uh-huh.

Q So Jelani Shackelford, you knew him before that day?

A Yes, sir.

Q Okay. and Rodnesha, you knew her -- Rodnesha Thompson, how did you know her?

A That was my friend. I met her at the protest when we was downtown. I met her at the protest. And I don't want to make it seem like no movie stuff, but when I did see her, it was, like I did feel obligated to approach her, like, I need to talk to her.

So after that, we became friends. But I wanted to started a relationship with her. But she said that she had got out of a abusive relationship and she wasn't really ready for that. So we was friends but we was sexually active as well.

Q And did you care about her at that time?

A Yes, enough to get her tatted on my face.

Q Now, so let's go back to the -- so she -- you contacted her to meet up with her, correct?

A No, she contacted me.

Q Well, and -- what the purpose was to get together, correct?

A Yes.

Q And Jelani was with you?

A Yes.

Q All right. And tell the jury where you met and what happened.

A So at the strip, she pulled up then, you know, I hug her and I congratulate her. I remember questioning her about who was in the vehicle. So I knock on the window, you feel me, to see who was in the vehicle, in the Hood Uber.

So I knock on the window. I remember the passenger window rolling down. I seen Joseph. I know Joseph. He is a familiar face; we're acquainted. We've been in each other presence before in our youth years.

So I reach in the car I shake his hand. What's up, with you brother. So he ended up getting out the car. So we're all out the car, posted at the vacant house. So I can't remember, specifically, what, word from word (sic) we was saying; it was two years ago.

But I do remember asking, like, is your -- like, can I connect your phone to your car? Like, play music; is it Bluetooth; is it the aux cord; like what is it? I remember him telling me it was Bluetooth because I had trouble getting it to connect.

So when I get into the car, I get in the driver's side. I'm trying to connect my phone to the Bluetooth, but I can't get it to connect. So I tell Jelani -- not Jelani, but Joseph, like, can you help me, like connect this? So he getting up, he get in the car. So and see, he grabbed my phone, he trying to connect the Bluetooth.

So as he trying to connect the Bluetooth, the seat all the way back, like he a fairly little -- like, he my size, so the seat all the way back, pushed back. So I'm making fun of him, I'm like, so I bet you be driving like this. And you, like, just doing hell of different positions.

MS. MELNICK: Can I --
A So --
MS. MELNICK: -- ask that there be some questions interjected in here?
MR. CASS: All right.
THE COURT: Stop for -- Mr. Cass, please lead your cross-examination (sic). I -- we're not going to have a narrative testimony here --
MR. CASS: Okay.
THE COURT: -- so just ask questions.
BY MR. CASS:
Q So let's go back to a minute. What -- tell the jury what "Hood Uber" means.
A A Hood Uber is -- it's, you know, on Facebook, you can join various different groups. It's a particular group called Dayton Hustlers. It's exactly what it sounds. People in Dayton, Ohio that sell materialistic things and you know, of course you got Hood Uber. You just text Uber. And a Hood Uber is somebody that's not officially a Uber. It's actually cheaper, faster, and up until the day of the incident, more convenient.
Q Okay. Let me stop you there. So when the -- when Rodnesha pulled up in this car --
A Uh-huh.
Q -- you said "Joseph". Who is Joseph?

A Joseph, I mean --
Q The Joseph we've been talking about through this trial?
A Yes, you know, Hes --
Q Okay.
A I don't know his last name. Hespin (sic)?
Q All right. And he's driving the car?
A Yes, sir.
Q All right. And did you know the car was stolen?
A No.
Q And who was already in the car?
A Well, at the time, it was just him because she got out and I hugged -- Rodnesha got out and I hugged her.
Q She had -- she came in the car, though, with him, correct?
A Yes.
Q All right. And where was she located in the car?
A Passenger seat. And you said you were at this strip. Can you tell the jury where this strip was located in terms of where this crash ended up? Were you on the same road, or?
A When I said strip, I started from the beginning of the beginning of the day.
Q Okay.
A But the strip was wherever -- where it start -- where I met everybody at. But the strip was on Fountain. I was Fountain in the Five Oaks neighborhood.

Q Okay.
A It wasn't -- not the -- anywhere around the crash.
Q And at some point, did you -- well, you got the -- you talked about the Bluetooth.
A Uh-huh.
Q You got that hooked up?
A Uh-huh.
Q And then, did you get in the car and leave?
A We did get in the car and leave after I got the Bluetooth hooked up. Somebody called me and said that they wanted some weed in Northland. So I asked Joseph, can you drive me to Northland so I can make this play.
Q Okay.
A He took me.
Q And when -- and so everybody got in the car?
A Yes, sir.
Q You, Jelani, Rodnesha, and Joseph?
A Yes.
Q Is that correct? All four of you?
A Yes, sir.
Q And where was everybody seated when you got in the car?
A Joseph was driving. Rodnesha was in the passenger seat, I was behind Joseph. And Jelani was behind Rodnesha.
Q So you would've been in the rear seat behind the driver?
A Yes.

Q Okay. And where did you go?
A To Northland. I mean, like, well, we were proceeding to Northland, but we never made it.
Q And what happened on the way?
A I remember -- I do remember vaguely driving, like, driving down Needmore, you feel me. So then turned into, like, the weed dispensary is. It's a weed dispensary on Needmore. So I do remember him turning inside the weed dispensary parking lot.

So as he's doing that, I remember going inside my fanny pack and getting my scale. I had a scale. So I'm putting weed on the scale at the time. But by the car moving, I couldn't, like, I get the accurate point because it kept moving; the car was moving.

So as he was going to Dixie to exit out of Dixie, the car stops. So now I can get an accurate point. So throughout that process, I hear Jelani, like, oh, shit. I look up; it's the police. But they don't got they lights on, so I'm not really paying no attention. I look back down, I'm still doing the scale thing.

So I'm like -- he like, boys, boys, boys. So I look up, they go the lights on. So oh, shit. I'm grabbing the weed. I'm trying to put the weed bag in the bag. So as I'm doing that, the car shoot in reverse. So when the car shoot in reverse, I drop all the weed on the floor.

So I reach down; I'm trying to pick all the weed up again. So as I'm trying to pick the weed up, the car shoot off again. So as it shoot off again, I, like, had gotten thrown back in my seat. And I reached back down so I can try and pick back up the weed. So --

Q Okay.

A -- as I'm picking back up the weed, he --

Q Let me stop you just a second. I know, we'll get right to that. I don't mean to cut you off. But are you on this -- in the Dixie area where this occurred?

A Yes, sir.

Q Okay. And everybody's still in the same location as when you had driven off?

A Yes, sir.

Q Okay. And this backpack that you're talking about, or fanny pack, is that the one we saw the picture of --

A Yes, sir.

Q -- earlier in the -- that was yours with your photo or ID in there?

A Yes, sir.

Q Okay. So you're in the backseat with the weed. And who said that there were the police? That they saw the police?

A Jelani.

Q Okay. And did somebody then tell the driver to go?

A No. He, I mean, he mashed gas on his own.

Q Joseph did?
A Yeah.
Q Okay. And what happened then once he --
A We turned on Dixie -- he turned on Dixie. He was shooting up. So at this time, I'm trying to focus on tucking my weed in my fanny pack because I'm going to get up through, like soon as the car stop, I'm gone.

You know, I didn't know it was going to be as serious as it was. But as soon as the car stopped, I was going to get up through. So after the fact, he driving down, Dixie. And I hear Jelani in my ear, go, go, go, go, go. I remember him keep saying it, like, he was irritating me because he just kept saying it.

So as he doing that, I'm looking back. I kept looking back. Like, oh, you got them. You got them. You got them. So I keep looking back, like, you got them. I see hell of smoke and shit. There's hell of smoke. I don't know where that smoke coming from ; but it's a lot of smoke. Like, so boom.

So after that, I get to grabbing weed. So like, I'm panicking because I've never been in a high-speed chase. I never been through something as serious as this. So I'm grabbing weed. At this point, I'm throwing weed out the window.

So I'm throwing weed out the window. I throw the scale

out the window. So as I'm doing that, I get to rolling the window back up. So as I'm rolling the window back up, I see a detective car. At the moment, I did not know it was a detective car. I never had interactions with a detective or anything.

So I mean, like, once again, I don't want to make it seem like a movie or nothing. But I thought it was -- my mind, went to totally different. I'm thinking it an FBI agent or some crazy spontaneous shit. So at this point, I'm like, man, let me out. Let me out. Let me out. Let me out.

So I mean, he tried to turn. He tried to turn let me out. The car started drifting and crashed.

Q Okay. And do you remember what happened when the car started to turn and lost control?

A Yeah. Jelani, he was sitting right in the middle. Like, he wasn't even sitting at the door at the point when the car took off. So he was sitting in the middle. So when the car started to veer off, he reached and grabbed the head of the seat.

He reached to grabbed the head of the seat. So when he grabbed the head -- I grabbed the head of the seat, too. So we was -- so next thing I know, we crashed. I felt like I really felt something hit my head or I hit my head or whatever it was. But I did have glass stuck in my head, though, like after the fact. So I mean, after that, I mean, like.

Q And so you have this impact that we've seen where the car hits the house --
A Uh-huh.
Q -- hits the porch there.
A Uh-huh.
Q Do you recall what happened to you when that happened?
A Now this is why I say I remember to a certain extent. Because I don't physically remember getting out the car and running. I do remember bits and pieces when I was running, like, for example, like, I remember running.
I remember a cop car, like, getting close as -- getting close. And I'm, like, I'm dodging it, like when -- then I stopped remembering. The next thing I know, I remember -- I start remembering again and it's a deputy. It was the black dude -- the black deputy that was right here.
Q Oh, that came earlier?
A Yeah.
Q Was that Hale? Well, whatever --
A Yeah, but --
Q -- one of the ones that testified?
A Yeah. The next thing I know, I remember him doing this, like, he's trying to hold up fingers to me, like, he asked me -- like, I'm -- I heard him, but my vision was like -- it was, like, doing this. It was like, shaking. And just, like, I was blinking long because it kept going dark.

So after that fact, then I start not remembering again. Next thing you know, I remember being escorted to the ambulance on the little -- on the roller thing I don't know how -- what it is. But on the roller thing. So I see lights. So I'm seeing lights, I know, like, damn, something happened.

But I can't actually put the pieces together, like, what actually happened. So I remember asking, like, what happened. What happened. What happened. The next thing I know, go back out of it. Next thing I know, I come back on. I got a neck brace on.

So when I got the neck brace on, I remember the nurse telling me, like, don't move. Because if you move, you can be paralyzed or spinal -- something like that. I can't really put the words together.

Q Where was she telling you this? What -- had you --
A At Grandview.
Q -- been moved?
A It was at Grandview.
Q You were already at the hospital then?
A Yes.
Q Okay. And then what -- do you recall what happened once you go to the hospital?
A When I got to the hospital, other than the neck brace situation when she was asking me about the neck brace, like, don't move because you could be paralyzed; we got to do a scan

or something of that nature. Then I, like, stopped remembering. And then I come back remembering.

I'm peeing in a cup. So after that, I remember sitting down on a bed. Like, I kept telling myself, like, it's my fault. It's my fault. It's my fault. It's my fault. So after the fact, I really don't know. But I kept saying that. So I end up, like, dang what happened if they find weed, like, I'm going to jail for life, like, if they find weed.

But really, like, logically now, I'm like, weed, no. So I mean, I left the hospital. Then soon as I get out -- I left the hospital without medical advice; I guess that's what it's called. So I leave the hospital. Soon as I get outside --

THE COURT: Okay. let's wait for a question.

MR. CASS: Okay.

THE COURT: We're getting a little bit off track.

BY MR. CASS:

Q So let me ask you this, do you recall getting any treatment while you were in the hospital?

A No, not other than peeing in a cup.

Q Do you remember being in the CAT scan room? Do you have a CAT scan?

A No.

Q You remember anybody asking you any questions while you were in there?

A No.

Q And you said that you left the hospital on your own?
A Yes.
Q Nobody told you you couldn't leave?
A No.
Q I mean, other than maybe hospital people. No police officer told you you couldn't leave?
A You said nobody told me I couldn't leave?
Q No police officer said that you were under arrest or that you couldn't --
A No.
Q -- leave the hospital?
A Not that I remember.
Q Okay. And how did you get home?
A I mean, like, I mean, I had to walk I'm pretty sure. I mean, like, I mean, when I left the hospital, when I got outside, I remember getting outside. Then I remember, as soon as I hit Grand, I took off running. The next I know, I stop remembering.
The next thing I know, I hear my mom screaming. And she's -- my mom live a fair different -- distance from Grandview. She live on Victor up by Marathon. So I -- it's crazy how I remember -- how I got that. It's crazy how I remembered how to get to her house, but I don't remember actually walking to her house.
Like, after I came back and I was back coherent, when

I -- when she was screaming. So she started getting my wounds together. She had to take pliers to pull the taser probe out of my head and out of my back.

And then after the fact, I had pulling glass out of my feet and out of my head. Like, I had glass in my head. After that it was (indiscernible).

Q When did you find out that you were charged in this case? That you had been --

A August, 2021. I was at Walmart. And then a female that I knew was like, hey, you know you on the news. She had the news app and she showed me.

Q And nobody had talked to you in between then?

A No.

Q Okay. Since this happened, have you ever seen Joseph Hespeth?

A No.

Q Or Jelani Shackelford, have you seen him?

A No.

MR. CASS: That's all.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. MELNICK:

Q Okay. Mr. Whitfield?

A Yes, ma'am.

Q I want to make sure that I understand what you're telling

us. So you are at a house --
A A vacant.
Q -- is that --
A A vacant house.
Q A vacant house that you called "the strip"?
A Yes, ma'am.
Q To sell weed?
A Yes, ma'am.
Q And you were there -- are you there all day?
A I mean, that particular day I'm not, no, I --
Q What time did you get to that strip --
A I --
Q -- to that house that day?
A I can't recall.
Q Was it, I mean, in the morning? Was it afternoon?
A I mean, it couldn't have been morning. It had to be afternoon. I would say afternoon if I had to make a guess.
Q Okay. But you don't have any idea what time?
A No
Q Or how long you were there?
A I would say a hour or so.
Q Okay. So you're at this -- the strip for about an hour. When does Jelani meet up with you?
A When Jelani -- he was already there when I got there.
Q He was there when you got there?

A Uh-huh.
Q Did you go there to meet with him?
A Uh-huh.
Q All right. So he calls you --
A No, I call him.
Q You call him and you say, hey, let's meet up. And he says, yeah, I'll meet you at the strip. And so you go there and you meet up there?
A Technically.
Q Okay. And then Rodnesha calls you?
A Uh-huh.
Q And she's excited about a job that she just got?
A At Molly's, yes.
Q And that you, I guess, you had met her at the protest, which was only a couple weeks before this; is that right?
A I really can't recall that. I can't even --
Q But I mean, you didn't -- you were in a sexual relationship with her, correct?
A Yes, ma'am.
Q All right. And you were friends?
A Uh-huh.
Q You weren't in a long-term sexual relationship were you?
A No.
Q You hadn't known her that long?
A No.

Q You met her at the protests?
A Yes.
Q Okay. How often were you and Rodnesha seeing each other?
A Everyday.
Q Okay. So it kind of became a strong friendship quickly?
A Yes.
Q Okay. And she calls you about the job and she shows up in this black Ford 500. Is that what you're telling us?
A Yes.
Q And she's in the front passenger seat?
A Yes.
Q And Joseph Hespeth is driving the car? You didn't know that at first. But you went over there and you found out he was the one driving the car?
A Yes.
Q All right. And so you say, hey, to him. You hadn't seen him in a while. You guys all get out and you're hanging out --
A Uh-huh.
Q -- at this house.
A Yes.
Q Am I right?
A Yes.
Q All right. And you're saying you get in the car to hook up to your Bluetooth?
A Yes.

Q Okay. And you hook it up and you guys listen to some music for a little bit?
A Yes.
Q Okay. Now, how long after you and Jelani got there did Rodnesha and Joseph show up?
A At approximately, be like, 25 minutes. I wasn't that long.
Q Okay. And how long do you think you guys were all there together before you guys decided -- you got the call to go sell some drugs somewhere else?
A It had to be like, 15, 20 minutes. It couldn't have been that long, either.
Q Okay. So I'm trying to figure out what Hood Uber has to do with this.
A A Hood Uber?
Q Is -- was that Joseph?
A Uh-huh.
Q Was that Hespeth?
A Uh-huh.
Q He was a Hood Uber?
A A Hood Uber.
Q Do Hood Ubers always drive stolen cars?
A I couldn't tell you that. I don't drive Hood Ubers.
Q Well, do you ever call for them?
A You can call -- no, you get on with Facebook. You get --

long onto the -- join the group, then you Uber. I usually say I pay well, so I always get immediate results.
Q So you use them all the time?
A Yes.
Q Okay. And you have money because you're dealing drugs, so you pay well.
A Yes.
Q Okay. So you get a call to go sell some weed. And Hespeth tells you, I'll drive. You paying him --
A Hm?
Q -- to drive you?
A Did I pay him? I mean, like I don't, I didn't get a chance to pay him. I never said nothing about paying him. He never requested it. That's another convenience to having a Hood Uber. You can, like, wait, kidnap him. Just put his weed in his system and then just drive you wherever; just keep gas in the tank. For real.
Q That's pretty manipulative, isn't it?
A If that's the way you look at it, yes. I take it as they just want something to do.
Q Okay. So you leave in this stolen car that Hespeth showed up in, according to you?
A (Indiscernible).
Q And you're saying -- now, I want to make sure I get this correct, okay?

A Yes, ma'am.
Q Hespeth was driving?
A Yes, ma'am.
Q And Rodnesha was in the front seat passenger?
A Uh-huh.
Q And Jelani was in the backseat passenger?
A Behind Rodnesha.
Q And you were on the back driver side of the car?
A Yes, ma'am.
Q And that's where everybody was sitting when this crash happened?
A Yes, ma'am.
Q According to you?
A Yes, ma'am.
Q All right. And you're saying that Jelani saw the police; Hespeth took off. And you're in the car finally yelling, I want to get out?
A Yeah.
Q And the cop's right on your tail --
A He wasn't right --
Q -- but you're saying --
A -- on the tail.
Q -- that Joseph -- well, you said you saw the guy turn around and was, like, FBI guy?
A That -- yeah. Okay.

Q Okay? And that he tried to turn to let you out?
A Uh-huh.
Q He's doing about 100 miles an hour.
A Uh-huh.
Q Between 80 and 100 miles an hour. And he's going to turn to try to let you out?
A Well, he did. I mean, like, what?
Q Did he start the turn, like, three blocks early?
A I'm not -- I don't -- I couldn't really tell you.
Q This is State's Exhibit 31.
A Uh-huh.
Q Do you remember looking at that?
A Uh-huh.

MS. MELNICK: Can I put that up, Your Honor?

THE COURT: Yes.

BY MS. MELNICK:

Q All right. So the crash is here.
A Uh-huh.
Q And the car starts to go out of control here.
A Uh-huh.
Q So are you telling me he's starting his turn all the way back here and that's what he's trying to do is he's trying to turn? And he goes out of control all the way back here?
A I'm not a reconstruction analyst, and I can't tell you. If you want me to give an analysis, he could've possibly been

trying to switch lanes and then turn. But when he tried to switch lanes, he lost control. That's just my analysis, though.

Q That's your analysis as a reconstructionist?

A I mean, like, I'm not a reconstructionist. So I really can't answer the question. I'm just trying to --

Q All right. So you're telling me that Joseph loses control; the car crashes. You're in the rear driver seat, correct?

A Rear -- yes, ma'am.

Q Rear driver side. When the car goes air born, it hits the house and flips over. And how do you get out?

A I don't specifically remember how I exit the vehicle.

Q How does -- well, you heard testimony from --

A Uh-huh.

Q -- the officer -- from the detective who drove right up and saw you crawling out the driver's door, basically?

A Uh-huh.

Q So did you crawl on top of Joe to get out?

A Okay. Now, let me give another analysis. So when --

Q No, I have a question that I would --

MS. MELNICK: I'm asking the Court to direct him to answer my question.

BY MS. MELNICK:

Q Did you crawl over Joseph to get out of the driver's

door?
A Previously, I just stated that I don't remember exactly how I exited the vehicle.
Q Okay.
A So that question just --
Q Well, then let me ask you this question. Did you craw between the seats to get to the driver's seat to get out? Did you -- or did you somehow shimmy between the headrest and the roof of the car? Because you're upside down, and then somehow get around Joseph Hespeth to get out the driver's door? Which of those things was it?
A Like I said, before that and after and before that, I can't specifically recall how I exited the vehicle.
Q Okay. So we have to rely on everybody else that was already testified to know how you got out of the vehicle.
A I'm not -- at the end of the day, how could they see past the door? If you let me get up and explain, I'll --
Q Okay. I'm not asking for --
A Oh, okay.
Q -- you to guess.
A Yeah.
Q You just said you don't know.
A Uh-huh.
Q So we have to rely on everyone else, correct?
A If that's what you want, yes. If (indiscernible).

Q Okay. So then you don't remember -- you remember bits and pieces. You -- do you remember running?
A I remember a piece of running, yes.
Q Do you remember running into Det. Saunders' unmarked car --
A No.
Q -- at full speed?
A No, I prob -- I would've stopped or ran around.
Q Do you remember getting tased?
A No.
Q Okay. But you remember somehow getting onto the cart -- the bed?
A I don't remember getting on it. I remember getting transported on it and seeing lights.
Q So you remember being wheeled on it to the --
A Uh-huh.
Q -- ambulance --
A Uh-huh.
Q -- but not actually being put on it?
A Uh-huh.
Q Okay. And do you remember the ride to the hospital?
A Huh-uh.
Q Inside the ambulance?
A Huh-uh.
Q No?

A No.
Q Do you remember being taken out of the ambulance and put --
A No.
Q -- brought into the hospital?
A No.
Q No? Do you remember being brought out of that first room you were in and taken into the room where you were going to get that scan?
A No.
Q You don't remember that either?
A No.
Q You don't remember telling the nurse in the scan room that you were driving the car?
A No.
Q You remember going, at some point, being back in a hospital room, though, out of the scanner room, right? When the scan when the scan was over, you remember peeing in a cup somewhere. Where were you when you peed in a cup?
A In the bathroom.
Q Was that in the scan room or in a regular emergency room?
A It was emergency room.
Q Regular room?
A Uh-huh.
Q So at some point, you remember being back in the regular

emergency room do you remember how you got there?
A No.
Q No? And nobody ever took the probes out of you because you said your mom did that when you got --
A Yes.
Q -- home, right?
A Yes, that's correct.
Q Okay. So when the hospital first saw you, they didn't remove any probes from the back of your head?
A No, my mom did it.
Q And you're telling me the EMTs didn't remove probes from the back of your head?
A No.
Q When did you leave the ho -- you said you left the hospital, like, on your own without hospital --
A Uh-huh.
Q -- advice to be leaving?
A Yes, ma'am.
Q Did you leave the same day?
A Yes, ma'am.
Q And you don't remember anything that's going on? You remember sitting there saying, it's my fault, it's my fault, it's my fault?
A Yes, ma'am.
Q Okay. And then you left the hospital?

A Yes, ma'am.
Q And you walked to your mom's house?
A I don't --
Q But you don't remember it?
A Yes, ma'am.
Q When did you start remembering things again?
A When I heard my mom scream and she was in my face. When I --
Q You remember everything after that?
A Yes.
Q What time was that?
A I didn't look at my watch, phone -- I didn't have a phone.
Q Was it dark?
A Yes, it was dark. Absolutely.
Q Was it past midnight?
A I couldn't tell you. I don't know what time it actually was. I knew it was dark, though.
Q So you're going to tell me -- you heard the testimony about the injuries of everybody involved in the car, right?
A Uh-huh.
Q So I want to show you State's Exhibit 48. Have you seen that?
A Yes, ma'am.
Q You agree with me that's the passenger side of that car,

right?
A Yeah, but --
Q You agree with me that Rodnesha was obviously in the front passenger seat. We know she was there. She was still buckled in there.
A Uh-huh.
Q And you're telling me that Joseph Hespeth wasn't sitting in the backseat behind her, but that it was Jelani?
A Uh-huh.
Q And you're telling me that Hespeth was in the driver's seat, right?
A Uh-huh.
Q Did you hear about this injuries?
A No, I'm not a doctor. I can't really --
Q You didn't understand what the doctor said?
A Huh-uh. I mean, I wasn't really --
Q He was admitted into the ICU, intensive care unit. He had --
A Uh-huh.
Q -- two collapsed lungs; he had pneumothoraxes; he had fractures all over his spine; he coded; he almost died. And you're going to tell me that he --
A I could see the medical records for that? I -- that seem -- (indiscernible)--
Q The doctor testified to that, sir.

A Oh, I didn't read it.
Q State's Exhibit 60.
A Uh-huh.
Q Are you going to tell me he's sitting in that driver's seat when this crash happens and those are his injuries?
A I'm not lying. He's sitting in the driver's seat. So I mean, like, something happened regardless.(indiscernible)
Q And you're going to tell me that in State's Exhibit 48 --
A Uh-huh.
Q -- he's not sitting in that back passenger side --
A Huh-uh.
Q -- to sustain all those injuries?
A That's a analysis. That's you're analysis.
Q You were the least injured person in that car. Would you agree with that?
A Allegedly.
Q Are you telling me you don't agree with that?
A You don't have my medical records. You never went through my records or nothing. You don't know what my injuries was.
Q You walked home.
A With that --
Q And you were fine after that.
A What that have to do with mentally? You don't what I had --

Q You told me you were fine after you got --
A -- fractures.
Q -- to your mom.
A I told you I remembered. I didn't say I was physically fine.
Q Okay.
A I could've had fractured ribs. I could've had broken something.
Q Okay. Well, we will never know, will we? Because you left the hospital. So we're not ever going to be able to know that with you, are we? Because you left.
A You would be able to subpoena my medical doc -- they did conduct a CAT scan, so you know, a CAT scan'll tell you a little something. Uh-huh.
Q You're going to tell me you weren't sitting in the one seat in that car that's intact?
A Are you telling me I'm lying?
Q I just asked you a question.
A No, I was not sitting in the driver's seat.
Q How long have you known Jelani Shackelford?
A I've known Jelani for a little second. Now, I'd say probably roughly 2015.
Q Okay. And you guys met up that day. How often did you guys hang out?
A Not very frequently because I've been in and out of

juvenile, so.
Q Is that the only place you've been in and out of?
A No, I've been to prison before, also.
Q You've got prior felonies, correct?
A Yes, ma'am.
Q Okay. And is one of those prior felonies for a burglary?
MR. CASS: Objection.
A Burglary? That's when I was --
MR. CASS: Wait just a second.
A -- 14 years old, yes.
THE COURT: Wait a minute, Mr. Whitfield, before you respond.
May I see Counsel at sidebar?
(At sidebar)
THE COURT: All right. I'm thinking here. I know you can ask about the felonies, but I -
MS. MELNICK: The burglary's a crime of dishonesty, Your Honor. So that's why I asked.
THE COURT: Okay. You're right. I just didn't know the reason for it. That's why I had you come up here.
Bill, did you have anything else?
MR. CASS: Well, now they're being (indiscernible) age of what the main crime is. (Indiscernible) --
MS. MELNICK: If I ask him if he's been convicted of a crime of dishonesty, (indiscernible). I'm not going to get

into the facts. I'm going to say (indiscernible).

THE COURT: If you want her to preface that, I will allow her to preface it.

MR. CASS: I guess I don't know, necessarily a burglary means there is theft. There's different kinds of burglaries that (indiscernible). I think having a prior conviction means that (indiscernible).

MS. MELNICK: Oh, and I agree that -- I mean --

MR. CASS: (Indiscernible) --

MS. MELNICK: -- the Court could say, look, you can't say because he has a prior conviction, he did this and instruct them on that. But I think burglary is a crime of dishonesty. And I -- it is one that can be used to cross-examine on (indiscernible).

MR. CASS: I think as far as the facts of the burglary.

MS. MELNICK: No.

THE COURT: No, no. I would not let her go any further than that.

MS. MELNICK: I'm not going to get into the facts of the case.

THE COURT: I was going to stop her there, but I forgot it was a crime of dishonesty. So I'm going to allow it, but that's where it's got to stop. She can't go -- unless, he denies it. If he denies it, then she can go further.

MS. MELNICK: And he admitted.

THE COURT: Yeah. Okay.

(End sidebar)

THE COURT: You may proceed.

MS. MELNICK: Thank you.

BY MS. MELNICK:

Q That's not the only felony you have on your record, is it?

A What else are you getting at?

Q Do you have any other felonies on your record?

A Adult or juvenile?

Q Adult.

A Yes.

Q Okay. And you haven't seen Jelani or Joseph since this incident, have you?

A Yes, ma'am.

Q Yes, you have? Or no, you haven't?

A Haven't.

Q Okay. So you remember everything up until the point where you can explain to us any details where we have evidence. Is that an accurate statement?

MR. CASS: Objection.

A Can you rephrase that? (Indiscernible) --

THE COURT: Wait -- wait a second. Objection's overruled.

BY MS. MELNICK:

Q You remember everything up until the point of the crash, right?
A Yes.
Q So everything that we have evidence of here to show you and ask you to explain your way out of and you conveniently don't remember; is that true?
MR. CASS: Objection.
THE COURT: Overruled.
A Correct.
MS. MELNICK: I have nothing further.
THE COURT: Mr. Cass, any further redirect?
MR. CASS: No.
THE COURT: Mr. Whitfield, you can return (indiscernible).
And I need to see Counsel at sidebar.
(At sidebar)
THE COURT: Just to confirm, you have no other evidence, right?
MR. CASS: I do not.
THE COURT: All right. Is there going to be any rebuttal?
MS. MELNICK: No.
THE COURT: Okay. If there's not going to be any rebuttal, I will let you rest. You can tell me there's no rebuttal. I'll release the jury tonight. What I'm thinking

about doing is this, if it's okay with you, you got copies of the proposed jury instructions --

MS. MELNICK: I do.

THE COURT: -- right? And that -- take a look at that tonight. Why don't we meet at 8:30 in the morning? I'll tell the jury to be here at 9.

MS. MELNICK: Uh-huh.

THE COURT: We'll go through the jury instructions. I'll let you do any motions that you want to do at that point in time. And --

MS. MELNICK: (Indiscernible).

THE COURT: -- then we will go from there. And then -- so if I have them ready to go at 9, we should be able to go into closings in the morning. Does that sound like a plan?

MR. CASS: Sure.

MS. MELNICK: Yeah.

THE COURT: Okay. And hopefully we'll get done and they'll come back and you can catch your plane. But anyway, so I'll let them go tonight.

But I'll let you go ahead and rest. You tell me there's no --

MS. MELNICK: You want to do the exhibits in the morning, then, too? Or do you want to --

THE COURT: If you'd like.

MS. MELNICK: -- finish those tonight? I mean --

THE COURT: It's up to you guys.

MS. MELNICK: -- they're in order. We could probably run through them before you leave and have that out of the way.

THE COURT: Okay. That's fine. We can do that.

MS. MELNICK: We can get out of here by 6.

THE COURT: You okay doing that?

MR. CASS: Yeah.

THE COURT: Okay.

MS. MELNICK: Yeah, I mean.

THE COURT: All right. Let's do that.

(End sidebar)

THE COURT: Mr. Cass?

MR. CASS: Your Honor, Defense has no further witnesses and we'd rest.

THE COURT: Very well. Any rebuttal from the State?

MS. MELNICK: No, Your Honor. Thank you.

THE COURT: Ladies and gentlemen, we have concluded the evidence portion of the trial. There are some items that myself and Counsel needs to take care of before final arguments and instructions of law.

Here's what we're going to do. We're going to release you for the evening. We're going to continue to work a little while. I want all the jurors to be back, ready to go, by 9:00. We have some work that we're going to do in the morning, too.

So if you can be in the jury room and ready to go by 9:00.

What will happen tomorrow just so you know, there'll be closing arguments by Counsel, first from the State, then the Defense, then the State. Then I will give you the instructions of law thereafter. And then the case will be submitted to you. You'll have all the exhibits and you can proceed.

If I can talk my bailiff into it, and I'll make sure he gets lunch tomorrow, too. And so you don't have to go out. But it's very crucial at this point in time, ladies and gentlemen, to remember my instructions. Do not discuss this case among yourselves or with anyone else.

Do not permit anyone to discuss it with you in your presence. Do not form or express any opinion on this case until it's finally submitted to you. That includes doing any research. Like I told you before, you can't do anything. And we'll see you tomorrow morning at 9:00. Thank you.

THE BAILIFF: All rise for the jury.

(Jury exiting courtroom)

(Outside the presence of the jury)

THE COURT: All right. Let's be seated. We're still on the record. Actually, why don't Counsel come forward to the exhibits and let's go through the exhibits and take care of that.

And why don't you get them in order and look at them and maybe we'll take them in groups to offer and we'll see if there's any objections.

MS. MELNICK: I think we have everything put together enough to go through it, Your Honor.

THE COURT: Okay. Go ahead, Ms. Melnick. And --

MS. MELNICK: So State's 1 through 16 are the autopsy photos.

THE COURT: Any objection?

MR. CASS: No, Your Honor.

THE COURT: They'll be admitted.

(State's Exhibit 1 through 16 received into evidence)

MS. MELNICK: Let's see, 17 -- let's see. Hold on. 17, 18, 19, 20, and 21 are the photos of Det. Statzer's vehicle.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: They'll be admitted.

(State's Exhibits 17, 18, 19, 20, 21 received into evidence)

MS. MELNICK: 22 is the thumb drive, which we have a stipulation to its authenticity.

THE COURT: That'll be admitted by stipulation.

(State's Exhibit 22 received into evidence)

MS. MELNICK: 23 is the cruiser video for Sgt. Vitali.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibit 23 received into evidence)

MS. MELNICK: 24 is the cruiser video for Dep. Benjamin Hale.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibit 24 received into evidence)

MS. MELNICK: 25 is the cruiser video from Dep. Gebhart.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibit 25 received into evidence)

MS. MELNICK: 26 is the photograph of Caleb Whitfield from the scene. 27 is Rodnesha Thompson at the scene. 28 is Jelani Shackelford at the scene. And 29 is Joseph Hespeth at the scene?

MR. CASS: Your Honor, I have an objection of 27 of the victim in the case. I don't think -- we have pictures from the coroner. I don't know that this adds anything to the evidence, a picture of her in the neck brace. I mean, I guess (indiscernible) the fact that she's deceased and (indiscernible).

THE COURT: So is that (indiscernible).

MR. CASS: 27.

MS. MELNICK: It's a picture of her at the scene that

was taken just like everybody else before she was deceased, Your Honor.

THE COURT: Okay. And the purpose of this?

MS. MELNICK: It was Capt. Parin identifying all the people at the scene while they were there capturing a photograph of what each one looked like at the scene before they were taken away.

THE COURT: Okay. I see nothing of concern to me. And it was identified. So I will allow that to be admitted.

(State's Exhibits 26, 27, 28, 29 received into evidence)

MS. MELNICK: Let's see. That was -- so 30 through 50 are the photos from the scene from Dep. Gisewite.

THE COURT: Any objections to any of those?

MR. CASS: No.

THE COURT: They'll be admitted.

(State's Exhibit 30 - 50 received into evidence)

MS. MELNICK: All right. 51 and 52 are the DNA swabs collected by Dep. Gisewite.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibits 51, 52 received into evidence)

MS. MELNICK: 53 is the known standard of Caleb Whitfield for DNA.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibit 53 received into evidence)

MS. MELNICK: 54 is a stipulated certified copy of the Defendant's driver's record.

THE COURT: It'll be admitted by stipulation.

(State's Exhibit 54 received into evidence)

MS. MELNICK: 55 is a picture of Donte Dixon's folder in the back of the vehicle at that scene.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted. You got a group of them there, don't you?

MS. MELNICK: Yeah. 56, 57, and 58 are all photos taken of the car during the search warrant.

THE COURT: And should those --

MS. MELNICK: And then also, 60 is another one that's in that grouping. But it's 60.

THE COURT: Did you look at those, Bill?

MR. CASS: Yes.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibits 55 - 58, 60 received into evidence)

MS. MELNICK: All right. 59 is Dep. Bone's cruiser cam

on a thumb drive.

THE COURT: Any objection?

MR. CASS: No.

THE COURT: Admitted.

(State's Exhibit 59 received into evidence)

MS. MELNICK: And that's everything.

THE COURT: Okay. So we have all those exhibits admitted that were offered.

Mr. Cass, do you have any exhibits to offer yourself?

MR. CASS: Well, I offered A and B, which are photos that are actually contained within the photos that are 30 to 50, so.

THE COURT: I think you talked about A, B, and C is what I've got.

MR. CASS: C I moved to admit, which is a picture of Caleb at the hospital, I believe, in the neck brace. And D was -- I just used to show Dep. Solomon was using for report. But not offered.

THE COURT: Okay. So are you offering A and B?

MR. CASS: No, I'm withdrawing A and B because we already have them in evidence in the State's case, but I am offering C.

THE COURT: Any objections from the State?

MS. MELNICK: No.

THE COURT: It'll be admitted.

(Defendant's Exhibit C received into evidence)

THE COURT: Okay. So --

MS. MELNICK: And then we also have one joint stipulation, Your Honor, as well.

THE COURT: And that is marked as a joint exhibit?

MS. MELNICK: Joint Exhibit 1, yes.

THE COURT: All right. Joint Exhibit 1 will be admitted.

(Joint's Exhibit 1 received into evidence)

MS. MELNICK: I think that's everything.

THE COURT: Does that cover all of the exhibits for both sides?

MS. MELNICK: I believe it does.

MR. CASS: Yes.

THE COURT: Very well. So what we will do, as I said at sidebar, we'll meet in the morning, go through the jury instructions, and then think about how long that you will need. I do put time limits on closing arguments. So we will talk about that in the morning.

But you know, I -- the most, very most, you're looking at probably 45 to 60 minutes just to give you some idea. (Indiscernible) we are. And we will try to come to some sort of agreement tomorrow what that time limit's going to be.

Is there anything further for this evening before we recess?

MS. MELNICK: I don't think so.

MR. CASS: No, sir.

THE COURT: Very well. Let's go off the record.

(Proceedings adjourned at 5:45 p.m., recommencing in Volume IV)

* * *